**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

JUDGE ALESIA

MAGISTRATE JUDGE SCHENKIER

| | |
|---|---|
| KEMPNER MOBILE ELECTRONICS, INC., an Illinois corporation,    ) | |
| ) | Case No. 02C 5403 |
| Plaintiff,    ) | |
| ) | Removed from Circuit Court of Cook County: Case No. 02 CH 8976 |
| v.    ) | |
| ) | **DOCKETED** |
| SOUTHWESTERN BELL MOBILE ) SYSTEMS, LLC, d/b/a CINGULAR ) WIRELESS f/k/a SOUTHWESTERN BELL ) MOBILE SYSTEMS, INC. d/b/a CELLULAR ) ONE-CHICAGO,    ) | JUL 3 1 2002 |
| ) | |
| Defendant.    ) | |

**NOTICE OF FILING**

To:   Kenneth B. Drost             Myron M. Cherry
       Thomas D. Laue            MYRON M. CHERRY & ASSOCIATES LLC
       DROST & LAUE, LLC         30 North LaSalle Street
       111 Lions Drive               Suite 2300
       Suite 206                   Chicago, Illinois 60602
       Barrington, Illinois 60010

     PLEASE TAKE NOTICE that on July 31, 2002, we filed with the Clerk of the United States District Court for the Northern District of Illinois, Defendant's **Notice of Removal**, a copy of which is attached and hereby served upon you.

_____
Attorneys for Defendant

Verónica Gómez
Lisa B. Swedenborg
Kenneth E. Kraus
Schopf & Weiss
312 W. Randolph Street
Suite 300
Chicago, Illinois 60606
(312) 701-9300

115224_1.DOC

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JUDGE ALESIA

MAGISTRATE JUDGE SCHENKIER

| | | |
|---|---|---|
| KEMPNER MOBILE ELECTRONICS, INC., an Illinois corporation, | ) ) ) | |
| Plaintiff, | ) ) | Case No. **02C 5403** |
| v. | ) ) ) | |
| SOUTHWESTERN BELL MOBILE SYSTEMS, LLC, d/b/a CINGULAR WIRELESS f/k/a SOUTHWESTERN BELL MOBILE SYSTEMS, INC. d/b/a CELLULAR ONE-CHICAGO, | ) ) ) ) ) | Removed from Circuit Court of Cook County: Case No. 02 CH 8976 Previously removed and remanded as Case No. 02 C 5279 |
| Defendant. | ) ) | |

**NOTICE OF REMOVAL**

DOCKETED   FILED

JUL 3 1 2002   JUL 3 1 2002

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

Defendant Southwestern Bell Mobile Systems, LLC d/b/a Cingular Wireless

("Cingular"), by its undersigned attorneys, files this Notice of Removal pursuant to 28 U.S.C. §§

1332, 1441 and 1446, and state as follows:

1.      Counsel for Cingular received a courtesy copy of the Amended Complaint

on July 24, 2002. On July 26, 2002, Cingular was served with the summons and Amended

Complaint in this action. Cingular is, therefore, timely filing this Notice of Removal within 30

days of receipt of service pursuant to 28 U.S.C. § 1446(b).

2.      Attached as Exhibit A to this Notice of Removal, as required under 28

U.S.C. § 1446(a), is a copy of the Amended Complaint received by counsel for Cingular in the

state court action being removed to this Court. A copy of the original Complaint, from the state

court file, is also attached as Exhibit B. Cingular has never received a copy of the summons in

this action.

115330_1.DOC

3.      On July 25, 2002, counsel for Cingular received courtesy copies of a Motion for Temporary Restraining Order, Memorandum in Support, Affidavit of Scott Kempner, and Motion for Expedited Discovery.  These are attached as Exhibit C.  The Motion for TRO indicates it was set for hearing before the state court on July 26, 2002 at 10:30 a.m.  No other process, pleadings or orders have been served on Cingular in the state court action.

4.      Cingular has not appeared, filed any responsive pleading or otherwise responded to Plaintiff's Complaint, Amended Complaint, or Motion for TRO in the state court action.

5.      The state court action was filed in the Circuit Court of Cook County, Illinois.  This Notice of Removal is filed in the District Court of the United States for the district and division in which the state court case was pending.

6.      This Court has original jurisdiction of this action pursuant to 28 U.S.C. §§ 1332 because this is an action between citizens of different states in which the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs.

7.      Plaintiff Kempner is a corporation organized and existing under the laws of the State of Illinois, with its principal place of business in Illinois.  (Am. Compl. ¶ 1.) Kempner is, therefore, a citizen of Illinois.

8.      Cingular is a limited liability company organized and existing under the laws of the State of Delaware with its principal place of business in Atlanta, Georgia.  The sole member of defendant, Southwestern Bell Mobile Systems, LLC (Cingular), is SBC Wireless, LLC, which is a Delaware limited liability company with its principal place of business in Georgia.

2

9.     The sole member of SBC Wireless, LLC is Cingular Wireless LLC, a Delaware limited liability company with its principal place of business in Georgia.

10.     Cingular Wireless LLC has five members:  Cingular Wireless Corporation, a Delaware corporation with its principal place of business in Georgia; SBC Alloy Holdings, Inc., a Delaware corporation with its principal place of business in Texas; BellSouth Corporation, a Georgia corporation with its principal place of business in Georgia; SBC Communications Inc., a Delaware corporation with its principal place of business in Texas; and BLS Cingular Holdings, LLC, a Georgia limited liability company with its principal place of business in Georgia.

11.     BLS Cingular Holdings, LLC has four members:  RAM Broadcasting Corporation, a New York corporation with its principal place of business in Georgia; BellSouth Mobile Data, Inc., a Georgia corporation with its principal place of business in Georgia; Wireless Telecommunications Investment Company, LLC, a Delaware limited liability company with its principal place of business in Georgia; and AB Cellular Holding, LLC,  a Delaware limited liability company with its principal place of business in Georgia.

12.     The sole member of Wireless Telecommunications Investment Company, LLC is ACCC of Los Angeles, Inc., a California corporation with its principal place of business in Georgia.

13.     There are three members of AB Cellular Holding, LLC:  ACCC of Los Angeles, Inc. (previously identified); BSCC of Houston Holdings, Inc., a Delaware corporation with its principal place of business in Georgia; and BSCC of Houston, LLC, a Texas limited liability company with its principal place of business in Georgia.

3

14.     The sole member of BSCC of Houston, LLC is ACCC of Los Angeles, Inc. (previously identified).

15.     Accordingly, neither Cingular, nor its sole member, is a citizen of Illinois, and complete diversity exists.

16.     The amount in controversy, exclusive of interest and costs, exceeds the sum of $75,000.   (See Am. Compl. at pp. 29-31.)

17.     This action was remanded from this Court on July 30, 2002 for failure to identify the citizenship of each member of the limited liability company which is the sole member of defendant Cingular.  As discussed at the hearing before Judge Alesia on the motion to remand, this second notice of removal is being filed now that these additional entities are properly identified and complete diversity confirmed.

18.     Upon the filing of this Notice of Removal, Cingular will promptly file a copy of this Notice of Removal with the Clerk of the Circuit Court of Cook County, Illinois, where the action was pending, pursuant to 28 U.S.C. § 1446(d).  Cingular will also promptly give written notice to Kempner of the filing of this Notice of Removal, pursuant to 28 U.S.C. § 1446(d).

For these reasons, defendant Cingular hereby remove this case from the Circuit Court of Cook County, Illinois, to this Court.

Dated: July 31, 2002

Respectfully submitted,

_____
One of the Attorneys for Defendant

Verónica Gómez
Kenneth E. Kraus
Lisa B. Swedenborg
Schopf & Weiss
312 W. Randolph Street; Suite 300
Chicago, Illinois 60606
(312) 701-9300

**CERTIFICATE OF SERVICE**

      I, Verónica Gomez, an attorney, certify that on July 31, 2002, I caused a copy of the attached Defendant's **Notice of Removal** to be served upon counsel listed below, as indicated:

**By Facsimile (w/o exhibits) and by United States Mail**

**By Messenger Delivery**

Kenneth B. Drost
Thomas D. Laue
DROST & LAUE, LLC
111 Lions Drive
Suite 206
Barrington, Illinois 60010

Facsimile: 847.381.1073

Myron M. Cherry
MYRON M. CHERRY & ASSOCIATES LLC
30 North LaSalle Street
Suite 2300
Chicago, Illinois 60602

Facsimile: 312.853.0279

Verónica Gómez

# Exhibit A

JUL-30-2002  TUE 11:33                                                      1 847 765 3671    P.02/03

2120 - Served                    2121 - ~ed
2220 - Not Served                2221 - ¦   Served
2320 - Served By Mail   2321 - Served by Mail
2420 - Served by Publication    2421 - Served by Publication
SUMMONS                          ALIAS - SUMMONS                              (Rev.12/22/92) CCG

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, CHANCERY DIVISION

(Name all parties)                                )
                                                  )
Kempner Mobile Electronics, Inc.,                 )         No.  02 CH 8976
                                                  )
            Plaintiff,                            )         Please serve at:
                                                  )
            v.                                    )         Any Officer or Agent
                                                  )         Southwestern Bell Mobile Systems,
Southwestern Bell Mobile Systems, LLC d/b/a Cingular )      LLC
Wireless,                                         )         2000 W. Ameritech Center Drive
                                                  )         Hoffman Estates, Illinois
            Defendant.                            )

ALIAS SUMMONS

To each defendant:

        YOU ARE SUMMONED and required to file an answer to the complaint in this case, a copy of which is heret
attached, or otherwise file appearance, in the office of the Clerk of this Court (located in the Richard J. Dale
Center, Room* 802, Chicago, Illinois 60602) within 30 days after service of this summons, not counting the day o
service. IF YOU FAIL TO DO SO, A JUDGMENT BY DEFAULT MAY
BE ENTERED AGAINST YOU FOR THE RELIEF ASKED IN THE COMPLAINT.

To the officer:
        This summons must be returned by the officer or other person to whom it was given for service, with
endorsement of service and fees, if any, immediately after service. If service cannot be made, this summons
shall be returned so endorsed. This summons may not be served later than 30 days after its date.

                                        WITNESS, _____JUL 1 8 2002_____,20____

                                                    _____
                                                              Clerk of Court

Name            Kenneth B. Drost          Date of service: _____,20____ Attorne
for             Plaintiff                                   (To be inserted by officer on copy left with
Address         101 Lions Drive, Suite 206                  defendant or other person)
City            Barrington, IL 60010
Telephone       (847) 381-1070
Atty. No.       23746
**Service by Facsimile Transmission will be accepted at _____
Code) (Facsimile Telephone Number)

        DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

*Law Division Room 801
Chancery-Divorce Room 802
County Division Room 801
Probate Division Room 1202

                                                    07/30/02  TUE 11:33  [TX/RX NO 6208]

FILED-5

2002 JUL ~~~~

AM 11: 31

~~~~ OF COOK

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT, CHANCERY DIVISION**

KEMPNER MOBILE ELECTRONICS,    )
INC., an Illinois corporation,    )
    )
    )
    Plaintiff,    )
    )
    )    Case No. 02 CH 8976
    v.    )
    )    Judge Aaron Jaffe
    )
SOUTHWESTERN BELL MOBILE    )
SYSTEMS, LLC, d/b/a CINGULAR    )
WIRELESS f/k/a SOUTHWESTERN    )
BELL MOBILE SYSTEMS, INC. d/b/a    )
CELLULAR ONE-CHICAGO    )
    )
    Defendant.    )

**FIRST AMENDED VERIFIED COMPLAINT**

Plaintiff Kempner Mobile Electronics, Inc., by its attorneys, for its First Amended

Verified Complaint against Defendant Southwestern Bell Mobile systems, LLC d/b/a

Cingular Wireless, states as follows:

**PARTIES**

1.        Kempner Mobile Electronics, Inc. ("Kempner") is an Illinois

corporation with its principal place of business at 4722 West Touhy Avenue,

Lincolnwood, Cook County, Illinois.

2.        Southwestern Bell Mobile Systems, LLC d/b/a Cingular Wireless

("Cingular") is on information and belief a limited liability company organized and

existing under the laws of the State of Delaware. Cingular's principal place of business is

located at 2000 West Ameritech Center Drive, Hoffman Estates, Cook County, Illinois.

Prior to a merger between SBC Communications and Bell South Corporation on or about

January 14, 2001, Cingular was known as Southwestern Bell Mobile Systems, Inc. d/b/a

Cellular One-Chicago.

## JURISDICTION AND VENUE

3.        The Court has jurisdiction to hear this matter pursuant to the

powers granted to it by the Illinois Constitution.

4.        Venue is appropriate in this county pursuant to 735 ILCS 5/2-101

as the cause of action arose from transactions or some part thereof that occurred in Cook

County and Cingular is a resident of Cook County, Illinois.

## COMMON FACTS

5.        Cingular has for a number of years and under various corporate

identities provided cellular telephone services in various parts of the United States,

including the metropolitan Chicago area.

6.        For a number of years Cingular's business practice was to utilize

and encourage independent dealers to market and sell its cellular telephone products and

services to consumers.

7.        Kempner has for a number of years been a dealer of among other

things cellular telephone products and services.

8.        In December 1993, Kempner executed an agreement with one of

Cingular's predecessors and became an authorized sales and service center.  Kempner has

continuously since December 1993 operated its sales and service center at 4722 West

Touhy Avenue, Lincolnwood, Cook County, Illinois from which Kempner marketed and

sold Cingular cellular telephone products and services.

2

9.        In approximately April 1996, Kempner and one of Cingular's predecessors executed that certain Authorized Agency Agreement between Southwestern Bell Mobile Systems, Inc. d/b/a Cellular One – Chicago and Kempner Mobile Electronics, Inc. (the "1996 Agreement"). A copy of the 1996 Agreement is attached as Exhibit 1.

10.        In December 1999 or January 2000, Kempner and one of Cingular's predecessors executed that certain Authorized Agency Agreement between Southwestern Bell Mobile Systems, Inc. d/b/a Cellular One – Chicago and Kempner Mobile Electronics, Inc. (the "1999 Agreement"). A copy of the 1999 Agreement is attached as Exhibit 2.

11.        The 1996 Agreement and the 1999 Agreement set forth many of the terms by which Kempner operated as an authorized sales and service center for Cingular. These agreements also incorporated by reference Cingular's Administrative Procedures Manual. In addition, Cingular adopted and Kempner accepted certain business practices developed from time to time during the relationship which encouraged dealerships like Kempner to make additional investments to expand its business with Cingular. The 1996 Agreement and the 1999 Agreement were drafted by Cingular. (The 1996 Agreement and the 1999 Agreement, and the other terms and business practices incorporated therein are sometimes hereinafter referred to as the "Agreements")

12.        As an authorized sales and service center for Cingular, Kempner agreed, among other things, to market cellular telephone products and services on behalf of Cingular. For its part, Cingular agreed, among other things, to compensate Kempner in accordance with the terms of the Agreements, to support Kempner's ability to sell

Cingular cellular telephone products and services, and to apply its business practices to Kempner on a fair and non-discriminatory basis. By virtue of being a sales and service center, Kempner was accorded various benefits, including but not limited to the cooperative marketing efforts of Cingular's corporate accounts group.

13.     The Agreements contain an implied covenant of good faith and fair dealing which required that Cingular act reasonably and with proper motive, and not act arbitrarily, capriciously, or in a manner inconsistent with Kempner's reasonable expectations.

14.     The Agreements provided that Cingular's approval was required for Kempner to expand its business to additional locations, but that this consent could not be unreasonably withheld.

15.     The Agreements prevented any entity from opening a store or other sales location for the sale of Cingular cellular telephone products and services within a three-mile radius of the Kempner store location. In addition, Kempner and such entities were prohibited from opening a store or other sales location within a three-mile radius of any other store that marketed and sold Cingular cellular telephone products and services (other than to replace an existing store location). The purpose of these restrictions was to protect and encourage the investment of time and money in the establishment of new business locations, and to permit and encourage the development of a customer base at locations such as Kempner's.

16.     Kempner developed customers for the purchase of cellular telephone products and services and delivered those customers to Cingular pursuant to the Agreements. These customers would not have become known to Cingular but for the

4

efforts of Kempner. In contracting with such customers for the benefit of the relationship, Kempner supplied the consideration for and earned the right to residual compensation for the duration of that customer's affiliation with Cingular, and developed the reasonable expectation of a continuing business relationship with those customers with which Cingular was obliged not to interfere.

17.     The Agreements included periodic schedules which set the compensation that Cingular would pay Kempner ("Commission Addendums"). Cingular represented, and Kempner relied on the representation that these periodic schedules were uniform as to compensation paid among all sales and service centers and provided for a monthly residual payment of no less than five percent of the revenue generated pursuant to customer service contracts. Most recently, for each customer that Kempner signed up to Cingular's cellular telephone service, Kempner was entitled to receive and Cingular was obliged to pay a monthly residual of approximately two dollars and forty cents ($2.40) for the duration of the customer relationship without interference from Cingular.

18.     Commencing at an unknown point in time, and contrary to its obligations to Kempner and others, Cingular determined to change its existing distribution practices without regard to Kempner's rights under the Agreements, the course of conduct developed over time between the parties, or its obligation of good faith and fair dealing by implementing an overall scheme and a series of actions which has had and continues to have the purpose and effect of eviscerating the Agreements and jeopardizing the investment of Kempner earlier encouraged by Cingular. These actions included, but are and were not limited to the following:

5

A.      Cingular intentionally and unjustifiably interfered with Kempner's relationship with the customers Kempner had originated by contacting consumers who had originally purchased a Cingular cellular telephone product and signed up for Cingular cellular telephone service through Kempner while such customers' contracts were still in effect and offering to allow such consumers to upgrade their cellular telephone products directly from Cingular without providing Kempner the opportunity to sell the equipment to the customer on the same terms. When such consumers upgraded their cellular telephone equipment directly from Cingular, Cingular "purged" such customers from Cingular's records as a Kempner-originated customer and terminated Kempner's monthly residuals for those customers.

B.      In April 1998, Cingular opened a sales kiosk at the Lincolnwood Town Center shopping mall that was within three miles of the Kempner store at 4722 West Touhy Avenue, and immediately began marketing and selling Cingular cellular telephone products and services. Cingular took this action within one year of prohibiting Kempner from expanding its business by marketing and selling Cingular cellular telephone products and services from a similar sales kiosk at the very same Lincolnwood Town Center shopping mall. Cingular's actions violated the terms and provisions of its own Administrative Procedures incorporated by reference into the Agreements.

C.      In September 2000, Cingular opened a sales location at 4730 West Dempster Street in Skokie that was also within three miles of the Kempner

6

location at 4722 West Touhy Avenue. In doing so, Cingular violated the terms and provisions of its own Administrative Procedures incorporated by reference into the Agreements.

D.      Cingular repeatedly and arbitrarily refused to give its approval to additional locations identified by Kempner for the expansion of Kempner's business to establish new and maintain existing customers for the sale of cellular telephone products and services.

E.      Cingular failed to deliver to Kempner the same level of pricing and equipment discounts that Cingular offered its internal channels of distribution, despite making affirmative representations to the contrary. As recently as May 8, 2001, Laren Whiddon, Vice-President and General Manager of Cingular, represented to Scott Kempner of Plaintiff, Kempner, that Kempner had access to the same level of pricing and equipment discounts as Cingular's internal channels of distribution. Similar representations had been repeatedly made to Kempner by representatives of Cingular throughout the term of the Agreements. The representations made by Whiddon and the other representatives of Cingular were false and Whiddon and each of the other representatives of Cingular knew at the time the representations were made that they were false. On information and belief, internal documentation at Cingular states specifically that certain pricing levels are available only at Cingular's points of distribution.

F.      Cingular published "bait and switch" advertisements designed to

attract the attention of Kempner's customers and then switch that customer

to accept services on terms and conditions more favorable to Cingular.

Beginning as early as March 31, 2000, Cingular represented to Kempner

that one of the benefits of being a sales and service center was Kempner's

inclusion in the promotional advertising prepared and distributed by

Cingular showing that the terms offered in that advertising would be

available to customers who patronized Kempner. However, the benefits

represented were not delivered. For example, sometime prior to January

31, 2002, Cingular prepared and distributed newspapers of general

circulation in the Chicago area including but not limited to the Chicago Sun

Times an advertisement indicating that new or existing customers who

engaged Cingular cellular telephone service and executed a contract

providing for a continuous term of such services would receive a free Nokia

5165 IRDB portable telephone. Kempner's business location was published

in this advertisement. On January 31, 2002, Gene R. Hyman, a regular

customer of Kempner responding to the advertisement, had a telephone

conversation with "Jennifer" at Cingular where Mr. Hyman indicated his

intention to avail himself of the offer published in the newspaper by

activating Cingular cellular telephone services through Kempner.

Cingular's representative Jennifer directed Mr. Hyman not to patronize

Kempner but rather to activate service at the Cingular point of distribution at

3333 West Touhy Avenue because he would not be able to receive a free

Nokia 5165 IRDB portable telephone if he activated Cingular cellular telephone service through Kempner, despite the advertised solicitation. On information and belief, similar examples of this conduct have occurred repeatedly and continuously since at least March 31, 2000.

G.     Cingular diverted potential customers from Kempner and misdirected those customers to Cingular. At all times relevant, Cingular has maintained 1-800 and 1-866 telephone numbers for support and referral of customers. The system is supposed to indicate for the benefit of customers and dealers like Kempner, through the telephonic input of zip code numbers, the identity of authorized sales and service locations for products and cellular telephone services offered by Cingular. Beginning at least at the time of Cingular's establishment of a company-owned location at 253 Old Orchard Center, Skokie, Illinois, the identity of Kempner's location in nearby Wilmette, Illinois, is indicated to a caller accessing the 1-866 support number as "Jillian Wireless" in "Roadhouse, Illinois." The location of the Cingular-owned store at 253 Old Orchard Center contained in the same listing is correctly identified. Kempner repeatedly complained to Cingular about the erroneous misidentification of Kempner in the 1-866 support number system. Cingular repeatedly and falsely represented to Kempner that the identity of store locations in the 1-866 support number system had been corrected. For example, On May 8, 2001, Laren Whiddon of Cingular represented to Scott Kempner of Kempner that Cingular was then currently reviewing the store listings on the support number system and making the

9

necessary revisions. On information and belief, these statements were untrue, the Cingular representatives, including Whiddon, knew at the time they were made that they were untrue, and to this day, the 1-866 support number system continues to misidentify Kempner. This misidentification has the purpose and effect of diverting potential customers from Kempner to Cingular-owned points of distribution.

H.        Cingular failed to pay Kempner the commissions and monthly residual payments due under the Agreements, and failed to make payments within the time periods established by the Agreements.

I.        Cingular failed to reimburse Kempner for out of pocket costs related to the substitution by Cingular of its trademarks, service marks, trade names and insignia which Kempner was required to utilize following the merger between SBC Communications and Bell South Corporation as required by the Agreements.

19.        Kempner has fully performed in good faith all of its legally required obligations under the 1996 Agreement and the 1999 Agreement.

20.        Various provisions of the Agreements, and particularly paragraphs 4(j) and 20 thereof, purport to restrict Kempner's ability to compete with Cingular in the market for cellular telephone products and services during and after the term of the Agreements. These provisions required that, so long as Cingular abided by the terms of the Agreements, to the extent Kempner sold cellular telephone products and services, Kempner did so exclusively on behalf of Cingular and would refrain from expanding its business by offering the products and services of Cingular's competitors. These

10

provisions further provided that, except in the event of a breach of the Agreements by

Cingular, Kempner was prohibited from offering the products and services of Cingular's

competitors for a period of one year following termination of the Agreements.

21.        Cingular recognized that the scope of the restrictions on

Kempner's activities contained in the Agreements were legally suspect, so Cingular

included in the Agreements a savings clause which permitted the offensive provisions to

be excised, with the remaining provisions of the Agreements being valid and enforceable.

By virtue of Cingular's breach of the Agreements, the provisions of paragraphs 4(j) and

20 thereof became unenforceable against Kempner, but the remaining provisions of the

Agreements endured.

22.        So long as Cingular abided by the terms of the Agreements, and

continued to support and encourage Kempner's development of a customer base for the

mutual benefit of Kempner and Cingular, the restrictions contained in paragraphs 4(j) and

20 of the Agreements arguably had a legitimate business purpose of protecting the

investment of time and effort that each had devoted to the relationship; however, once

Cingular breached the Agreements and embarked on its scheme to destroy these

relationships, the purported business purpose of the restrictions evaporated and they

became naked restraints of trade. Therefore, the restrictions contained in paragraphs 4(j)

and 20 of the Agreements are not only unenforceable against Kempner because of

Cingular's breach of the Agreements, but also because these provisions constitute

unenforceable restraints of trade in that, among other things:

A.   Cingular has no legitimate protectable interest in and no near-permanent

      relationship with customers for cellular telephone services and products. Such

11

customers often switch suppliers without regard to purported goodwill allegedly associated with various marks owned by Cingular.

B. Kempner has a legitimate and protectable interest in its customers by reason of the time, effort and expense invested in the development of its customers, and Kempner has cultivated near-permanent relationships with these customers. Kempner provides demonstrations of cellular telephone products and services, and trains customers in the use of cellular telephone products and services. Section 4(g) of the Agreements provides that those persons who purchase or lease cellular telephone products from Kempner are customers of Kempner.

C. The purported restrictions are not necessary in their full extent for the protection of Cingular. On information and belief, Cingular does not impose such restrictions on other Cingular points of distribution that compete with Kempner, including but not limited to A.B.T. Electronics and Circuit City.

D. There has been a failure of the consideration allegedly supporting Kempner's agreement to these restrictions. The advertising that Cingular promised Kempner was deceptive in that it falsely stated to customers that advertised terms and conditions were available from Kempner. Moreover, any purported value associated with the use of Cingular's marks has been substantially diluted by Cingular's permitted use of these marks on a discriminatory, non-exclusive basis to other points of distribution. Cingular did not impart to Kempner any specialized or technical knowledge of the cellular industry not generally available or otherwise known to Kempner.

E.  The purported restrictions are oppressive to Kempner. Cingular has for a
number of years interfered with Kempner's ability to conduct business under
the guise of marketing cellular telephone services, while simultaneously
preventing Kempner from offering competing services pursuant to these
purported restrictions. The inclusion of these illegal provisions in the
Agreements has diminished the value of Kempner's business.

F.  The purported restrictions are harmful to the public because they restrict
competition. Competition by Kempner would not impair the operation of
Cingular beyond that which would arise from the competition of an unrelated
third party with similar marketing skills. The fact that Cingular does not
impose these restrictions on all points of distribution demonstrates that the
restrictions on Kempner serve no purpose other than to restrain competition.

23.        Because the restrictions contained in paragraphs 4(j) and 20 of
the Agreements were unenforceable, Kempner had the right to expand its business by
offering the service of competing providers of cellular telephone products and services,
while simultaneously adhering to the enforceable provisions of the Agreement.
Beginning in 1999, Kempner was repeatedly approached by providers of other cellular
telephone products and services competitive with Cingular and offered the opportunity
to affiliate with these alternate providers on terms more favorable than that afforded
Kempner under the Agreements. In reliance on the false statements made to Kempner
by Cingular, Kempner refrained from exercising its rights to expand its business until
May, 2002. Cingular knew that Kempner would rely on its false statements and

intended that Kempner would do so. As a result of that reliance in refraining from exercising its rights to expand, the value of Kempner's business has been diminshed.

24.        Beginning in May, 2002, in order to attempt to rectify the injury suffered as a result of Cingular's scheme, to mitigate its damages, and to exercise its rights by virtue of the unenforceablity of the illegal restrictions contained in the Agreements, Kempner began to expand its business by offering cellular telephone products and services marketed by providers other than Cingular. On or about June 20, 2002, Cingular notified Kempner that it would terminate the Agreements as a result of Kempner's exercise of its right to expand its business, effective July 21, 2002. On information and belief, this attempted termination is the culmination of Cingular's scheme, whereby Kempner was induced to invest in and develop a customer base which resulted in substantial benefits to Cingular, without being told of Cingular's true intention to misappropriate those customers and eliminate the commissions and residuals that Kempner had earned, while wrongfully denying Kempner permission to establish additional locations. Simultaneously, Cingular placed in Kempner's contracts overbroad and illegal restrictions purely for their *in terrorem* effect to deter Kempner from exercising its right to expand its business despite Cingular's intention to breach and attempts to conceal its repeated breaches of the Agreements. This scheme had the purpose and effect of inducing Kempner to initially bear the economic risks associated with the development of the market for the sale of cellular telephone products and services, and then permitting Cingular to capitalize on the success Kempner had realized and to deny Kempner the benefits of that success by preventing Kempner from

further expansion while gradually misappropriating Kempner's customer base and

terminating Kempner's residual commissions. This scheme placed Kempner in the

untenable position of being unable to continue to operate and expand its business on

behalf of Cingular because of Cingular's interference, and unable to operate and

expand its business on behalf of other providers of cellular telephone products and

services because of Cingular's threats to enforce the illegal restrictions contained in the

Agreements. When Kempner finally exercised the only alternative available to it,

Cingular acted by attempting to terminate the Agreements, attempting to cut off

payment of Kempner's residual commissions, and attempting to eliminate Kempner as a

competitive threat.

## COUNT I

## (Declaratory Judgment Pursuant to 735 ILCS 2/701)

25.        Plaintiff Kempner repeats and realleges the allegations of

paragraphs 1 through 24 as if fully set forth herein.

26.        Cingular's actions as described above constitute a breach of its

obligations under the Agreements, as well as the duty of good faith and fair dealing

inherent between all contracting parties and inherent in the Agreements. As a result of

these breaches, the restrictions contained in paragraphs 4(j) and 20 of the Agreements are

unenforceable against Kempner.

27.        The restraints on competition contained in paragraphs 4 (j) and 20

of the Agreements are also void as against public policy. These provisions serve no

purpose other than to restrict competition and to encourage Cingular to unfairly and

unilaterally modify the terms of its business relationship with Kempner while purporting

to deny Kempner the ability to offer its services to competing providers of cellular

telephone products and services. In addition, Cingular has provided no substantial

consideration for Kempner's adherence to these terms and has enforced these terms on a

discriminatory basis, permitting other providers of Cingular's cellular telephone service

to ignore them or to operate in their absence. On information and belief, Cingular uses

the discriminatory enforcement of these provisions as a ruse for terminating contracts

with distributors in order to avoid the payment of earned residual commissions.

Accordingly, Kempner asserts that it is not bound by the unenforceable terms of either

Agreement, including but not limited to the exclusivity provisions of paragraphs 4(j) and

20. As a result of Cingular's conduct and the facts and circumstances of this case, there

is no construction of these provisions that could be enforced consistent with applicable

legal principles.

        28.       As a result of Cingular's threatened termination of the Agreements

and other actions, there exists a ripe controversy regarding Kempner's rights and

Cingular's obligations under the Agreements.

        29.       Pursuant to Section 2-701 of the Code of Civil Procedure, this

Court is authorized to declare the rights and liabilities of the parties and to adjudicate and

enforce by appropriate remedy such rights and liabilities. Kempner requires relief and a

declaration of its rights and Cingular's obligations under the Agreements, including but

not limited to:

        B.       A declaration that the exclusivity and anti-competitive provisions of

            paragraphs 4(j) and 20 of each of the Agreements are void and unenforceable

by Cingular, but that the remaining provisions of the Agreements remain valid and enforceable;

C.      A declaration that Kempner's right to receive residual commissions under the terms of the Agreements accrues upon origination of a customer by Kempner for the purchase of Cingular cellular telephone services and continues for so long as such customer remains a subscriber for Cingular cellular telephone;

D.      An injunction to prevent Cingular from terminating the Agreements prior to their expiration on December 31, 2002, and preventing Cingular from terminating Kempner's right to receive residual commissions for so long as such commissions accrue;

E.      An award of damages sufficient to compensate Kempner for the illegal actions of Cingular, and the diminution of the value of Kempner's business.

## COUNT II

### (Injunction)

30.     Plaintiff Kempner repeats and realleges paragraphs 1 through 24 as if fully set forth herein.

31.     Cingular has threatened to enforce the illegal and anti-competitive provisions of the Agreements against Kempner, and to terminate Kempner's ability to receive residual commissions. Kempner is informed and believes that Cingular intends to do so as soon as July 21, 2002.

32.     Unless Cingular is enjoined from enforcing the illegal provisions of the Agreements, Kempner will suffer irreparable injury, for which there is no adequate

17

remedy at law. Kempner enjoys significant goodwill and ongoing relationships with its existing customers as the result of the time, money and effort invested in customer development. If the illegal provisions of the Agreements are enforced, even on a temporary basis, these relationships will be destroyed and cannot easily be recreated.

33.        Unless Cingular is enjoined from terminating the 1999 Agreement prior to its expiration on December 31, 2002, Kempner will suffer irreparable injury, for which there is no adequate remedy at law. As a result of Kempner's reliance on the fraudulent inducements of Cingular, Kempner has been prevented from developing the revenue stream that otherwise would have been generated from competing providers of cellular telephone services, and Kempner requires the remaining term of the 1999 Agreement in order to be placed in a position remotely similar to that which it would have been in had Cingular not deceived Kempner. If Kempner's revenue stream from Cingular is terminated before Kempner has the opportunity to establish a competitive position, there is a substantial likelihood that Kempner would go out of business, the fruits of Cingular's illegal scheme will be realized, and the damages for such loss may not be not readily susceptible to calculation. This Court has the power to fashion an equitable remedy which will relieve Kempner from the consequences of Cingular's fraud.

## COUNT III

### (Breach of Contract - Store at Lincolnwood Town Center)

34.        Plaintiff Kempner repeats and realleges the allegations of paragraphs 1 through 24 as if fully set forth herein.

18

35.      In April 1997, Kempner opened a sales kiosk at the Lincolnwood Town Center, a shopping center located in Lincolnwood, Cook County, Illinois, for the purpose of selling paging products and services.

36.      Prior to April 1997, Kempner had requested that Cingular authorize Kempner to market and sell Cingular cellular telephone products and services at the kiosk at Lincolnwood Town Center.

37.      Cingular refused to grant Kempner authority to sell Cingular cellular telephone products and services at the kiosk at Lincolnwood Town Center. Such refusal was unreasonable and violated the terms of the Agreements which permitted such expansion by Kempner.

38.      In April 1998, Kempner closed its sales kiosk at the Lincolnwood Town Center.

39.      At no time during the period from April 1997 through April 1998 would Cingular grant Kempner authority to sell Cingular cellular products or services at the sales kiosk at Lincolnwood Town Center.

40.      In September 1998, Cingular opened a company owned kiosk at the Lincolnwood Town Center.

41.      From and after September 1998, Cingular sold Cingular cellular telephone products and services from the company owned sales kiosk at Lincolnwood Town Center. Cingular did so despite the fact that Cingular refused to grant Kempner the authority to take the very same action.

42.      The Agreements provide that Cingular is obligated to, among other things, establish administrative procedures and guidelines for the sale of Cingular cellular

telephone services. One administrative procedure established by Cingular is that no entity may open a sales location for the sale of Cingular cellular telephone services and equipment within a three mile radius of any other sales location for the sale of Cingular cellular telephone services and equipment.

43.     The Cingular owned sales kiosk at Lincolnwood Town Center was located within a three-mile radius of Kempner's sales location at 4722 West Touhy Avenue, Lincolnwood, Illinois.

44.     Kempner has been damaged by Cingular's breach of its obligations under the Agreements and by Cingular's operation of the company owned sales kiosk at Lincolnwood Town Center.

## COUNT IV

### (Breach of Contract – Skokie Store)

45.     Plaintiff Kempner repeats and realleges the allegations of paragraphs 1 through 24 as if fully set forth herein.

46.     In September 2000, Cingular opened a company owned sales store at 4730 West Dempster Street, Skokie, Cook County, Illinois, for the purpose of selling Cingular cellular telephone products and services to consumers.

47.     The Cingular sales store at 4730 West Dempster Street in Skokie is located within a three-mile radius of Kempner's sales location at 4722 West Touhy Avenue, Lincolnwood, Illinois.

48.     The Agreements provide that Cingular is obligated to, among other things, establish administrative procedures and guidelines for the sale of Cingular cellular telephone services. One administrative procedure established by Cingular is that no

entity may open a sales location for the sale of Cingular cellular telephone services and equipment within a three mile radius of any other sales location for the sale of Cingular cellular telephone services and equipment.

49.     The Cingular owned sales store at 4730 West Dempster Street in Skokie was located within a three-mile radius of Kempner's sales location at 4722 West Touhy, Lincolnwood, Illinois.

50.     Kempner has been damaged by Cingular's breach of its obligations under the Agreements and by Cingular's operation of the company owned sales store at 4730 West Dempster Street in Skokie.

## COUNT V

### (Breach of Contract – Accounting of Commissions And Residuals)

51.     Plaintiff Kempner repeats and realleges the allegations of paragraphs 1 through 24 as if fully set forth herein.

52.     The Agreements, and each Commission Addendum provides for the payment of commission and residual income to Kempner. Commissions are to be paid within fifteen (15) days of activation. Residuals are to be paid within forty-five (45) days after the end of each calendar month.

53.     On information and belief, Cingular has breached the Agreements by failing to pay commissions when due. Kempner has demanded payment of the sums due and owing, but Cingular has failed and refused to pay said amounts or to account for sums due.

21

54.     Kempner has been damaged by Cingular's breach of contract, but is unable to determine the extent of its losses without an accounting from Cingular of the sums due and owing.

## COUNT VI

### (Breach of Contract - Failure To Reimburse Expenses)

55.     Plaintiff, Kempner repeats and realleges the allegations of paragraphs 1 through 24 as if fully set forth herein.

56.     The Agreements each provide that Cingular will reimburse Kempner for out of pocket costs related to the substitution by Cingular of its trademarks, service marks, trade names and insignia which Kempner is required to utilize.

57.     As a result of the merger between SBC Communications and Bell South Corporation, many of the trademarks, service marks, trade names and insignia utilized by Cingular were changed and Kempner was required to implement these changes.

58.     Kempner has incurred out of pocket costs as a result of these changes. In accordance with the Agreements, Kempner has demanded that Cingular reimburse Kempner for these costs, but Cingular has failed and refused to do so.

59.     As a result of Cingular's breach of contract, Kempner has incurred damages which are estimated to total $4,500.00.

## COUNT VII

### (Fraud)

60.     Plaintiff, Kempner, repeats and realleges the allegations of Paragraph 1 through 24 as if fully set forth herein.

61.     The false statements that Cingular made to Kempner as a part of Cingular's scheme to defraud Kempner were material and included the following:

A.     Cingular falsely represented to Kempner that Kempner had access to the same level of pricing and equipment discounts as Cingular's internal channels of distribution;

B.     Cingular falsely represented to Kempner that the terms offered in the joint promotional advertising required by the Agreements would be available to customers who patronized Kempner;

C.     Cingular falsely represented to Kempner that Cingular was then currently reviewing the store listings on the support number system and making the necessary revisions.

62.     The Cingular representatives who made the representations to Kempner knew at the time that representations were made that they were false. Whiddon and the other Cingular representatives made these false statements to Kempner in order to induce Kempner to refrain from exercising its right to expand its business by offering the cellular telephone products and service of other providers, and to conceal from Kempner the fact that Cingular had breached the Agreements, rendering the illegal provisions of the Agreements unenforceable against Kempner.

63.     Kempner in fact relied on the statements of Whiddon and other Cingular representatives by refraining from exercising its right to expand his business by offering the cellular telephone products and services of other providers.

64.     Kempner has been damaged as a result of its reasonable reliance on the fraudulent statements made by Whiddon and the other Cingular representatives in that Kempner has lost the profits that it would have had it expanded its business by selling to customers the cellular telephone products and services of providers who competed with Cingular. As a result, the value of Kempner's business has been diminished.

65.     The actions of Cingular were intentional and malicious, thereby entitling Kempner to an award of punitive damages to punish Cingular and deter others from similar conduct in the future,

## COUNT VIII

### (Illinois Consumer Fraud and Deceptive Business Practices Act)

66.     Plaintiff, Kempner, repeats and realleges the allegations of Paragraphs 1 through 24 as if fully set forth herein.

67.     The Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 et. seq. ("CFA") prohibits unfair methods of competition and unfair or deceptive acts or practices.

68.     Cingular violated Section 2 of the CFA [815 ILCS 505/2] by, among other things:

A.     Falsely representing to Kempner that Kempner had access to the same level of pricing and equipment discount as Cingular's internal channels of distribution.

B.     Publishing advertisements in newspapers of general circulation containing Kempner's business address and offering terms and conditions of sale unavailable at Kempner's location without clearly indicating to consumers that such terms and conditions will not be honored for purchases from Kempner.

C.     Falsely representing to Kempner that Cingular was then currently reviewing the store listings on the support number system and making the necessary revisions. ILCS 505/10a(c ) Kempner is entitled to an award of attorneys fees.

69.     These statements were made in a course of conduct involving trade or commerce and related to consumer protection issues because it enabled Cingular to obtain business from customers that would otherwise have been directed to its competitors on terms more favorable to the customer.

70.     Cingular intended that Kempner would rely on the deception by refraining from exercising its right to expand its business by offering the cellular telephone products and service of other providers, and to conceal from Kempner the fact that Cingular had breached the Agreements, rendering the illegal provisions of the Agreements unenforceable against Kempner.

71.     Kempner suffered actual damages as a result of Cingular's violation of the CFA and brings this claim under 815 ILCS 505/10a.  Pursuant to 815 ILCS 505/10a(c) Kempner is entitled to an award of attorney's fees.

72.     The actions of Cingular were intentional and malicious, thereby entitling Kempner to an award of punitive damages to punish Cingular and deter others from similar conduct in the future.

## COUNT IX

### (Violation of Illinois Franchise Disclosure Act)

73.     Plaintiff, Kempner, repeats and realleges the allegations of Paragraphs 1 through 24 as if fully set forth herein.

74.     The 1999 Agreement constituted the sale of a franchise to Kempner in that:

a.     Kempner was granted the right to engage in business of offering, selling or distributing goods or services under a marketing plan or system prescribed or suggested in substantial part by Cingular; and

b.     The operation of Kempner's business pursuant to this plan or system was substantially associated with Cingular's trademark service, trade name, logo type advertising or other commercial symbols designating Cingular; and

c.     Kempner was granted the right to engage in this business and was required to pay indirectly a sum in excess of $500.00 by, among other things, procuring insurance coverage in excess of 1 million dollars protecting Cingular.

75.     On information and belief, the Cingular franchise sold to Kempner was unregistered, and its sale therefore violated 815 ILCS 705/5(1).

76.    Cingular failed to deliver to Kempner a disclosure statement meeting the requirements of the Illinois Franchise Disclosure Act, and therefore violated 815 ILCS 705/5(2).

77.    Cingular violated 815 ILCS 705/6 by, among other things, falsely representing to Kempner that Cingular would cooperate with Kempner to grow Kempner's customer base when Cingular actually intended to steal as many customers as possible from Kempner and drive Kempner out of business. Pursuant to 815 ILCS 705/5(2) Cingular was required to disclose to Kempner all of its business practices and the details regarding the operation of its franchise contracts and to clearly disclose to Kempner that Cingular intended to target customers developed by Kempner and to market directly to those customers in a manner that would deprive Kempner of commissions and residual revenues, while preventing Kempner from expanding its business. Had Cingular made these disclosures to Kempner, Kempner would not have entered into the 1999 Agreement.

78.    Kempner has been damaged by Cingular's violation of the Illinois Franchise Disclosure Act in that Kempner has expended great sums of money to develop and maintain a customer base, only to have those customers and the commission and residual revenue which they generate misappropriated by Cingular. As a consequence, the value of Kempner's business has been diminished. Pursuant to 735 ILCS 705/26, Kempner is entitled to recover the costs of this action and reasonable attorneys fees.

## COUNT X

### (Intentional Interference With Prospective Economic Advantage)

79.    Plaintiff, Kempner, repeats and realleges the allegations of Paragraphs 1 through 24 as if fully set forth herein.

80.    At all times, Kempner had a reasonable expectation of maintaining a continuing business relationship and of an economic advantage derived from its relationship with customers that it originated for cellular telephone services provided by Cingular. Pursuant to the scheme described herein, Cingular intentionally and unjustifiably interfered with Kempner's relationship with the customers Kempner had originated in a manner that induced or caused a breach or termination of the expectancy.

81.    Cingular was aware of Kempner's expectancy. The Agreements and each periodic Commission Addendum identified Kempner's continuing interest in residual income derived from the customers it had originated.

82.    Kempner has been damaged by the intentional and unjustified interference of Cingular with its reasonable expectation of a prospective economic advantage because it has lost residual income that it would otherwise be paid. Kempner is unable to determine the amount of these damages without an accounting of the residuals due.

83.    The actions of Cingular were intentional and malicious, thereby entitling Kempner to an award of punitive damages to punish Cingular and deter others from similar conduct in the future.

WHEREFORE, Kempner Mobile Electronics, Inc. prays that the Court find in its favor and enter judgment against Southwestern Bell Mobile Systems d/b/a Cingular Wireless as follows:

**PURSUANT TO COUNT I:**

A.  In favor of Kempner declaring that Kempner is no longer bound by the unenforceable restrictions contained in the Agreements; and

B.  In favor of Kempner declaring that Kempner has a right under the Agreements to receive residual commissions for customers originated by Kempner for so long as such customer remains a subscriber for Cingular cellular telephone services; and

C.  In favor of Kempner prohibiting Cingular from terminating the Agreements prior to their expiration on December 31, 2002; and

D.  In favor of Kempner awarding damages for Cingular's illegal conduct; and

E.  For such other and additional relief as the Court deems just and appropriate;

**PURSUANT TO COUNT II:**

F.  For an order temporarily, preliminarily and permanently enjoining, restraining and prohibiting Cingular from enforcing the provisions of paragraph 4(j) and paragraph 20 of the Agreements; and

G.  For an order temporarily, preliminarily and permanently enjoining, restraining and prohibiting Cingular from terminating the 1999 Agreement prior to its expiration on December 31, 2002; and

H.  For an injunction temporarily, preliminary and permanently enjoining, restraining and prohibiting Cingular from failing to pay residual commissions to Kempner for so long as such commissions accrue; and

I.  For such other and additional relief as this Court deems just and appropriate.

**PURSUANT TO COUNT III:**

J.  In favor of Kempner and against Cingular in an amount to be proven at trial but no less than $1,200,000;

K.  In favor of Kempner for prejudgment interest at the statutory rate because the sum owed is certain;

L.  In favor of Kempner for post judgment interest at the statutory rate;

M.  In favor of Kempner and against Cingular for attorney fees and costs;

N.  For such other and additional relief as the Court deems just and appropriate;

**PURSUANT TO COUNT IV:**

O.    In favor of Kempner and against Cingular in an amount to be proven at trial but no less than $560,000;

P.    In favor of Kempner for prejudgment interest at the statutory rate because the sum owed is certain;

Q.    In favor of Kempner for post judgment interest at the statutory rate;

R.    In favor of Kempner and against Cingular for attorney fees and costs;

S.    For such other and additional relief as the Court deems just and appropriate;

**PURSUANT TO COUNT V:**

T.    In favor of Kempner and against Cingular in an amount to be proven at trial as shown by the requested accounting;

U.    In favor of Kempner for prejudgment interest at the statutory rate because the sum owed is certain;

V.    In favor of Kempner for post judgment interest at the statutory rate;

W.    In favor of Kempner and against Cingular for attorney fees and costs;

X.    For such other and additional relief as the Court deems just and appropriate;

**PURSUANT TO COUNT VI:**

Y.    In favor of Kempner and against Cingular in an amount to be proven at trial but no less than $4,500.00;

Z.    In favor of Kempner for prejudgment interest at the statutory rate because the sum owed is certain;

AA.    In favor of Kempner for post judgment interest at the statutory rate;

BB.    In favor of Kempner and against Cingular for attorney fees and costs;

CC.    For such other and additional relief as the Court deems just and appropriate;

**PURSUANT TO COUNT VII:**

DD.    In favor of Kempner and against Cingular in an amount to be proven at trial but no less than $10,000,000;

EE.    In favor of Kempner and against Cingular in an amount to be proven at trial for punitive damages;

FF.    In favor of Kempner for post judgment interest at the statutory rate;

GG.    In favor of Kempner and against Cingular for attorney fees and costs;

HH.  For such other and additional relief as the Court deems just and appropriate;

**PURSUANT TO COUNT VIII:**

II.  In favor of Kempner and against Cingular in an amount to be proven at trial but no less than $10,000,000;

JJ.  In favor of Kempner and against Cingular in an amount to be proven at trial for punitive damages;

KK.  In favor of Kempner for post judgment interest at the statutory rate;

LL.  In favor of Kempner and against Cingular for attorney fees and costs;

MM.  For such other and additional relief as the Court deems just and appropriate;

**PURSUANT TO COUNT IX:**

NN.  In favor of Kempner and against Cingular in an amount to be proven at trial but no less than $5,000,000;

OO.  In favor of Kempner for post judgment interest at the statutory rate;

PP.  In favor of Kempner and against Cingular for attorney fees and costs;

QQ.  For such other and additional relief as the Court deems just and appropriate;

**PURSUANT TO COUNT X:**

RR.  In favor of Kempner and against Cingular in an amount to be proven at trial as shown by the requested accounting;

SS.  In favor of Kempner and against Cingular in an amount to be proven at trial for punitive damages;

TT  In favor of Kempner for post judgment interest at the statutory rate;

UU.  In favor of Kempner and against Cingular for attorney fees and costs;

VV.  For such other and additional relief as the Court deems just and

appropriate.

Respectfully submitted,
Kempner Mobile Electronics, Inc.

By: _____
One of Its attorneys

Kenneth B. Drost
Thomas D. Laue
DROST & LAUE, LLC, Firm No. 23746
111 Lions Drive, Suite 206
Barrington, Illinois 60010
Telephone: 847-381-1070
Facsimile: 847-381-1073

Myron M. Cherry
Myron M. Cherry & Associates LLC, Firm No. 37264
30 N. LaSalle Street
Suite 2300
Chicago, Illinois 60602
Telephone: 312-372-2100
Facsimile: 312-853-0279

# EXHIBIT 1

# AUTHORIZED SALES AND SERVICE AGREEMENT

## BETWEEN

## SOUTHWESTERN BELL MOBILE SYSTEMS, INC.
### d/b/a CELLULAR ONE® - Chicago

## AND

## KEMPNER MOBILE ELECTRONICS, INC.

THIS AGREEMENT is made and entered into this _____ day of _____,
199_, by and between SOUTHWESTERN BELL MOBILE SYSTEMS, INC. d/b/a CELLULAR
ONE® - Chicago ("CELLULAR ONE"), a Delaware and Virginia Corporation, with its principal
place of business at 930 North National Parkway, Schaumburg, Illinois 60173, acting on behalf
of itself as licensee of the Chicago MSA non-wireline cellular system and as a provider of other
services, and on behalf of Gary Telephone Company, an Indiana general partnership, as licensee
of the Gary MSA non-wireline cellular system, and KEMPNER MOBILE ELECTRONICS, INC.
("AGENT"), an Illinois corporation, with its principal place of business at 4722 West Touhy
Avenue, Lincolnwood, Illinois 60646.

### WITNESSETH:

Whereas, CELLULAR ONE is involved in the development, establishment and sale of
cellular radio service ("CRS") which requires the use by CRS Subscribers of cellular terminal
equipment;

Whereas, CELLULAR ONE and/or its affiliates is or may become involved in the
development, establishment and/or sale of other services, including but not limited to long
distance/toll service for CRS Subscribers, paging services, other Commercial Mobile Radio
Services, and competitive landline local exchange and/or long distance services (collectively
referred to as the "Services");

Whereas, CELLULAR ONE has regulatory authority to provide CRS in the cellular
geographic service area(s) within the Chicago and Gary metropolitan statistical areas and desires
to provide CRS in those areas, as well as other Services in designated areas, through Agents,
Retailers, Resellers, and direct sale to Subscribers;

Whereas, CELLULAR ONE has adopted and used or intends to adopt and use certain
valuable Marks in the provision of its Services and CPE;

Whereas, AGENT desires to sell certain of CELLULAR ONE's Services as a
nonexclusive, authorized agent of CELLULAR ONE, and desires to sell or lease, install, provide
warranty service and maintain CPE necessary for Subscribers to utilize such Services;

Now, therefore, in consideration of the mutual promises herein contained, it is hereby agreed:

1. DEFINITIONS

Activation. The act of initiating an Authorized Service in or to a Subscriber's CPE by CELLULAR ONE.

Affiliate. A person, association, partnership, corporation or joint-stock company, trust or other business entity however organized ("Entity") is an affiliate of that person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Entity. Control shall be defined as (i) ownership of a majority of the voting power of all classes of voting stock or (ii) ownership of a majority of the beneficial interests in income and capital of an entity other than a corporation.

Authorized Services. Those Services provided by CELLULAR ONE that AGENT is authorized hereunder to sell on behalf of CELLULAR ONE, including CRS and any other Services set forth on Exhibit A hereto.

Area. With respect to CRS and ancillary services, Area is defined as the Chicago and Gary metropolitan statistical areas ("MSAs") within which CELLULAR ONE has regulatory authority to provide CRS. The counties generally comprising these MSAs are listed in Exhibit A, and any additional adjoining counties that may be added to the areas served by CELLULAR ONE shall be deemed added to the Area, without the necessity of an amendment to this Agreement. With respect to other Authorized Services, Area is defined as those areas in which Cellular One is authorized to and is providing or reselling such Authorized Service, except as may be otherwise defined or limited on Exhibit A.

CELLULAR ONE. The term CELLULAR ONE includes Southwestern Bell Mobile Systems, Inc. d/b/a Cellular One - Chicago, and, where applicable to a specific Service, includes that affiliate of Southwestern Bell Mobile Systems, Inc., that provides such Service.

Cellular Radio Service (CRS). Any and all service (including resale of said service) authorized by the Federal Communications Commission ("FCC") under Part 22 of its rules as amended under the cellular orders set forth in An Inquiry Into the Use of the Bands 825-845 MHZ and 870-890 MHZ for Cellular Communications Systems; and Amendments of Parts 2 and 22 of the Commission's Rules Relative to Cellular Communications Systems (CC Docket No. 79-318), 86 F.C.C. 2d 469 (1981), modified as set forth in reconsideration order 89 F.C.C. 2d 58 (1982), and as further modified as set forth in other rules or orders from time to time.

Commercial Mobile Radio Services (CMRS). Any and all services (including resale of said services) that (1) fit the definition of commercial mobile services pursuant to Section 332 of the Communications Act, 47 U.S.C. §332, (2) are subject to regulation as commercial mobile radio services by the FCC under the orders set forth in Implementation of Sections 3(n) and 332 of the Communications Act; Regulatory Treatment of Mobile Services (CC Docket No. 93-252) or such other orders or rules as may be in effect from time to time, or (3) are the functional equivalent of a commercial mobile service as defined in 47 U.S.C. §332. CMRS shall in any

[11/95 REV]                                                    2

event include CRS, all forms of specialized mobile radio service (SMR and ESMR), and personal communications services (PCS).

CPE. The customer premises equipment, including cellular terminal equipment, that a Subscriber needs for using CRS and other Authorized Services.

Marks. Trademarks, service marks, trade names, insignia, symbols, logos; decorative designs, and/or other identifying insignia that CELLULAR ONE owns or is licensed or sublicensed to use in connection with its Services or products relating thereto, and which CELLULAR ONE, in its sole discretion, determines from time to time that AGENT is authorized to use.

Paging Services. One-way non-voice communication services provided by a communication common carrier and commonly referred to as paging services.

Reseller. Any entity that purchases bulk quantities of a telecommunications service from a telecommunications carrier for resale distribution, directly or indirectly, to ultimate users of such service.

Subscriber. A customer of an Authorized Service provided by CELLULAR ONE. The CRS telephone number or other service access number assigned to a customer of CELLULAR ONE's Authorized Services is deemed to be a separate Subscriber, regardless of how many CRS telephone numbers or service access numbers may be used by any one customer.

Successor. A person, association, partnership, corporation, joint stock company, trust or other business entity, however organized, that succeeds to or acquires the rights, title or interests of another.

## 2. ACKNOWLEDGEMENTS AND REPRESENTATIONS

CELLULAR ONE and AGENT acknowledge that they have read this Agreement and understand and accept the terms, conditions and covenants contained herein as being reasonably necessary to maintain CELLULAR ONE's high standards for its CRS and other Services thereby to protect and preserve the goodwill of CELLULAR ONE's CRS, Services and Marks.

AGENT has read and understands the obligations imposed by the FCC upon CRS licensees and their duties to CELLULAR ONE as specified in Section 22.912 of the FCC's cellular rules.

AGENT acknowledges that CELLULAR ONE's ability to provide CRS and other Services is conditioned upon the continuing validity of its FCC operating license(s) and any other required licenses, certificates and permits, and may be affected by state and federal court decisions and regulatory approvals. CELLULAR ONE makes no representation concerning whether said licenses, certificates and permits will continue to be valid. AGENT agrees that if CELLULAR ONE is prohibited from, or otherwise ceases, selling an Authorized Service in the Area, CELLULAR ONE may declare this Agreement null and void as to any or all Authorized Services with no penalty.

[11/95 REV]                                     3

AGENT acknowledges that it has conducted an independent investigation of the business of selling CRS and any other Authorized Services that it will conduct pursuant to this Agreement. AGENT recognizes that entry into business as an AGENT of CELLULAR ONE involves business risks and the AGENT's success in such business will depend primarily upon its abilities and efforts. CELLULAR ONE expressly disclaims the making of, and AGENT acknowledges that it has not received or relied upon, any GUARANTY, express or implied, as to the amount of commissions or other gross revenue that it may earn as a result of its agency relationship with CELLULAR ONE and acknowledges that it has no knowledge of any representations relating to its agency relationship with CELLULAR ONE by an officer, employee or agent of CELLULAR ONE that are contrary to the terms herein. AGENT represents to CELLULAR ONE, as an inducement to its entry into this Agreement, that AGENT has made no misrepresentations to CELLULAR ONE in its application for appointment as a nonexclusive, authorized AGENT of CELLULAR ONE or in any other manner.

AGENT and CELLULAR ONE mutually agree that they shall not have any liability to the other for any lost profits or consequential damages, even if advised of the possibility of such damages.

3. RELATIONSHIP OF THE PARTIES

CELLULAR ONE hereby appoints AGENT as a nonexclusive, authorized agent in the Area to solicit and contract, on behalf of CELLULAR ONE, with Subscribers for the Authorized Services, subject to all of the terms and conditions hereof.

During the term of this Agreement or thereafter, CELLULAR ONE reserves the right without obligation or liability to AGENT to market the Authorized Services and CPE in the same geographical areas served by AGENT, whether through CELLULAR ONE's own representatives or through others including, but not limited to other authorized agents, retailers, resellers and distributors.

Upon enrollment of a particular Subscriber, that Subscriber shall become a customer of CELLULAR ONE, and CELLULAR ONE shall offer and furnish such customer billing services as CELLULAR ONE deems appropriate. CELLULAR ONE shall be responsible to collect any charges for Authorized Services from Subscribers.

With the sole exception of the Subscribers enrolled by AGENT for the account of CELLULAR ONE, with respect to which AGENT acts as agent of CELLULAR ONE and owes CELLULAR ONE the fiduciary and other obligations of an agent to its principal, CELLULAR ONE and AGENT acknowledge and agree that their agency relationship arising from this Agreement does not constitute or create a general agency, joint venture, partnership, employment relationship or franchise between them.

The parties agree that personnel employed by AGENT to perform services under this Agreement are not CELLULAR ONE employees and AGENT assumes full responsibility for their acts. Such personnel employed by AGENT shall be informed that they are not entitled to the provisions of any CELLULAR ONE employee benefits. With respect to such personnel,

[11/95 REV]                                                4

AGENT shall have sole responsibility for supervision, daily direction and control. CELLULAR ONE will not be responsible for worker's compensation, disability benefits, unemployment insurance and withholding income taxes and social security for said personnel.

### 3A.  RELATIONSHIP WITH SUB-AGENTS

AGENT warrants it has entered into or may enter into appropriate agreements with all persons (other than AGENT's own employees) and businesses that sell the Authorized Services on behalf of AGENT ("sub-agents"), and that such agreements are sufficient to enable it to comply with all provisions of this Agreement. Without limiting the generality of the foregoing, AGENT understands, covenants and agrees that: (1) any sub-agents appointed by AGENT must agree to comply with all of the restrictive covenants in Paragraph 20 of this Agreement and the Confidentiality Obligations in Paragraph 33 of this Agreement; (2) AGENT will inform CELLULAR ONE thirty (30) days' in advance of the identity of any proposed sub-agent; CELLULAR ONE shall have the right to disapprove the appointment of any sub-agent that reflects adversely upon CELLULAR ONE in the opinion of CELLULAR ONE or which is or has been associated in any way with a competitor of CELLULAR ONE in the Area or for any other reasonable business purpose; and CELLULAR ONE shall have the right to request the removal of any sub-agent who breaches the agreements set forth above or whose actions, in the opinion of CELLULAR ONE, reflect adversely upon CELLULAR ONE; (3) AGENT shall inform CELLULAR ONE prior to any intended relocation of any of its sub-agents which relocation shall then be subject to CELLULAR ONE's approval; and (4) CELLULAR ONE may require any further information it deems necessary prior to AGENT's appointment of the sub-agent. A complete list of all of AGENT's current sub-agents, along with the names of the owners, managers, principals, officers and directors thereof is attached as Exhibit B. AGENT understands and agrees that sub-agents of AGENT shall not be permitted to use, in any manner whatsoever, the name, trademarks or service marks of CELLULAR ONE, unless expressly agreed in a writing signed by AGENT, CELLULAR ONE and sub-agent. Any such use of CELLULAR ONE's name, trademarks or service marks shall be made a ground for immediate termination of any sub-agent agreements.

### 4.  AGENT RESPONSIBILITIES

(a) AGENT agrees to provide materials and advertising to actively promote CELLULAR ONE Authorized Services and appropriate sales facilities to enhance the sale of CELLULAR ONE Authorized Services.

(b) AGENT will sell CELLULAR ONE's Authorized Services to customers by employing the following techniques (in addition to others): providing demonstrations of CELLULAR ONE's Service, explaining its benefits, explaining the terms and conditions of purchase of the Service, providing sales literature prepared by CELLULAR ONE, and training the customer in the use of CELLULAR ONE's Service. AGENT will offer the Authorized Services subject to all of the applicable terms of CELLULAR ONE's form of contract for customers.

(c) AGENT agrees that it must obtain CELLULAR ONE's prior written approval to open any locations in addition to those listed in Exhibit A. However, an amendment of this

Agreement shall not be necessary to subject any new or additional AGENT locations to the terms and conditions of this Agreement; rather, the opening of such locations shall automatically subject them to the terms and conditions of this Agreement. AGENT agrees to establish and maintain installation and maintenance facilities at the locations set forth in Exhibit A and other such locations as AGENT may establish from time to time to the satisfaction of CELLULAR ONE, approval of which shall not be unreasonably withheld, and to furnish high quality and prompt installation, warranty and maintenance service for all CPE sold or leased by it to Subscribers. Notwithstanding anything to the contrary contained herein, the closing of one or more locations shall not be considered a default by AGENT so long as AGENT keeps open at least 80% (eighty percent) of the locations which are initially listed in Exhibit A and operates them in compliance with all of the requirements hereof.

(d) AGENT, at its own expense, shall obtain from the manufacturer(s) and distributor(s) all required training in the operation, installation, warranty and maintenance service of CPE. If AGENT (1) chooses to handle any one or more of the CELLULAR ONE rental, lease or third-party financing plans and installs the equipment provided pursuant thereto, or (2) performs installs of other CELLULAR ONE-owned equipment provided directly to customers and referred to AGENT for installation (as required by Paragraph 4(o)), then AGENT shall be obligated to comply with all of the requirements of the Cellular One Authorized Service Center Program, as amended from time to time, and with the specific requirements described in the remainder of this subparagraph (d). AGENT's installation, warranty and maintenance service CRS facility shall be required to obtain certification from the manufacturer(s) of the CPE that AGENT leases or sells and AGENT shall be responsible to secure such certifications. AGENT may only delegate by contract its installation, warranty and maintenance service obligations hereunder to a subcontractor with the express prior written approval of CELLULAR ONE, which will not be unreasonably withheld or withdrawn, and any approval necessary from each manufacturer and/or distributor of an approved model of CPE to be sold or leased by AGENT. Such delegation shall be by written agreement between AGENT and the service subcontractor. Notwithstanding such agreement with a service subcontractor, AGENT shall remain responsible to CELLULAR ONE for all installation, warranty and maintenance service obligations hereunder. AGENT shall reimburse CELLULAR ONE for the reasonable cost of installation, repair or warranty which CELLULAR ONE, in its sole discretion, deems necessary to have performed at a facility other than AGENT's for customers as to whom AGENT fails to comply with CELLULAR ONE's standards applicable thereto.

(e) AGENT agrees to maintain sufficient liability insurance to protect CELLULAR ONE from all customer claims arising out of the acts, omissions, and/or representations of AGENT. CELLULAR ONE shall be named as an additional insured party on each policy. Such insurance coverage shall be maintained under one or more policies of insurance from a recognized insurance company qualified to do business within the Area providing in the aggregate minimum liability protection of ONE MILLION DOLLARS per occurrence for bodily and personal injury and death and ONE MILLION DOLLARS per occurrence of property damage. Each such insurance policy shall provide for not less than thirty (30) days' prior notice to all insured of any modification, cancellation or non-renewal. CELLULAR ONE may, at any time and with ninety (90) days' prior notice to AGENT, require AGENT to increase its coverage of any type of insurance in reasonable amounts and require different or

additional kinds of insurance, to reflect inflation, identification of special risks, changes in law or standards of liability, higher damage awards or other reasonable changes in circumstances. Upon request by CELLULAR ONE, AGENT shall furnish proof satisfactory to CELLULAR ONE that insurance coverage required hereunder is in force.

(f)  AGENT agrees to maintain operations and follow procedures that are in full compliance with CELLULAR ONE's requirements as specified, amended and distributed from time to time, and to allow CELLULAR ONE reasonable access to AGENT's facilities for inspection.

(g)  For its own account, AGENT agrees to sell or lease CPE to be used by Subscribers of the Authorized Services, including CELLULAR ONE's CRS, or other End Users. AGENT may only offer FCC approved equipment. AGENT agrees to maintain an inventory of CPE sufficient to meet reasonable anticipated demand therefore by Subscribers which AGENT enrolls. If AGENT handles any CELLULAR ONE rental or lease plans in AGENT's inventory, AGENT agrees to comply with any inventory control or tracking procedures as CELLULAR ONE may adopt from time to time. AGENT also agrees to maintain a minimum inventory of parts. The parties agree that CELLULAR ONE may restrict AGENT's choice in CPE which AGENT may, on its own behalf, sell, lease or otherwise make available with CELLULAR ONE Services, which will further CELLULAR ONE's legitimate business objectives, if CELLULAR ONE reasonably maintains that the particular type of CPE restricted reflects adversely upon the quality of CELLULAR ONE's Services by reason of the limitations or characteristics of the equipment and CELLULAR ONE will provide AGENT thirty (30) days notice of such restriction. AGENT agrees not to use any CPE bearing trademarks similar to or resembling the Marks of CELLULAR ONE. Except for any CELLULAR ONE-owned CPE which AGENT handles on behalf of CELLULAR ONE as part of a rental, lease or third-party financing plan, all CPE sales and leases shall be made by or on behalf of AGENT for its own account and not as agent for, or for the account of, CELLULAR ONE. AGENT may establish fees and charges for sales prices and lease charges for the CPE and CELLULAR ONE shall have no control over such prices or for AGENT's CPE. With respect to the sale or lease of AGENT's CPE, Subscribers shall be customers of AGENT and CELLULAR ONE shall have no responsibility to AGENT or to Subscribers with respect to the sale or lease of AGENT's CPE. CELLULAR ONE is not obligated to offer any lease, rental or other CPE program to AGENT.

(h)  AGENT agrees to take all necessary steps to ensure compliance with AGENT obligations under this Agreement by AGENT and its personnel and any other parties involved in the sale of the Authorized Services by AGENT, including but not limited to sub-agents.

(i)  AGENT agrees that AGENT will at all times faithfully, honestly and diligently perform its obligations hereunder, and that AGENT will continuously exert its best efforts to promote and enhance the use of CELLULAR ONE's Authorized Services.

(j)  In the relevant Area, AGENT agrees that it will not, at any time either during the term of this Agreement, or any extension thereof, (1) induce, influence or suggest to any Subscriber of CELLULAR ONE's CRS to purchase CRS or any other CMRS from another provider or reseller of CRS or CMRS, or (2) induce, influence or suggest to any Subscriber of any other

Authorized Service to purchase a competing service from any other provider or reseller of such competing service, whether or not the competing service is technologically the same as the Authorized Service in question. As more fully described in paragraph 20, AGENT agrees not to act as a representative or agent of any other reseller or provider of CMRS or any Authorized Service in the relevant Area. Notwithstanding any language to the contrary, AGENT shall have the right to enter into or continue its current provision of Paging Services.

(k) Agrees not to take any action inconsistent with the provisions of this Agreement and shall use its best efforts to support CELLULAR ONE's efforts in providing the Authorized Services to Subscribers.

(l) AGENT agrees not to take any action inconsistent with, and agrees to support CELLULAR ONE's efforts before regulatory authorities regarding any modification of rates.

(m) AGENT agrees that during or after the term of this Agreement, AGENT will not reveal, divulge, make known, sell, exchange, give away, or transfer in any way any part of its list of Subscribers or use such information for any purpose other than 1) AGENT (but no other successor business entity) maintaining such periodic contact with Subscribers as is required for warranty service, installation or maintenance of CPE, and 2) AGENT (but no other corporate entity) business activities unrelated to CRS, CMRS, or any other Authorized Services; provided, however, AGENT shall be under no restriction regarding the use of such information as long as such use is consistent with the terms of this Agreement.

(n) AGENT agrees to advertise association with CELLULAR ONE Authorized Services as an authorized AGENT of CELLULAR ONE, pursuant to any written procedures CELLULAR ONE may publish from time to time.

(o) AGENT agrees to use its best efforts to install and maintain CPE for Subscribers referred to AGENT by CELLULAR ONE's Sales Associates for installation and maintenance on a "first come, first serve basis," such installation and maintenance to be according to CELLULAR ONE standards established from time to time.

## 5. CELLULAR ONE'S RESPONSIBILITIES

CELLULAR ONE will:

(a) Upon approval, and subject to compliance with procedures and guidelines established from time to time, CELLULAR ONE will furnish the Authorized Services to Subscribers.

(b) Secure any necessary regulatory approvals to conduct the Authorized Services.

(c) Establish the rates, terms, and conditions of the sale of its Authorized Services to Subscribers.

(d) Establish the administrative procedures and guidelines for sale of Authorized Services, enrollment of Subscribers, and customer service provided to Subscribers.

(e)  Promote CELLULAR ONE's Authorized Services and provide promotional literature as CELLULAR ONE deems necessary and appropriate. CELLULAR ONE may advertise CELLULAR ONE's Authorized Services from time to time if it deems necessary and appropriate.

(f)  Provide at cost a reasonable number of CELLULAR ONE sales brochures and other information and illustrative material for the preparation of catalogs, advertising and other promotional activities as CELLULAR ONE deems necessary and appropriate.

(g)  Provide a reasonable amount of training on sales of CELLULAR ONE's Authorized Services and administrative procedures associated with the enrollment of Subscribers.

6.  CPE BEARING CELLULAR ONE'S MARKS

AGENT shall not have the right, except after CELLULAR ONE's approval, to sell CPE bearing CELLULAR ONE's Marks to any person or entity other than a Subscriber to whom AGENT has sold CELLULAR ONE's Authorized Service(s) hereunder. This clause is intended to protect CELLULAR ONE's Marks and to assure that such Marks are used properly.

7.  COMPENSATION

CELLULAR ONE will compensate AGENT for Subscribers enrolled by AGENT onto CELLULAR ONE's Authorized Services in accordance with the following terms and conditions:

(a)     CELLULAR ONE may withhold and offset or apply AGENT compensation against any past due amount owed to CELLULAR ONE by AGENT. Whenever AGENT fails to comply with any term hereof or any procedure in the Administrative Procedures Manual or AGENT does not provide complete and/or accurate information concerning Subscribers to whom an Authorized Service is sold or, if applicable, the CELLULAR ONE CPE is sold or leased, CELLULAR ONE shall have the right to withhold all or a portion of any compensation or other amount otherwise payable hereunder to AGENT with respect to such Authorized Service or, if applicable, CPE. CELLULAR ONE reserves the right to establish and modify procedures to govern the specific manner in which any compensation is administered and to modify periodic intervals for payments, by notice to AGENT. Residual commissions and any other compensation shall only continue to accrue as long as this Agreement is in effect, and the expiration or termination of this Agreement shall effectively terminate AGENT's right to any further commissions or other amounts except for those residual commissions that accrued prior to the date of expiration or termination, provided that a knowingly wrongful termination by CELLULAR ONE without cause or justification shall not cut off AGENT's right to payment of commissions for the term of this Agreement.

(b)     Unless provided otherwise in an annual or other addendum or amendment to this Agreement, from the commencement date through December 31, 2000, CELLULAR ONE will pay Residual Commissions on a monthly basis to AGENT for each active CRS Subscriber that has been accepted and activated by CELLULAR ONE, provided that (1) AGENT is in compliance with the obligations and conditions of this Agreement, and (2) a properly completed

[11/95 REV]                                            9

and signed customer service contract has been received by CELLULAR ONE within fifteen (15) days after activation of such Subscriber's cellular service. Residual Commissions will be paid within forty-five (45) days after the end of each calendar month or at such other periodic interval as CELLULAR ONE may establish from time to time. Taxes, long distance charges, equipment charges, directory assistance charges, any third party charges passed through to Subscribers, one-time charges, enhanced feature charges, roamer charges and charges other than recurring CRS base charges and local airtime charges shall not be included in the computation of the Residual Commission. The Residual Commission schedule is as follows:

From the commencement date through December 31, 1998: An amount equal to five percent (5%) of the total recurring CRS base charges and local airtime charges billed by CELLULAR ONE to AGENT-originated CRS Subscribers;

From January 1, 1999 through December 31, 1999: An amount equal to four percent (4%) of the total recurring CRS base charges and local airtime charges billed by CELLULAR ONE to AGENT-originated CRS Subscribers;

From January 1, 2000 through December 31, 2000: An amount equal to three percent (3%) of the total recurring CRS base charges and local airtime charges billed by CELLULAR ONE to AGENT-originated CRS Subscribers.

Payment of the above referenced Residual Commissions is subject to the requirement that AGENT must have annual net growth in AGENT-originated CRS Subscribers who are active and in good standing on CELLULAR ONE's cellular radio system. That is, the total number of AGENT-originated Subscribers who are active and in good standing as of the first of the calendar year must be greater than such number as of the first of the preceding calendar year. Otherwise, if there is no net growth or if there is a reduction, then the Residual Commission payable for the current year shall be one percentage point less than the Residual Commission described above. (For example, if there were 100 active AGENT-originated Subscribers as of January 1, 1995, and only 95 active AGENT-originated Subscribers as of January 1, 1996, AGENT would not have met the annual net growth requirement and its applicable Residual Commission for 1996 would be four percent (4%) rather than five percent (5%).)

8. <u>USE OF MARKS BY AGENT</u>

Periodically CELLULAR ONE will publish a list of Marks AGENT is licensed to use under the Agreement. Such list will also be supplemented with reasonable rules and regulations pertaining to the Marks, which AGENT agrees to follow. AGENT acknowledges that its right to use the Marks is derived solely from the Agreement and is limited to the identification of AGENT as an agent of CELLULAR ONE. AGENT agrees to comply with all reasonable rules and procedures pertaining to such Marks prescribed by CELLULAR ONE from time to time during the term of this Agreement. AGENT recognizes the great value of the goodwill associated with the Marks, and acknowledges that the Marks and all rights herein and goodwill pertaining thereto belong exclusively to CELLULAR ONE, and that the Marks have a secondary meaning in the mind of the public. AGENT acknowledges and agrees that all usage of the Marks by AGENT and any goodwill established thereby shall inure to the exclusive benefit of CELLULAR ONE and its Affiliates and that this Agreement does not confer any goodwill or

other interests in the Marks upon AGENT. Any unauthorized use of the Marks by AGENT, or any use not in compliance herewith, shall constitute an infringement of the rights of CELLULAR ONE and its Affiliates in and to the Marks and shall further constitute a material breach of this Agreement. AGENT shall use the Marks with such words qualifying or identifying the agency relationship of CELLULAR ONE and AGENT as CELLULAR ONE from time to time shall reasonably prescribe. AGENT shall not use the Marks as part of any corporate or trade name or with any prefix, suffix or other modifying words, terms, designs or symbols, or in any modified form, nor may AGENT use the Marks in connection with the sale or lease of any unauthorized product or service or in any other manner not expressly authorized by this Agreement or separately in writing by CELLULAR ONE. If AGENT uses CELLULAR ONE's Marks on any of AGENT's stationery, other forms or business cards, AGENT agrees to display the Marks on such stationery, other forms, and business cards used in its business of selling the Authorized Services in the manner prescribed by CELLULAR ONE. AGENT agrees to obtain such fictitious or assumed name certificates or registrations as may be required by applicable law, provided the fictitious or assumed name is approved in writing by CELLULAR ONE and CELLULAR ONE is provided a copy of the certificate and/or registration. If any fictitious or assumed name used by AGENT includes anything that identifies CELLULAR ONE or its Marks, CELLULAR ONE may at any time require AGENT to cease using such fictitious or assumed name, and to cancel any corresponding certificate and/or registration. If it becomes advisable at any time in CELLULAR ONE's sole discretion for AGENT to modify or discontinue use of any Mark or substitute one or more additional Marks to identify its relationship with CELLULAR ONE or, if applicable, any CPE, AGENT agrees to comply therewith within a reasonable time after notice thereof by CELLULAR ONE and the sole obligation of CELLULAR ONE in any such event shall be to reimburse AGENT for the out-of-pocket costs, if any, of complying with this obligation and to indemnify AGENT as provided in Paragraph 9 below. In addition, AGENT shall replace obsolete identification signs or identification material with new signs or identification material should AGENT adopt new Marks replacing one or more Marks identified by CELLULAR ONE in such list as hereinbefore specified.

### 9. CELLULAR ONE'S TITLE AND PROTECTION OF CELLULAR ONE'S RIGHTS

AGENT agrees that it will not during the term of this Agreement, or thereafter, attack the title or any rights of CELLULAR ONE in and to the Marks. CELLULAR ONE hereby indemnifies AGENT and undertakes to hold AGENT harmless against any damages and costs from claims or suits arising out of the use by AGENT of the Marks as authorized in this Agreement, provided that prompt notice is given to CELLULAR ONE of any such claim or suit and provided, further, that CELLULAR ONE shall have the option to undertake and conduct the defense of any suit so brought and that no settlement of any such claim or suit is to be made by AGENT without the prior written consent of CELLULAR ONE. AGENT agrees to assist CELLULAR ONE and CELLULAR ONE agrees to reimburse AGENT for all associated reasonable costs to the extent necessary in the procurement of any protection or to protect any of CELLULAR ONE's rights to the Marks, and CELLULAR ONE, if it so desires, may commence or prosecute any claims or suits in its own name or in the name of AGENT or join AGENT as a party thereto. When known, AGENT shall notify CELLULAR ONE in writing of any infringements or imitations by others of the Marks which are the same as or similar to those covered by this Agreement. CELLULAR ONE shall have the sole right to determine whether any action shall be taken on account of any such infringements or imitations. AGENT shall not

institute any suit or take any action on account of any such infringements or imitations without first obtaining the written consent of CELLULAR ONE.

## 10. RULES AND PROCEDURES

AGENT understands that if AGENT operates its CPE business or represents CELLULAR ONE's Authorized Services in a manner that is inconsistent with or contrary to state or federal law or regulation, such action will reflect adversely upon the name and goodwill of CELLULAR ONE and its Affiliates. Therefore, AGENT agrees to comply, if applicable, with Part 22 of the FCC rules, and all tariffs, other governmental rules and procedures in existence relating to the sale of the Authorized Services and the sale, lease, warranty service and the conduct of AGENT's CPE business hereunder as well as any rules and procedures relating to such matters reasonably prescribed from time to time by CELLULAR ONE through the Administrative Procedures Manual, which rules and procedures shall constitute provisions hereof as if fully set forth herein. All references herein to the Agreement shall include all such tariffs, rules and procedures. CELLULAR ONE may incorporate all such tariffs, rules and procedures in one or more Administrative Procedures Manuals or other written form, but is not obligated to do so. AGENT shall itself be responsible to familiarize itself with the laws and regulations applicable to the conduct of its business.

## 11. COMPLIANCE WITH LAWS AND GOOD BUSINESS PRACTICES

AGENT shall secure and maintain in force all licenses and permits required by AGENT and its employees in the enrollment of Subscribers and the sale or lease of CPE, installation and maintenance of CPE, including without limitation, all required FCC permits and certifications, if required, and business and sales tax licenses, and shall conduct its business in full compliance with all state and federal laws, ordinances and regulations applicable to AGENT's business. CELLULAR ONE shall sell or resell the Authorized Services in accordance with applicable rules, regulations, statutes and decisions governing such Services. AGENT shall promptly pay, when due, all taxes and assessments against any real or personal property used in connection with AGENT's business, and all liens or encumbrances or every kind or character created or placed upon or against any such property, and all accounts and other indebtedness of every kind incurred by AGENT in the conduct of its business. AGENT shall comply, at its own expense, with the provisions of all applicable municipal requirements and those state and federal laws applicable to AGENT as an employer of labor or otherwise. AGENT expressly agrees not to discriminate against any employee or applicant for employment because of race, creed, color, national origin or sex. The provisions of Executive Order No. 11246, as amended, are incorporated herein by reference. AGENT will fully comply with the provisions of the Federal Occupational Safety and Health Act of 1970 and with any rules and regulations issued pursuant to this Act.

The undersigned parties agree that this Agreement is subject to any and all restrictions now existing or hereafter imposed by the FCC or under the Modified Final Judgment ("MFJ") entered on August 24, 1982, in the United States District Court for the District of Columbia in United States vs. Western Electric et. all; Civil Action No. 82-0192, 552 F. Supp. 131 (D.D.C. 1982), and any subsequent interpretation thereof by the Court or the Department of Justice, and this Agreement shall be deemed amended to the extent inconsistent with any such interpretation. In the event that CELLULAR ONE reasonably determines that any aspect of the arrangements

[11/95 REV]                                             12

made between the parties pursuant to this Agreement would violate any present or future requirements of the MFJ and related rulings, CELLULAR ONE may immediately, upon written notice to AGENT, terminate this Agreement without further obligation.

## 12. ADVERTISING AND BUSINESS PRACTICES OF AGENT

All advertising and promotion by AGENT shall be completely factual and shall conform to the highest standards of ethical advertising. AGENT shall adhere to the highest standards of honesty, integrity, fair dealing and ethical conduct in all dealings with Subscribers, AGENT and the public. AGENT agrees to refrain from any business or advertising practice which may be injurious to the business of CELLULAR ONE and the goodwill associated with the Marks. All advertising and marketing materials that AGENT desires to use in connection with the Authorized Services or CPE and which have not been prepared or previously approved by CELLULAR ONE must be submitted to CELLULAR ONE for approval. AGENT shall not use any advertising or marketing materials that CELLULAR ONE has failed to approve. AGENT agrees that it will not begin its advertising and promotion without CELLULAR ONE's prior written consent. AGENT shall notify CELLULAR ONE in writing within five (5) days of the commencement of any material action, suit or proceeding, and of the issuance of any order, writ, injunction, award or decree of any court, agency of other governmental instrumentality, involving AGENT, or any business conducted by AGENT on behalf of CELLULAR ONE hereunder.

## 13. AGENT'S BUSINESS RECORDS

AGENT agrees to create and to maintain at its principal office and preserve for three (3) years from the date of their preparation, full, complete and accurate records of its business conducted pursuant to this Agreement. Such records shall include, without limitation, records of all Authorized Service enrollments and CPE sales, leases, or rentals.

## 14. REPORTS AND FINANCIAL STATEMENTS

AGENT shall maintain at its principal office for a period of three (3) years complete and accurate books of account and records, including all documentation and correspondence related to advertising and publicity, Subscriber contacts and solicitations, Subscriber applications and contracts, Subscriber complaints, use of CELLULAR ONE's name and trademarks, payments to AGENT, agreements with and payments to third parties in connection with this Agreement, AGENT's licenses and authorizations, compliance with the requirements of any governmental agency and all other documents or records in connection with AGENT's performance of its duties hereunder. CELLULAR ONE shall have the right to inspect and make copies of AGENT's books of account and records during normal working hours, upon reasonable notice by CELLULAR ONE. CELLULAR ONE expressly agrees, and will require its authorized representatives to agree, that it will keep all such records strictly confidential and that it will not disclose such information to any other agent or distributor of CELLULAR ONE's Services or to any other person without AGENT's express prior written consent; provided, however, CELLULAR ONE may disclose such information if required to do so by any state or federal regulatory agency.

## 15. ASSIGNMENT

This Agreement is fully assignable by CELLULAR ONE to any affiliated person or entity and shall inure to the benefit of any assignee or other legal successor to the interest of CELLULAR ONE herein.

AGENT acknowledges that CELLULAR ONE has entered into this Agreement in reliance upon the character, business experience and ability of AGENT and its owner(s), officers and managers and that neither the rights and duties created by this Agreement nor a controlling interest in the ownership of AGENT may be voluntarily, involuntarily, directly or indirectly assigned, or otherwise transferred (including, without limitation, by transfer of capital stock or partnership interests, by merger or consolidation, by issuance of additional securities representing an ownership interest in AGENT or convertible thereto, or in the event of the death of a shareholder or partner of AGENT, by will, in declaration of or transfer in trust or the laws of intestate succession) without the written approval of CELLULAR ONE, which will not be unreasonably withheld, subject to such conditions as CELLULAR ONE deems reasonably necessary. Any such assignment or transfer without such approval shall constitute a breach hereof and convey no rights to or interests herein. Any change in management, personnel or identity which materially impairs the ability of AGENT to market the Authorized Services shall also constitute such a breach. "Control" for purposes hereof is defined in Paragraph 1 above.

## 16. TERM AND EXTENSION OF AGENCY RELATIONSHIP

The term of this Agreement shall commence on the 1st day of January, 1996, and shall end on the 31st day of December, 2000. AGENT shall provide to CELLULAR ONE written notice of the date on which AGENT initiates operations under this Agreement in the Area. AGENT agrees that CELLULAR ONE must provide written consent before AGENT actually initiates business operations. This Agreement shall be effective only after its execution by an officer or other authorized employee of both AGENT and CELLULAR ONE.

CELLULAR ONE may give AGENT written notice of its determination that the agency relationship between CELLULAR ONE and AGENT may be extended upon mutual Agreement, not less than sixty (60) days prior to the expiration hereof, if CELLULAR ONE determines that it is renewable.

## 17. LATE PAYMENTS; SECURITY DEPOSIT

In the event any amount payable by AGENT to CELLULAR ONE is more than thirty (30) days overdue, CELLULAR ONE may, at its option, do one or more of the following: (i) require AGENT to pay its account in full; (ii) apply commissions and any credits or other amounts payable to AGENT to reduce the AGENT's account payable balance; or (iii) require AGENT to deposit with CELLULAR ONE an irrevocable commercial letter of credit, cash or other form of security acceptable to CELLULAR ONE in its sole discretion to secure future delays or defaults in payment. This deposit will secure payment of any amounts due under this Agreement or any other agreement between the parties.

AGENT understands that in order to purchase CPE from CELLULAR ONE (if CELLULAR ONE determines that it will sell CPE) other than on a cash on delivery basis,

AGENT may be required to sign Security Agreements, Financing Statements and related documents.

18. TERMINATION OF AGREEMENT

A. By Agent

If AGENT is in substantial compliance with this Agreement and CELLULAR ONE materially breaches this Agreement and fails to cure such breach within thirty (30) days after written notice thereof is delivered to CELLULAR ONE, AGENT may terminate this Agreement effective thirty (30) days after delivery to CELLULAR ONE of written notice thereof and AGENT shall not be bound by the provisions in Paragraph 20, "Covenants Not To Compete." A termination of this Agreement by AGENT (whether express or reasonably implied from AGENT's acts or omissions) for any reason other than a material breach hereof by CELLULAR ONE (coupled with substantial compliance by AGENT), and CELLULAR ONE's failure to cure such breach within thirty (30) days after receipt of written notice thereof, shall be deemed a termination by AGENT without cause.

B. By CELLULAR ONE

CELLULAR ONE shall have the right to terminate this Agreement effective upon thirty (30) days written notice should (A) the FCC Cellular Radio Decisions or other requisite governmental decisions and authorities not be continued in substantially the same form and such change materially impacts CELLULAR ONE's (or an affiliate's) ability to conduct its business in the Area; (B) state and/or federal regulatory approval empowering CELLULAR ONE or its Affiliate to construct and provide the Authorized Services and/or CPE in the Area is not granted to either CELLULAR ONE or an Affiliate, is granted subject to terms and conditions unacceptable to CELLULAR ONE or an Affiliate, or is granted under such terms and conditions which, in CELLULAR ONE's opinion, materially adversely affects the intended purpose of this Agreement; or (C) regulatory authorization of the commission schedule of this Agreement is made subject to terms and conditions unacceptable to CELLULAR ONE or Affiliates.

Further, CELLULAR ONE shall have the right to terminate this Agreement effective upon written notice if (a) AGENT makes an assignment for the benefit of creditors; (b) an Order for Relief under Title ll of the United States Code is entered by any United States Court against AGENT; (c) a trustee or receiver of any substantial part of the AGENT's assets, is appointed by any Court; (d) AGENT sells all or substantially all of AGENT's inventory or Assets other than in the ordinary course of business.

In addition, CELLULAR ONE shall have the right to terminate this Agreement for cause effective upon delivery of notice of termination of AGENT, if AGENT (or one of more of its owners and affiliates): (1) has made any material misrepresentation or omission in its application to establish an agency relationship with CELLULAR ONE or is convicted of or pleads no contest to a felony or other crime or offense that is likely to adversely affect the reputation of CELLULAR ONE or its affiliated companies or the goodwill of the Marks; (2) attempts to make an unauthorized assignment of this Agreement; (3) receives a notice of violation of the terms or conditions of any license or permit required by AGENT or its employees in the conduct of

[11/95 REV]                                15

AGENT's business and fails to correct such violation, or to terminate the employment of such employee(s) within the time period specified in such notice, if any, or within thirty (30) days after receipt of such notice, whichever first expires; (4) fails to comply with any provision of this Agreement, including, if applicable, sales of Authorized Services consistent with AGENT forecasts, or any applicable tariff or CELLULAR ONE procedure relating to the Authorized Services and/or CPE, and AGENT does not correct such failure within ten (10) days as to monetary defaults and within thirty (30) days if non-monetary default after written notice of such failure to comply is delivered to AGENT.

19.    OBLIGATIONS OF AGENT UPON TERMINATION OR EXPIRATION

AGENT agrees that upon the expiration or termination of this Agreement in the Area, AGENT and its owner(s) and Affiliates will: (1) not thereafter use any actual or similar Marks, or any actual or similar trade name, service mark, trademark, logo, insignia, symbols or decorative design theretofore used by AGENT specifically in its sale of the Authorized Services, in any manner or for any purpose in the Area except that AGENT and its owner(s) may use or continue to use any trade name, service mark, logo, insignia, symbols or decorative designs AGENT or its owner(s) used in any business prior to the date of this Agreement; and will not utilize for any purpose any actual or similar trade name, trade or service mark or other commercial symbol that suggests or indicates a connection or association with CELLULAR ONE or any affiliated company of CELLULAR ONE, or directly or indirectly, at any time or in any manner identify itself or any business associated with CELLULAR ONE or such affiliated company in the Area; (2) return to CELLULAR ONE all advertising and marketing materials, forms, and other materials containing any Mark or otherwise identifying or relating to CELLULAR ONE's Authorized Services in the Area; (3) take such action as may be required to cancel all fictitious or assumed name or equivalent registrations relating to any Mark or authorize CELLULAR ONE, and any officer of CELLULAR ONE, as AGENT's attorney in fact, to take such actions as may be required to cancel such fictitious or assumed name or equivalent registration; if AGENT fails or refuses to do so, all governmental agencies administering fictitious or assumed name or equivalent registrations may accept and rely upon appropriate documents executed by CELLULAR ONE or its officer canceling any such registration; and (4) provide CELLULAR ONE with an updated list of names, addresses and all other relevant information AGENT then possesses concerning Subscribers of all Authorized Services that AGENT has enrolled in the Area.

20.    COVENANTS NOT TO COMPETE

In consideration of CELLULAR ONE's grant to AGENT of the right to use the Marks, the right to advertise affiliation with CELLULAR ONE as an authorized agent of CELLULAR ONE and the great value of the goodwill associated with AGENT's ability to use the Marks, which rights and value are not available to distributors generally, and in recognition of the value of specialized, technical knowledge of the cellular industry and other Services to be imparted by CELLULAR ONE to AGENT from time to time, AGENT agrees to be bound by the covenants in this Paragraph 20. Such rights and value shall constitute independent consideration for the covenants in this Paragraph 20.

Therefore, for value received as identified above, AGENT agrees that AGENT, its officers, directors, key employees, and principals, any Affiliate or the person or persons owning a controlling interest in AGENT or an Affiliate, during the term of this Agreement and for a period of one (1) year following the later of the expiration or termination of this Agreement, shall not

(1) directly or indirectly, induce, influence or suggest to any Subscriber of CELLULAR ONE's CRS to purchase CRS or any other CMRS from another reseller or provider of CRS or CMRS in the Area;

(2) directly or indirectly, induce, influence or suggest to any Subscriber of any other Authorized Service to purchase a competing service from any other provider or reseller of such competing service in the Area, whether or not the competing service is technologically the same as the Authorized Service in question;

(3) under any circumstances or conditions whatsoever, directly or indirectly, as an individual, partner, stockholder, director, officer, employee, manager or in any other relation or capacity whatsoever engage in the sale or promotion of CRS, CMRS, or any other Authorized Service on behalf of any competing reseller or provider of such service in the Area;

(4) directly or indirectly, allow any other person, firm or other entity to use the name, trade name, goodwill or any other assets or property of AGENT or CELLULAR ONE in any manner in connection with such other entity's sale of CRS, CMRS or any other Authorized Service on behalf of a competing reseller or provider in the Area, and AGENT specifically agrees not to transfer, assign, authorize or consent to the transfer of an AGENT telephone number to any other person, firm or other entity upon the expiration or termination of this Agreement.

Notwithstanding any language to the contrary, the restrictive covenants contained herein shall not operate so as to restrict AGENT from the businesses of providing or selling Paging Services.

21. SEVERABILITY AND SUBSTITUTION OF VALID PROVISIONS

Except as expressly provided to the contrary herein, each term and condition of this Agreement, and any portion thereof, shall be considered severable and if, for any reason, any such provision hereof is held to be invalid, contrary to, or in conflict with any applicable present or future law, regulation or public policy in a final, unappealable ruling issued by any court, agency or tribunal with competent jurisdiction in a proceeding to which CELLULAR ONE or its Affiliate is a party, that ruling shall not impair the operation of, or have any other effect upon, such other portions of this Agreement as may remain otherwise enforceable which shall continue to be given full force and effect and bind the parties hereto, although any portion held to be invalid shall be deemed not to be a part of this Agreement from the date the time for appeal expires, if AGENT is a party thereto, otherwise upon AGENT's receipt of a notice of nonenforcement thereof from CELLULAR ONE.

To the extent that Paragraphs 4 or 20 contain or impose a restriction upon AGENT that is deemed unenforceable by virtue of its scope in terms of area, business activity prohibited and/or length of time, but could be enforceable by reducing any or all thereof, AGENT and CELLULAR ONE agree that same shall be enforced to the fullest extent permissible under the laws and public policies applied in the jurisdiction in which enforcement is sought. CELLULAR ONE and AGENT shall mutually agree to a modification of any invalid or unenforceable term or condition hereof to the extent required to be valid and enforceable. Such modifications to this Agreement shall be required only in the area directly affected by any such ruling.

22.    <u>WAIVER OF OBLIGATIONS</u>

CELLULAR ONE and AGENT may by written instrument unilaterally waive or reduce any obligation of or restriction upon the other under this Agreement, effective upon delivery of written notice thereof to the other or such other effective date stated in the notice of waiver.

Whenever this Agreement requires the consent of a Party, such request shall be in writing and no consent may be unreasonably withheld. All consents or withholding of consent with reasons therefore shall be in writing. Neither party makes any guarantees upon which the other may rely, and assumes no liability or obligation to the other, by granting any waiver, approval or consent to the other, or by reason of any neglect, delay or denial of any request therefor. Any waiver granted by either Party shall be without prejudice to any other right that Party may have, will be subject to continuing review, and may be revoked, at the waiving party's sole discretion, at any time and for any reason, effective upon delivery to the other of ten (10) days' prior written notice.

CELLULAR ONE and AGENT shall not be deemed to have waived or impaired any right, power or option reserved by this Agreement (including, without limitation, the right to demand exact compliance with every term, condition and covenant herein, or to declare any breach hereof to be a default and to terminate this Agreement prior to the expiration of its term), by virtue of any custom or practice of the parties at variance with the terms hereof, or any failure, refusal or neglect of CELLULAR ONE or AGENT to exercise any right under this Agreement or to insist upon exact compliance by the other with its obligations hereunder, including without limitation any rule or procedure, or any waiver, forbearance, delay, failure or omission by CELLULAR ONE to exercise any right, power or option, whether of the same, similar or different nature, with respect to one or more other authorized agents or other forms of distribution.

23.    <u>RIGHTS OF PARTIES ARE CUMULATIVE</u>

The rights of CELLULAR ONE and AGENT hereunder are cumulative and no exercise or enforcement by CELLULAR ONE and AGENT of any right or remedy hereunder shall preclude the exercise or enforcement by CELLULAR ONE or AGENT of any other right or remedy hereunder or which CELLULAR ONE or AGENT is entitled by law to enforce.

24.    <u>GOVERNING LAW</u>

Except to the extent governed by United States law that preempts state law, this Agreement shall be interpreted under and governed by the laws of the State of Illinois. If any suit or action shall be brought to enforce or declare any of the terms of this Agreement, to terminate this Agreement or to recover any damages sustained as a result of a default in the performance of any obligations under this Agreement, or a breach of any of the representations and warranties herein contained or otherwise pursuant to this Agreement, then except as otherwise provided in Paragraph 35, the party not prevailing in such suit or action shall be liable to the prevailing party for the prevailing party's costs and expenses, including, without limitation, court costs and reasonable attorneys' and expert witnesses' fees (including, without limitation, the value of time spent by in-house personnel), the amount of which shall be fixed by the court and shall be made a part of any judgment rendered. The parties agree that any such suit or action must be brought, if at all, within one (1) year after the underlying cause of action accrues.

25.  **TESTIMONY**

Matters relating to this Agreement may be an issue before various regulatory bodies. Upon reasonable notice AGENT agrees to fully cooperate with CELLULAR ONE regarding any such matters including willingly providing employees of AGENT to testify at appropriate times regarding any aspect of this Agreement or other related issues. CELLULAR ONE agrees to reimburse AGENT for reasonable costs expended in supplying such testimony.

26.  **BINDING EFFECT**

This Agreement is binding upon the parties hereto, their respective executors, administrators, heirs, assigns and successors in interest.

All obligations by either party which expressly or by their nature survive the expiration or termination of this Agreement shall continue in full force and effect subsequent to and notwithstanding its expiration or termination and until they are satisfied in full or by their nature.

27.  **IMPOSSIBILITY OF PERFORMANCE**

Neither CELLULAR ONE nor AGENT shall be liable for loss or damage or deemed to be in breach of this Agreement if its failure to perform its obligations results from: (1) compliance with any law, ruling, order, regulation, requirement or instruction of any federal, state or municipal government or any department or agency thereof or court of competent jurisdiction; (2) acts of God; (3) acts or omissions of the other party; and (4) fires, strikes, embargoes, war, insurrection or riot. Any delay resulting from any of said causes shall extend performance accordingly or excuse performance, in whole or in part, as may be reasonable.

28.  **INTERPRETATION**

The preambles and exhibits to this Agreement are a part of this Agreement, which constitutes the entire agreement of the parties, and there are no other oral or written understandings or agreements between CELLULAR ONE and AGENT relating to the subject matter hereof. This Agreement supersedes any prior agreements or understandings between the parties relating to the subject matter hereof.

[11/95 REV]                                    19

Nothing in this Agreement is intended, nor shall be deemed, to confer any rights or remedies upon any person or legal entity not a party hereto, except for those affiliates of CELLULAR ONE as may be involved in the provision of one or more of the Authorized Services.

The headings of the several paragraphs hereof are for convenience only and do not define, limit or construe the contents of such paragraphs.

The term "AGENT" as used herein is applicable to one or more persons, a corporation or a partnership, as the case may be, and the singular usage include the other the feminine.

If two or more persons are at any time AGENT hereunder, whether or not as partners or joint venturers, their obligations and liabilities to CELLULAR ONE shall be joint and several.

This Agreement shall be executed in multiple copies, each of which shall be deemed an original.

29. INDEMNITY

Subject to the provisions of Paragraph 3, each party hereto agrees to defend, indemnify and save harmless the other party and its successors and assigns and its employees and agents and their heirs, legal representatives and assigns from any and all claims or demands whatsoever, including the costs, expenses and reasonable attorney's fees incurred on account thereof, that may be made (1) by the indemnifying Party's employees or any other persons for bodily injury or damage to property occasioned by the acts or omissions of the Party of its subcontractor, or the employees or agents of any of them, and (2) by the Party's employees under worker's compensation or similar acts.

Further, AGENT agrees to indemnify, hold harmless and, upon CELLULAR ONE's written request, defend CELLULAR ONE (including its officers, directors and employees) from and against any and all liability, loss, damages, costs, attorneys' fees, or other expense of any kind, that arises out of any threatened or actual claim or any suit for damages, injunction, or other relief on account of (a) injury to or death of any person, (b) damage to any property, (c) public charges and penalties, or (d) any demand, liability or lien, whether caused by, resulting from, or in connection with, the negligent or intentional acts, omissions or misrepresentations of AGENT (including any of its subordinates, sub-agents, employees or servants), solely or jointly with others, including CELLULAR ONE, its employees or servants (except for the negligent acts or omissions solely of CELLULAR ONE or any of its employees or servants) in the performance of or in connection with the performance of AGENT's responsibilities under this Agreement.

30.   SURVIVAL

The terms, provisions, representations, and warranties contained in this Agreement that by their sense and context are intended to survive the performance thereof by either or both parties hereunder shall so survive the completion of performances and termination of this Agreement, including the making of any and all payments due hereunder.

31. <u>LICENSES</u>

No licenses, express or implied, under any patents or copyrights are granted by CELLULAR ONE or its Affiliates to AGENT.

32. <u>NOTICES AND PAYMENTS</u>

All payments due AGENT shall be made to such address or bank as AGENT from time to time designates. All notices and reports required to be delivered by the provisions of the Agreement shall be deemed so delivered three (3) business days after placement in the United States Certified or Registered Mail, postage prepaid and addressed to the party to be notified at its most current principal business address of which the notifying party has been notified. All reports and other information required by this Agreement shall be directed to CELLULAR ONE at the data processing center or the address provided to AGENT from time to time, or to such other persons and places as CELLULAR ONE may direct from time to time. Any required report not actually received or postmarked by CELLULAR ONE or AGENT during regular business hours on the date due, shall be deemed delinquent.

33. <u>CONFIDENTIAL INFORMATION</u>

Any specifications, drawings, sketches, models, samples, data, computer programs or documentation, or technical or business information ("Information") furnished or disclosed by CELLULAR ONE to AGENT hereunder shall be deemed the exclusive property of CELLULAR ONE, including title to copyright in all copyrightable material, and, when in tangible form, shall be returned to CELLULAR ONE upon completion or termination of authorized work. Unless such information was previously known to AGENT free of any obligation to keep it confidential, or has been or is subsequently made public by CELLULAR ONE or a third party, it shall be held in confidence by AGENT, shall be used only for the purposes hereunder, and may be used for other purposes only upon such terms and conditions as may be mutually agreed upon in writing. In addition, the parties hereby agree that Subscriber lists and related information or data are the exclusive property of CELLULAR ONE and are to be used by AGENT solely in the performance of its obligations and duties as described herein and are to be returned to CELLULAR ONE upon the termination of this Agreement.

If AGENT is served with process to obtain Information, AGENT shall immediately notify CELLULAR ONE which shall, in addition to AGENT efforts, if any, have the right to seek to quash such process.

Unless marked "proprietary," any Information furnished or disclosed by AGENT to CELLULAR ONE shall not obligate CELLULAR ONE to hold such information in confidence.

34. <u>COVENANT NOT TO SOLICIT EMPLOYMENT</u>

AGENT recognizes and agrees that CELLULAR ONE takes a great deal of time to hire and train employees for its business. AGENT fully understands the time and expense CELLULAR ONE incurs to obtain qualified personnel, and AGENT therefore agrees not to offer employment to or accept to hire any of CELLULAR ONE's employees. This Paragraph 34

cannot be waived except by the President and Chief Executive Officer of CELLULAR ONE in writing. In the event AGENT, or any affiliate or person associated with AGENT, does hire any of CELLULAR ONE's employees during the term of this Agreement, or during any renewal or option period, or hires such employees during a period of 90 days after any such employee leaves the employment of CELLULAR ONE, such hiring also will constitute a material breach of this Agreement.

Moreover, CELLULAR ONE and AGENT have considered the matter and have reasonably endeavored to estimate the actual damages to CELLULAR ONE in the event AGENT breaches this Agreement and offers or accepts to hire any of CELLULAR ONE's employees, and both realize that it would be impractical or extremely difficult to fix the actual damages to CELLULAR ONE resulting from such offer or hiring of CELLULAR ONE's employees. CELLULAR ONE and AGENT therefore agree that if AGENT offers or accepts to hire any of CELLULAR ONE's employees during the periods of time heretofore mentioned, AGENT agrees to reimburse CELLULAR ONE for its costs in replacing each such employee, which costs shall be deemed to be one year's salary or wages of each such employee. Said sum represents the amount agreed upon by the parties as CELLULAR ONE's liquidated damages for such breach and shall be in addition to CELLULAR ONE's right to terminate this Agreement for such breach.

35. DISPUTE RESOLUTION AND MEDIATION

For all disputes relating to this Agreement except those relating to Paragraph 20, Covenants Not to Compete, prior to instituting litigation in connection with this Agreement in any forum, including but not limited to, state, federal, or regulatory proceedings, each party agrees to the following procedures:

(a)     The aggrieved party shall give detailed written notice to the other party of its specific complaint, including the amount of actual damages and expenses, including attorney's fees, claimed by the aggrieved party. The aggrieved party shall include copies of all documents that support its claims. Within thirty (30) days after receipt of the notice, the party receiving the notice shall tender to the aggrieved party a written offer of settlement. Any offer of settlement not accepted within thirty (30) days of receipt by the aggrieved party shall be deemed to have been rejected.

(b)     In the event of litigation, a settlement offer made pursuant to Paragraph 35(a) above, if rejected by the aggrieved party, may be filed with the court together with an affidavit certifying its rejection. If the court finds that the amount tendered in the settlement offer is greater than or equal to the actual damages found by the trier of fact, the aggrieved party shall incur the costs of its own attorney's fees and shall reimburse the other party for its reasonable attorneys' fees incurred. If recovery is more that the amount tendered in the settlement offer, then the accused party will reimburse the aggrieved party for its reasonable attorneys' fees.

(c)     The tender of an offer of settlement is not an admission of engaging in an unlawful act or practice or of liability. Evidence of a settlement offer may be used only for the purposes specified in Paragraph 35(b) above, and is not to be revealed to the trier of fact as part of its determination of damages or liability.

(d)   If the parties are unable to settle their disputes through the above procedure, the parties agree to submit their dispute to mediation as described in this paragraph within 90 days after rejection of the settlement offer. Compliance with these procedures on dispute resolution and mediation shall be a condition precedent to instituting any judicial, quasi-judicial and/or regulatory proceeding.

(i) Mediation is a process under which an impartial mediator facilitates communication between the parties to promote settlement between them. The mediator does not have the authority to decide any issue for the parties, but will attempt to facilitate the voluntary resolution of the dispute by the parties. The mediator is authorized to conduct joint and separate meetings with the parties and to offer suggestions to assist the parties to achieve settlement.

(ii)   The parties shall agree to selection of an impartial mediator. A person shall not serve as a mediator in any dispute in which he has any financial or personal interest. Prior to accepting an appointment, the mediator shall disclose any circumstance likely to create a presumption or appearance of bias or prevent a prompt meeting with the parties. The aggrieved party shall have the right to name a mediator, subject to disagreement from the other party based on the mediator's interest in a dispute, affiliation or connection to the aggrieved party or other circumstance likely to create a presumption or appearance of bias. The parties shall each bear half the cost of the mediation.

(iii)   The parties, while not committing in advance to settle their case, agree to participate in mediation in good faith with the intention to settle, if at all possible.

## 36. AUTHORITY

Each of the parties represents, warrants and agrees that it is a corporation or partnership duly organized, validly existing and in good standing under the laws of the state of its formation, and has all requisite power and authority to execute and deliver this Agreement and to consummate the transactions contemplated hereby; that the execution and delivery of this Agreement and the performance hereof have been duly and validly authorized by all necessary corporate or partnership action; and that the execution and delivery by it of this Agreement and the performance of this Agreement by it will not conflict with or result in a breach of or constitute or result in a default under any of the terms, conditions or provisions of the Articles or Certificates of Incorporation, By-Laws, or other of its governing instruments or any judgment, order, decree, law, regulation or ruling of any court or governmental authority or any agreement, contract, commitment or other instrument to which it is a party or by which it is bound.

Specifically, AGENT represents and warrants that (i) AGENT is not a party to any agreement to distribute, promote or otherwise sell CRS, CMRS or any other Authorized Service (except Paging Services) on behalf of any competing provider, reseller or agent in the Area; (ii) the execution and delivery by it of this Agreement and the performance of this Agreement by it will not conflict with or result in a breach or constitute or result in a default under any of the terms, conditions or provisions of any agreement between AGENT and any other carrier, reseller or agent of CRS, CMRS or any other Authorized Service.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement on the date first above written and hereby declare that they HAVE READ AND DO UNDERSTAND EACH AND EVERY TERM, CONDITION AND COVENANT CONTAINED IN, OR INCORPORATED BY REFERENCE INTO, THIS AGREEMENT.

SOUTHWESTERN BELL MOBILE SYSTEMS, INC., d/b/a CELLULAR ONE-Chicago

By: _____

Name: ~~Robert J. Nelson~~ Stan Sigman

Title: President/~~General Manager~~ + CEO

Date: 4/4/96 _____

KEMPNER MOBILE ELECTRONICS, INC.

By: _____

Name: Scott Kempner

Title: Vile president _____

Date: 2/10/11 _____

## EXHIBIT A

AUTHORIZED AGENT LOCATIONS

Initial locations at which AGENT is authorized to operate as described in this Agreement:

It is agreed by AGENT and CELLULAR ONE that if the initial business location(s) and/or the date upon which CRS operations of AGENT will commence are not known at the date of execution of this Agreement, the same may be added from time to time as such information becomes known but no later than the effective date of AGENT operations.

AGENT shall not change or add business locations without CELLULAR ONE's prior written approval. AGENT shall consult with CELLULAR ONE before initiating any action to change or supplement any of its business locations.

Any business locations that AGENT opens and operates in the Area shall be subject to all of the terms of the Agreement, whether or not an amendment is signed by the parties adding the addresses of any new or different locations.

Authorized Locations:

4722 W. Touhy Avenue, Lincolnwood, IL 60646

COUNTIES

Counties in which AGENT is authorized:

Cook, Lake, DuPage, Kane, McHenry, Will

AUTHORIZED SERVICES

CRS (including long distance/toll service, if any, provided by CELLULAR ONE to its CRS subscribers)

Paging

EXHIBIT B

SUBAGENTS

# EXHIBIT 2

## AUTHORIZED AGENCY AGREEMENT

### BETWEEN

### SOUTHWESTERN BELL MOBILE SYSTEMS, INC.
#### d/b/a CELLULAR ONE© - Chicago

### AND

### KEMPNER MOBILE ELECTRONICS, INC.

THIS AGREEMENT is made and entered into this _____ day of _____, 199\_\_\_\_, by and between SOUTHWESTERN BELL MOBILE SYSTEMS, INC. d/b/a CELLULAR ONE© - Chicago ("CELLULAR ONE"), a Delaware and Virginia Corporation, with its principal place of business at 930 North National Parkway, Schaumburg, Illinois 60173, acting on behalf of itself as licensee of the Chicago MSA non-wireline cellular system and as a provider of other services, and on behalf of Gary Telephone Company, an Indiana general partnership, as licensee of the Gary MSA non-wireline cellular system, and KEMPNER MOBILE ELECRONICS, INC. ("AGENT"), an Illinois corporation, with its principal place of business at 4722 W. Touhy Avenue, Lincolnwood, Illinois 60646.

### W I T N E S S E T H :

Whereas, CELLULAR ONE is involved in the development, establishment and sale of cellular radio service ("CRS") which requires the use by CRS Subscribers of cellular terminal equipment;

Whereas, CELLULAR ONE and/or its affiliates is or may become involved in the development, establishment and/or sale of other services, including but not limited to long distance/toll service for CRS Subscribers, paging services, other Commercial Mobile Radio Services, and competitive landline local exchange and/or long distance services (collectively referred to as the ("Services");

Whereas, CELLULAR ONE has regulatory authority to provide CRS in the cellular geographic service area(s) within the Chicago and Gary metropolitan statistical areas and desires to provide CRS in those areas, as well as other Services in designated areas, through Agents, Retailers, Resellers, and direct sale to Subscribers;

Whereas, CELLULAR ONE has adopted and used or intends to adopt and use certain valuable Marks in the provision of its Services and CPE;

Whereas, AGENT desires to sell certain of CELLULAR ONE's Services as a nonexclusive, authorized agent of CELLULAR ONE, and desires to sell or lease, install, provide warranty service and maintain CPE necessary for Subscribers to utilize such Services;

[8/31/99 REV]

1

Now, therefore, in consideration of the mutual promises herein contained, it is hereby agreed:

1. DEFINITIONS

Activation. The act of initiating an Authorized Service in or to a Subscriber's CPE by CELLULAR ONE.

Affiliate. A person, association, partnership, corporation or joint-stock company, trust or other business entity however organized ("Entity") is an affiliate of that person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Entity. Control shall be defined as (i) ownership of a majority of the voting power of all classes of voting stock or (ii) ownership of a majority of the beneficial interests in income and capital of an entity other than a corporation.

Authorized Services. Those Services provided by CELLULAR ONE that AGENT is authorized hereunder to sell on behalf of CELLULAR ONE, including CRS and any other Services set forth on Exhibit A hereto.

Area. With respect to CRS and ancillary services, Area is defined as the Chicago and Gary metropolitan statistical areas ("MSAs") within which CELLULAR ONE has regulatory authority to provide CRS. The counties generally comprising these MSAs are listed in Exhibit A, and any additional adjoining counties that may be added to the areas served by CELLULAR ONE shall be deemed added to the Area, without the necessity of an amendment to this Agreement. With respect to other Authorized Services, Area is defined as those areas in which Cellular One is authorized to and is providing or reselling such Authorized Service, except as may be otherwise defined or limited on Exhibit A.

CELLULAR ONE. The term CELLULAR ONE includes Southwestern Bell Mobile Systems, Inc. d/b/a Cellular One - Chicago, and, where applicable to a specific Service, includes that affiliate of Southwestern Bell Mobile Systems, Inc., that provides such Service.

Cellular Radio Service (CRS). Any and all service (including resale of said service) authorized by the Federal Communications Commission ("FCC") under Part 22 of its rules as amended under the cellular orders set forth in An Inquiry Into the Use of the Bands 825-845 MHz and 870-890 MHz for Cellular Communications Systems; and Amendments of Parts 2 and 22 of the Commission's Rules Relative to Cellular Communications Systems (CC Docket No. 79-318), 86 FCC 2d 469 (1981), modified as set forth in reconsideration order 89 FCC 2d 58 (1982), and as further modified as set forth in other rules or orders from time to time.

Commercial Mobile Radio Services (CMRS). Any and all services (including resale of said services) that (1) fit the definition of commercial mobile services pursuant to Section 332 of the Communications Act, 47 U.S.C. §332, (2) are subject to regulation as commercial mobile radio services by the FCC under the orders set forth in Implementation of Sections 3(n) and 332 of the

Communications Act; Regulatory Treatment of Mobile Services (CC Docket No. 93-252) or such other orders or rules as may be in effect from time to time, or (3) are the functional equivalent of a commercial mobile service as defined in 47 U.S.C. §332. CMRS shall in any event include CRS, all forms of specialized mobile radio service (SMR and ESMR), and personal communications services (PCS).

CPE. The customer premises equipment, including cellular terminal equipment that a Subscriber needs for using CRS and other Authorized Services.

Marks. Trademarks, service marks, trade names, insignia, symbols, logos, decorative designs, and/or other identifying insignia that CELLULAR ONE owns or is licensed or sublicensed to use in connection with its Services or products relating thereto, and which CELLULAR ONE, in its sole discretion, determines from time to time that AGENT is authorized to use.

Paging Services. One-way non-voice communication services provided by a communication common carrier and commonly referred to as paging services.

Reseller. Any entity that purchases bulk quantities of a telecommunications service from a telecommunications carrier for resale distribution, directly or indirectly, to ultimate users of such service.

Subscriber. A customer of an Authorized Service provided by CELLULAR ONE. The CRS telephone number or other service access number assigned to a customer of CELLULAR ONE's Authorized Services is deemed to be a separate Subscriber, regardless of how many CRS telephone numbers or service access numbers may be used by any one customer.

Successor. A person, association, partnership, corporation, joint stock company, trust or other business entity, however organized, that succeeds to or acquires the rights, title or interests of another.

2. ACKNOWLEDGMENTS AND REPRESENTATIONS

CELLULAR ONE and AGENT acknowledge that they have read this Agreement and understand and accept the terms, conditions and covenants contained herein as being reasonably necessary to maintain CELLULAR ONE's high standards for its CRS and other Services thereby to protect and preserve the goodwill of CELLULAR ONE's CRS, Services and Marks.

AGENT has read and understands the obligations imposed by the FCC upon CRS licensees and their duties to CELLULAR ONE as specified in Section 22.912 of the FCC's cellular rules.

AGENT acknowledges that CELLULAR ONE's ability to provide CRS and other Services is conditioned upon the continuing validity of its FCC operating license(s) and any other required licenses, certificates and permits, and may be affected by state and federal court decisions and regulatory approvals. CELLULAR ONE makes no representation concerning whether said licenses, certificates and permits will continue to be valid. AGENT agrees that if CELLULAR ONE is

[8/31/99 REV]

3

prohibited from, or otherwise ceases selling an Authorized Service in the Area, CELLULAR ONE may declare this Agreement null and void as to any or all Authorized Services with no penalty.

AGENT acknowledges that it has conducted an independent investigation of the business of selling CRS and any other Authorized Services that it will conduct pursuant to this Agreement. AGENT recognizes that entry into business as an AGENT of CELLULAR ONE involves business risks and the AGENT's success in such business will depend primarily upon its abilities and efforts CELLULAR ONE expressly disclaims the making of, and AGENT acknowledges that it has not received or relied upon, any GUARANTY, express or implied, as to the amount of commissions or other gross revenue that it may earn as a result of its agency relationship with CELLULAR ONE and acknowledges that it has no knowledge of any representations relating to its agency relationship with CELLULAR ONE by an officer, employee or agent of CELLULAR ONE that are contrary to the terms herein. AGENT represents to CELLULAR ONE, as an inducement to its entry into this Agreement, that AGENT has made no misrepresentations to CELLULAR ONE in its application for appointment as a nonexclusive, authorized AGENT of CELLULAR ONE or in any other manner.

AGENT and CELLULAR ONE mutually agree that they shall not have any liability to the other for any lost profits or consequential damages, even if advised of the possibility of such damages.

## 3. RELATIONSHIP OF THE PARTIES

CELLULAR ONE hereby appoints AGENT as a nonexclusive, authorized agent in the Area to solicit and contract, on behalf of CELLULAR ONE, with Subscribers for the Authorized Services, subject to all of the terms and conditions hereof.

During the term of this Agreement or thereafter, CELLULAR ONE reserves the right without obligation or liability to AGENT to market the Authorized Services and CPE in the same geographical areas served by AGENT, whether through CELLULAR ONE's own representatives or through others including, but not limited to other authorized agents, retailers, resellers and distributors.

Upon enrollment of a particular Subscriber, that Subscriber shall become a customer of CELLULAR ONE, and CELLULAR ONE shall offer and furnish such customer billing services as CELLULAR ONE deems appropriate. CELLULAR ONE shall be responsible to collect any charges for Authorized Services from Subscribers.

With the sole exception of the Subscribers enrolled by AGENT for the account of CELLULAR ONE, with respect to which AGENT acts as agent of CELLULAR ONE and owes CELLULAR ONE the fiduciary and other obligations of an agent to its principal, CELLULAR ONE and AGENT acknowledge and agree that their agency relationship arising from this Agreement does not constitute or create a general agency, joint venture, partnership, employment relationship or franchise between them.

The parties agree that personnel employed by AGENT to perform services under this Agreement are not CELLULAR ONE employees and AGENT assumes full responsibility for their acts. Such personnel employed by AGENT shall be informed that they are not entitled to the provisions of any CELLULAR ONE employee benefits. With respect to such personnel, AGENT shall have sole responsibility for supervision, daily direction and control. CELLULAR ONE will not be responsible for worker's compensation, disability benefits, unemployment insurance and withholding income taxes and social security for said personnel.

### 3A. RELATIONSHIP WITH SUB-AGENTS

AGENT warrants it has entered into or may enter into appropriate agreements with all persons (other than AGENT's own employees) and businesses that sell the Authorized Services on behalf of AGENT ("sub-agents"), and that such agreements are sufficient to enable it to comply with all provisions of this Agreement. Without limiting the generality of the foregoing, AGENT understands, covenants and agrees that: (1) any sub-agents appointed by AGENT must agree to comply with all of the restrictive covenants in Paragraph 20 of this Agreement and the Confidentiality Obligations in Paragraph 33 of this Agreement; (2) AGENT will inform CELLULAR ONE thirty (30) days' in advance of the identity of any proposed sub-agent; CELLULAR ONE shall have the right to disapprove the appointment of any sub-agent that reflects adversely upon CELLULAR ONE in the opinion of CELLULAR ONE or which is or has been associated in any way with a competitor of CELLULAR ONE in the Area or for any other reasonable business purpose; and CELLULAR ONE shall have the right to request the removal of any sub-agent who breaches the agreements set forth above or whose actions, in the opinion of CELLULAR ONE, reflect adversely upon CELLULAR ONE; (3) AGENT shall inform CELLULAR ONE prior to any intended relocation of any of its sub-agents which relocation shall then be subject to CELLULAR ONE's approval; and (4) CELLULAR ONE may require any further information it deems necessary prior to AGENT's appointment of the sub-agent. A complete list of all of AGENT's current sub-agents, along with the names of the owners, managers, principals, officers and directors thereof is attached as Exhibit B. AGENT understands and agrees that sub-agents of AGENT shall not be permitted to use, in any manner whatsoever, the name, trademarks or service marks of CELLULAR ONE, unless expressly agreed in a writing signed by AGENT, CELLULAR ONE and sub-agent. Any such use of CELLULAR ONE's name, trademarks or service marks shall be made a ground for immediate termination of any sub-agent agreements.

### 4. AGENT RESPONSIBILITIES

(a) AGENT agrees to provide materials and advertising to actively promote CELLULAR ONE Authorized Services and appropriate sales facilities to enhance the sale of CELLULAR ONE Authorized Services.

(b) AGENT will sell CELLULAR ONE's Authorized Services to customers by employing the following techniques (in addition to others): providing demonstrations of CELLULAR ONE's Service, explaining its benefits, explaining the terms and conditions of purchase of the Service, providing sales literature prepared by CELLULAR ONE, and training the customer in the use of CELLULAR ONE's Service. AGENT will offer the Authorized Services subject to all of the applicable terms of CELLULAR ONE's form of contract for customers.

(c) AGENT agrees that it must obtain CELLULAR ONE's prior written approval to open any locations in addition to those listed in Exhibit A. However, an amendment of this Agreement shall not be necessary to subject any new or additional AGENT locations to the terms and conditions of this Agreement; rather, the opening of such locations shall automatically subject them to the terms and conditions of this Agreement. AGENT agrees to establish and maintain installation and maintenance facilities at the locations set forth in Exhibit A and other such locations as AGENT may establish from time to time to the satisfaction of CELLULAR ONE, approval of which shall not be unreasonably withheld, and to furnish high quality and prompt installation, warranty and maintenance service for all CPE sold or leased by it to Subscribers. Notwithstanding anything to the contrary contained herein, the closing of one or more locations shall not be considered a default by AGENT so long as AGENT keeps open at least 80% (eighty percent) of the locations which are initially listed in Exhibit A and operates them in compliance with all of the requirements hereof.

(d) AGENT, at its own expense, shall obtain from the manufacturer(s) and distributor(s) all required training in the operation, installation, warranty and maintenance service of CPE. If AGENT (1) chooses to handle any one or more of the CELLULAR ONE rental, lease or third-party financing plans and installs the equipment provided pursuant thereto, or (2) performs installs of other CELLULAR ONE-owned equipment provided directly to customers and referred to AGENT for installation (as required by Paragraph 4(o)), then AGENT shall be obligated to comply with all of the requirements of the Cellular One Authorized Service Center Program, as amended from time to time, and with the specific requirements described in the remainder of this subparagraph (d). AGENT's installation, warranty and maintenance service CRS facility shall be required to obtain certification from the manufacturer(s) of the CPE that AGENT leases or sells and AGENT shall be responsible to secure such certifications. AGENT may only delegate by contract its installation, warranty and maintenance service obligations hereunder to a subcontractor with the express prior written approval of CELLULAR ONE, which will not be unreasonably withheld or withdrawn, and any approval necessary from each manufacturer and/or distributor of an approved model of CPE to be sold or leased by AGENT. Such delegation shall be by written agreement between AGENT and the service subcontractor. Notwithstanding such agreement with a service subcontractor, AGENT shall remain responsible to CELLULAR ONE for all installation, warranty and maintenance service obligations hereunder. AGENT shall reimburse CELLULAR ONE for the reasonable cost of installation, repair or warranty which CELLULAR ONE, in its sole discretion, deems necessary to have performed at a facility other than AGENT's for customers as to whom AGENT fails to comply with CELLULAR ONE's standards applicable thereto.

(e) AGENT agrees to maintain sufficient liability insurance to protect CELLULAR ONE from all customer claims arising out of the acts, omissions, and/or representations of AGENT. CELLULAR ONE shall be named as an additional insured party on each policy. Such insurance coverage shall be maintained under one or more policies of insurance from a recognized insurance company qualified to do business within the Area providing in the aggregate minimum liability protection of ONE MILLION DOLLARS per occurrence for bodily and personal injury and death and ONE MILLION DOLLARS per occurrence of

property damage. Each such insurance policy shall provide for not less than thirty (30) days' prior notice to all insured of any modification, cancellation or non-renewal. CELLULAR ONE may, at any time and with ninety (90) days' prior notice to AGENT, require AGENT to increase its coverage of any type of insurance in reasonable amounts and require different or additional kinds of insurance, to reflect inflation, identification of special risks, changes in law or standards of liability, higher damage awards or other reasonable changes in circumstances. Upon request by CELLULAR ONE, AGENT shall furnish proof satisfactory to CELLULAR ONE that insurance coverage required hereunder is in force.

(f) AGENT agrees to maintain operations and follow procedures that are in full compliance with CELLULAR ONE's requirements as specified, amended and distributed from time to time, and to allow CELLULAR ONE reasonable access to AGENT's facilities for inspection.

(g) For its own account, AGENT agrees to sell or lease CPE to be used by Subscribers of the Authorized Services, including CELLULAR ONE's CRS, or other End Users. AGENT may only offer FCC approved equipment. AGENT agrees to maintain an inventory of CPE sufficient to meet reasonable anticipated demand therefore by Subscribers which AGENT enrolls. If AGENT handles any CELLULAR ONE rental or lease plans in AGENT's inventory, AGENT agrees to comply with any inventory control or tracking procedures as CELLULAR ONE may adopt from time to time. AGENT also agrees to maintain a minimum inventory of parts. The parties agree that CELLULAR ONE may restrict AGENT's choice in CPE which AGENT may, on its own behalf, sell, lease or otherwise make available with CELLULAR ONE Services, which will further CELLULAR ONE's legitimate business objectives, if CELLULAR ONE reasonably maintains that the particular type of CPE restricted reflects adversely upon the quality of CELLULAR ONE's Services by reason of the limitations or characteristics of the equipment and CELLULAR ONE will provide AGENT thirty (30) days notice of such restriction. AGENT agrees not to use any CPE bearing trademarks similar to or resembling the Marks of CELLULAR ONE. Except for any CELLULAR ONE-owned CPE which AGENT handles on behalf of CELLULAR ONE as part of a rental, lease or third-party financing plan, all CPE sales and leases shall be made by or on behalf of AGENT for its own account and not as agent for, or for the account of, CELLULAR ONE. AGENT may establish fees and charges for sales prices and lease charges for the CPE and CELLULAR ONE shall have no control over such prices or for AGENT's CPE. With respect to the sale or lease of AGENT's CPE, Subscribers shall be customers of AGENT and CELLULAR ONE shall have no responsibility to AGENT or to Subscribers with respect to the sale or lease of AGENT's CPE. CELLULAR ONE is not obligated to offer any lease, rental or other CPE program to AGENT.

(h) AGENT agrees to take all necessary steps to ensure compliance with AGENT obligations under this Agreement by AGENT and its personnel and any other parties involved in the sale of the Authorized Services by AGENT, including but not limited to sub-agents.

(i) AGENT agrees that AGENT will at all times faithfully, honestly and diligently perform its obligations hereunder, and that AGENT will continuously exert its best efforts to promote and enhance the use of CELLULAR ONE's Authorized Services.

[8/31/99 REV]

(j) In the relevant Area, AGENT agrees that it will not, at any time either during the term of this Agreement, or any extension thereof, (1) induce, influence or suggest to any Subscriber of CELLULAR ONE's CRS to purchase CRS or any other CMRS from another provider or reseller of CRS or CMRS, or (2) induce, influence or suggest to any Subscriber of any other Authorized Service to purchase a competing service from any other provider or reseller of such competing service, whether or not the competing service is technologically the same as the Authorized Service in question. As more fully described in paragraph 20, AGENT agrees not to act as a representative or agent of any other reseller or provider of CMRS or any Authorized Service in the relevant Area. Notwithstanding any language to the contrary, AGENT shall have the right to enter into or continue its current provision of Paging Services.

(k) AGENT agrees not to take any action inconsistent with the provisions of this Agreement and shall use its best efforts to support CELLULAR ONE's efforts in providing the Authorized Services to Subscribers.

(l) AGENT agrees not to take any action inconsistent with, and agrees to support CELLULAR ONE's efforts before regulatory authorities regarding any modification of rates.

(m) AGENT agrees that during or after the term of this Agreement, AGENT will not reveal, divulge, make known, sell, exchange, give away, or transfer in any way any part of its list of Subscribers or use such information for any purpose other than 1) AGENT (but no other successor business entity) maintaining such periodic contact with Subscribers as is required for warranty service, installation or maintenance of CPE, and 2) AGENT (but no other corporate entity) business activities unrelated to CRS, CMRS, or any other Authorized Services; provided, however, AGENT shall be under no restriction regarding the use of such information as long as such use is consistent with the terms of this Agreement.

(n) AGENT agrees to advertise association with CELLULAR ONE Authorized Services as an authorized AGENT of CELLULAR ONE, pursuant to any written procedures CELLULAR ONE may publish from time to time.

(o) AGENT agrees to use its best efforts to install and maintain CPE for Subscribers referred to AGENT by CELLULAR ONE's Sales Associates for installation and maintenance on a "first come, first serve basis," such installation and maintenance to be according to CELLULAR ONE standards established from time to time.

## 5. CELLULAR ONE'S RESPONSIBILITIES

CELLULAR ONE will:

(a) Upon approval, and subject to compliance with procedures and guidelines established from time to time, CELLULAR ONE will furnish the Authorized Services to Subscribers.

(b) Secure any necessary regulatory approvals to conduct the Authorized Services.

(c) Establish the rates, terms, and conditions of the sale of its Authorized Services to Subscribers.

(d) Establish the administrative procedures and guidelines for sale of Authorized Services, enrollment of Subscribers, and customer service provided to Subscribers.

(e) Promote CELLULAR ONE's Authorized Services and provide promotional literature as CELLULAR ONE deems necessary and appropriate. CELLULAR ONE may advertise CELLULAR ONE's Authorized Services from time to time if it deems necessary and appropriate.

(f) Provide at cost a reasonable number of CELLULAR ONE sales brochures and other information and illustrative material for the preparation of catalogs, advertising and other promotional activities, as CELLULAR ONE deems necessary and appropriate.

(g) Provide a reasonable amount of training on sales of CELLULAR ONE's Authorized Services and administrative procedures associated with the enrollment of Subscribers.

## 6. CPE BEARING CELLULAR ONE'S MARKS

AGENT shall not have the right, except after CELLULAR ONE's approval, to sell CPE bearing CELLULAR ONE's Marks to any person or entity other than a Subscriber to whom AGENT has sold CELLULAR ONE's Authorized Service(s) hereunder. This clause is intended to protect CELLULAR ONE's Marks and to assure that such Marks are used properly.

## 7. COMPENSATION

CELLULAR ONE will compensate AGENT for Subscribers enrolled by AGENT onto CELLULAR ONE's Authorized Services in accordance with the following terms and conditions:

(a) CELLULAR ONE may withhold and offset or apply AGENT compensation against any past due amount owed to CELLULAR ONE by AGENT. Whenever AGENT fails to comply with any term hereof or any procedure in the Administrative Procedures Manual or AGENT does not provide complete and/or accurate information concerning Subscribers to whom an Authorized Service is sold or, if applicable, the CELLULAR ONE CPE is sold or leased, CELLULAR ONE shall have the right to withhold all or a portion of any compensation or other amount otherwise payable hereunder to AGENT with respect to such Authorized Service or, if applicable, CPE. CELLULAR ONE reserves the right to establish and modify procedures to govern the specific manner in which any compensation is administered and to modify the periodic intervals for payments, by notice to AGENT. Residual commissions and any other compensation shall only continue to accrue as long as this Agreement is in effect, and the expiration or termination of this Agreement shall effectively terminate AGENT's right to any further commissions or other amounts except for those residual commissions that accrued prior to the date of expiration or termination, provided that a knowingly wrongful termination

by CELLULAR ONE without cause or justification shall not cut off AGENT's right to payment of commissions for the term of this Agreement.

(b) Unless provided otherwise in an annual or other addendum or amendment to this Agreement, from the commencement date through December 31, 2002, CELLULAR ONE will pay Residual Commissions pursuant to the terms herein on a monthly basis to AGENT for each active CRS Subscriber that has been accepted and activated by CELLULAR ONE, provided that (1) AGENT is in compliance with the obligations and conditions of this Agreement, and (2) a properly completed and signed customer service contract has been received by CELLULAR ONE within fifteen (15) days after activation of such Subscriber's cellular service. Residual Commissions will be paid within forty-five (45) days after the end of each calendar month or at such other periodic interval as CELLULAR ONE may establish from time to time. Taxes, long distance charges, equipment charges, directory assistance charges, any third party charges passed through to Subscribers, one-time fees, enhanced feature charges, roamer charges and charges other than recurring CRS base charges and local airtime charges shall not be included in the computation of the Residual Commission. The Residual Commission schedule is as follows:

From the commencement date through December 31, 2002: An amount equal to four percent (4%) of the total recurring CRS base charges and local airtime charges billed by CELLULAR ONE to AGENT-originated CRS Subscribers;

## 8. USE OF MARKS BY AGENT

Periodically CELLULAR ONE will publish a list of Marks AGENT is licensed to use under the Agreement. Such list will also be supplemented with reasonable rules and regulations pertaining to the Marks, which AGENT agrees to follow. AGENT acknowledges that its right to use the Marks is derived solely from the Agreement and is limited to the identification of AGENT as an agent of CELLULAR ONE. AGENT agrees to comply with all reasonable rules and procedures pertaining to such Marks prescribed by CELLULAR ONE from time to time during the term of this Agreement. AGENT recognizes the great value of the goodwill associated with the Marks, and acknowledges that the Marks and all rights herein and goodwill pertaining thereto belong exclusively to CELLULAR ONE, and that the Marks have a secondary meaning in the mind of the public. AGENT acknowledges and agrees that all usage of the Marks by AGENT and any goodwill established thereby shall inure to the exclusive benefit of CELLULAR ONE and its Affiliates and that this Agreement does not confer any goodwill or other interests in the Marks upon AGENT. Any unauthorized use of the Marks by AGENT, or any use not in compliance herewith, shall constitute an infringement of the rights of CELLULAR ONE and its Affiliates in and to the Marks and shall further constitute a material breach of this Agreement. AGENT shall use the Marks with such words qualifying or identifying the agency relationship of CELLULAR ONE and AGENT as CELLULAR ONE from time to time shall reasonably prescribe. AGENT shall not use the Marks as part of any corporate or trade name or with any prefix, suffix or other modifying words, terms, designs or symbols, or in any modified form, nor may AGENT use the Marks in connection with the sale or lease of any unauthorized product or service or in any other manner not expressly authorized by this Agreement or separately in writing by CELLULAR ONE. If AGENT uses CELLULAR ONE's Marks on any of AGENT's stationery, other

[8/31/99 REV]

10

forms or business cards, AGENT agrees to display the Marks on such stationery, other forms, and business cards used in its business of selling the Authorized Services in the manner prescribed by CELLULAR ONE. AGENT agrees to obtain such fictitious or assumed name certificates or registrations as may be required by applicable law, provided the fictitious or assumed name is approved in writing by CELLULAR ONE and CELLULAR ONE is provided a copy of the certificate and/or registration. If any fictitious or assumed name used by AGENT includes anything that identifies CELLULAR ONE or its Marks, CELLULAR ONE may at any time require AGENT to cease using such fictitious or assumed name, and to cancel any corresponding certificate and/or registration. If it becomes advisable at any time in CELLULAR ONE's sole discretion for AGENT to modify or discontinue use of any Mark or substitute one or more additional Marks to identify its relationship with CELLULAR ONE or, if applicable, any CPE, AGENT agrees to comply therewith within a reasonable time after notice thereof by CELLULAR ONE and the sole obligation of CELLULAR ONE in any such event shall be to reimburse AGENT for the out-of-pocket costs, if any, of complying with this obligation and to indemnify AGENT as provided in Paragraph 9 below. In addition, AGENT shall replace obsolete identification signs or identification material with new signs or identification material should AGENT adopt new Marks replacing one or more Marks identified by CELLULAR ONE in such list as herein before specified.

## 9. CELLULAR ONE'S TITLE AND PROTECTION OF CELLULAR ONE'S RIGHTS

AGENT agrees that it will not during the term of this Agreement, or thereafter, attack the title or any rights of CELLULAR ONE in and to the Marks. CELLULAR ONE hereby indemnifies AGENT and undertakes to hold AGENT harmless against any damages and costs from claims or suits arising out of the use by AGENT of the Marks as authorized in this Agreement, provided that prompt notice is given to CELLULAR ONE of any such claim or suit and provided, further, that CELLULAR ONE shall have the option to undertake and conduct the defense of any suit so brought and that no settlement of any such claim or suit is to be made by AGENT without the prior written consent of CELLULAR ONE. AGENT agrees to assist CELLULAR ONE and CELLULAR ONE agrees to reimburse AGENT for all associated reasonable costs to the extent necessary in the procurement of any protection or to protect any of CELLULAR ONE's rights to the Marks, and CELLULAR ONE, if it so desires, may commence or prosecute any claims or suits in its own name or in the name of AGENT or join AGENT as a party thereto. When known, AGENT shall notify CELLULAR ONE in writing of any infringements or imitations by others of the Marks which are the same as or similar to those covered by this Agreement. CELLULAR ONE shall have the sole right to determine whether any action shall be taken on account of any such infringements or imitations. AGENT shall not institute any suit or take any action on account of any such infringements or imitations without first obtaining the written consent of CELLULAR ONE.

## 10. RULES AND PROCEDURES

AGENT understands that if AGENT operates its CPE business or represents CELLULAR ONE's Authorized Services in a manner that is inconsistent with or contrary to state or federal law or regulation, such action will reflect adversely upon the name and goodwill of CELLULAR ONE and its Affiliates. Therefore, AGENT agrees to comply, if applicable, with Part 22 of the FCC rules, and all tariffs, other governmental rules and procedures in existence relating to the sale of the Authorized

Services and the sale, lease, warranty service and the conduct of AGENT's CPE business hereunder as well as any rules and procedures relating to such matters reasonably prescribed from time to time by CELLULAR ONE through the Administrative Procedures Manual, which rules and procedures shall constitute provisions hereof as if fully set forth herein. All references herein to the Agreement shall include all such tariffs, rules and procedures. CELLULAR ONE may incorporate all such tariffs, rules and procedures in one or more Administrative Procedures Manuals or other written form, but is not obligated to do so. AGENT shall itself be responsible to familiarize itself with the laws and regulations applicable to the conduct of its business.

## 11. COMPLIANCE WITH LAWS AND GOOD BUSINESS PRACTICES

AGENT shall secure and maintain in force all licenses and permits required by AGENT and its employees in the enrollment of Subscribers and the sale or lease of CPE, installation and maintenance of CPE, including without limitation, all required FCC permits and certifications, if required, and business and sales tax licenses, and shall conduct its business in full compliance with all state and federal laws, ordinances and regulations applicable to AGENT's business. CELLULAR ONE shall sell or resell the Authorized Services in accordance with applicable rules, regulations, statutes and decisions governing such Services. AGENT shall promptly pay, when due, all taxes and assessments against any real or personal property used in connection with AGENT's business, and all liens or encumbrances or every kind or character created or placed upon or against any such property, and all accounts and other indebtedness of every kind incurred by AGENT in the conduct of its business. AGENT shall comply, at its own expense, with the provisions of all applicable municipal requirements and those state and federal laws applicable to AGENT as an employer of labor or otherwise. AGENT expressly agrees not to discriminate against any employee or applicant for employment because of race, creed, color, national origin or sex. The provisions of Executive Order No. 11246, as amended, are incorporated herein by reference. AGENT will fully comply with the provisions of the Federal Occupational Safety and Health Act of 1970 and with any rules and regulations issued pursuant to this Act.

AGENT understands that if AGENT operates its CPE business or represents CELLULAR ONE Authorized Services in a manner that is inconsistent with or contrary to state or federal law or regulation, such action will reflect adversely upon the name and goodwill of CELLULAR ONE and its Affiliates. Therefore, AGENT agrees to comply, if applicable, with Part 22 of the FCC rules, and all tariffs, other governmental rules and procedures in existence relating to the sale of the Authorized Services and the sale, lease, warranty service and the conduct of AGENT's CPE business hereunder as well as any rules and procedures relating to such matters reasonably prescribed from time to time by CELLULAR ONE. AGENT shall itself be responsible to familiarize itself with the laws and regulations applicable to the conduct of business.

## 12. ADVERTISING AND BUSINESS PRACTICES OF AGENT

All advertising and promotion by AGENT shall be completely factual and shall conform to the highest standards of ethical advertising. AGENT shall adhere to the highest standards of honesty, integrity, fair dealing and ethical conduct in all dealings with Subscribers, AGENT and the public. AGENT agrees to refrain from any business or advertising practice which may be injurious to the

[8/31/99 REV]

12

business of CELLULAR ONE and the goodwill associated with the Marks. All advertising and marketing materials that AGENT desires to use in connection with the Authorized Services or CPE and which have not been prepared or previously approved by CELLULAR ONE must be submitted to CELLULAR ONE for approval. AGENT shall not use any advertising or marketing materials that CELLULAR ONE has failed to approve. AGENT agrees that it will not begin its advertising and promotion without CELLULAR ONE's prior written consent. AGENT shall notify CELLULAR ONE in writing within five (5) days of the commencement of any material action, suit or proceeding, and of the issuance of any order, writ, injunction, award or decree of any court, agency of other governmental instrumentality, involving AGENT, or any business conducted by AGENT on behalf of CELLULAR ONE hereunder.

### 13. AGENT'S BUSINESS RECORDS

AGENT agrees to create and to maintain at its principal office and preserve for three (3) years from the date of their preparation, full, complete and accurate records of its business conducted pursuant to this Agreement. Such records shall include, without limitation, records of all Authorized Service enrollments and CPE sales, leases, or rentals.

### 14. REPORTS AND FINANCIAL STATEMENTS

AGENT shall maintain at its principal office for a period of three (3) years complete and accurate books of account and records, including all documentation and correspondence related to advertising and publicity, Subscriber contacts and solicitations, Subscriber applications and contracts, Subscriber complaints, use of CELLULAR ONE's name and trademarks, payments to AGENT, agreements with and payments to third parties in connection with this Agreement, AGENT's licenses and authorizations, compliance with the requirements of any governmental agency and all other documents or records in connection with AGENT's performance of its duties hereunder. CELLULAR ONE shall have the right to inspect and make copies of AGENT's books of account and records during normal working hours, upon reasonable notice by CELLULAR ONE. CELLULAR ONE expressly agrees, and will require its authorized representatives to agree, that it will keep all such records strictly confidential and that it will not disclose such information to any other agent or distributor of CELLULAR ONE's Services or to any other person without AGENT's express prior written consent; provided, however, CELLULAR ONE may disclose such information if required to do so by any state or federal regulatory agency.

### 15. ASSIGNMENT

This Agreement is fully assignable by CELLULAR ONE to any affiliated person or entity and shall inure to the benefit of any assignee or other legal successor to the interest of CELLULAR ONE herein.

AGENT acknowledges that CELLULAR ONE has entered into this Agreement in reliance upon the character, business experience and ability of AGENT and its owner(s), officers and managers and that neither the rights and duties created by this Agreement nor a controlling interest in the ownership of AGENT may be voluntarily, involuntarily, directly or indirectly assigned, or otherwise

[8/31/99 REV]

transferred (including, without limitation, by transfer of capital stock or partnership interests, by merger or consolidation, by issuance of additional securities representing an ownership interest in AGENT or convertible thereto, or in the event of the death of a shareholder or partner of AGENT, by will, in declaration of or transfer in trust or the laws of intestate succession) without the written approval of CELLULAR ONE, which will not be unreasonably withheld, subject to such conditions as CELLULAR ONE deems reasonably necessary. Any such assignment or transfer without such approval shall constitute a breach hereof and convey no rights to or interests herein. Any change in management, personnel or identity which materially impairs the ability of AGENT to market the Authorized Services shall also constitute such a breach. "Control" for purposes hereof is defined in Paragraph 1 above.

### 16.  TERM AND EXTENSION OF AGENCY RELATIONSHIP

The term of this Agreement shall commence upon execution of this Agreement, and shall end on the 31st day of December, 2002. AGENT shall provide to CELLULAR ONE written notice of the date on which AGENT initiates operations under this Agreement in the Area. AGENT agrees that CELLULAR ONE must provide written consent before AGENT actually initiates business operations. This Agreement shall be effective only after its execution by an officer or other authorized employee of both AGENT and CELLULAR ONE.

CELLULAR ONE may give AGENT written notice of its determination that the agency relationship between CELLULAR ONE and AGENT may be extended upon mutual Agreement, not less than sixty (60) days prior to the expiration hereof, if CELLULAR ONE determines that it is renewable.

### 17.  LATE PAYMENTS; SECURITY DEPOSIT

In the event any amount payable by AGENT to CELLULAR ONE is more than thirty (30) days overdue, CELLULAR ONE may, at its option, do one or more of the following: (i) require AGENT to pay its account in full; (ii) apply commissions and any credits or other amounts payable to AGENT to reduce the AGENT's account payable balance; or (iii) require AGENT to deposit with CELLULAR ONE an irrevocable commercial letter of credit, cash or other form of security acceptable to CELLULAR ONE in its sole discretion to secure future delays or defaults in payment. This deposit will secure payment of any amounts due under this Agreement or any other agreement between the parties.

AGENT understands that in order to purchase CPE from CELLULAR ONE (if CELLULAR ONE determines that it will sell CPE) other than on a cash on delivery basis, AGENT may be required to sign Security Agreements, Financing Statements and related documents.

### 18.  TERMINATION OF AGREEMENT

A.  By Agent

[8/31/99 REV]

If AGENT is in substantial compliance with this Agreement and CELLULAR ONE materially breaches this Agreement and fails to cure such breach within thirty (30) days after written notice thereof is delivered to CELLULAR ONE, AGENT may terminate this Agreement effective thirty (30) days after delivery to CELLULAR ONE of written notice thereof and AGENT shall not be bound by the provisions in Paragraph 20, "Covenants Not To Compete." A termination of this Agreement by AGENT (whether express or reasonably implied from AGENT's acts or omissions) for any reason other than a material breach hereof by CELLULAR ONE (coupled with substantial compliance by AGENT), and CELLULAR ONE's failure to cure such breach within thirty (30) days after receipt of written notice thereof, shall be deemed a termination by AGENT without cause.

## B. By CELLULAR ONE

CELLULAR ONE shall have the right to terminate this Agreement effective upon thirty (30) days written notice should (A) the FCC Cellular Radio Decisions or other requisite governmental decisions and authorities not be continued in substantially the same form and such change materially adversely impacts CELLULAR ONE's (or an affiliate's) ability to conduct its business in the Area; (B) state and/or federal regulatory approval empowering CELLULAR ONE or its Affiliate to construct and provide the Authorized Services and/or CPE in the Area is not granted to either CELLULAR ONE or an Affiliate, is granted subject to terms and conditions unacceptable to CELLULAR ONE or an Affiliate, or is granted under such terms and conditions which, in CELLULAR ONE's opinion, materially adversely affects the intended purpose of this Agreement; (C) regulatory authorization of the commission schedule of this Agreement is made subject to terms and conditions unacceptable to CELLULAR ONE or Affiliates; or Agent has had negative net growth exceeding twenty percent (20%) for the past twelve (12) months (for example, if there were 100 (100) active Agent-originated subscribers as of January 1, 2000 and only seventy-nine (79) active Agent-originated subscribers as of January 1, 2001, Agent would have negative net growth exceeding twenty percent (20%) and Cellular One would have the right to terminate this Agreement).

Further, CELLULAR ONE shall have the right to terminate this Agreement effective upon written notice if (a) AGENT makes an assignment for the benefit of creditors; (b) an Order for Relief under Title 11 of the United States Code is entered by any United States Court against AGENT; (c) a trustee or receiver of any substantial part of the AGENT's assets, is appointed by any Court; (d) AGENT sells all or substantially all of AGENT's inventory or Assets other than in the ordinary course of business.

In addition, CELLULAR ONE shall have the right to terminate this Agreement for cause effective upon delivery of notice of termination of AGENT, if AGENT (or one of more of its owners and affiliates): (1) has made any material misrepresentation or omission in its application to establish an agency relationship with CELLULAR ONE or is convicted of or pleads no contest to a felony or other crime or offense that is likely to adversely affect the reputation of CELLULAR ONE or its affiliated companies or the goodwill of the Marks; (2) attempts to make an unauthorized assignment of this Agreement; (3) receives a notice of violation of the terms or conditions of any license or permit required by AGENT or its employees in the conduct of AGENT's business and fails to correct such violation, or to terminate the employment of such employee(s) within the time period specified in such notice, if any, or within thirty (30) days after receipt of such notice, whichever first expires; (4) fails to

[8/31/99 REV]

comply with any provision of this Agreement, including, if applicable, sales of Authorized Services consistent with AGENT forecasts, or any applicable tariff or CELLULAR ONE procedure relating to the Authorized Services and/or CPE, and AGENT does not correct such failure within ten (10) days as to monetary defaults and within thirty (30) days if non-monetary default after written notice of such failure to comply is delivered to AGENT.

19.    OBLIGATIONS OF AGENT UPON TERMINATION OR EXPIRATION

AGENT agrees that upon the expiration or termination of this Agreement in the Area, AGENT and its owner(s) and Affiliates will: (1) not thereafter use any actual or similar Marks, or any actual or similar trade name, service mark, trademark, logo, insignia, symbols or decorative design theretofore used by AGENT specifically in its sale of the Authorized Services, in any manner or for any purpose in the Area except that AGENT and its owner(s) may use or continue to use any trade name, service mark, logo, insignia, symbols or decorative designs AGENT or its owner(s) used in any business prior to the date of this Agreement; and will not utilize for any purpose any actual or similar trade name, trade or service mark or other commercial symbol that suggests or indicates a connection or association with CELLULAR ONE or any affiliated company of CELLULAR ONE, or directly or indirectly, at any time or in any manner identify itself or any business associated with CELLULAR ONE or such affiliated company in the Area; (2) return to CELLULAR ONE all advertising and marketing materials, forms, and other materials containing any Mark or otherwise identifying or relating to CELLULAR ONE's Authorized Services in the Area; (3) take such action as may be required to cancel all fictitious or assumed name or equivalent registrations relating to any Mark or authorize CELLULAR ONE, and any officer of CELLULAR ONE, as AGENT's attorney in fact, to take such actions as may be required to cancel such fictitious or assumed name or equivalent registration; if AGENT fails or refuses to do so, all governmental agencies administering fictitious or assumed name or equivalent registrations may accept and rely upon appropriate documents executed by CELLULAR ONE or its officer canceling any such registration; and (4) provide CELLULAR ONE with an updated list of names, addresses and all other relevant information AGENT then possesses concerning Subscribers of all Authorized Services that AGENT has enrolled in the Area.

20.    COVENANTS NOT TO COMPETE

In consideration of CELLULAR ONE's grant to AGENT of the right to use the Marks, the right to advertise affiliation with CELLULAR ONE as an authorized agent of CELLULAR ONE and the great value of the goodwill associated with AGENT's ability to use the Marks, which rights and value are not available to distributors generally, and in recognition of the value of specialized, technical knowledge of the cellular industry and other Services to be imparted by CELLULAR ONE to AGENT from time to time, AGENT agrees to be bound by the covenants in this Paragraph 20. Such rights and value shall constitute independent consideration for the covenants in this Paragraph 20.

Therefore, for value received as identified above, AGENT agrees that AGENT, its officers, directors, key employees, and principals, any Affiliate or the person or persons owning a controlling interest in AGENT or an Affiliate, during the term of this Agreement and for a period of one (1) year following the later of the expiration or termination of this Agreement, shall not:

[8/31/99 REV]

16

(1) directly or indirectly, induce, influence or suggest to any Subscriber of CELLULAR ONE's CRS to purchase CRS or any other CMRS from another reseller or provider of CRS or CMRS in the Area;

(2) directly or indirectly, induce, influence or suggest to any Subscriber of any other Authorized Service to purchase a competing service from any other provider or reseller of such competing service in the Area, whether or not the competing service is technologically the same as the Authorized Service in question;

(3) under any circumstances or conditions whatsoever, directly or indirectly, as an individual, partner, stockholder, director, officer, employee, manager or in any other relation or capacity whatsoever engage in the sale or promotion of CRS, CMRS, or any other Authorized Service on behalf of any competing reseller or provider of such service in the Area;

(4) directly or indirectly, allow any other person, firm or other entity to use the name, trade name, goodwill or any other assets or property of AGENT or CELLULAR ONE in any manner in connection with such other entity's sale of CRS, CMRS or any other Authorized Service on behalf of a competing reseller or provider in the Area, and AGENT specifically agrees not to transfer, assign, authorize or consent to the transfer of an AGENT telephone number to any other person, firm or other entity upon the expiration or termination of this Agreement.

Notwithstanding any language to the contrary, the restrictive covenants contained herein shall not operate so as to restrict AGENT from the businesses of providing or selling Paging Services.

## 21. SEVERABILITY AND SUBSTITUTION OF VALID PROVISIONS

Except as expressly provided to the contrary herein, each term and condition of this Agreement, and any portion thereof, shall be considered severable and if, for any reason, any such provision hereof is held to be invalid, contrary to, or in conflict with any applicable present or future law, regulation or public policy in a final, unappealable ruling issued by any court, agency or tribunal with competent jurisdiction in a proceeding to which CELLULAR ONE or its Affiliate is a party, that ruling shall not impair the operation of, or have any other effect upon, such other portions of this Agreement as may remain otherwise enforceable which shall continue to be given full force and effect and bind the parties hereto, although any portion held to be invalid shall be deemed not to be a part of this Agreement from the date the time for appeal expires, if AGENT is a party thereto, otherwise upon AGENT's receipt of a notice of nonenforcement thereof from CELLULAR ONE.

To the extent that Paragraphs 4 or 20 contain or impose a restriction upon AGENT that is deemed unenforceable by virtue of its scope in terms of area, business activity prohibited and/or length of time, but could be enforceable by reducing any or all thereof, AGENT and CELLULAR ONE agree that same shall be enforced to the fullest extent permissible under the laws and public policies applied in the jurisdiction in which enforcement is sought. CELLULAR ONE and AGENT shall mutually agree to a modification of any invalid or unenforceable term or condition hereof to the extent required

to be valid and enforceable. Such modifications to this Agreement shall be required only in the area directly affected by any such ruling.

22.    WAIVER OF OBLIGATIONS

CELLULAR ONE and AGENT may by written instrument unilaterally waive or reduce any obligation of or restriction upon the other under this Agreement, effective upon delivery of written notice thereof to the other or such other effective date stated in the notice of waiver.

Whenever this Agreement requires the consent of a Party, such request shall be in writing and no consent may be unreasonably withheld. All consents or withholding of consent with reasons therefore shall be in writing. Neither party makes any guarantees upon which the other may rely, and assumes no liability or obligation to the other, by granting any waiver, approval or consent to the other, or by reason of any neglect, delay or denial of any request therefor. Any waiver granted by either Party shall be without prejudice to any other right that Party may have, will be subject to continuing review, and may be revoked, at the waiving party's sole discretion, at any time and for any reason, effective upon delivery to the other of ten (10) days' prior written notice.

CELLULAR ONE and AGENT shall not be deemed to have waived or impaired any right, power or option reserved by this Agreement (including, without limitation, the right to demand exact compliance with every term, condition and covenant herein, or to declare any breach hereof to be a default and to terminate this Agreement prior to the expiration of its term), by virtue of any custom or practice of the parties at variance with the terms hereof, or any failure, refusal or neglect of CELLULAR ONE or AGENT to exercise any right under this Agreement or to insist upon exact compliance by the other with its obligations hereunder, including without limitation any rule or procedure, or any waiver, forbearance, delay, failure or omission by CELLULAR ONE to exercise any right, power or option, whether of the same, similar or different nature, with respect to one or more other authorized agents or other forms of distribution.

23.    RIGHTS OF PARTIES ARE CUMULATIVE

The rights of CELLULAR ONE and AGENT hereunder are cumulative and no exercise or enforcement by CELLULAR ONE and AGENT of any right or remedy hereunder shall preclude the exercise or enforcement by CELLULAR ONE or AGENT of any other right or remedy hereunder or which CELLULAR ONE or AGENT is entitled by law to enforce.

24.    GOVERNING LAW

Except to the extent governed by United States law that preempts state law, this Agreement shall be interpreted under and governed by the laws of the State of Illinois. If any suit or action shall be brought to enforce or declare any of the terms of this Agreement, to terminate this Agreement or to recover any damages sustained as a result of a default in the performance of any obligations under this Agreement, or a breach of any of the representations and warranties herein contained or otherwise pursuant to this Agreement, then except as otherwise provided in Paragraph 35, the party not prevailing in such suit or action shall be liable to the prevailing party for the prevailing party's costs

and expenses, including, without limitation, court costs and reasonable attorneys' and expert witnesses' fees (including, without limitation, the value of time spent by in-house personnel), the amount of which shall be fixed by the court and shall be made a part of any judgment rendered. The parties agree that any such suit or action must be brought, if at all, within one (1) year after the underlying cause of action accrues.

25. <u>TESTIMONY</u>

Matters relating to this Agreement may be an issue before various regulatory bodies. Upon reasonable notice AGENT agrees to fully cooperate with CELLULAR ONE regarding any such matters including willingly providing employees of AGENT to testify at appropriate times regarding any aspect of this Agreement or other related issues. CELLULAR ONE agrees to reimburse AGENT for reasonable costs expended in supplying such testimony.

26. <u>BINDING EFFECT</u>

This Agreement is binding upon the parties hereto, their respective executors, administrators, heirs, assigns and successors in interest.

All obligations by either party which expressly or by their nature survive the expiration or termination of this Agreement shall continue in full force and effect subsequent to and notwithstanding its expiration or termination and until they are satisfied in full or by their nature.

27. <u>IMPOSSIBILITY OF PERFORMANCE</u>

Neither CELLULAR ONE nor AGENT shall be liable for loss or damage or deemed to be in breach of this Agreement if its failure to perform its obligations results from: (1) compliance with any law, ruling, order, regulation, requirement or instruction of any federal, state or municipal government or any department or agency thereof or court of competent jurisdiction; (2) acts of God; (3) acts or omissions of the other party; and (4) fires, strikes, embargoes, war, insurrection or riot. Any delay resulting from any of said causes shall extend performance accordingly or excuse performance, in whole or in part, as may be reasonable.

28. <u>INTERPRETATION</u>

The preambles and exhibits to this Agreement are a part of this Agreement, which constitutes the entire agreement of the parties, and there are no other oral or written understandings or agreements between CELLULAR ONE and AGENT relating to the subject matter hereof. This Agreement supersedes any prior agreements or understandings between the parties relating to the subject matter hereof.

Nothing in this Agreement is intended, nor shall be deemed, to confer any rights or remedies upon any person or legal entity not a party hereto, except for those affiliates of CELLULAR ONE as may be involved in the provision of one or more of the Authorized Services.

[8/31/99 REV]

The headings of the several paragraphs hereof are for convenience only and do not define, limit or construe the contents of such paragraphs.

The term "AGENT" as used herein is applicable to one or more persons, a corporation or a partnership, as the case may be, and the singular usage includes the plural and the masculine includes the feminine.

If two or more persons are at any time AGENT hereunder, whether or not as partners or joint venturers, their obligations and liabilities to CELLULAR ONE shall be joint and several.

This Agreement shall be executed in multiple copies, each of which shall be deemed an original.

### 29. INDEMNITY

Subject to the provisions of Paragraph 3, each party hereto agrees to defend, indemnify and save harmless the other party and its successors and assigns and its employees and agents and their heirs, legal representatives and assigns from any and all claims or demands whatsoever, including the costs, expenses and reasonable attorney's fees incurred on account thereof, that may be made (1) by the indemnifying Party's employees or any other persons for bodily injury or damage to property occasioned by the acts or omissions of the Party of its subcontractor, or the employees or agents of any of them, and (2) by the Party's employees under worker's compensation or similar acts.

Further, AGENT agrees to indemnify, hold harmless and, upon CELLULAR ONE's written request, defend CELLULAR ONE (including its officers, directors and employees) from and against any and all liability, loss, damages, costs, attorneys' fees, or other expense of any kind, that arises out of any threatened or actual claim or any suit for damages, injunction, or other relief on account of (a) injury to or death of any person, (b) damage to any property, (c) public charges and penalties, or (d) any demand, liability or lien, whether caused by, resulting from, or in connection with, the negligent or intentional acts, omissions or misrepresentations of AGENT (including any of its subordinates, sub-agents, employees or servants), solely or jointly with others, including CELLULAR ONE, its employees or servants (except for the negligent acts or omissions solely of CELLULAR ONE or any of its employees or servants) in the performance of or in connection with the performance of AGENT's responsibilities under this Agreement.

### 30. SURVIVAL

The terms, provisions, representations, and warranties contained in this Agreement that by their sense and context are intended to survive the performance thereof by either or both parties hereunder shall so survive the completion of performances and termination of this Agreement, including the making of any and all payments due hereunder.

### 31. LICENSES

[8/31/99 REV]

No licenses, express or implied, under any patents or copyrights are granted by CELLULAR ONE or its Affiliates to AGENT.

## 32.   NOTICES AND PAYMENTS

All payments due AGENT shall be made to such address or bank as AGENT from time to time designates.  All notices and reports required to be delivered by the provisions of the Agreement shall be deemed so delivered three (3) business days after placement in the United States Certified or Registered Mail, postage prepaid and addressed to the party to be notified at its most current principal business address of which the notifying party has been notified.  All reports and other information required by this Agreement shall be directed to CELLULAR ONE at the data processing center or the address provided to AGENT from time to time, or to such other persons and places as CELLULAR ONE may direct from time to time.  Any required report not actually received or postmarked by CELLULAR ONE or AGENT during regular business hours on the date due shall be deemed delinquent.

## 33.   CONFIDENTIAL INFORMATION

Any specifications, drawings, sketches, models, samples, data, computer programs or documentation, or technical or business information ("Information") furnished or disclosed by CELLULAR ONE to AGENT hereunder shall be deemed the exclusive property of CELLULAR ONE, including title to copyright in all copyrightable material, and, when in tangible form, shall be returned to CELLULAR ONE upon completion or termination of authorized work.  Unless such information was previously known to AGENT free of any obligation to keep it confidential, or has been or is subsequently made public by CELLULAR ONE or a third party, it shall be held in confidence by AGENT, shall be used only for the purposes hereunder, and may be used for other purposes only upon such terms and conditions as may be mutually agreed upon in writing.  In addition, the parties hereby agree that Subscriber lists and related information or data are the exclusive property of CELLULAR ONE and are to be used by AGENT solely in the performance of its obligations and duties as described herein and are to be returned to CELLULAR ONE upon the termination of this Agreement.

If AGENT is served with process to obtain Information, AGENT shall immediately notify CELLULAR ONE which shall, in addition to AGENT efforts, if any, have the right to seek to quash such process.

Unless marked "proprietary," any Information furnished or disclosed by AGENT to CELLULAR ONE shall not obligate CELLULAR ONE to hold such information in confidence.

## 34.   COVENANT NOT TO SOLICIT EMPLOYMENT

AGENT recognizes and agrees that CELLULAR ONE takes a great deal of time to hire and train employees for its business.  AGENT fully understands the time and expense CELLULAR ONE incurs to obtain qualified personnel, and AGENT therefore agrees not to offer employment to or accept to hire any of CELLULAR ONE's employees.  This Paragraph 34 cannot be waived except by

the President and Chief Executive Officer of CELLULAR ONE in writing. In the event AGENT, or any affiliate or person associated with AGENT, does hire any of CELLULAR ONE's employees during the term of this Agreement, or during any renewal or option period, or hires such employees during a period of 90 days after any such employee leaves the employment of CELLULAR ONE, such hiring also will constitute a material breach of this Agreement.

Moreover, CELLULAR ONE and AGENT have considered the matter and have reasonably endeavored to estimate the actual damages to CELLULAR ONE in the event AGENT breaches this Agreement and offers or accepts to hire any of CELLULAR ONE's employees, and both realize that it would be impractical or extremely difficult to fix the actual damages to CELLULAR ONE resulting from such offer or hiring of CELLULAR ONE's employees. CELLULAR ONE and AGENT therefore agree that if AGENT offers or accepts to hire any of CELLULAR ONE's employees during the periods of time heretofore mentioned, AGENT agrees to reimburse CELLULAR ONE for its costs in replacing each such employee, which costs shall be deemed to be one year's salary or wages of each such employee. Said sum represents the amount agreed upon by the parties as CELLULAR ONE's liquidated damages for such breach and shall be in addition to CELLULAR ONE's right to terminate this Agreement for such breach.

## 35. DISPUTE RESOLUTION AND MEDIATION

For all disputes relating to this Agreement except those relating to Paragraph 20, Covenants Not to Compete, prior to instituting litigation in connection with this Agreement in any forum, including but not limited to, state, federal, or regulatory proceedings, each party agrees to the following procedures:

(a) The aggrieved party shall give detailed written notice to the other party of its specific complaint, including the amount of actual damages and expenses, including attorney's fees, claimed by the aggrieved party. The aggrieved party shall include copies of all documents that support its claims. Within thirty (30) days after receipt of the notice, the party receiving the notice shall tender to the aggrieved party a written offer of settlement. Any offer of settlement not accepted within thirty (30) days of receipt by the aggrieved party shall be deemed to have been rejected.

(b) In the event of litigation, a settlement offer made pursuant to Paragraph 35(a) above, if rejected by the aggrieved party, may be filed with the court together with an affidavit certifying its rejection. If the court finds that the amount tendered in the settlement offer is greater than or equal to the actual damages found by the trier of fact, the aggrieved party shall incur the costs of its own attorney's fees and shall reimburse the other party for its reasonable attorney's fees incurred. If recovery is more that the amount tendered in the settlement offer, then the accused party will reimburse the aggrieved party for its reasonable attorneys' fees.

(c) The tender of an offer of settlement is not an admission of engaging in an unlawful act or practice or of liability. Evidence of a settlement offer may be used only for the purposes specified in Paragraph 35(b) above, and is not to be revealed to the trier of fact as part of its determination of damages or liability.

(d) If the parties are unable to settle their disputes through the above procedure, the parties agree to submit their dispute to mediation as described in this paragraph within 90 days after rejection of the settlement offer. Compliance with these procedures on dispute resolution and mediation shall be a condition precedent to instituting any judicial, quasi-judicial and/or regulatory proceeding.

(i) Mediation is a process under which an impartial mediator facilitates communication between the parties to promote settlement between them. The mediator does not have the authority to decide any issue for the parties, but will attempt to facilitate the voluntary resolution of the dispute by the parties. The mediator is authorized to conduct joint and separate meetings with the parties and to offer suggestions to assist the parties to achieve settlement.

(ii) The parties shall agree to selection of an impartial mediator. A person shall not serve as a mediator in any dispute in which he has any financial or personal interest. Prior to accepting an appointment, the mediator shall disclose any circumstance likely to create a presumption or appearance of bias or prevent a prompt meeting with the parties. The aggrieved party shall have the right to name a mediator, subject to disagreement from the other party based on the mediator's interest in a dispute, affiliation or connection to the aggrieved party or other circumstance likely to create a presumption or appearance of bias. The parties shall each bear half the cost of the mediation.

(iii) The parties, while not committing in advance to settle their case, agree to participate in mediation in good faith with the intention to settle, if at all possible.


36. <u>AUTHORITY</u>

Each of the parties represents, warrants and agrees that it is a corporation or partnership duly organized, validly existing and in good standing under the laws of the state of its formation, and has all requisite power and authority to execute and deliver this Agreement and to consummate the transactions contemplated hereby; that the execution and delivery of this Agreement and the performance hereof have been duly and validly authorized by all necessary corporate or partnership action; and that the execution and delivery by it of this Agreement and the performance of this Agreement by it will not conflict with or result in a breach of or constitute or result in a default under any of the terms, conditions or provisions of the Articles or Certificates of Incorporation, By-Laws, or other of its governing instruments or any judgment, order, decree, law, regulation or ruling of any court or governmental authority or any agreement, contract, commitment or other instrument to which it is a party or by which it is bound.

Specifically, AGENT represents and warrants that (i) AGENT is not a party to any agreement to distribute, promote or otherwise sell CRS, CMRS or any other Authorized Service (except Paging

Services) on behalf of any competing provider, reseller or agent in the Area; (ii) the execution and delivery by it of this Agreement and the performance of this Agreement by it will not conflict with or result in a breach or constitute or result in a default under any of the terms, conditions or provisions of any agreement between AGENT and any other carrier, reseller or agent of CRS, CMRS or any other Authorized Service.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement on the date first above written and hereby declare that they HAVE READ AND DO UNDERSTAND EACH AND EVERY TERM, CONDITION AND COVENANT CONTAINED IN, OR INCORPORATED BY REFERENCE INTO, THIS AGREEMENT.

SOUTHWESTERN BELL MOBILE SYSTEMS,      KEMPNER MOBILE ELECTRONICS, INC.
INC., d/b/a CELLULAR ONE-Chicago

By: _____          By: _____

Name: Robert J. Nelson                 Name: Scott Kempner

Title: President – Great Lakes Region   Title: President

Date: __1__/__5__/__00__               Date: __12__/__23__/__99__

## EXHIBIT A

## AUTHORIZED AGENT LOCATIONS

Initial locations at which AGENT is authorized to operate as described in this Agreement:

It is agreed by AGENT and CELLULAR ONE that if the initial business location(s) and/or the date upon which CRS operations of AGENT will commence are not known at the date of execution of this Agreement, the same may be added from time to time as such information becomes known but no later than the effective date of AGENT operations.

AGENT shall not change or add business locations without CELLULAR ONE's prior written approval. AGENT shall consult with CELLULAR ONE before initiating any action to change or supplement any of its business locations.

Any business locations that AGENT opens and operates in the Area shall be subject to all of the terms of the Agreement, whether or not an amendment is signed by the parties adding the addresses of any new or different locations.

Authorized Locations:

_____

_____

## COUNTIES

Counties in which AGENT is authorized:

Cook, Lake, DuPage, Kane, McHenry, Will

## AUTHORIZED SERVICES

CRS (including long distance/toll service, if any, provided by CELLULAR ONE to its CRS subscribers)

_____

_____

[8/31/99 REV]

<u>VERIFICATION</u>

Under penalties provided by law pursuant to 735 ILCS 5/l-l09, the undersigned certifies that (s)he is an authorized agent of the Plaintiff herein having knowledge of the facts; that the statements set forth in the attached First Amended Verified Complaint are true and correct, except as to matters therein stated to be on information and belief and as to such matters the undersigned certifies as aforesaid that (s)he verily believes the same to be true

_____
Scott Kempner

Dated:_____7-17_____, 2002

# Exhibit B

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, CHANCERY DIVISION

KEMPNER MOBILE ELECTRONICS,     )
INC., an Illinois corporation,            )
                                          )
          Plaintiff,                      )
                                          )      Case No. _____
          v.                              )
                                          )      Judge _____ 02CH08976
SOUTHWESTERN BELL MOBILE        )
SYSTEMS, LLC, d/b/a CINGULAR    )      JURY DEMAND
WIRELESS f/k/a SOUTHWESTERN     )
BELL MOBILE SYSTEMS, INC. d/b/a )
CELLULAR ONE-CHICAGO,           )
                                          )
          Defendant.                      )

### VERIFIED COMPLAINT

Plaintiff Kempner Mobile Electronics, Inc., by its attorneys, complains of
Defendant Southwestern Bell Mobile Systems, LLC d/b/a Cingular Wireless as follows:

### PARTIES

1.          Kempner Mobile Electronics, Inc. ("Kempner") is an Illinois
corporation with its principal place of business at 4722 West Touhy Avenue,
Lincolnwood, Cook County, Illinois.

2.          Southwestern Bell Mobile Systems, LLC d/b/a Cingular Wireless
("Cingular") is on information and belief a limited liability company organized and
existing under the laws of the State of Delaware. Cingular's principal place of business is
located at 2000 West Ameritech Center Drive, Hoffman Estates, Cook County, Illinois.
Prior to a merger between SBC Communications and Bell South Corporation on or about
January 14, 2001, Cingular was known as Southwestern Bell Mobile Systems, Inc. d/b/a
Cellular One-Chicago.

## JURISDICTION AND VENUE

3.  The Court has jurisdiction to hear this matter pursuant to the powers granted to it by the Illinois Constitution.

4.  Venue is appropriate in this county pursuant to 735 ILCS 5/2-101 as the cause of action arose from transactions or some part thereof that occurred in Cook County and Cingular is a resident of Cook County, Illinois.

## COMMON FACTS

5.  Cingular has for a number of years and under various corporate identities provided cellular telephone services in various parts of the United States, including the metropolitan Chicago area.

6.  For a number of years Cingular's business practice was to utilize independent dealers to market and sell its cellular telephone products and services to consumers.

7.  Kempner has for a number of years been an independent dealer of among other things cellular telephone products and services.

8.  In December 1993, Kempner executed an agreement with one of Cingular's predecessors and became an authorized sales and service center. Kempner has continuously since December 1993 operated its sales and service center at 4722 West Touhy Avenue, Lincolnwood, Cook County, Illinois from which Kempner marketed and sold Cingular cellular telephone products and services.

9.  In approximately April 1996, Kempner and one of Cingular's predecessors executed that certain Authorized Agency Agreement between Southwestern Bell Mobile Systems, Inc. d/b/a Cellular One – Chicago and Kempner Mobile

Electronics, Inc. (the "1996 Agreement"). A copy of the 1996 Agreement is attached as Exhibit 1.

10.          In December 1999 or January 2000, Kempner and one of Cingular's predecessors executed that certain Authorized Agency Agreement between Southwestern Bell Mobile Systems, Inc. d/b/a Cellular One – Chicago and Kempner Mobile Electronics, Inc. (the "1999 Agreement"). A copy of the 1999 Agreement is attached as Exhibit 2.

11.          The 1996 Agreement and the 1999 Agreement set forth many of the terms by which Kempner operated as an authorized sales and service center for Cingular.

12.          As an authorized sales and service center for Cingular, Kempner agreed to among other things market cellular telephone products and services on behalf of Cingular. On it's part, Cingular agreed, among other things, not to interfere with Kempner's ability to sell Cingular cellular telephone products and services.

13.          The 1996 Agreement and the 1999 Agreement required that to the extent Kempner sold cellular telephone products and services, Kempner did so exclusively on behalf of Cingular. Neither the 1996 Agreement nor the 1999 Agreement prohibited Kempner from selling non-cellular telephone products and services on behalf of itself or any other company.

14.          The 1996 Agreement, the 1999 Agreement and Cingular's regular business practices forbid any competing entity from opening a store or other sales location for the sale of Cingular cellular telephone products and services within a three-mile radius of the Kempner store location. In addition, Kempner was prohibited by the

Agreements and Cingular's regular business practice from opening a store within a three-mile radius of any other store that marketed and sold Cingular cellular telephone products and services.

15.     The 1996 Agreement, the 1999 Agreement and Cingular's regular business practices recognize that Kempner was entitled to monthly residuals for all customers to whom Kempner originally sold cellular telephone equipment and signed up for cellular telephone services offered by Cingular.

16.     Both the 1996 Agreement and the 1999 Agreement included periodic schedules which set the compensation that Cingular would pay Kempner ("Commission Addendums"). Most recently, for each customer that Kempner signed up to Cingular's cellular telephone service, Kempner received a monthly residual from Cingular of approximately two dollars and forty cents ($2.40).

17.     Commencing at an unknown point in time, Cingular began a pattern of contacting consumers who had purchased a Cingular cellular telephone product and signed up for Cingular cellular telephone service through Kempner and offering to allow such consumers to upgrade their cellular telephone products at favorable pricing. When such consumers upgraded their cellular telephone equipment directly from Cingular, Cingular terminated Kempner's monthly residuals for those customers.

18.     In April 1998, Cingular opened a sales kiosk at the Lincolnwood Town Center shopping mall that was within three miles of the Kempner store at 4722 West Touhy Avenue, and immediately began marketing and selling Cingular cellular telephone products and services. Cingular took this action within one year of prohibiting

Kempner from marketing and selling Cingular cellular telephone products and services from a similar sales kiosk at the Lincolnwood Town Center shopping mall.

19. In September 2000, Cingular opened a sales location at 4730 West Dempster Street in Skokie that was also within three miles of the Kempner location at 4722 West Touhy Avenue.

20. Kempner has fully performed in good faith all of its obligations under the 1996 Agreement and the 1999 Agreement.

## COUNT I

### (Declaratory Judgment Pursuant to 735 ILCS 2/701)

21. Plaintiff Kempner repeats and realleges the allegations of paragraphs 1 through 20 as if fully set forth herein.

22. Cingular's actions as described above constitute a breach of its obligations under the 1996 Agreement, the 1999 Agreement as well as Cingular's written business practice guidelines and the duty of good faith and fair dealing inherent between all contracting parties and inherent in the 1996 Agreement and the 1999 Agreement.

23. As a result of Cingular's breach of its duties and obligations under the 1996 Agreement and the 1999 Agreement, Kempner asserts that it is no longer bound by the terms of either Agreement, including but not limited to the exclusivity provisions of paragraph 20.

24. Kempner requires a declaration of its rights and obligations under the 1996 Agreement and the 1999 Agreement, including but not limited to its obligations under the exclusivity provisions of paragraph 20 of each of the Agreements.

25.     There exists a ripe controversy regarding Kempner's rights and obligations under the 1996 Agreement and the 1999 Agreement including but limited paragraph 20 of the Agreement.

26.     Kempner also requires a declaration of Cingular's rights and obligations under the 1996 Agreement and the 1999 Agreement, specifically concerning Cingular's rights and ability to open and operate the sales kiosk at the Lincolnwood Town Center shopping mall and the sales location at 4730 West Dempster Street in Skokie.

## COUNT II

### (Breach of Contract - Store at Lincolnwood Town Center)

27.     Plaintiff Kempner repeats and realleges the allegations of paragraphs 1 through 20 as if fully set forth herein.

28.     In April 1997, Kempner opened a sales kiosk at the Lincolnwood Town Center, a shopping center located in Lincolnwood, Cook County, Illinois, for the purpose of selling paging products and services.

29.     Prior to April 1997, Kempner had requested that Cingular authorize Kempner to market and sell Cingular cellular telephone products and services at the sales kiosk at Lincolnwood Town Center.

30.     Cingular refused to grant Kempner authority to sell Cingular cellular telephone products and services at the sales kiosk at Lincolnwood Town Center.

31.     In April 1998, Kempner closed its sales kiosk at the Lincolnwood Town Center.

32.         At no time during the period from April 1997 through April 1998 would Cingular grant Kempner authority to sell Cingular cellular products or services at the sales kiosk at Lincolnwood Town Center.

33.         In September 1998, Cingular opened a company owned sales kiosk at the Lincolnwood Town Center.

34.         From and after September 1998, Cingular sold Cingular cellular telephone products and services from the company owned sales kiosk at Lincolnwood Town Center.  Cingular did so despite the fact that Cingular refused to grant Kempner the authority to take the very same action.

35.         The 1996 Agreement and the 1999 Agreement provide that Cingular is obligated to, among other things, establish administrative procedures and guidelines for the sale of Cingular cellular telephone services.

36.         One administrative procedure established by Cingular is that no entity may open a sales location for the sale of Cingular cellular telephone services and equipment within a three mile radius of any other sales location for the sale of Cingular cellular telephone services and equipment.

37.         The Cingular owned sales kiosk at Lincolnwood Town Center was located within a three-mile radius of Kempner's sales location at 4722 West Touhy Avenue, Lincolnwood, Illinois.

38.         Kempner has been damaged by Cingular's breach of its obligations under the 1996 Agreement and the 1999 Agreement and by Cingular's operation of the company owned sales kiosk at Lincolnwood Town Center.

## COUNT III

### (Breach of Contract -- Skokie Store)

39.　　　　Plaintiff Kempner repeats and realleges the allegations of Paragraphs 1 through 20 as if fully set forth herein.

40.　　　　In September 2000, Cingular opened a company owned sales store at 4730 West Dempster Street, Skokie, Cook County, Illinois, for the purpose of selling Cingular cellular telephone products and services to consumers.

41.　　　　The Cingular owned sales store at 4730 West Dempster Street in Skokie is located within a three-mile radius of Kempner's sales location at 4722 West Touhy Avenue, Lincolnwood, Illinois.

42.　　　　The 1996 Agreement and the 1999 Agreement provide that Cingular is obligated to, among other things, establish administrative procedures and guidelines for the sale of Cingular cellular telephone services.

43.　　　　One administrative procedure established by Cingular is that no entity may open a sales location for the sale of Cingular cellular telephone services and equipment within a three mile radius of any other sales location for the sale of Cingular cellular telephone services and equipment.

44.　　　　The Cingular owned sales kiosk at Lincolnwood Town Center was located within a three-mile radius of Kempner's sales location at 4722 West Touhy, Lincolnwood, Illinois.

## COUNT IV

### (Breach of Contract -- Accounting of Commissions And Residuals)

45.     Plaintiff Kempner repeats and realleges the allegations of paragraphs 1 through 20 as if fully set forth herein.

46.     The 1996 Contract, the 1999 Contract, and each Commission Addendum provides for the payment of commission and residual to Kempner. Commissions are to be paid within fifteen (15) days of activation. Residuals are to be paid within forty-five (45) days after the end of each calendar month.

47.     On information and belief, Cingular has breached the 1996 Agreement and the 1999 Agreement by failing to pay commissions when due. Kempner has demanded payment of the sums due and owing, but Cingular has failed and refused to pay said amounts or to account for sums due.

48.     Kempner has performed all terms and conditions required of it to be performed under the 1996 Agreement and the 1999 Agreement except as prevented by Cingular or excused by operation of law.

49.     Kempner has been damaged by Cingular's breach of contract, but is unable to determine the extent of its losses without an accounting from Cingular of the sums due and owing.

## COUNT V

### (Breach of Contract - Failure To Reimburse Expenses)

50.     Plaintiff, Kempner repeats and realleges the allegations of paragraphs 1 through 20 as if fully set forth herein.

51.     The 1996 Agreement and the 1999 Agreement each provides that Cingular will reimburse Kempner for out of pocket costs related to the substitution by Cingular of its trademarks, service marks, trade names and insignia which Kempner is required to utilize.

52.     As a result of the merger between SBC Communications and Bell South Corporation, many of the trademarks, service marks, trade names and insignia utlized by Cingular were changed and Kempner was required to implement these changes.

53.     Kempner has incurred out of pocket costs as a result of these changes.  Kempner has demanded that Cingular reimburse Kempner for these costs, but Cingular has failed and refused to do so.

54.     Kempner has performed all terms and conditions required of it to be performed under the 1996 Agreement and the 1999 Agreement except as prevented by Cingular or excused by operation of law.

55.     As a result of Cingular's breach of contract, Kempner has incurred damages which are estimated to total $4,500.00.

## COUNT VI
### (Fraud)

56.     Plaintiff, Kempner, repeats and realleges the allegations of Paragraph 1 through 20 as if fully set forth herein.

57.     The 1996 Agreement and the 1999 Agreement prohibited Kempner from influencing, inducing or suggesting that customers purchase cellular telephone services or any other competing services from a provider other than Cingular

during the term that these agreements were in effect.

58.        The 1996 Agreement and the 1999 Agreement further provided that Kempner could terminate the agreement (and thereafter induce customers to utilize services competitive with Cingular) upon thirty days written notice.  Kempner on numerous occasions threatened to terminate the 1996 Agreement and the 1999 Agreement because of perceived inequities in Cingular's treatment of Plaintiff and Cingular's points of distribution with respect to the pricing of Cingular's cellular telephone services and equipment.

59.        On May 8, 2001, Laren Whiddon, Vice-President and General Manager of Cingular, represented to Scott Kempner of Plaintiff, Kempner, that Kempner had access to the same level of pricing and equipment discounts as Cingular's internal channels of distribution.  Similar representations had been repeatedly made to Kempner by representatives of Cingular throughout the term of the 1996 Agreement and the 1999 Agreement.

60.        The representations made by Whiddon and the other representatives of Cingular were false and Whiddon and each of the other representatives of Cingular knew at the time the representations were made that they were false.  On information and belief, internal documentation at Cingular states specifically that certain pricing levels are available only at Cingular's points of distribution.

61.        Widdon and the other Cingular representatives made these statements to Kempner in order to induce Kempner not to terminate the 1996 Agreement or the 1999 Agreement and to continue to abide by the terms of the

agreements by refraining from offering competitive services to customers.

62.        Kempner relied on the statements of Whiddon and other Cingular representatives by refraining from terminating the 1996 Agreement and the 1999 Agreement but instead continuing to abide by the terms of those agreements offering to customers only the cellular telephone services provided by Cingular.

63.        Kempner has been damaged as a result of its reasonable reliance on the fraudulent statements made by Whiddon and the other Cingular representatives in that Cingular has stolen customers from Kempner that would otherwise have purchased cellular telephone products and cellular telephone services from Kempner and Kempner has lost the profits that it would have made from the purchase of cellular telephone services and cellular telephone products by those customers as well as the profits it would have made had it terminated the 1996 Agreement and the 1999 Agreement and offered those customers competing cellular telephone services. Kempner estimates that these damages exceed the sum of $20 million dollars.

64.        The actions of Cingular were intentional and malicious, thereby entitling Kempner to an award of punitive damages to punish Cingular and deter others from similar conduct in the future.

## COUNT VII

### (Illinois Consumer Fraud and Deceptive Business Practices Act)

### (False Representations of Equal Access )

65.        Plaintiff, Kempner, repeats and realleges the allegations of Paragraphs 1 through 20 and Paragraphs 56 through 64 as if fully set forth herein.

66.     The Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 et. seq. ("CFA") prohibts unfair methods of competition and unfair or deceptive acts or practices.

67.     Cingular violated Section 2 of the CFA [815 ILCS 505/2] by falsely representing to Kempner that Kempner had access to the same pricing level as Cingular's internal channels of distribution. These statements were calculated to deceive Kempner and Cingular intended that Kempner would rely on these statements by refraining from terminating the 1996 Agreement and the 1999 Agreement. These statements were made in a course of conduct involving trade or commerce and related to consumer protection issues because it enabled Cingular to obtain business from customers that would otherwise have been directed to its competitors on terms more favorable to the customer.

68.     Kempner suffered actual damages as a result of Cingular's violation of the CFA and brings this claim under 815 ILCS 505/10a. Kempner estimates that its damages exceed the sum of $20 million dollars. Pursuant to 815 ILCS 505/10a(c ) Kempner is entitled to an award of attorneys fees.

69.     The actions of Cingular were intentional and malicious, thereby entitling Kempner to an award of punitive damages to punish Cingular and deter others from similar conduct in the future.

**COUNT VIII**

**(Illinois Consumer Fraud and Deceptive Business Practices Act)**

**(False Representations of Joint Promotions)**

70.     Plaintiff, Kempner, repeats and realleges the allegations of Paragraphs 1 and 20 and Paragraphs 56 through 64 as fully set forth herein.

71.     Beginning as early as March 31, 2000, Cingular represented to Kempner that one of the benefits of being a sales and service center was Kempner's inclusion in the promotional advertising prepared and distributed by Cingular implying that the terms offered in that advertising would be available to customers who patronized Kempner.

72.     Some time prior to January 31, 2002, Cingular prepared and distributed newspapers of general circulation in the Chicago area including but not limited to the Chicago Sun Times an advertisement indicating that customers who signed up for new Cingular cellular telephone service activation and executed a contract providing for a continuous term of such services would receive a free Nokia 5165 IRDB portable telephone.  Kempner's business location was published in this advertisement.

73.     On January 31, 2002, Gene R. Hyman, a regular customer of Kempner, had a telephone conversation with "Jennifer" at Cingular where Mr. Hyman indicated his intention to avail himself of the offer published in the newspaper by activating Cingular cellular telephone services through Kempner.  Jennifer directed Mr. Hyman not to patronize Kempner but rather to activate service at the Cingular point of distribution at 3333 West Touhy Avenue because he would not be able to receive a free Nokia 5165 IRDB portable telephone if he activated Cingular cellular telephone service through Kempner.

74.     On information and belief, circumstances such as those identified in Paragraph 73 above have occurred repeatedly and continuously since at least March 31, 2000.

75.     Cingular's practice of publishing advertisements in newspapers of general circulation containing Kempner's business address and offering terms and conditions of sale unavailable at Kemnper's location without clearly indicating to consumers that such terms and conditions will not be honored for purchases from Kempner is unfair and deceptive and violates 815 ILCS 505/2. The practice is a "bait and switch" technique whereby Cingular attracts the attention of Kempner's customers and then switches the customer to accept services on terms and conditions more favorable to Cingular.

76.     Cingular intended that Kempner would rely on its unfair and deceptive acts and practices by continuing to operate under the terms of the 1996 Agreement and the 1999 Agreement and refraining from offering customers competitive cellular telephone services.

77.     Cingular's unfair and deceptive acts and practices occured in the course of conduct involving trade and commerce and implicated consumer protection concerns.

78.     Kempner was damaged by Cingular's unfair and deceptive acts and practices in that Kempner has suffered lost profits estimate to exceed 20 million dollars. Pursuant to 815 ILCS 505/102(c ), Kempner is entitled to an award of attorneys fees.

79.     The actions of Cingular were intentional and malicious, thereby entitling Kempner to an award of punitive damages to punish Cingular and deter others from similar conduct in the future.

## COUNT IX

### (Illinois Consumer Fraud and Deceptive Practices Act)

### (False Representations of Corrective Action)

80.     Plaintiff, Kempner, repeats and realleges the allegations of Paragraphs 1 through 20 and paragraphs 56 through 64 as if fully set forth herein.

81.     At all times relevant, Cingular has maintained 1-800 and 1-866 telephone numbers for support and referral of customers. The system is supposed to identify through the telephonic input of zip code numbers, the identity of authorized locations for products and cellular telephone services offered by Cingular.

82.     Beginning at least at the time of Cingular's establishment of a company-owned location at 253 Old Orchard Center, Skokie, Illinois, the identity of Kempner's location in nearby Wilmette, Illinois, is identified to a caller accessing the 1-866 support number as "Jillian Wireless" in "Roadhouse, Illinois." The location of the Cingular-owned store at 253 Old Orchard Center contained in the same listing is correctly identified.

83.     Kempner has repeatedly complained to Cingular about the erroneous misidentification of Kempner in the 1-866 support number system.

84.     Cingular has repeatedly represented to Kempner that the identity of store locations in the 1-866 support number system has been corrected. On May 8, 2001, Laren Whiddon represented to Scott Kempner of Kemnper that Cingular was then

currently reviewing the store listings on the support number system and making the necessary revisions. The statements made to Kempner by Cingular that Cingular was reviewing store listings on the 1-866 support number system and making necessary corrections was a false and deceptive act or practice in violation of 815 ILCS 505/2.

85.     Cingular intended that Kempner would rely on the deception by continuing to honor the 1996 Agreement and the 1999 Agreement and refraining from offering customers competing cellular telephone services.

86.     The unfair and deceptive acts and practices of Cingular occured in a course of conduct involving trade and commerce and implicated consumer protection concerns in that consumers were denied the opportunity to purchase cellular telephone services and cellular products at a location convenient for them.

87.     Kempner has suffered damages as an approximate result of the unfair and deceptive acts and practices of Cingular in that Kempner has lost profits on sales to customers diverted by Cingular in an amount estimated to exceed 20 million dollars. Pursuant to 815 ILCS 505/102(c), Kempner is entitled to an award of attorneys fees.

88.     The actions of Cingular were intentional and malicious, thereby entitling Kempner to an award of punitive damages to punish Cingular and deter others from similar conduct in the future.

### COUNT X

### (Violation of Illinois Franchise Discloure Act)

89.     Plaintiff, Kempner, repeats and realleges the allegations of Paragraphs 1 through 20 as if fully set forth herein.

90. The 1996 Agreement and the 1999 Agreement constituted the sale of a franchise to Kempner in that:

   a. Kempner was granted the right to engage in business of offering, selling or distributing goods or services under a marketing plan or system prescribed or suggested in substantial part by Cingular; and

   b. The operation of Kempner's business pursuant to this plan or system was substantially associated with Cingular's trademark service, trade name, logo type advertising or other commercial symbols designating Cingular; and

   c. Kempner was granted the right to engage in this business and was required to pay indirectly a sum in excess of $500.00 by, among other things, procuring insurance coverage in excess of 1 million dollars protecting Cingular.

91. On information and belief, the Cingular franchise sold to Kempner was unregistered, and its sale therefore violated 815 ILCS 705/5(1).

92. Cingular failed to deliver to Kempner a disclosure statement meeting the requirements of the Illinois Franchise Disclosure Act, and therefore violated 815 ILCS 705/5(2).

93. Cingular violated 815 ILCS 705/6 by, among other things, falsely representing to Kempner that Cingular would cooperate with Kempner to grow Kempner's customer base when Cingular actually intended to steal as many customers as possible from Kempner and drive Kempner out of business.

94. Kempner has been damaged by Cingular's violation of the Illinois Franchise Disclosure Act in that Kempner has lost the profits that have been diverted to Cingular from customers originated by Kempner and these damages are estimated to

exceed the sum of 20 million dollars. Pursuant to 735 ILCS 705/26, Kempner is

entitled to recover the costs of this action and reasonable attorneys fees.

## COUNT XI

### (Intentional Interference With Prospective Economic Advantage)

94.    Plaintiff, Kempner, repeats and realleges the allegations of

Paragraphs 1 through 20 as if fully set forth herein.

95.    At all times, Kempner had a reasonable expectation of

maintaining a continuing business relationship and of an economic advantage derived

from its relationship with customers that it originated for cellular telephone services

provided by Cingular.

96.    Cingular was aware of Kempner's expectancy. The 1996

Agreement and the 1999 Agreement and each periodic commission addendum to these

agreements identified Kempner's continuing interest in residual income derived from

the customers it had originated.

97.    Cingular intentionally and unjustifiably interfered with

Kempner's relationship with the customers Kempner had originated in a manner that

induced or caused a breach or termination of the expectancy. Among other things,

Cingular offered direct equipment upgrades to customers originated by Kempner

without providing Kempner the opportunity to sell the equipment directly to the

customer and having Cingular credit the customer's account for the cost of the

equipment. As a result of this practice, the customer is "purged" from Cingular's

records as a Kempner-originated customer and residual income from that customer is

terminated.

98.     Kempner has been damaged by the intentional and unjustified interference of Cingular with its reasonable expectation of a prospective economic advantage because it has lost residual income that it would otherwise be paid.   The amount of these damages is estimated to exceed 3 million dollars.

99.     The actions of Cingular were intentional and malicious, thereby entitling Kempner to an award of punitive damages to punish Cingular and deter others from similar conduct in the future.

WHEREFORE, Kempner Mobile Electronics, Inc. prays that the Court find in its favor and enter judgment against Southwestern Bell Mobile Systems d/b/a Cingular Wireless as follows:

**PURSUANT TO COUNT I:**

A.     In favor of Kempner declaring that Kempner is no longer bound by the restrictions contained in paragraph 20 of the Agreement; and

B.     For such other and additional relief as the Court deems just and appropriate;

**PURSUANT TO COUNT II:**

C.     In favor of Kempner and against Cingular in an amount to be proven at trial but no less than $1,200,000;

D.     In favor of Kempner for prejudgment interest at the statutory rate because the sum owed is certain;

E.     In favor of Kempner for post judgment interest at the statutory rate;

F.     In favor of Kempner and against Cingular for attorney fees and costs;

G.     For such other and additional relief as the Court deems just and appropriate;

**PURSUANT TO COUNT III:**

H.     In favor of Kempner and against Cingular in an amount to be proven at trial but no less than $560,000;

I.     In favor of Kempner for prejudgment interest at the statutory rate because the sum owed is certain;

J.     In favor of Kempner for post judgment interest at the statutory rate;

K.     In favor of Kempner and against Cingular for attorney fees and costs;
L.     For such other and additional relief as the Court deems just and appropriate;

**PURSUANT TO COUNT IV:**

M.     In favor of Kempner and against Cingular in an amount to be proven at trial as proved by the requested accounting;
N.     In favor of Kempner for prejudgment interest at the statutory rate because the sum owed is certain;
O.     In favor of Kempner for post judgment interest at the statutory rate;
P.     In favor of Kempner and against Cingular for attorney fees and costs;
Q.     For such other and additional relief as the Court deems just and appropriate;

**PURSUANT TO COUNT V:**

R.     In favor of Kempner and against Cingular in an amount to be proven at trial but no less than $4,500,000;
S.     In favor of Kempner for prejudgment interest at the statutory rate because the sum owed is certain;
T.     In favor of Kempner for post judgment interest at the statutory rate;
U.     In favor of Kempner and against Cingular for attorney fees and costs;
V.     For such other and additional relief as the Court deems just and appropriate;

**PURSUANT TO COUNT VI:**

W.     In favor of Kempner and against Cingular in an amount to be proven at trial but no less than $20,000,000;
X.     In favor of Kempner and against Cingular in an amount to be proven at trial for punitive damages;
Y.     In favor of Kempner for post judgment interest at the statutory rate;
Z.     In favor of Kempner and against Cingular for attorney fees and costs;
AA.    For such other and additional relief as the Court deems just and appropriate;

**PURSUANT TO COUNT VII:**

BB.    In favor of Kempner and against Cingular in an amount to be proven at trial but no less than $20,000,000;
CC.    In favor of Kempner and against Cingular in an amount to be proven at trial for punitive damages;
DD.    In favor of Kempner for post judgment interest at the statutory rate;
EE.    In favor of Kempner and against Cingular for attorney fees and costs;

FF.     For such other and additional relief as the Court deems just and appropriate;

**PURSUANT TO COUNT VIII:**

GG.     In favor of Kempner and against Cingular in an amount to be proven at trial but no less than $20,000,000;

HH.     In favor of Kempner and against Cingular in an amount to be proven at trial for punitive damages;

II.     In favor of Kempner for post judgment interest at the statutory rate;

JJ.     In favor of Kempner and against Cingular for attorney fees and costs;

KK.     For such other and additional relief as the Court deems just and appropriate;

**PURSUANT TO COUNT IX:**

LL.     In favor of Kempner and against Cingular in an amount to be proven at trial but no less than $20,000,000;

MM.     In favor of Kempner and against Cingular in an amount to be proven at trial for punitive damages;

NN.     In favor of Kempner for post judgment interest at the statutory rate;

OO.     In favor of Kempner and against Cingular for attorney fees and costs;

PP.     For such other and additional relief as the Court deems just and appropriate;

**PURSUANT TO COUNT X:**

QQ.     In favor of Kempner and against Cingular in an amount to be proven at trial but no less than $20,000,000;

RR.     In favor of Kempner and against Cingular in an amount to be proven at trial for punitive damages;

SS.     In favor of Kempner for post judgment interest at the statutory rate;

TT.     In favor of Kempner and against Cingular for attorney fees and costs;

UU.     For such other and additional relief as the Court deems just and appropriate;

**PURSUANT TO COUNT XI:**

QQ.     In favor of Kempner and against Cingular in an amount to be proven at trial but no less than $3,000,000;

RR.     In favor of Kempner and against Cingular in an amount to be proven at trial for punitive damages;

SS.     In favor of Kempner for post judgment interest at the statutory rate;

TT.     In favor of Kempner and against Cingular for attorney fees and costs;

UU.     For such other and additional relief as the Court deems just and

appropriate;

Respectfully submitted,
Kempner Mobile Electronics, Inc.

By _____
One of Its attorneys

Kenneth B. Drost, ARDC No. 03123292
Thomas D. Laue, ARDC No. 06207265
DROST & LAUE, LLC, Firm No. 23746
111 Lions Drive, Suite 206
Barrington, Illinois 60010
Telephone: 847-381-1070
Facsimile: 847-381-1073

## VERIFICATION

Under penalties provided by law pursuant to 735 ILCS 5/I-I09, the undersigned certifies that (s)he is an authorized agent of the Plaintiff herein having knowledge of the facts; that the statements set forth in the attached Verified Complaint are true and correct, except as to matters therein stated to be on information and belief and as to such matters the undersigned certifies as aforesaid that (s)he verily believes the same to be true

Scott Kempner

Dated:_____5 / 6_____, 2002

## AUTHORIZED SALES AND SERVICE AGREEMENT

### BETWEEN

### SOUTHWESTERN BELL MOBILE SYSTEMS, INC.
### d/b/a CELLULAR ONE® - Chicago

### AND

### KEMPNER MOBILE ELECTRONICS, INC.

THIS AGREEMENT is made and entered into this _____ day of _____, 199_, by and between SOUTHWESTERN BELL MOBILE SYSTEMS, INC. d/b/a CELLULAR ONE® - Chicago ("CELLULAR ONE"), a Delaware and Virginia Corporation, with its principal place of business at 930 North National Parkway, Schaumburg, Illinois 60173, acting on behalf of itself as licensee of the Chicago MSA non-wireline cellular system and as a provider of other services, and on behalf of Gary Telephone Company, an Indiana general partnership, as licensee of the Gary MSA non-wireline cellular system, and KEMPNER MOBILE ELECTRONICS, INC. ("AGENT"), an Illinois corporation, with its principal place of business at 4722 West Touhy Avenue, Lincolnwood, Illinois 60646.

### WITNESSETH:

Whereas, CELLULAR ONE is involved in the development, establishment and sale of cellular radio service ("CRS") which requires the use by CRS Subscribers of cellular terminal equipment;

Whereas, CELLULAR ONE and/or its affiliates is or may become involved in the development, establishment and/or sale of other services, including but not limited to long distance/toll service for CRS Subscribers, paging services, other Commercial Mobile Radio Services, and competitive landline local exchange and/or long distance services (collectively referred to as the "Services");

Whereas, CELLULAR ONE has regulatory authority to provide CRS in the cellular geographic service area(s) within the Chicago and Gary metropolitan statistical areas and desires to provide CRS in those areas, as well as other Services in designated areas, through Agents, Retailers, Resellers, and direct sale to Subscribers;

Whereas, CELLULAR ONE has adopted and used or intends to adopt and use certain valuable Marks in the provision of its Services and CPE;

Whereas, AGENT desires to sell certain of CELLULAR ONE's Services as a nonexclusive, authorized agent of CELLULAR ONE, and desires to sell or lease, install, provide warranty service and maintain CPE necessary for Subscribers to utilize such Services;

Now, therefore, in consideration of the mutual promises herein contained, it is hereby agreed:

## 1. DEFINITIONS

<u>Activation</u>. The act of initiating an Authorized Service in or to a Subscriber's CPE by CELLULAR ONE.

<u>Affiliate</u>. A person, association, partnership, corporation or joint-stock company, trust or other business entity however organized ("Entity") is an affiliate of that person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Entity. Control shall be defined as (i) ownership of a majority of the voting power of all classes of voting stock or (ii) ownership of a majority of the beneficial interests in income and capital of an entity other than a corporation.

<u>Authorized Services</u>. Those Services provided by CELLULAR ONE that AGENT is authorized hereunder to sell on behalf of CELLULAR ONE, including CRS and any other Services set forth on Exhibit A hereto.

<u>Area</u>. With respect to CRS and ancillary services, Area is defined as the Chicago and Gary metropolitan statistical areas ("MSAs") within which CELLULAR ONE has regulatory authority to provide CRS. The counties generally comprising these MSAs are listed in Exhibit A, and any additional adjoining counties that may be added to the areas served by CELLULAR ONE shall be deemed added to the Area, without the necessity of an amendment to this Agreement. With respect to other Authorized Services, Area is defined as those areas in which Cellular One is authorized to and is providing or reselling such Authorized Service, except as may be otherwise defined or limited on Exhibit A.

<u>CELLULAR ONE</u>. The term CELLULAR ONE includes Southwestern Bell Mobile Systems, Inc. d/b/a Cellular One - Chicago, and, where applicable to a specific Service, includes that affiliate of Southwestern Bell Mobile Systems, Inc., that provides such Service.

<u>Cellular Radio Service (CRS)</u>. Any and all service (including resale of said service) authorized by the Federal Communications Commission ("FCC") under Part 22 of its rules as amended under the cellular orders set forth in An Inquiry Into the Use of the Bands 825-845 MHZ and 870-890 MHZ for Cellular Communications Systems; and Amendments of Parts 2 and 22 of the Commission's Rules Relative to Cellular Communications Systems (CC Docket No. 79-318), 86 F.C.C. 2d 469 (1981), modified as set forth in reconsideration order 89 F.C.C. 2d 58 (1982), and as further modified as set forth in other rules or orders from time to time.

<u>Commercial Mobile Radio Services (CMRS)</u>. Any and all services (including resale of said services) that (1) fit the definition of commercial mobile services pursuant to Section 332 of the Communications Act, 47 U.S.C. §332, (2) are subject to regulation as commercial mobile radio services by the FCC under the orders set forth in Implementation of Sections 3(n) and 332 of the Communications Act; Regulatory Treatment of Mobile Services (CC Docket No. 93-252) or such other orders or rules as may be in effect from time to time, or (3) are the functional equivalent of a commercial mobile service as defined in 47 U.S.C. §332. CMRS shall in any

event include CRS, all forms of specialized mobile radio service (SMR and ESMR), and personal communications services (PCS).

CPE. The customer premises equipment, including cellular terminal equipment, that a Subscriber needs for using CRS and other Authorized Services.

Marks. Trademarks, service marks, trade names, insignia, symbols, logos, decorative designs, and/or other identifying insignia that CELLULAR ONE owns or is licensed or sublicensed to use in connection with its Services or products relating thereto, and which CELLULAR ONE, in its sole discretion, determines from time to time that AGENT is authorized to use.

Paging Services. One-way non-voice communication services provided by a communication common carrier and commonly referred to as paging services.

Reseller. Any entity that purchases bulk quantities of a telecommunications service from a telecommunications carrier for resale distribution, directly or indirectly, to ultimate users of such service.

Subscriber. A customer of an Authorized Service provided by CELLULAR ONE. The CRS telephone number or other service access number assigned to a customer of CELLULAR ONE's Authorized Services is deemed to be a separate Subscriber, regardless of how many CRS telephone numbers or service access numbers may be used by any one customer.

Successor. A person, association, partnership, corporation, joint stock company, trust or other business entity, however organized, that succeeds to or acquires the rights, title or interests of another.

2. ACKNOWLEDGEMENTS AND REPRESENTATIONS

CELLULAR ONE and AGENT acknowledge that they have read this Agreement and understand and accept the terms, conditions and covenants contained herein as being reasonably necessary to maintain CELLULAR ONE's high standards for its CRS and other Services thereby to protect and preserve the goodwill of CELLULAR ONE's CRS, Services and Marks.

AGENT has read and understands the obligations imposed by the FCC upon CRS licensees and their duties to CELLULAR ONE as specified in Section 22.912 of the FCC's cellular rules.

AGENT acknowledges that CELLULAR ONE's ability to provide CRS and other Services is conditioned upon the continuing validity of its FCC operating license(s) and any other required licenses, certificates and permits, and may be affected by state and federal court decisions and regulatory approvals. CELLULAR ONE makes no representation concerning whether said licenses, certificates and permits will continue to be valid. AGENT agrees that if CELLULAR ONE is prohibited from, or otherwise ceases, selling an Authorized Service in the Area, CELLULAR ONE may declare this Agreement null and void as to any or all Authorized Services with no penalty.

[11/95 REV]                                                    3

AGENT acknowledges that it has conducted an independent investigation of the business of selling CRS and any other Authorized Services that it will conduct pursuant to this Agreement. AGENT recognizes that entry into business as an AGENT of CELLULAR ONE involves business risks and the AGENT's success in such business will depend primarily upon its abilities and efforts. CELLULAR ONE expressly disclaims the making of, and AGENT acknowledges that it has not received or relied upon, any GUARANTY, express or implied, as to the amount of commissions or other gross revenue that it may earn as a result of its agency relationship with CELLULAR ONE and acknowledges that it has no knowledge of any representations relating to its agency relationship with CELLULAR ONE by an officer, employee or agent of CELLULAR ONE that are contrary to the terms herein. AGENT represents to CELLULAR ONE, as an inducement to its entry into this Agreement, that AGENT has made no misrepresentations to CELLULAR ONE in its application for appointment as a nonexclusive, authorized AGENT of CELLULAR ONE or in any other manner.

AGENT and CELLULAR ONE mutually agree that they shall not have any liability to the other for any lost profits or consequential damages, even if advised of the possibility of such damages.

3. RELATIONSHIP OF THE PARTIES

CELLULAR ONE hereby appoints AGENT as a nonexclusive, authorized agent in the Area to solicit and contract, on behalf of CELLULAR ONE, with Subscribers for the Authorized Services, subject to all of the terms and conditions hereof.

During the term of this Agreement or thereafter, CELLULAR ONE reserves the right without obligation or liability to AGENT to market the Authorized Services and CPE in the same geographical areas served by AGENT, whether through CELLULAR ONE's own representatives or through others including, but not limited to other authorized agents, retailers, resellers and distributors.

Upon enrollment of a particular Subscriber, that Subscriber shall become a customer of CELLULAR ONE, and CELLULAR ONE shall offer and furnish such customer billing services as CELLULAR ONE deems appropriate. CELLULAR ONE shall be responsible to collect any charges for Authorized Services from Subscribers.

With the sole exception of the Subscribers enrolled by AGENT for the account of CELLULAR ONE, with respect to which AGENT acts as agent of CELLULAR ONE and owes CELLULAR ONE the fiduciary and other obligations of an agent to its principal, CELLULAR ONE and AGENT acknowledge and agree that their agency relationship arising from this Agreement does not constitute or create a general agency, joint venture, partnership, employment relationship or franchise between them.

The parties agree that personnel employed by AGENT to perform services under this Agreement are not CELLULAR ONE employees and AGENT assumes full responsibility for their acts. Such personnel employed by AGENT shall be informed that they are not entitled to the provisions of any CELLULAR ONE employee benefits. With respect to such personnel,

AGENT shall have sole responsibility for supervision, daily direction and control. CELLULAR ONE will not be responsible for worker's compensation, disability benefits, unemployment insurance and withholding income taxes and social security for said personnel.

### 3A.   RELATIONSHIP WITH SUB-AGENTS

AGENT warrants it has entered into or may enter into appropriate agreements with all persons (other than AGENT's own employees) and businesses that sell the Authorized Services on behalf of AGENT ("sub-agents"), and that such agreements are sufficient to enable it to comply with all provisions of this Agreement. Without limiting the generality of the foregoing, AGENT understands, covenants and agrees that: (1) any sub-agents appointed by AGENT must agree to comply with all of the restrictive covenants in Paragraph 20 of this Agreement and the Confidentiality Obligations in Paragraph 33 of this Agreement; (2) AGENT will inform CELLULAR ONE thirty (30) days' in advance of the identity of any proposed sub-agent; CELLULAR ONE shall have the right to disapprove the appointment of any sub-agent that reflects adversely upon CELLULAR ONE in the opinion of CELLULAR ONE or which is or has been associated in any way with a competitor of CELLULAR ONE in the Area or for any other reasonable business purpose; and CELLULAR ONE shall have the right to request the removal of any sub-agent who breaches the agreements set forth above or whose actions, in the opinion of CELLULAR ONE, reflect adversely upon CELLULAR ONE; (3) AGENT shall inform CELLULAR ONE prior to any intended relocation of any of its sub-agents which relocation shall then be subject to CELLULAR ONE's approval; and (4) CELLULAR ONE may require any further information it deems necessary prior to AGENT's appointment of the sub-agent. A complete list of all of AGENT's current sub-agents, along with the names of the owners, managers, principals, officers and directors thereof is attached as Exhibit B. AGENT understands and agrees that sub-agents of AGENT shall not be permitted to use, in any manner whatsoever, the name, trademarks or service marks of CELLULAR ONE, unless expressly agreed in a writing signed by AGENT, CELLULAR ONE and sub-agent. Any such use of CELLULAR ONE's name, trademarks or service marks shall be made a ground for immediate termination of any sub-agent agreements.

### 4.   AGENT RESPONSIBILITIES

(a) AGENT agrees to provide materials and advertising to actively promote CELLULAR ONE Authorized Services and appropriate sales facilities to enhance the sale of CELLULAR ONE Authorized Services.

(b) AGENT will sell CELLULAR ONE's Authorized Services to customers by employing the following techniques (in addition to others): providing demonstrations of CELLULAR ONE's Service, explaining its benefits, explaining the terms and conditions of purchase of the Service, providing sales literature prepared by CELLULAR ONE, and training the customer in the use of CELLULAR ONE's Service. AGENT will offer the Authorized Services subject to all of the applicable terms of CELLULAR ONE's form of contract for customers.

(c) AGENT agrees that it must obtain CELLULAR ONE's prior written approval to open any locations in addition to those listed in Exhibit A. However, an amendment of this

Agreement shall not be necessary to subject any new or additional AGENT locations to the terms and conditions of this Agreement; rather, the opening of such locations shall automatically subject them to the terms and conditions of this Agreement. AGENT agrees to establish and maintain installation and maintenance facilities at the locations set forth in Exhibit A and other such locations as AGENT may establish from time to time to the satisfaction of CELLULAR ONE, approval of which shall not be unreasonably withheld, and to furnish high quality and prompt installation, warranty and maintenance service for all CPE sold or leased by it to Subscribers. Notwithstanding anything to the contrary contained herein, the closing of one or more locations shall not be considered a default by AGENT so long as AGENT keeps open at least 80% (eighty percent) of the locations which are initially listed in Exhibit A and operates them in compliance with all of the requirements hereof.

(d)  AGENT, at its own expense, shall obtain from the manufacturer(s) and distributor(s) all required training in the operation, installation, warranty and maintenance service of CPE. If AGENT (1) chooses to handle any one or more of the CELLULAR ONE rental, lease or third-party financing plans and installs the equipment provided pursuant thereto, or (2) performs installs of other CELLULAR ONE-owned equipment provided directly to customers and referred to AGENT for installation (as required by Paragraph 4(o)), then AGENT shall be obligated to comply with all of the requirements of the Cellular One Authorized Service Center Program, as amended from time to time, and with the specific requirements described in the remainder of this subparagraph (d).  AGENT's installation, warranty and maintenance service CRS facility shall be required to obtain certification from the manufacturer(s) of the CPE that AGENT leases or sells and AGENT shall be responsible to secure such certifications.  AGENT may only delegate by contract its installation, warranty and maintenance service obligations hereunder to a subcontractor with the express prior written approval of CELLULAR ONE, which will not be unreasonably withheld or withdrawn, and any approval necessary from each manufacturer and/or distributor of an approved model of CPE to be sold or leased by AGENT.  Such delegation shall be by written agreement between AGENT and the service subcontractor.  Notwithstanding such agreement with a service subcontractor, AGENT shall remain responsible to CELLULAR ONE for all installation, warranty and maintenance service obligations hereunder.  AGENT shall reimburse CELLULAR ONE for the reasonable cost of installation, repair or warranty which CELLULAR ONE, in its sole discretion, deems necessary to have performed at a facility other than AGENT's for customers as to whom AGENT fails to comply with CELLULAR ONE's standards applicable thereto.

(e)  AGENT agrees to maintain sufficient liability insurance to protect CELLULAR ONE from all customer claims arising out of the acts, omissions, and/or representations of AGENT. CELLULAR ONE shall be named as an additional insured party on each policy. Such insurance coverage shall be maintained under one or more policies of insurance from a recognized insurance company qualified to do business within the Area providing in the aggregate minimum liability protection of ONE MILLION DOLLARS per occurrence for bodily and personal injury and death and ONE MILLION DOLLARS per occurrence of property damage. Each such insurance policy shall provide for not less than thirty (30) days' prior notice to all insured of any modification, cancellation or non-renewal. CELLULAR ONE may, at any time and with ninety (90) days' prior notice to AGENT, require AGENT to increase its coverage of any type of insurance in reasonable amounts and require different or

additional kinds of insurance, to reflect inflation, identification of special risks, changes in law or standards of liability, higher damage awards or other reasonable changes in circumstances. Upon request by CELLULAR ONE, AGENT shall furnish proof satisfactory to CELLULAR ONE that insurance coverage required hereunder is in force.

(f) AGENT agrees to maintain operations and follow procedures that are in full compliance with CELLULAR ONE's requirements as specified, amended and distributed from time to time, and to allow CELLULAR ONE reasonable access to AGENT's facilities for inspection.

(g) For its own account, AGENT agrees to sell or lease CPE to be used by Subscribers of the Authorized Services, including CELLULAR ONE's CRS, or other End Users. AGENT may only offer FCC approved equipment. AGENT agrees to maintain an inventory of CPE sufficient to meet reasonable anticipated demand therefore by Subscribers which AGENT enrolls. If AGENT handles any CELLULAR ONE rental or lease plans in AGENT's inventory, AGENT agrees to comply with any inventory control or tracking procedures as CELLULAR ONE may adopt from time to time. AGENT also agrees to maintain a minimum inventory of parts. The parties agree that CELLULAR ONE may restrict AGENT's choice in CPE which AGENT may, on its own behalf, sell, lease or otherwise make available with CELLULAR ONE Services, which will further CELLULAR ONE's legitimate business objectives, if CELLULAR ONE reasonably maintains that the particular type of CPE restricted reflects adversely upon the quality of CELLULAR ONE's Services by reason of the limitations or characteristics of the equipment and CELLULAR ONE will provide AGENT thirty (30) days notice of such restriction. AGENT agrees not to use any CPE bearing trademarks similar to or resembling the Marks of CELLULAR ONE. Except for any CELLULAR ONE-owned CPE which AGENT handles on behalf of CELLULAR ONE as part of a rental, lease or third-party financing plan, all CPE sales and leases shall be made by or on behalf of AGENT for its own account and not as agent for, or for the account of, CELLULAR ONE. AGENT may establish fees and charges for sales prices and lease charges for the CPE and CELLULAR ONE shall have no control over such prices or for AGENT's CPE. With respect to the sale or lease of AGENT's CPE, Subscribers shall be customers of AGENT and CELLULAR ONE shall have no responsibility to AGENT or to Subscribers with respect to the sale or lease of AGENT's CPE. CELLULAR ONE is not obligated to offer any lease, rental or other CPE program to AGENT.

(h) AGENT agrees to take all necessary steps to ensure compliance with AGENT obligations under this Agreement by AGENT and its personnel and any other parties involved in the sale of the Authorized Services by AGENT, including but not limited to sub-agents.

(i) AGENT agrees that AGENT will at all times faithfully, honestly and diligently perform its obligations hereunder, and that AGENT will continuously exert its best efforts to promote and enhance the use of CELLULAR ONE's Authorized Services.

(j) In the relevant Area, AGENT agrees that it will not, at any time either during the term of this Agreement, or any extension thereof, (1) induce, influence or suggest to any Subscriber of CELLULAR ONE's CRS to purchase CRS or any other CMRS from another provider or reseller of CRS or CMRS, or (2) induce, influence or suggest to any Subscriber of any other

Authorized Service to purchase a competing service from any other provider or reseller of such competing service, whether or not the competing service is technologically the same as the Authorized Service in question. As more fully described in paragraph 20, AGENT agrees not to act as a representative or agent of any other reseller or provider of CMRS or any Authorized Service in the relevant Area. Notwithstanding any language to the contrary, AGENT shall have the right to enter into or continue its current provision of Paging Services.

(k) Agrees not to take any action inconsistent with the provisions of this Agreement and shall use its best efforts to support CELLULAR ONE's efforts in providing the Authorized Services to Subscribers.

(l) AGENT agrees not to take any action inconsistent with, and agrees to support CELLULAR ONE's efforts before regulatory authorities regarding any modification of rates.

(m) AGENT agrees that during or after the term of this Agreement, AGENT will not reveal, divulge, make known, sell, exchange, give away, or transfer in any way any part of its list of Subscribers or use such information for any purpose other than 1) AGENT (but no other successor business entity) maintaining such periodic contact with Subscribers as is required for warranty service, installation or maintenance of CPE, and 2) AGENT (but no other corporate entity) business activities unrelated to CRS, CMRS, or any other Authorized Services; provided, however, AGENT shall be under no restriction regarding the use of such information as long as such use is consistent with the terms of this Agreement.

(n) AGENT agrees to advertise association with CELLULAR ONE Authorized Services as an authorized AGENT of CELLULAR ONE, pursuant to any written procedures CELLULAR ONE may publish from time to time.

(o) AGENT agrees to use its best efforts to install and maintain CPE for Subscribers referred to AGENT by CELLULAR ONE's Sales Associates for installation and maintenance on a "first come, first serve basis," such installation and maintenance to be according to CELLULAR ONE standards established from time to time.

## 5. CELLULAR ONE'S RESPONSIBILITIES

CELLULAR ONE will:

(a) Upon approval, and subject to compliance with procedures and guidelines established from time to time, CELLULAR ONE will furnish the Authorized Services to Subscribers.

(b) Secure any necessary regulatory approvals to conduct the Authorized Services.

(c) Establish the rates, terms, and conditions of the sale of its Authorized Services to Subscribers.

(d) Establish the administrative procedures and guidelines for sale of Authorized Services, enrollment of Subscribers, and customer service provided to Subscribers.

(e) Promote CELLULAR ONE's Authorized Services and provide promotional literature as CELLULAR ONE deems necessary and appropriate. CELLULAR ONE may advertise CELLULAR ONE's Authorized Services from time to time if it deems necessary and appropriate.

(f) Provide at cost a reasonable number of CELLULAR ONE sales brochures and other information and illustrative material for the preparation of catalogs, advertising and other promotional activities as CELLULAR ONE deems necessary and appropriate.

(g) Provide a reasonable amount of training on sales of CELLULAR ONE's Authorized Services and administrative procedures associated with the enrollment of Subscribers.

## 6. CPE BEARING CELLULAR ONE'S MARKS

AGENT shall not have the right, except after CELLULAR ONE's approval, to sell CPE bearing CELLULAR ONE's Marks to any person or entity other than a Subscriber to whom AGENT has sold CELLULAR ONE's Authorized Service(s) hereunder. This clause is intended to protect CELLULAR ONE's Marks and to assure that such Marks are used properly.

## 7. COMPENSATION

CELLULAR ONE will compensate AGENT for Subscribers enrolled by AGENT onto CELLULAR ONE's Authorized Services in accordance with the following terms and conditions:

(a) CELLULAR ONE may withhold and offset or apply AGENT compensation against any past due amount owed to CELLULAR ONE by AGENT. Whenever AGENT fails to comply with any term hereof or any procedure in the Administrative Procedures Manual or AGENT does not provide complete and/or accurate information concerning Subscribers to whom an Authorized Service is sold or, if applicable, the CELLULAR ONE CPE is sold or leased, CELLULAR ONE shall have the right to withhold all or a portion of any compensation or other amount otherwise payable hereunder to AGENT with respect to such Authorized Service or, if applicable, CPE. CELLULAR ONE reserves the right to establish and modify procedures to govern the specific manner in which any compensation is administered and to modify the periodic intervals for payments, by notice to AGENT. Residual commissions and any other compensation shall only continue to accrue as long as this Agreement is in effect, and the expiration or termination of this Agreement shall effectively terminate AGENT's right to any further commissions or other amounts except for those residual commissions that accrued prior to the date of expiration or termination, provided that a knowingly wrongful termination by CELLULAR ONE without cause or justification shall not cut off AGENT's right to payment of commissions for the term of this Agreement.

(b) Unless provided otherwise in an annual or other addendum or amendment to this Agreement, from the commencement date through December 31, 2000, CELLULAR ONE will pay Residual Commissions on a monthly basis to AGENT for each active CRS Subscriber that has been accepted and activated by CELLULAR ONE, provided that (1) AGENT is in compliance with the obligations and conditions of this Agreement, and (2) a properly completed

and signed customer service contract has been received by CELLULAR ONE within fifteen (15) days after activation of such Subscriber's cellular service. Residual Commissions will be paid within forty-five (45) days after the end of each calendar month or at such other periodic interval as CELLULAR ONE may establish from time to time. Taxes, long distance charges, equipment charges, directory assistance charges, any third party charges passed through to Subscribers, one-time fees, enhanced feature charges, roamer charges and charges other than recurring CRS base charges and local airtime charges shall not be included in the computation of the Residual Commission. The Residual Commission schedule is as follows:

> From the commencement date through December 31, 1998: An amount equal to five percent (5%) of the total recurring CRS base charges and local airtime charges billed by CELLULAR ONE to AGENT-originated CRS Subscribers;

> From January 1, 1999 through December 31, 1999: An amount equal to four percent (4%) of the total recurring CRS base charges and local airtime charges billed by CELLULAR ONE to AGENT-originated CRS Subscribers;

> From January 1, 2000 through December 31, 2000: An amount equal to three percent (3%) of the total recurring CRS base charges and local airtime charges billed by CELLULAR ONE to AGENT-originated CRS Subscribers.

Payment of the above referenced Residual Commissions is subject to the requirement that AGENT must have annual net growth in AGENT-originated CRS Subscribers who are active and in good standing on CELLULAR ONE's cellular radio system. That is, the total number of AGENT-originated Subscribers who are active and in good standing as of the first of the calendar year must be greater than such number as of the first of the preceding calendar year. Otherwise, if there is no net growth or if there is a reduction, then the Residual Commission payable for the current year shall be one percentage point less than the Residual Commission described above. (For example, if there were 100 active AGENT-originated Subscribers as of January 1, 1995, and only 95 active AGENT-originated Subscribers as of January 1, 1996, AGENT would not have met the annual net growth requirement and its applicable Residual Commission for 1996 would be four percent (4%) rather than five percent (5%).)

## 8. USE OF MARKS BY AGENT

Periodically CELLULAR ONE will publish a list of Marks AGENT is licensed to use under the Agreement. Such list will also be supplemented with reasonable rules and regulations pertaining to the Marks, which AGENT agrees to follow. AGENT acknowledges that its right to use the Marks is derived solely from the Agreement and is limited to the identification of AGENT as an agent of CELLULAR ONE. AGENT agrees to comply with all reasonable rules and procedures pertaining to such Marks prescribed by CELLULAR ONE from time to time during the term of this Agreement. AGENT recognizes the great value of the goodwill associated with the Marks, and acknowledges that the Marks and all rights herein and goodwill pertaining thereto belong exclusively to CELLULAR ONE, and that the Marks have a secondary meaning in the mind of the public. AGENT acknowledges and agrees that all usage of the Marks by AGENT and any goodwill established thereby shall inure to the exclusive benefit of CELLULAR ONE and its Affiliates and that this Agreement does not confer any goodwill or

other interests in the Marks upon AGENT. Any unauthorized use of the Marks by AGENT, or any use not in compliance herewith, shall constitute an infringement of the rights of CELLULAR ONE and its Affiliates in and to the Marks and shall further constitute a material breach of this Agreement. AGENT shall use the Marks with such words qualifying or identifying the agency relationship of CELLULAR ONE and AGENT as CELLULAR ONE from time to time shall reasonably prescribe. AGENT shall not use the Marks as part of any corporate or trade name or with any prefix, suffix or other modifying words, terms, designs or symbols, or in any modified form, nor may AGENT use the Marks in connection with the sale or lease of any unauthorized product or service or in any other manner not expressly authorized by this Agreement or separately in writing by CELLULAR ONE. If AGENT uses CELLULAR ONE's Marks on any of AGENT's stationery, other forms or business cards, AGENT agrees to display the Marks on such stationery, other forms, and business cards used in its business of selling the Authorized Services in the manner prescribed by CELLULAR ONE. AGENT agrees to obtain such fictitious or assumed name certificates or registrations as may be required by applicable law, provided the fictitious or assumed name is approved in writing by CELLULAR ONE and CELLULAR ONE is provided a copy of the certificate and/or registration. If any fictitious or assumed name used by AGENT includes anything that identifies CELLULAR ONE or its Marks, CELLULAR ONE may at any time require AGENT to cease using such fictitious or assumed name, and to cancel any corresponding certificate and/or registration. If it becomes advisable at any time in CELLULAR ONE's sole discretion for AGENT to modify or discontinue use of any Mark or substitute one or more additional Marks to identify its relationship with CELLULAR ONE or, if applicable, any CPE, AGENT agrees to comply therewith within a reasonable time after notice thereof by CELLULAR ONE and the sole obligation of CELLULAR ONE in any such event shall be to reimburse AGENT for the out-of-pocket costs, if any, of complying with this obligation and to indemnify AGENT as provided in Paragraph 9 below. In addition, AGENT shall replace obsolete identification signs or identification material with new signs or identification material should AGENT adopt new Marks replacing one or more Marks identified by CELLULAR ONE in such list as hereinbefore specified.

## 9. CELLULAR ONE'S TITLE AND PROTECTION OF CELLULAR ONE'S RIGHTS

AGENT agrees that it will not during the term of this Agreement, or thereafter, attack the title or any rights of CELLULAR ONE in and to the Marks. CELLULAR ONE hereby indemnifies AGENT and undertakes to hold AGENT harmless against any damages and costs from claims or suits arising out of the use by AGENT of the Marks as authorized in this Agreement, provided that prompt notice is given to CELLULAR ONE of any such claim or suit and provided, further, that CELLULAR ONE shall have the option to undertake and conduct the defense of any suit so brought and that no settlement of any such claim or suit is to be made by AGENT without the prior written consent of CELLULAR ONE. AGENT agrees to assist CELLULAR ONE and CELLULAR ONE agrees to reimburse AGENT for all associated reasonable costs to the extent necessary in the procurement of any protection or to protect any of CELLULAR ONE's rights to the Marks, and CELLULAR ONE, if it so desires, may commence or prosecute any claims or suits in its own name or in the name of AGENT or join AGENT as a party thereto. When known, AGENT shall notify CELLULAR ONE in writing of any infringements or imitations by others of the Marks which are the same as or similar to those covered by this Agreement. CELLULAR ONE shall have the sole right to determine whether any action shall be taken on account of any such infringements or imitations. AGENT shall not

institute any suit or take any action on account of any such infringements or imitations without first obtaining the written consent of CELLULAR ONE.

## 10. RULES AND PROCEDURES

AGENT understands that if AGENT operates its CPE business or represents CELLULAR ONE's Authorized Services in a manner that is inconsistent with or contrary to state or federal law or regulation, such action will reflect adversely upon the name and goodwill of CELLULAR ONE and its Affiliates. Therefore, AGENT agrees to comply, if applicable, with Part 22 of the FCC rules, and all tariffs, other governmental rules and procedures in existence relating to the sale of the Authorized Services and the sale, lease, warranty service and the conduct of AGENT's CPE business hereunder as well as any rules and procedures relating to such matters reasonably prescribed from time to time by CELLULAR ONE through the Administrative Procedures Manual, which rules and procedures shall constitute provisions hereof as if fully set forth herein. All references herein to the Agreement shall include all such tariffs, rules and procedures. CELLULAR ONE may incorporate all such tariffs, rules and procedures in one or more Administrative Procedures Manuals or other written form, but is not obligated to do so. AGENT shall itself be responsible to familiarize itself with the laws and regulations applicable to the conduct of its business.

## 11. COMPLIANCE WITH LAWS AND GOOD BUSINESS PRACTICES

AGENT shall secure and maintain in force all licenses and permits required by AGENT and its employees in the enrollment of Subscribers and the sale or lease of CPE, installation and maintenance of CPE, including without limitation, all required FCC permits and certifications, if required, and business and sales tax licenses, and shall conduct its business in full compliance with all state and federal laws, ordinances and regulations applicable to AGENT's business. CELLULAR ONE shall sell or resell the Authorized Services in accordance with applicable rules, regulations, statutes and decisions governing such Services. AGENT shall promptly pay, when due, all taxes and assessments against any real or personal property used in connection with AGENT's business, and all liens or encumbrances or every kind or character created or placed upon or against any such property, and all accounts and other indebtedness of every kind incurred by AGENT in the conduct of its business. AGENT shall comply, at its own expense, with the provisions of all applicable municipal requirements and those state and federal laws applicable to AGENT as an employer of labor or otherwise. AGENT expressly agrees not to discriminate against any employee or applicant for employment because of race, creed, color, national origin or sex. The provisions of Executive Order No. 11246, as amended, are incorporated herein by reference. AGENT will fully comply with the provisions of the Federal Occupational Safety and Health Act of 1970 and with any rules and regulations issued pursuant to this Act.

The undersigned parties agree that this Agreement is subject to any and all restrictions now existing or hereafter imposed by the FCC or under the Modified Final Judgment ("MFJ") entered on August 24, 1982, in the United States District Court for the District of Columbia in United States vs. Western Electric et. all; Civil Action No. 82-0192, 552 F. Supp. 131 (D.D.C. 1982), and any subsequent interpretation thereof by the Court or the Department of Justice, and this Agreement shall be deemed amended to the extent inconsistent with any such interpretation. In the event that CELLULAR ONE reasonably determines that any aspect of the arrangements

[11/95 REV]                                        12

made between the parties pursuant to this Agreement would violate any present or future requirements of the MFJ and related rulings, CELLULAR ONE may immediately, upon written notice to AGENT, terminate this Agreement without further obligation.

## 12. ADVERTISING AND BUSINESS PRACTICES OF AGENT

All advertising and promotion by AGENT shall be completely factual and shall conform to the highest standards of ethical advertising. AGENT shall adhere to the highest standards of honesty, integrity, fair dealing and ethical conduct in all dealings with Subscribers, AGENT and the public. AGENT agrees to refrain from any business or advertising practice which may be injurious to the business of CELLULAR ONE and the goodwill associated with the Marks. All advertising and marketing materials that AGENT desires to use in connection with the Authorized Services or CPE and which have not been prepared or previously approved by CELLULAR ONE must be submitted to CELLULAR ONE for approval. AGENT shall not use any advertising or marketing materials that CELLULAR ONE has failed to approve. AGENT agrees that it will not begin its advertising and promotion without CELLULAR ONE's prior written consent. AGENT shall notify CELLULAR ONE in writing within five (5) days of the commencement of any material action, suit or proceeding, and of the issuance of any order, writ, injunction, award or decree of any court, agency of other governmental instrumentality, involving AGENT, or any business conducted by AGENT on behalf of CELLULAR ONE hereunder.

## 13. AGENT'S BUSINESS RECORDS

AGENT agrees to create and to maintain at its principal office and preserve for three (3) years from the date of their preparation, full, complete and accurate records of its business conducted pursuant to this Agreement. Such records shall include, without limitation, records of all Authorized Service enrollments and CPE sales, leases, or rentals.

## 14. REPORTS AND FINANCIAL STATEMENTS

AGENT shall maintain at its principal office for a period of three (3) years complete and accurate books of account and records, including all documentation and correspondence related to advertising and publicity, Subscriber contacts and solicitations, Subscriber applications and contracts, Subscriber complaints, use of CELLULAR ONE's name and trademarks, payments to AGENT, agreements with and payments to third parties in connection with this Agreement, AGENT's licenses and authorizations, compliance with the requirements of any governmental agency and all other documents or records in connection with AGENT's performance of its duties hereunder. CELLULAR ONE shall have the right to inspect and make copies of AGENT's books of account and records during normal working hours, upon reasonable notice by CELLULAR ONE. CELLULAR ONE expressly agrees, and will require its authorized representatives to agree, that it will keep all such records strictly confidential and that it will not disclose such information to any other agent or distributor of CELLULAR ONE's Services or to any other person without AGENT's express prior written consent; provided, however, CELLULAR ONE may disclose such information if required to do so by any state or federal regulatory agency.

## 15. ASSIGNMENT

This Agreement is fully assignable by CELLULAR ONE to any affiliated person or entity and shall inure to the benefit of any assignee or other legal successor to the interest of CELLULAR ONE herein.

AGENT acknowledges that CELLULAR ONE has entered into this Agreement in reliance upon the character, business experience and ability of AGENT and its owner(s), officers and managers and that neither the rights and duties created by this Agreement nor a controlling interest in the ownership of AGENT may be voluntarily, involuntarily, directly or indirectly assigned, or otherwise transferred (including, without limitation, by transfer of capital stock or partnership interests, by merger or consolidation, by issuance of additional securities representing an ownership interest in AGENT or convertible thereto, or in the event of the death of a shareholder or partner of AGENT, by will, in declaration of or transfer in trust or the laws of intestate succession) without the written approval of CELLULAR ONE, which will not be unreasonably withheld, subject to such conditions as CELLULAR ONE deems reasonably necessary. Any such assignment or transfer without such approval shall constitute a breach hereof and convey no rights to or interests herein. Any change in management, personnel or identity which materially impairs the ability of AGENT to market the Authorized Services shall also constitute such a breach. "Control" for purposes hereof is defined in Paragraph 1 above.

## 16. TERM AND EXTENSION OF AGENCY RELATIONSHIP

The term of this Agreement shall commence on the 1st day of January, 1996, and shall end on the 31st day of December, 2000. AGENT shall provide to CELLULAR ONE written notice of the date on which AGENT initiates operations under this Agreement in the Area. AGENT agrees that CELLULAR ONE must provide written consent before AGENT actually initiates business operations. This Agreement shall be effective only after its execution by an officer or other authorized employee of both AGENT and CELLULAR ONE.

CELLULAR ONE may give AGENT written notice of its determination that the agency relationship between CELLULAR ONE and AGENT may be extended upon mutual Agreement, not less than sixty (60) days prior to the expiration hereof, if CELLULAR ONE determines that it is renewable.

## 17. LATE PAYMENTS; SECURITY DEPOSIT

In the event any amount payable by AGENT to CELLULAR ONE is more than thirty (30) days overdue, CELLULAR ONE may, at its option, do one or more of the following: (i) require AGENT to pay its account in full; (ii) apply commissions and any credits or other amounts payable to AGENT to reduce the AGENT's account payable balance; or (iii) require AGENT to deposit with CELLULAR ONE an irrevocable commercial letter of credit, cash or other form of security acceptable to CELLULAR ONE in its sole discretion to secure future delays or defaults in payment. This deposit will secure payment of any amounts due under this Agreement or any other agreement between the parties.

AGENT understands that in order to purchase CPE from CELLULAR ONE (if CELLULAR ONE determines that it will sell CPE) other than on a cash on delivery basis,

AGENT may be required to sign Security Agreements, Financing Statements and related documents.

## 18. TERMINATION OF AGREEMENT

### A. By Agent

If AGENT is in substantial compliance with this Agreement and CELLULAR ONE materially breaches this Agreement and fails to cure such breach within thirty (30) days after written notice thereof is delivered to CELLULAR ONE, AGENT may terminate this Agreement effective thirty (30) days after delivery to CELLULAR ONE of written notice thereof and AGENT shall not be bound by the provisions in Paragraph 20, "Covenants Not To Compete." A termination of this Agreement by AGENT (whether express or reasonably implied from AGENT's acts or omissions) for any reason other than a material breach hereof by CELLULAR ONE (coupled with substantial compliance by AGENT), and CELLULAR ONE's failure to cure such breach within thirty (30) days after receipt of written notice thereof, shall be deemed a termination by AGENT without cause.

### B. By CELLULAR ONE

CELLULAR ONE shall have the right to terminate this Agreement effective upon thirty (30) days written notice should (A) the FCC Cellular Radio Decisions or other requisite governmental decisions and authorities not be continued in substantially the same form and such change materially adversely impacts CELLULAR ONE's (or an affiliate's) ability to conduct its business in the Area; (B) state and/or federal regulatory approval empowering CELLULAR ONE or its Affiliate to construct and provide the Authorized Services and/or CPE in the Area is not granted to either CELLULAR ONE or an Affiliate, is granted subject to terms and conditions unacceptable to CELLULAR ONE or an Affiliate, or is granted under such terms and conditions which, in CELLULAR ONE's opinion, materially adversely affects the intended purpose of this Agreement; or (C) regulatory authorization of the commission schedule of this Agreement is made subject to terms and conditions unacceptable to CELLULAR ONE or Affiliates.

Further, CELLULAR ONE shall have the right to terminate this Agreement effective upon written notice if (a) AGENT makes an assignment for the benefit of creditors; (b) an Order for Relief under Title ll of the United States Code is entered by any United States Court against AGENT; (c) a trustee or receiver of any substantial part of the AGENT's assets, is appointed by any Court; (d) AGENT sells all or substantially all of AGENT's inventory or Assets other than in the ordinary course of business.

In addition, CELLULAR ONE shall have the right to terminate this Agreement for cause effective upon delivery of notice of termination of AGENT, if AGENT (or one of more of its owners and affiliates): (1) has made any material misrepresentation or omission in its application to establish an agency relationship with CELLULAR ONE or is convicted of or pleads no contest to a felony or other crime or offense that is likely to adversely affect the reputation of CELLULAR ONE or its affiliated companies or the goodwill of the Marks; (2) attempts to make an unauthorized assignment of this Agreement; (3) receives a notice of violation of the terms or conditions of any license or permit required by AGENT or its employees in the conduct of

[11/95 REV]                                              15

AGENT's business and fails to correct such violation, or to terminate the employment of such employee(s) within the time period specified in such notice, if any; or within thirty (30) days after receipt of such notice, whichever first expires; (4) fails to comply with any provision of this Agreement, including, if applicable, sales of Authorized Services consistent with AGENT forecasts, or any applicable tariff or CELLULAR ONE procedure relating to the Authorized Services and/or CPE, and AGENT does not correct such failure within ten (10) days as to monetary defaults and within thirty (30) days if non-monetary default after written notice of such failure to comply is delivered to AGENT.

### 19.  OBLIGATIONS OF AGENT UPON TERMINATION OR EXPIRATION

AGENT agrees that upon the expiration or termination of this Agreement in the Area, AGENT and its owner(s) and Affiliates will: (1) not thereafter use any actual or similar Marks, or any actual or similar trade name, service mark, trademark, logo, insignia, symbols or decorative design theretofore used by AGENT specifically in its sale of the Authorized Services, in any manner or for any purpose in the Area except that AGENT and its owner(s) may use or continue to use any trade name, service mark, logo, insignia, symbols or decorative designs AGENT or its owner(s) used in any business prior to the date of this Agreement; and will not utilize for any purpose any actual or similar trade name, trade or service mark or other commercial symbol that suggests or indicates a connection or association with CELLULAR ONE or any affiliated company of CELLULAR ONE, or directly or indirectly, at any time or in any manner identify itself or any business associated with CELLULAR ONE or such affiliated company in the Area; (2) return to CELLULAR ONE all advertising and marketing materials, forms, and other materials containing any Mark or otherwise identifying or relating to CELLULAR ONE's Authorized Services in the Area; (3) take such action as may be required to cancel all fictitious or assumed name or equivalent registrations relating to any Mark or authorize CELLULAR ONE, and any officer of CELLULAR ONE, as AGENT's attorney in fact, to take such actions as may be required to cancel such fictitious or assumed name or equivalent registration; if AGENT fails or refuses to do so, all governmental agencies administering fictitious or assumed name or equivalent registrations may accept and rely upon appropriate documents executed by CELLULAR ONE or its officer canceling any such registration; and (4) provide CELLULAR ONE with an updated list of names, addresses and all other relevant information AGENT then possesses concerning Subscribers of all Authorized Services that AGENT has enrolled in the Area.

### 20.  COVENANTS NOT TO COMPETE

In consideration of CELLULAR ONE's grant to AGENT of the right to use the Marks, the right to advertise affiliation with CELLULAR ONE as an authorized agent of CELLULAR ONE and the great value of the goodwill associated with AGENT's ability to use the Marks, which rights and value are not available to distributors generally, and in recognition of the value of specialized, technical knowledge of the cellular industry and other Services to be imparted by CELLULAR ONE to AGENT from time to time, AGENT agrees to be bound by the covenants in this Paragraph 20. Such rights and value shall constitute independent consideration for the covenants in this Paragraph 20.

Therefore, for value received as identified above, AGENT agrees that AGENT, its officers, directors, key employees, and principals, any Affiliate or the person or persons owning a controlling interest in AGENT or an Affiliate, during the term of this Agreement and for a period of one (1) year following the later of the expiration or termination of this Agreement, shall not

(1) directly or indirectly, induce, influence or suggest to any Subscriber of CELLULAR ONE's CRS to purchase CRS or any other CMRS from another reseller or provider of CRS or CMRS in the Area;

(2) directly or indirectly, induce, influence or suggest to any Subscriber of any other Authorized Service to purchase a competing service from any other provider or reseller of such competing service in the Area, whether or not the competing service is technologically the same as the Authorized Service in question;

(3) under any circumstances or conditions whatsoever, directly or indirectly, as an individual, partner, stockholder, director, officer, employee, manager or in any other relation or capacity whatsoever engage in the sale or promotion of CRS, CMRS, or any other Authorized Service on behalf of any competing reseller or provider of such service in the Area;

(4) directly or indirectly, allow any other person, firm or other entity to use the name, trade name, goodwill or any other assets or property of AGENT or CELLULAR ONE in any manner in connection with such other entity's sale of CRS, CMRS or any other Authorized Service on behalf of a competing reseller or provider in the Area, and AGENT specifically agrees not to transfer, assign, authorize or consent to the transfer of an AGENT telephone number to any other person, firm or other entity upon the expiration or termination of this Agreement.

Notwithstanding any language to the contrary, the restrictive covenants contained herein shall not operate so as to restrict AGENT from the businesses of providing or selling Paging Services.

## 21. SEVERABILITY AND SUBSTITUTION OF VALID PROVISIONS

Except as expressly provided to the contrary herein, each term and condition of this Agreement, and any portion thereof, shall be considered severable and if, for any reason, any such provision hereof is held to be invalid, contrary to, or in conflict with any applicable present or future law, regulation or public policy in a final, unappealable ruling issued by any court, agency or tribunal with competent jurisdiction in a proceeding to which CELLULAR ONE or its Affiliate is a party, that ruling shall not impair the operation of, or have any other effect upon, such other portions of this Agreement as may remain otherwise enforceable which shall continue to be given full force and effect and bind the parties hereto, although any portion held to be invalid shall be deemed not to be a part of this Agreement from the date the time for appeal expires, if AGENT is a party thereto, otherwise upon AGENT's receipt of a notice of nonenforcement thereof from CELLULAR ONE.

To the extent that Paragraphs 4 or 20 contain or impose a restriction upon AGENT that is deemed unenforceable by virtue of its scope in terms of area, business activity prohibited and/or length of time, but could be enforceable by reducing any or all thereof, AGENT and CELLULAR ONE agree that same shall be enforced to the fullest extent permissible under the laws and public policies applied in the jurisdiction in which enforcement is sought. CELLULAR ONE and AGENT shall mutually agree to a modification of any invalid or unenforceable term or condition hereof to the extent required to be valid and enforceable. Such modifications to this Agreement shall be required only in the area directly affected by any such ruling.

22. WAIVER OF OBLIGATIONS

CELLULAR ONE and AGENT may by written instrument unilaterally waive or reduce any obligation of or restriction upon the other under this Agreement, effective upon delivery of written notice thereof to the other or such other effective date stated in the notice of waiver.

Whenever this Agreement requires the consent of a Party, such request shall be in writing and no consent may be unreasonably withheld. All consents or withholding of consent with reasons therefore shall be in writing. Neither party makes any guarantees upon which the other may rely, and assumes no liability or obligation to the other, by granting any waiver, approval or consent to the other, or by reason of any neglect, delay or denial of any request therefor. Any waiver granted by either Party shall be without prejudice to any other right that Party may have, will be subject to continuing review, and may be revoked, at the waiving party's sole discretion, at any time and for any reason, effective upon delivery to the other of ten (10) days' prior written notice.

CELLULAR ONE and AGENT shall not be deemed to have waived or impaired any right, power or option reserved by this Agreement (including, without limitation, the right to demand exact compliance with every term, condition and covenant herein, or to declare any breach hereof to be a default and to terminate this Agreement prior to the expiration of its term), by virtue of any custom or practice of the parties at variance with the terms hereof, or any failure, refusal or neglect of CELLULAR ONE or AGENT to exercise any right under this Agreement or to insist upon exact compliance by the other with its obligations hereunder, including without limitation any rule or procedure, or any waiver, forbearance, delay, failure or omission by CELLULAR ONE to exercise any right, power or option, whether of the same, similar or different nature, with respect to one or more other authorized agents or other forms of distribution.

23. RIGHTS OF PARTIES ARE CUMULATIVE

The rights of CELLULAR ONE and AGENT hereunder are cumulative and no exercise or enforcement by CELLULAR ONE and AGENT of any right or remedy hereunder shall preclude the exercise or enforcement by CELLULAR ONE or AGENT of any other right or remedy hereunder or which CELLULAR ONE or AGENT is entitled by law to enforce.

24. GOVERNING LAW

Except to the extent governed by United States law that preempts state law, this Agreement shall be interpreted under and governed by the laws of the State of Illinois. If any suit or action shall be brought to enforce or declare any of the terms of this Agreement, to terminate this Agreement or to recover any damages sustained as a result of a default in the performance of any obligations under this Agreement, or a breach of any of the representations and warranties herein contained or otherwise pursuant to this Agreement, then except as otherwise provided in Paragraph 35, the party not prevailing in such suit or action shall be liable to the prevailing party for the prevailing party's costs and expenses, including, without limitation, court costs and reasonable attorneys' and expert witnesses' fees (including, without limitation, the value of time spent by in-house personnel), the amount of which shall be fixed by the court and shall be made a part of any judgment rendered. The parties agree that any such suit or action must be brought, if at all, within one (1) year after the underlying cause of action accrues.

25. TESTIMONY

Matters relating to this Agreement may be an issue before various regulatory bodies. Upon reasonable notice AGENT agrees to fully cooperate with CELLULAR ONE regarding any such matters including willingly providing employees of AGENT to testify at appropriate times regarding any aspect of this Agreement or other related issues. CELLULAR ONE agrees to reimburse AGENT for reasonable costs expended in supplying such testimony.

26. BINDING EFFECT

This Agreement is binding upon the parties hereto, their respective executors, administrators, heirs, assigns and successors in interest.

All obligations by either party which expressly or by their nature survive the expiration or termination of this Agreement shall continue in full force and effect subsequent to and notwithstanding its expiration or termination and until they are satisfied in full or by their nature.

27. IMPOSSIBILITY OF PERFORMANCE

Neither CELLULAR ONE nor AGENT shall be liable for loss or damage or deemed to be in breach of this Agreement if its failure to perform its obligations results from: (1) compliance with any law, ruling, order, regulation, requirement or instruction of any federal, state or municipal government or any department or agency thereof or court of competent jurisdiction; (2) acts of God; (3) acts or omissions of the other party; and (4) fires, strikes, embargoes, war, insurrection or riot. Any delay resulting from any of said causes shall extend performance accordingly or excuse performance, in whole or in part, as may be reasonable.

28. INTERPRETATION

The preambles and exhibits to this Agreement are a part of this Agreement, which constitutes the entire agreement of the parties, and there are no other oral or written understandings or agreements between CELLULAR ONE and AGENT relating to the subject matter hereof. This Agreement supersedes any prior agreements or understandings between the parties relating to the subject matter hereof.

Nothing in this Agreement is intended, nor shall be deemed, to confer any rights or remedies upon any person or legal entity not a party hereto, except for those affiliates of CELLULAR ONE as may be involved in the provision of one or more of the Authorized Services.

The headings of the several paragraphs hereof are for convenience only and do not define, limit or construe the contents of such paragraphs.

The term "AGENT" as used herein is applicable to one or more persons, a corporation or a partnership, as the case may be, and the singular usage include the other the feminine.

If two or more persons are at any time AGENT hereunder, whether or not as partners or joint venturers, their obligations and liabilities to CELLULAR ONE shall be joint and several.

This Agreement shall be executed in multiple copies, each of which shall be deemed an original.

## 29. INDEMNITY

Subject to the provisions of Paragraph 3, each party hereto agrees to defend, indemnify and save harmless the other party and its successors and assigns and its employees and agents and their heirs, legal representatives and assigns from any and all claims or demands whatsoever, including the costs, expenses and reasonable attorney's fees incurred on account thereof, that may be made (1) by the indemnifying Party's employees or any other persons for bodily injury or damage to property occasioned by the acts or omissions of the Party of its subcontractor, or the employees or agents of any of them, and (2) by the Party's employees under worker's compensation or similar acts.

Further, AGENT agrees to indemnify, hold harmless and, upon CELLULAR ONE's written request, defend CELLULAR ONE (including its officers, directors and employees) from and against any and all liability, loss, damages, costs, attorneys' fees, or other expense of any kind, that arises out of any threatened or actual claim or any suit for damages, injunction, or other relief on account of (a) injury to or death of any person, (b) damage to any property, (c) public charges and penalties, or (d) any demand, liability or lien, whether caused by, resulting from, or in connection with, the negligent or intentional acts, omissions or misrepresentations of AGENT (including any of its subordinates, sub-agents, employees or servants), solely or jointly with others, including CELLULAR ONE, its employees or servants (except for the negligent acts or omissions solely of CELLULAR ONE or any of its employees or servants) in the performance of or in connection with the performance of AGENT's responsibilities under this Agreement.

## 30. SURVIVAL

The terms, provisions, representations, and warranties contained in this Agreement that by their sense and context are intended to survive the performance thereof by either or both parties hereunder shall so survive the completion of performances and termination of this Agreement, including the making of any and all payments due hereunder.

31. LICENSES

No licenses, express or implied, under any patents or copyrights are granted by CELLULAR ONE or its Affiliates to AGENT.

32. NOTICES AND PAYMENTS

All payments due AGENT shall be made to such address or bank as AGENT from time to time designates. All notices and reports required to be delivered by the provisions of the Agreement shall be deemed so delivered three (3) business days after placement in the United States Certified or Registered Mail, postage prepaid and addressed to the party to be notified at its most current principal business address of which the notifying party has been notified. All reports and other information required by this Agreement shall be directed to CELLULAR ONE at the data processing center or the address provided to AGENT from time to time, or to such other persons and places as CELLULAR ONE may direct from time to time. Any required report not actually received or postmarked by CELLULAR ONE or AGENT during regular business hours on the date due, shall be deemed delinquent.

33. CONFIDENTIAL INFORMATION

Any specifications, drawings, sketches, models, samples, data, computer programs or documentation, or technical or business information ("Information") furnished or disclosed by CELLULAR ONE to AGENT hereunder shall be deemed the exclusive property of CELLULAR ONE, including title to copyright in all copyrightable material, and, when in tangible form, shall be returned to CELLULAR ONE upon completion or termination of authorized work. Unless such information was previously known to AGENT free of any obligation to keep it confidential, or has been or is subsequently made public by CELLULAR ONE or a third party, it shall be held in confidence by AGENT, shall be used only for the purposes hereunder, and may be used for other purposes only upon such terms and conditions as may be mutually agreed upon in writing. In addition, the parties hereby agree that Subscriber lists and related information or data are the exclusive property of CELLULAR ONE and are to be used by AGENT solely in the performance of its obligations and duties as described herein and are to be returned to CELLULAR ONE upon the termination of this Agreement.

If AGENT is served with process to obtain Information, AGENT shall immediately notify CELLULAR ONE which shall, in addition to AGENT efforts, if any, have the right to seek to quash such process.

Unless marked "proprietary," any Information furnished or disclosed by AGENT to CELLULAR ONE shall not obligate CELLULAR ONE to hold such information in confidence.

34. COVENANT NOT TO SOLICIT EMPLOYMENT

AGENT recognizes and agrees that CELLULAR ONE takes a great deal of time to hire and train employees for its business. AGENT fully understands the time and expense CELLULAR ONE incurs to obtain qualified personnel, and AGENT therefore agrees not to offer employment to or accept to hire any of CELLULAR ONE's employees. This Paragraph 34

[11/95 REV]                                    21

cannot be waived except by the President and Chief Executive Officer of CELLULAR ONE in writing. In the event AGENT, or any affiliate or person associated with AGENT, does hire any of CELLULAR ONE's employees during the term of this Agreement, or during any renewal or option period, or hires such employees during a period of 90 days after any such employee leaves the employment of CELLULAR ONE, such hiring also will constitute a material breach of this Agreement.

Moreover, CELLULAR ONE and AGENT have considered the matter and have reasonably endeavored to estimate the actual damages to CELLULAR ONE in the event AGENT breaches this Agreement and offers or accepts to hire any of CELLULAR ONE's employees, and both realize that it would be impractical or extremely difficult to fix the actual damages to CELLULAR ONE resulting from such offer or hiring of CELLULAR ONE's employees. CELLULAR ONE and AGENT therefore agree that if AGENT offers or accepts to hire any of CELLULAR ONE's employees during the periods of time heretofore mentioned, AGENT agrees to reimburse CELLULAR ONE for its costs in replacing each such employee, which costs shall be deemed to be one year's salary or wages of each such employee. Said sum represents the amount agreed upon by the parties as CELLULAR ONE's liquidated damages for such breach and shall be in addition to CELLULAR ONE's right to terminate this Agreement for such breach.

## 35. DISPUTE RESOLUTION AND MEDIATION

For all disputes relating to this Agreement except those relating to Paragraph 20, Covenants Not to Compete, prior to instituting litigation in connection with this Agreement in any forum, including but not limited to, state, federal, or regulatory proceedings, each party agrees to the following procedures:

(a) The aggrieved party shall give detailed written notice to the other party of its specific complaint, including the amount of actual damages and expenses, including attorney's fees, claimed by the aggrieved party. The aggrieved party shall include copies of all documents that support its claims. Within thirty (30) days after receipt of the notice, the party receiving the notice shall tender to the aggrieved party a written offer of settlement. Any offer of settlement not accepted within thirty (30) days of receipt by the aggrieved party shall be deemed to have been rejected.

(b) In the event of litigation, a settlement offer made pursuant to Paragraph 35(a) above, if rejected by the aggrieved party, may be filed with the court together with an affidavit certifying its rejection. If the court finds that the amount tendered in the settlement offer is greater than or equal to the actual damages found by the trier of fact, the aggrieved party shall incur the costs of its own attorney's fees and shall reimburse the other party for its reasonable attorneys' fees incurred. If recovery is more that the amount tendered in the settlement offer, then the accused party will reimburse the aggrieved party for its reasonable attorneys' fees.

(c) The tender of an offer of settlement is not an admission of engaging in an unlawful act or practice or of liability. Evidence of a settlement offer may be used only for the purposes specified in Paragraph 35(b) above, and is not to be revealed to the trier of fact as part of its determination of damages or liability.

(d)    If the parties are unable to settle their disputes through the above procedure, the parties agree to submit their dispute to mediation as described in this paragraph within 90 days after rejection of the settlement offer. Compliance with these procedures on dispute resolution and mediation shall be a condition precedent to instituting any judicial, quasi-judicial and/or regulatory proceeding.

(i) Mediation is a process under which an impartial mediator facilitates communication between the parties to promote settlement between them. The mediator does not have the authority to decide any issue for the parties, but will attempt to facilitate the voluntary resolution of the dispute by the parties. The mediator is authorized to conduct joint and separate meetings with the parties and to offer suggestions to assist the parties to achieve settlement.

(ii)    The parties shall agree to selection of an impartial mediator. A person shall not serve as a mediator in any dispute in which he has any financial or personal interest. Prior to accepting an appointment, the mediator shall disclose any circumstance likely to create a presumption or appearance of bias or prevent a prompt meeting with the parties. The aggrieved party shall have the right to name a mediator, subject to disagreement from the other party based on the mediator's interest in a dispute, affiliation or connection to the aggrieved party or other circumstance likely to create a presumption or appearance of bias. The parties shall each bear half the cost of the mediation.

(iii)    The parties, while not committing in advance to settle their case, agree to participate in mediation in good faith with the intention to settle, if at all possible.

## 36. AUTHORITY

Each of the parties represents, warrants and agrees that it is a corporation or partnership duly organized, validly existing and in good standing under the laws of the state of its formation, and has all requisite power and authority to execute and deliver this Agreement and to consummate the transactions contemplated hereby; that the execution and delivery of this Agreement and the performance hereof have been duly and validly authorized by all necessary corporate or partnership action; and that the execution and delivery by it of this Agreement and the performance of this Agreement by it will not conflict with or result in a breach of or constitute or result in a default under any of the terms, conditions or provisions of the Articles or Certificates of Incorporation, By-Laws, or other of its governing instruments or any judgment, order, decree, law, regulation or ruling of any court or governmental authority or any agreement, contract, commitment or other instrument to which it is a party or by which it is bound.

Specifically, AGENT represents and warrants that (i) AGENT is not a party to any agreement to distribute, promote or otherwise sell CRS, CMRS or any other Authorized Service (except Paging Services) on behalf of any competing provider, reseller or agent in the Area; (ii) the execution and delivery by it of this Agreement and the performance of this Agreement by it will not conflict with or result in a breach or constitute or result in a default under any of the terms, conditions or provisions of any agreement between AGENT and any other carrier, reseller or agent of CRS, CMRS or any other Authorized Service.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement on the date first above written and hereby declare that they HAVE READ AND DO UNDERSTAND EACH AND EVERY TERM, CONDITION AND COVENANT CONTAINED IN, OR INCORPORATED BY REFERENCE INTO, THIS AGREEMENT.

SOUTHWESTERN BELL MOBILE SYSTEMS, INC., d/b/a CELLULAR ONE-Chicago

By: _____

Name: ~~Robert J. Nelson~~ Stan Sigman

Title: President/~~General Manager~~ & CEO

Date: 4/4/96

KEMPNER MOBILE ELECTRONICS, INC.

By: _____

Name: Scott Kempner

Title: Vice president

Date: 2/10/11

[11/95 REV]                                    24

## EXHIBIT A

## AUTHORIZED AGENT LOCATIONS

Initial locations at which AGENT is authorized to operate as described in this Agreement:

It is agreed by AGENT and CELLULAR ONE that if the initial business location(s) and/or the date upon which CRS operations of AGENT will commence are not known at the date of execution of this Agreement, the same may be added from time to time as such information becomes known but no later than the effective date of AGENT operations.

AGENT shall not change or add business locations without CELLULAR ONE's prior written approval. AGENT shall consult with CELLULAR ONE before initiating any action to change or supplement any of its business locations.

Any business locations that AGENT opens and operates in the Area shall be subject to all of the terms of the Agreement, whether or not an amendment is signed by the parties adding the addresses of any new or different locations.

Authorized Locations:

4722 W. Touhy Avenue, Lincolnwood, IL 60646

## COUNTIES

Counties in which AGENT is authorized:

Cook, Lake, DuPage, Kane, McHenry, Will

## AUTHORIZED SERVICES

CRS (including long distance/toll service, if any, provided by CELLULAR ONE to its CRS subscribers)

Paging

## EXHIBIT B

## SUBAGENTS

## AUTHORIZED AGENCY AGREEMENT

### BETWEEN

## SOUTHWESTERN BELL MOBILE SYSTEMS, INC.
### d/b/a CELLULAR ONE© - Chicago

### AND

### KEMPNER MOBILE ELECTRONICS, INC.

THIS AGREEMENT is made and entered into this _____ day of _____, 199____, by and between SOUTHWESTERN BELL MOBILE SYSTEMS, INC. d/b/a CELLULAR ONE© - Chicago ("CELLULAR ONE"), a Delaware and Virginia Corporation, with its principal place of business at 930 North National Parkway, Schaumburg, Illinois 60173, acting on behalf of itself as licensee of the Chicago MSA non-wireline cellular system and as a provider of other services, and on behalf of Gary Telephone Company, an Indiana general partnership, as licensee of the Gary MSA non-wireline cellular system, and KEMPNER MOBILE ELECRONICS, INC. ("AGENT"), an Illinois corporation, with its principal place of business at 4722 W. Touhy Avenue, Lincolnwood, Illinois 60646.

### WITNESSETH:

Whereas, CELLULAR ONE is involved in the development, establishment and sale of cellular radio service ("CRS") which requires the use by CRS Subscribers of cellular terminal equipment;

Whereas, CELLULAR ONE and/or its affiliates is or may become involved in the development, establishment and/or sale of other services, including but not limited to long distance/toll service for CRS Subscribers, paging services, other Commercial Mobile Radio Services, and competitive landline local exchange and/or long distance services (collectively referred to as the ("Services");

Whereas, CELLULAR ONE has regulatory authority to provide CRS in the cellular geographic service area(s) within the Chicago and Gary metropolitan statistical areas and desires to provide CRS in those areas, as well as other Services in designated areas, through Agents, Retailers, Resellers, and direct sale to Subscribers;

Whereas, CELLULAR ONE has adopted and used or intends to adopt and use certain valuable Marks in the provision of its Services and CPE;

Whereas, AGENT desires to sell certain of CELLULAR ONE's Services as a nonexclusive, authorized agent of CELLULAR ONE, and desires to sell or lease, install, provide warranty service and maintain CPE necessary for Subscribers to utilize such Services;

Now, therefore, in consideration of the mutual promises herein contained, it is hereby agreed:

1. DEFINITIONS

Activation. The act of initiating an Authorized Service in or to a Subscriber's CPE by CELLULAR ONE.

Affiliate. A person, association, partnership, corporation or joint-stock company, trust or other business entity however organized ("Entity") is an affiliate of that person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Entity. Control shall be defined as (i) ownership of a majority of the voting power of all classes of voting stock or (ii) ownership of a majority of the beneficial interests in income and capital of an entity other than a corporation.

Authorized Services. Those Services provided by CELLULAR ONE that AGENT is authorized hereunder to sell on behalf of CELLULAR ONE, including CRS and any other Services set forth on Exhibit A hereto.

Area. With respect to CRS and ancillary services, Area is defined as the Chicago and Gary metropolitan statistical areas ("MSAs") within which CELLULAR ONE has regulatory authority to provide CRS. The counties generally comprising these MSAs are listed in Exhibit A, and any additional adjoining counties that may be added to the areas served by CELLULAR ONE shall be deemed added to the Area, without the necessity of an amendment to this Agreement. With respect to other Authorized Services, Area is defined as those areas in which Cellular One is authorized to and is providing or reselling such Authorized Service, except as may be otherwise defined or limited on Exhibit A.

CELLULAR ONE. The term CELLULAR ONE includes Southwestern Bell Mobile Systems, Inc. d/b/a Cellular One - Chicago, and, where applicable to a specific Service, includes that affiliate of Southwestern Bell Mobile Systems, Inc., that provides such Service.

Cellular Radio Service (CRS). Any and all service (including resale of said service) authorized by the Federal Communications Commission ("FCC") under Part 22 of its rules as amended under the cellular orders set forth in An Inquiry Into the Use of the Bands 825-845 MHz and 870-890 MHz for Cellular Communications Systems; and Amendments of Parts 2 and 22 of the Commission's Rules Relative to Cellular Communications Systems (CC Docket No. 79-318), 86 FCC 2d 469 (1981), modified as set forth in reconsideration order 89 FCC 2d 58 (1982), and as further modified as set forth in other rules or orders from time to time.

Commercial Mobile Radio Services (CMRS). Any and all services (including resale of said services) that (1) fit the definition of commercial mobile services pursuant to Section 332 of the Communications Act, 47 U.S.C. §332, (2) are subject to regulation as commercial mobile radio services by the FCC under the orders set forth in Implementation of Sections 3(n) and 332 of the

Communications Act; Regulatory Treatment of Mobile Services (CC Docket No. 93-252) or such other orders or rules as may be in effect from time to time, or (3) are the functional equivalent of a commercial mobile service as defined in 47 U.S.C. §332. CMRS shall in any event include CRS, all forms of specialized mobile radio service (SMR and ESMR), and personal communications services (PCS).

CPE. The customer premises equipment, including cellular terminal equipment that a Subscriber needs for using CRS and other Authorized Services.

Marks. Trademarks, service marks, trade names, insignia, symbols, logos, decorative designs, and/or other identifying insignia that CELLULAR ONE owns or is licensed or sublicensed to use in connection with its Services or products relating thereto, and which CELLULAR ONE, in its sole discretion, determines from time to time that AGENT is authorized to use.

Paging Services. One-way non-voice communication services provided by a communication common carrier and commonly referred to as paging services.

Reseller. Any entity that purchases bulk quantities of a telecommunications service from a telecommunications carrier for resale distribution, directly or indirectly, to ultimate users of such service.

Subscriber. A customer of an Authorized Service provided by CELLULAR ONE. The CRS telephone number or other service access number assigned to a customer of CELLULAR ONE's Authorized Services is deemed to be a separate Subscriber, regardless of how many CRS telephone numbers or service access numbers may be used by any one customer.

Successor. A person, association, partnership, corporation, joint stock company, trust or other business entity, however organized, that succeeds to or acquires the rights, title or interests of another.

## 2. ACKNOWLEDGMENTS AND REPRESENTATIONS

CELLULAR ONE and AGENT acknowledge that they have read this Agreement and understand and accept the terms, conditions and covenants contained herein as being reasonably necessary to maintain CELLULAR ONE's high standards for its CRS and other Services thereby to protect and preserve the goodwill of CELLULAR ONE's CRS, Services and Marks.

AGENT has read and understands the obligations imposed by the FCC upon CRS licensees and their duties to CELLULAR ONE as specified in Section 22.912 of the FCC's cellular rules.

AGENT acknowledges that CELLULAR ONE's ability to provide CRS and other Services is conditioned upon the continuing validity of its FCC operating license(s) and any other required licenses, certificates and permits, and may be affected by state and federal court decisions and regulatory approvals. CELLULAR ONE makes no representation concerning whether said licenses, certificates and permits will continue to be valid. AGENT agrees that if CELLULAR ONE is

prohibited from, or otherwise ceases selling an Authorized Service in the Area, CELLULAR ONE may declare this Agreement null and void as to any or all Authorized Services with no penalty.

AGENT acknowledges that it has conducted an independent investigation of the business of selling CRS and any other Authorized Services that it will conduct pursuant to this Agreement. AGENT recognizes that entry into business as an AGENT of CELLULAR ONE involves business risks and the AGENT's success in such business will depend primarily upon its abilities and efforts CELLULAR ONE expressly disclaims the making of, and AGENT acknowledges that it has not received or relied upon, any GUARANTY, express or implied, as to the amount of commissions or other gross revenue that it may earn as a result of its agency relationship with CELLULAR ONE and acknowledges that it has no knowledge of any representations relating to its agency relationship with CELLULAR ONE by an officer, employee or agent of CELLULAR ONE that are contrary to the terms herein. AGENT represents to CELLULAR ONE, as an inducement to its entry into this Agreement, that AGENT has made no misrepresentations to CELLULAR ONE in its application for appointment as a nonexclusive, authorized AGENT of CELLULAR ONE or in any other manner.

AGENT and CELLULAR ONE mutually agree that they shall not have any liability to the other for any lost profits or consequential damages, even if advised of the possibility of such damages.

## 3. RELATIONSHIP OF THE PARTIES

CELLULAR ONE hereby appoints AGENT as a nonexclusive, authorized agent in the Area to solicit and contract, on behalf of CELLULAR ONE, with Subscribers for the Authorized Services, subject to all of the terms and conditions hereof.

During the term of this Agreement or thereafter, CELLULAR ONE reserves the right without obligation or liability to AGENT to market the Authorized Services and CPE in the same geographical areas served by AGENT, whether through CELLULAR ONE's own representatives or through others including, but not limited to other authorized agents, retailers, resellers and distributors.

Upon enrollment of a particular Subscriber, that Subscriber shall become a customer of CELLULAR ONE, and CELLULAR ONE shall offer and furnish such customer billing services as CELLULAR ONE deems appropriate. CELLULAR ONE shall be responsible to collect any charges for Authorized Services from Subscribers.

With the sole exception of the Subscribers enrolled by AGENT for the account of CELLULAR ONE, with respect to which AGENT acts as agent of CELLULAR ONE and owes CELLULAR ONE the fiduciary and other obligations of an agent to its principal, CELLULAR ONE and AGENT acknowledge and agree that their agency relationship arising from this Agreement does not constitute or create a general agency, joint venture, partnership, employment relationship or franchise between them.

The parties agree that personnel employed by AGENT to perform services under this Agreement are not CELLULAR ONE employees and AGENT assumes full responsibility for their acts. Such personnel employed by AGENT shall be informed that they are not entitled to the provisions of any CELLULAR ONE employee benefits. With respect to such personnel, AGENT shall have sole responsibility for supervision, daily direction and control. CELLULAR ONE will not be responsible for worker's compensation, disability benefits, unemployment insurance and withholding income taxes and social security for said personnel.

### 3A.   RELATIONSHIP WITH SUB-AGENTS

AGENT warrants it has entered into or may enter into appropriate agreements with all persons (other than AGENT's own employees) and businesses that sell the Authorized Services on behalf of AGENT ("sub-agents"), and that such agreements are sufficient to enable it to comply with all provisions of this Agreement. Without limiting the generality of the foregoing, AGENT understands, covenants and agrees that: (1) any sub-agents appointed by AGENT must agree to comply with all of the restrictive covenants in Paragraph 20 of this Agreement and the Confidentiality Obligations in Paragraph 33 of this Agreement; (2) AGENT will inform CELLULAR ONE thirty (30) days' in advance of the identity of any proposed sub-agent; CELLULAR ONE shall have the right to disapprove the appointment of any sub-agent that reflects adversely upon CELLULAR ONE in the opinion of CELLULAR ONE or which is or has been associated in any way with a competitor of CELLULAR ONE in the Area or for any other reasonable business purpose; and CELLULAR ONE shall have the right to request the removal of any sub-agent who breaches the agreements set forth above or whose actions, in the opinion of CELLULAR ONE, reflect adversely upon CELLULAR ONE; (3) AGENT shall inform CELLULAR ONE prior to any intended relocation of any of its sub-agents which relocation shall then be subject to CELLULAR ONE's approval; and (4) CELLULAR ONE may require any further information it deems necessary prior to AGENT's appointment of the sub-agent. A complete list of all of AGENT's current sub-agents, along with the names of the owners, managers, principals, officers and directors thereof is attached as Exhibit B. AGENT understands and agrees that sub-agents of AGENT shall not be permitted to use, in any manner whatsoever, the name, trademarks or service marks of CELLULAR ONE, unless expressly agreed in a writing signed by AGENT, CELLULAR ONE and sub-agent. Any such use of CELLULAR ONE's name, trademarks or service marks shall be made a ground for immediate termination of any sub-agent agreements.

### 4.   AGENT RESPONSIBILITIES

(a) AGENT agrees to provide materials and advertising to actively promote CELLULAR ONE Authorized Services and appropriate sales facilities to enhance the sale of CELLULAR ONE Authorized Services.

(b) AGENT will sell CELLULAR ONE's Authorized Services to customers by employing the following techniques (in addition to others): providing demonstrations of CELLULAR ONE's Service, explaining its benefits, explaining the terms and conditions of purchase of the Service, providing sales literature prepared by CELLULAR ONE, and training the customer in the use of CELLULAR ONE's Service. AGENT will offer the Authorized Services subject to all of the applicable terms of CELLULAR ONE's form of contract for customers.

[8/31/99 REV]

(c) AGENT agrees that it must obtain CELLULAR ONE's prior written approval to open any locations in addition to those listed in Exhibit A. However, an amendment of this Agreement shall not be necessary to subject any new or additional AGENT locations to the terms and conditions of this Agreement; rather, the opening of such locations shall automatically subject them to the terms and conditions of this Agreement. AGENT agrees to establish and maintain installation and maintenance facilities at the locations set forth in Exhibit A and other such locations as AGENT may establish from time to time to the satisfaction of CELLULAR ONE, approval of which shall not be unreasonably withheld, and to furnish high quality and prompt installation, warranty and maintenance service for all CPE sold or leased by it to Subscribers. Notwithstanding anything to the contrary contained herein, the closing of one or more locations shall not be considered a default by AGENT so long as AGENT keeps open at least 80% (eighty percent) of the locations which are initially listed in Exhibit A and operates them in compliance with all of the requirements hereof.

(d) AGENT, at its own expense, shall obtain from the manufacturer(s) and distributor(s) all required training in the operation, installation, warranty and maintenance service of CPE. If AGENT (1) chooses to handle any one or more of the CELLULAR ONE rental, lease or third-party financing plans and installs the equipment provided pursuant thereto, or (2) performs installs of other CELLULAR ONE-owned equipment provided directly to customers and referred to AGENT for installation (as required by Paragraph 4(o)), then AGENT shall be obligated to comply with all of the requirements of the Cellular One Authorized Service Center Program, as amended from time to time, and with the specific requirements described in the remainder of this subparagraph (d). AGENT's installation, warranty and maintenance service CRS facility shall be required to obtain certification from the manufacturer(s) of the CPE that AGENT leases or sells and AGENT shall be responsible to secure such certifications. AGENT may only delegate by contract its installation, warranty and maintenance service obligations hereunder to a subcontractor with the express prior written approval of CELLULAR ONE, which will not be unreasonably withheld or withdrawn, and any approval necessary from each manufacturer and/or distributor of an approved model of CPE to be sold or leased by AGENT. Such delegation shall be by written agreement between AGENT and the service subcontractor. Notwithstanding such agreement with a service subcontractor, AGENT shall remain responsible to CELLULAR ONE for all installation, warranty and maintenance service obligations hereunder. AGENT shall reimburse CELLULAR ONE for the reasonable cost of installation, repair or warranty which CELLULAR ONE, in its sole discretion, deems necessary to have performed at a facility other than AGENT's for customers as to whom AGENT fails to comply with CELLULAR ONE's standards applicable thereto.

(e) AGENT agrees to maintain sufficient liability insurance to protect CELLULAR ONE from all customer claims arising out of the acts, omissions, and/or representations of AGENT. CELLULAR ONE shall be named as an additional insured party on each policy. Such insurance coverage shall be maintained under one or more policies of insurance from a recognized insurance company qualified to do business within the Area providing in the aggregate minimum liability protection of ONE MILLION DOLLARS per occurrence for bodily and personal injury and death and ONE MILLION DOLLARS per occurrence of

property damage. Each such insurance policy shall provide for not less than thirty (30) days' prior notice to all insured of any modification, cancellation or non-renewal. CELLULAR ONE may, at any time and with ninety (90) days' prior notice to AGENT, require AGENT to increase its coverage of any type of insurance in reasonable amounts and require different or additional kinds of insurance, to reflect inflation, identification of special risks, changes in law or standards of liability, higher damage awards or other reasonable changes in circumstances. Upon request by CELLULAR ONE, AGENT shall furnish proof satisfactory to CELLULAR ONE that insurance coverage required hereunder is in force.

(f) AGENT agrees to maintain operations and follow procedures that are in full compliance with CELLULAR ONE's requirements as specified, amended and distributed from time to time, and to allow CELLULAR ONE reasonable access to AGENT's facilities for inspection.

(g) For its own account, AGENT agrees to sell or lease CPE to be used by Subscribers of the Authorized Services, including CELLULAR ONE's CRS, or other End Users. AGENT may only offer FCC approved equipment. AGENT agrees to maintain an inventory of CPE sufficient to meet reasonable anticipated demand therefore by Subscribers which AGENT enrolls. If AGENT handles any CELLULAR ONE rental or lease plans in AGENT's inventory, AGENT agrees to comply with any inventory control or tracking procedures as CELLULAR ONE may adopt from time to time. AGENT also agrees to maintain a minimum inventory of parts. The parties agree that CELLULAR ONE may restrict AGENT's choice in CPE which AGENT may, on its own behalf, sell, lease or otherwise make available with CELLULAR ONE Services, which will further CELLULAR ONE's legitimate business objectives, if CELLULAR ONE reasonably maintains that the particular type of CPE restricted reflects adversely upon the quality of CELLULAR ONE's Services by reason of the limitations or characteristics of the equipment and CELLULAR ONE will provide AGENT thirty (30) days notice of such restriction. AGENT agrees not to use any CPE bearing trademarks similar to or resembling the Marks of CELLULAR ONE. Except for any CELLULAR ONE-owned CPE which AGENT handles on behalf of CELLULAR ONE as part of a rental, lease or third-party financing plan, all CPE sales and leases shall be made by or on behalf of AGENT for its own account and not as agent for, or for the account of, CELLULAR ONE. AGENT may establish fees and charges for sales prices and lease charges for the CPE and CELLULAR ONE shall have no control over such prices or for AGENT's CPE. With respect to the sale or lease of AGENT's CPE, Subscribers shall be customers of AGENT and CELLULAR ONE shall have no responsibility to AGENT or to Subscribers with respect to the sale or lease of AGENT's CPE. CELLULAR ONE is not obligated to offer any lease, rental or other CPE program to AGENT.

(h) AGENT agrees to take all necessary steps to ensure compliance with AGENT obligations under this Agreement by AGENT and its personnel and any other parties involved in the sale of the Authorized Services by AGENT, including but not limited to sub-agents.

(i) AGENT agrees that AGENT will at all times faithfully, honestly and diligently perform its obligations hereunder, and that AGENT will continuously exert its best efforts to promote and enhance the use of CELLULAR ONE's Authorized Services.

(j) In the relevant Area, AGENT agrees that it will not, at any time either during the term of this Agreement, or any extension thereof, (1) induce, influence or suggest to any Subscriber of CELLULAR ONE's CRS to purchase CRS or any other CMRS from another provider or reseller of CRS or CMRS, or (2) induce, influence or suggest to any Subscriber of any other Authorized Service to purchase a competing service from any other provider or reseller of such competing service, whether or not the competing service is technologically the same as the Authorized Service in question. As more fully described in paragraph 20, AGENT agrees not to act as a representative or agent of any other reseller or provider of CMRS or any Authorized Service in the relevant Area. Notwithstanding any language to the contrary, AGENT shall have the right to enter into or continue its current provision of Paging Services.

(k) AGENT agrees not to take any action inconsistent with the provisions of this Agreement and shall use its best efforts to support CELLULAR ONE's efforts in providing the Authorized Services to Subscribers.

(l) AGENT agrees not to take any action inconsistent with, and agrees to support CELLULAR ONE's efforts before regulatory authorities regarding any modification of rates.

(m) AGENT agrees that during or after the term of this Agreement, AGENT will not reveal, divulge, make known, sell, exchange, give away, or transfer in any way any part of its list of Subscribers or use such information for any purpose other than 1) AGENT (but no other successor business entity) maintaining such periodic contact with Subscribers as is required for warranty service, installation or maintenance of CPE, and 2) AGENT (but no other corporate entity) business activities unrelated to CRS, CMRS, or any other Authorized Services; provided, however, AGENT shall be under no restriction regarding the use of such information as long as such use is consistent with the terms of this Agreement.

(n) AGENT agrees to advertise association with CELLULAR ONE Authorized Services as an authorized AGENT of CELLULAR ONE, pursuant to any written procedures CELLULAR ONE may publish from time to time.

(o) AGENT agrees to use its best efforts to install and maintain CPE for Subscribers referred to AGENT by CELLULAR ONE's Sales Associates for installation and maintenance on a "first come, first serve basis," such installation and maintenance to be according to CELLULAR ONE standards established from time to time.

5. CELLULAR ONE'S RESPONSIBILITIES

CELLULAR ONE will:

(a) Upon approval, and subject to compliance with procedures and guidelines established from time to time, CELLULAR ONE will furnish the Authorized Services to Subscribers.

(b) Secure any necessary regulatory approvals to conduct the Authorized Services.

[8/31/99 REV]

(c) Establish the rates, terms, and conditions of the sale of its Authorized Services to Subscribers.

(d) Establish the administrative procedures and guidelines for sale of Authorized Services, enrollment of Subscribers, and customer service provided to Subscribers.

(e) Promote CELLULAR ONE's Authorized Services and provide promotional literature as CELLULAR ONE deems necessary and appropriate. CELLULAR ONE may advertise CELLULAR ONE's Authorized Services from time to time if it deems necessary and appropriate.

(f) Provide at cost a reasonable number of CELLULAR ONE sales brochures and other information and illustrative material for the preparation of catalogs, advertising and other promotional activities, as CELLULAR ONE deems necessary and appropriate.

(g) Provide a reasonable amount of training on sales of CELLULAR ONE's Authorized Services and administrative procedures associated with the enrollment of Subscribers.

## 6. CPE BEARING CELLULAR ONE'S MARKS

AGENT shall not have the right, except after CELLULAR ONE's approval, to sell CPE bearing CELLULAR ONE's Marks to any person or entity other than a Subscriber to whom AGENT has sold CELLULAR ONE's Authorized Service(s) hereunder. This clause is intended to protect CELLULAR ONE's Marks and to assure that such Marks are used properly.

## 7. COMPENSATION

CELLULAR ONE will compensate AGENT for Subscribers enrolled by AGENT onto CELLULAR ONE's Authorized Services in accordance with the following terms and conditions:

(a) CELLULAR ONE may withhold and offset or apply AGENT compensation against any past due amount owed to CELLULAR ONE by AGENT. Whenever AGENT fails to comply with any term hereof or any procedure in the Administrative Procedures Manual or AGENT does not provide complete and/or accurate information concerning Subscribers to whom an Authorized Service is sold or, if applicable, the CELLULAR ONE CPE is sold or leased, CELLULAR ONE shall have the right to withhold all or a portion of any compensation or other amount otherwise payable hereunder to AGENT with respect to such Authorized Service or, if applicable, CPE. CELLULAR ONE reserves the right to establish and modify procedures to govern the specific manner in which any compensation is administered and to modify the periodic intervals for payments, by notice to AGENT. Residual commissions and any other compensation shall only continue to accrue as long as this Agreement is in effect, and the expiration or termination of this Agreement shall effectively terminate AGENT's right to any further commissions or other amounts except for those residual commissions that accrued prior to the date of expiration or termination, provided that a knowingly wrongful termination

by CELLULAR ONE without cause or justification shall not cut off AGENT's right to payment of commissions for the term of this Agreement.

(b) Unless provided otherwise in an annual or other addendum or amendment to this Agreement, from the commencement date through December 31, 2002, CELLULAR ONE will pay Residual Commissions pursuant to the terms herein on a monthly basis to AGENT for each active CRS Subscriber that has been accepted and activated by CELLULAR ONE, provided that (1) AGENT is in compliance with the obligations and conditions of this Agreement, and (2) a properly completed and signed customer service contract has been received by CELLULAR ONE within fifteen (15) days after activation of such Subscriber's cellular service. Residual Commissions will be paid within forty-five (45) days after the end of each calendar month or at such other periodic interval as CELLULAR ONE may establish from time to time. Taxes, long distance charges, equipment charges, directory assistance charges, any third party charges passed through to Subscribers, one-time fees, enhanced feature charges, roamer charges and charges other than recurring CRS base charges and local airtime charges shall not be included in the computation of the Residual Commission. The Residual Commission schedule is as follows:

From the commencement date through December 31, 2002: An amount equal to four percent (4%) of the total recurring CRS base charges and local airtime charges billed by CELLULAR ONE to AGENT-originated CRS Subscribers;

## 8. USE OF MARKS BY AGENT

Periodically CELLULAR ONE will publish a list of Marks AGENT is licensed to use under the Agreement. Such list will also be supplemented with reasonable rules and regulations pertaining to the Marks, which AGENT agrees to follow. AGENT acknowledges that its right to use the Marks is derived solely from the Agreement and is limited to the identification of AGENT as an agent of CELLULAR ONE. AGENT agrees to comply with all reasonable rules and procedures pertaining to such Marks prescribed by CELLULAR ONE from time to time during the term of this Agreement. AGENT recognizes the great value of the goodwill associated with the Marks, and acknowledges that the Marks and all rights herein and goodwill pertaining thereto belong exclusively to CELLULAR ONE, and that the Marks have a secondary meaning in the mind of the public. AGENT acknowledges and agrees that all usage of the Marks by AGENT and any goodwill established thereby shall inure to the exclusive benefit of CELLULAR ONE and its Affiliates and that this Agreement does not confer any goodwill or other interests in the Marks upon AGENT. Any unauthorized use of the Marks by AGENT, or any use not in compliance herewith, shall constitute an infringement of the rights of CELLULAR ONE and its Affiliates in and to the Marks and shall further constitute a material breach of this Agreement. AGENT shall use the Marks with such words qualifying or identifying the agency relationship of CELLULAR ONE and AGENT as CELLULAR ONE from time to time shall reasonably prescribe. AGENT shall not use the Marks as part of any corporate or trade name or with any prefix, suffix or other modifying words, terms, designs or symbols, or in any modified form, nor may AGENT use the Marks in connection with the sale or lease of any unauthorized product or service or in any other manner not expressly authorized by this Agreement or separately in writing by CELLULAR ONE. If AGENT uses CELLULAR ONE's Marks on any of AGENT's stationery, other

forms or business cards, AGENT agrees to display the Marks on such stationery, other forms, and business cards used in its business of selling the Authorized Services in the manner prescribed by CELLULAR ONE. AGENT agrees to obtain such fictitious or assumed name certificates or registrations as may be required by applicable law, provided the fictitious or assumed name is approved in writing by CELLULAR ONE and CELLULAR ONE is provided a copy of the certificate and/or registration. If any fictitious or assumed name used by AGENT includes anything that identifies CELLULAR ONE or its Marks, CELLULAR ONE may at any time require AGENT to cease using such fictitious or assumed name, and to cancel any corresponding certificate and/or registration. If it becomes advisable at any time in CELLULAR ONE's sole discretion for AGENT to modify or discontinue use of any Mark or substitute one or more additional Marks to identify its relationship with CELLULAR ONE or, if applicable, any CPE, AGENT agrees to comply therewith within a reasonable time after notice thereof by CELLULAR ONE and the sole obligation of CELLULAR ONE in any such event shall be to reimburse AGENT for the out-of-pocket costs, if any, of complying with this obligation and to indemnify AGENT as provided in Paragraph 9 below. In addition, AGENT shall replace obsolete identification signs or identification material with new signs or identification material should AGENT adopt new Marks replacing one or more Marks identified by CELLULAR ONE in such list as herein before specified.

## 9. CELLULAR ONE'S TITLE AND PROTECTION OF CELLULAR ONE'S RIGHTS

AGENT agrees that it will not during the term of this Agreement, or thereafter, attack the title or any rights of CELLULAR ONE in and to the Marks. CELLULAR ONE hereby indemnifies AGENT and undertakes to hold AGENT harmless against any damages and costs from claims or suits arising out of the use by AGENT of the Marks as authorized in this Agreement, provided that prompt notice is given to CELLULAR ONE of any such claim or suit and provided, further, that CELLULAR ONE shall have the option to undertake and conduct the defense of any suit so brought and that no settlement of any such claim or suit is to be made by AGENT without the prior written consent of CELLULAR ONE. AGENT agrees to assist CELLULAR ONE and CELLULAR ONE agrees to reimburse AGENT for all associated reasonable costs to the extent necessary in the procurement of any protection or to protect any of CELLULAR ONE's rights to the Marks, and CELLULAR ONE, if it so desires, may commence or prosecute any claims or suits in its own name or in the name of AGENT or join AGENT as a party thereto. When known, AGENT shall notify CELLULAR ONE in writing of any infringements or imitations by others of the Marks which are the same as or similar to those covered by this Agreement. CELLULAR ONE shall have the sole right to determine whether any action shall be taken on account of any such infringements or imitations. AGENT shall not institute any suit or take any action on account of any such infringements or imitations without first obtaining the written consent of CELLULAR ONE.

## 10. RULES AND PROCEDURES

AGENT understands that if AGENT operates its CPE business or represents CELLULAR ONE's Authorized Services in a manner that is inconsistent with or contrary to state or federal law or regulation, such action will reflect adversely upon the name and goodwill of CELLULAR ONE and its Affiliates. Therefore, AGENT agrees to comply, if applicable, with Part 22 of the FCC rules, and all tariffs, other governmental rules and procedures in existence relating to the sale of the Authorized

Services and the sale, lease, warranty service and the conduct of AGENT's CPE business hereunder as well as any rules and procedures relating to such matters reasonably prescribed from time to time by CELLULAR ONE through the Administrative Procedures Manual, which rules and procedures shall constitute provisions hereof as if fully set forth herein. All references herein to the Agreement shall include all such tariffs, rules and procedures. CELLULAR ONE may incorporate all such tariffs, rules and procedures in one or more Administrative Procedures Manuals or other written form, but is not obligated to do so. AGENT shall itself be responsible to familiarize itself with the laws and regulations applicable to the conduct of its business.

## 11. COMPLIANCE WITH LAWS AND GOOD BUSINESS PRACTICES

AGENT shall secure and maintain in force all licenses and permits required by AGENT and its employees in the enrollment of Subscribers and the sale or lease of CPE, installation and maintenance of CPE, including without limitation, all required FCC permits and certifications, if required, and business and sales tax licenses, and shall conduct its business in full compliance with all state and federal laws, ordinances and regulations applicable to AGENT's business. CELLULAR ONE shall sell or resell the Authorized Services in accordance with applicable rules, regulations, statutes and decisions governing such Services. AGENT shall promptly pay, when due, all taxes and assessments against any real or personal property used in connection with AGENT's business, and all liens or encumbrances or every kind or character created or placed upon or against any such property, and all accounts and other indebtedness of every kind incurred by AGENT in the conduct of its business. AGENT shall comply, at its own expense, with the provisions of all applicable municipal requirements and those state and federal laws applicable to AGENT as an employer of labor or otherwise. AGENT expressly agrees not to discriminate against any employee or applicant for employment because of race, creed, color, national origin or sex. The provisions of Executive Order No. 11246, as amended, are incorporated herein by reference. AGENT will fully comply with the provisions of the Federal Occupational Safety and Health Act of 1970 and with any rules and regulations issued pursuant to this Act.

AGENT understands that if AGENT operates its CPE business or represents CELLULAR ONE Authorized Services in a manner that is inconsistent with or contrary to state or federal law or regulation, such action will reflect adversely upon the name and goodwill of CELLULAR ONE and its Affiliates. Therefore, AGENT agrees to comply, if applicable, with Part 22 of the FCC rules, and all tariffs, other governmental rules and procedures in existence relating to the sale of the Authorized Services and the sale, lease, warranty service and the conduct of AGENT's CPE business hereunder as well as any rules and procedures relating to such matters reasonably prescribed from time to time by CELLULAR ONE. AGENT shall itself be responsible to familiarize itself with the laws and regulations applicable to the conduct of business.

## 12. ADVERTISING AND BUSINESS PRACTICES OF AGENT

All advertising and promotion by AGENT shall be completely factual and shall conform to the highest standards of ethical advertising. AGENT shall adhere to the highest standards of honesty, integrity, fair dealing and ethical conduct in all dealings with Subscribers, AGENT and the public. AGENT agrees to refrain from any business or advertising practice which may be injurious to the

business of CELLULAR ONE and the goodwill associated with the Marks. All advertising and marketing materials that AGENT desires to use in connection with the Authorized Services or CPE and which have not been prepared or previously approved by CELLULAR ONE must be submitted to CELLULAR ONE for approval. AGENT shall not use any advertising or marketing materials that CELLULAR ONE has failed to approve. AGENT agrees that it will not begin its advertising and promotion without CELLULAR ONE's prior written consent. AGENT shall notify CELLULAR ONE in writing within five (5) days of the commencement of any material action, suit or proceeding, and of the issuance of any order, writ, injunction, award or decree of any court, agency of other governmental instrumentality, involving AGENT, or any business conducted by AGENT on behalf of CELLULAR ONE hereunder.

## 13. AGENT'S BUSINESS RECORDS

AGENT agrees to create and to maintain at its principal office and preserve for three (3) years from the date of their preparation, full, complete and accurate records of its business conducted pursuant to this Agreement. Such records shall include, without limitation, records of all Authorized Service enrollments and CPE sales, leases, or rentals.

## 14. REPORTS AND FINANCIAL STATEMENTS

AGENT shall maintain at its principal office for a period of three (3) years complete and accurate books of account and records, including all documentation and correspondence related to advertising and publicity, Subscriber contacts and solicitations, Subscriber applications and contracts, Subscriber complaints, use of CELLULAR ONE's name and trademarks, payments to AGENT, agreements with and payments to third parties in connection with this Agreement, AGENT's licenses and authorizations, compliance with the requirements of any governmental agency and all other documents or records in connection with AGENT's performance of its duties hereunder. CELLULAR ONE shall have the right to inspect and make copies of AGENT's books of account and records during normal working hours, upon reasonable notice by CELLULAR ONE. CELLULAR ONE expressly agrees, and will require its authorized representatives to agree, that it will keep all such records strictly confidential and that it will not disclose such information to any other agent or distributor of CELLULAR ONE's Services or to any other person without AGENT's express prior written consent; provided, however, CELLULAR ONE may disclose such information if required to do so by any state or federal regulatory agency.

## 15. ASSIGNMENT

This Agreement is fully assignable by CELLULAR ONE to any affiliated person or entity and shall inure to the benefit of any assignee or other legal successor to the interest of CELLULAR ONE herein.

AGENT acknowledges that CELLULAR ONE has entered into this Agreement in reliance upon the character, business experience and ability of AGENT and its owner(s), officers and managers and that neither the rights and duties created by this Agreement nor a controlling interest in the ownership of AGENT may be voluntarily, involuntarily, directly or indirectly assigned, or otherwise

transferred (including, without limitation, by transfer of capital stock or partnership interests, by merger or consolidation, by issuance of additional securities representing an ownership interest in AGENT or convertible thereto, or in the event of the death of a shareholder or partner of AGENT, by will, in declaration of or transfer in trust or the laws of intestate succession) without the written approval of CELLULAR ONE, which will not be unreasonably withheld, subject to such conditions as CELLULAR ONE deems reasonably necessary. Any such assignment or transfer without such approval shall constitute a breach hereof and convey no rights to or interests herein. Any change in management, personnel or identity which materially impairs the ability of AGENT to market the Authorized Services shall also constitute such a breach. "Control" for purposes hereof is defined in Paragraph 1 above.

### 16. TERM AND EXTENSION OF AGENCY RELATIONSHIP

The term of this Agreement shall commence upon execution of this Agreement, and shall end on the 31st day of December, 2002. AGENT shall provide to CELLULAR ONE written notice of the date on which AGENT initiates operations under this Agreement in the Area. AGENT agrees that CELLULAR ONE must provide written consent before AGENT actually initiates business operations. This Agreement shall be effective only after its execution by an officer or other authorized employee of both AGENT and CELLULAR ONE.

CELLULAR ONE may give AGENT written notice of its determination that the agency relationship between CELLULAR ONE and AGENT may be extended upon mutual Agreement, not less than sixty (60) days prior to the expiration hereof, if CELLULAR ONE determines that it is renewable.

### 17. LATE PAYMENTS; SECURITY DEPOSIT

In the event any amount payable by AGENT to CELLULAR ONE is more than thirty (30) days overdue, CELLULAR ONE may, at its option, do one or more of the following: (i) require AGENT to pay its account in full; (ii) apply commissions and any credits or other amounts payable to AGENT to reduce the AGENT's account payable balance; or (iii) require AGENT to deposit with CELLULAR ONE an irrevocable commercial letter of credit, cash or other form of security acceptable to CELLULAR ONE in its sole discretion to secure future delays or defaults in payment. This deposit will secure payment of any amounts due under this Agreement or any other agreement between the parties.

AGENT understands that in order to purchase CPE from CELLULAR ONE (if CELLULAR ONE determines that it will sell CPE) other than on a cash on delivery basis, AGENT may be required to sign Security Agreements, Financing Statements and related documents.

### 18. TERMINATION OF AGREEMENT

#### A. By Agent

If AGENT is in substantial compliance with this Agreement and CELLULAR ONE materially breaches this Agreement and fails to cure such breach within thirty (30) days after written notice thereof is delivered to CELLULAR ONE, AGENT may terminate this Agreement effective thirty (30) days after delivery to CELLULAR ONE of written notice thereof and AGENT shall not be bound by the provisions in Paragraph 20, "Covenants Not To Compete." A termination of this Agreement by AGENT (whether express or reasonably implied from AGENT's acts or omissions) for any reason other than a material breach hereof by CELLULAR ONE (coupled with substantial compliance by AGENT), and CELLULAR ONE's failure to cure such breach within thirty (30) days after receipt of written notice thereof, shall be deemed a termination by AGENT without cause.

## B. By CELLULAR ONE

CELLULAR ONE shall have the right to terminate this Agreement effective upon thirty (30) days written notice should (A) the FCC Cellular Radio Decisions or other requisite governmental decisions and authorities not be continued in substantially the same form and such change materially adversely impacts CELLULAR ONE's (or an affiliate's) ability to conduct its business in the Area; (B) state and/or federal regulatory approval empowering CELLULAR ONE or its Affiliate to construct and provide the Authorized Services and/or CPE in the Area is not granted to either CELLULAR ONE or an Affiliate, is granted subject to terms and conditions unacceptable to CELLULAR ONE or an Affiliate, or is granted under such terms and conditions which, in CELLULAR ONE's opinion, materially adversely affects the intended purpose of this Agreement; (C) regulatory authorization of the commission schedule of this Agreement is made subject to terms and conditions unacceptable to CELLULAR ONE or Affiliates; or Agent has had negative net growth exceeding twenty percent (20%) for the past twelve (12) months (for example, if there were 100 (100) active Agent-originated subscribers as of January 1, 2000 and only seventy-nine (79) active Agent-originated subscribers as of January 1, 2001, Agent would have negative net growth exceeding twenty percent (20%) and Cellular One would have the right to terminate this Agreement).

Further, CELLULAR ONE shall have the right to terminate this Agreement effective upon written notice if (a) AGENT makes an assignment for the benefit of creditors; (b) an Order for Relief under Title ll of the United States Code is entered by any United States Court against AGENT; (c) a trustee or receiver of any substantial part of the AGENT's assets, is appointed by any Court; (d) AGENT sells all or substantially all of AGENT's inventory or Assets other than in the ordinary course of business.

In addition, CELLULAR ONE shall have the right to terminate this Agreement for cause effective upon delivery of notice of termination of AGENT, if AGENT (or one of more of its owners and affiliates): (1) has made any material misrepresentation or omission in its application to establish an agency relationship with CELLULAR ONE or is convicted of or pleads no contest to a felony or other crime or offense that is likely to adversely affect the reputation of CELLULAR ONE or its affiliated companies or the goodwill of the Marks; (2) attempts to make an unauthorized assignment of this Agreement; (3) receives a notice of violation of the terms or conditions of any license or permit required by AGENT or its employees in the conduct of AGENT's business and fails to correct such violation, or to terminate the employment of such employee(s) within the time period specified in such notice, if any, or within thirty (30) days after receipt of such notice, whichever first expires; (4) fails to

[8/31/99 REV]

15

comply with any provision of this Agreement, including, if applicable, sales of Authorized Services consistent with AGENT forecasts, or any applicable tariff or CELLULAR ONE procedure relating to the Authorized Services and/or CPE, and AGENT does not correct such failure within ten (10) days as to monetary defaults and within thirty (30) days if non-monetary default after written notice of such failure to comply is delivered to AGENT.

19.    OBLIGATIONS OF AGENT UPON TERMINATION OR EXPIRATION

AGENT agrees that upon the expiration or termination of this Agreement in the Area, AGENT and its owner(s) and Affiliates will: (1) not thereafter use any actual or similar Marks, or any actual or similar trade name, service mark, trademark, logo, insignia, symbols or decorative design theretofore used by AGENT specifically in its sale of the Authorized Services, in any manner or for any purpose in the Area except that AGENT and its owner(s) may use or continue to use any trade name, service mark, logo, insignia, symbols or decorative designs AGENT or its owner(s) used in any business prior to the date of this Agreement; and will not utilize for any purpose any actual or similar trade name, trade or service mark or other commercial symbol that suggests or indicates a connection or association with CELLULAR ONE or any affiliated company of CELLULAR ONE, or directly or indirectly, at any time or in any manner identify itself or any business associated with CELLULAR ONE or such affiliated company in the Area; (2) return to CELLULAR ONE all advertising and marketing materials, forms, and other materials containing any Mark or otherwise identifying or relating to CELLULAR ONE's Authorized Services in the Area; (3) take such action as may be required to cancel all fictitious or assumed name or equivalent registrations relating to any Mark or authorize CELLULAR ONE, and any officer of CELLULAR ONE, as AGENT's attorney in fact, to take such actions as may be required to cancel such fictitious or assumed name or equivalent registration; if AGENT fails or refuses to do so, all governmental agencies administering fictitious or assumed name or equivalent registrations may accept and rely upon appropriate documents executed by CELLULAR ONE or its officer canceling any such registration; and (4) provide CELLULAR ONE with an updated list of names, addresses and all other relevant information AGENT then possesses concerning Subscribers of all Authorized Services that AGENT has enrolled in the Area.

20.    COVENANTS NOT TO COMPETE

In consideration of CELLULAR ONE's grant to AGENT of the right to use the Marks, the right to advertise affiliation with CELLULAR ONE as an authorized agent of CELLULAR ONE and the great value of the goodwill associated with AGENT's ability to use the Marks, which rights and value are not available to distributors generally, and in recognition of the value of specialized, technical knowledge of the cellular industry and other Services to be imparted by CELLULAR ONE to AGENT from time to time, AGENT agrees to be bound by the covenants in this Paragraph 20. Such rights and value shall constitute independent consideration for the covenants in this Paragraph 20.

Therefore, for value received as identified above, AGENT agrees that AGENT, its officers, directors, key employees, and principals, any Affiliate or the person or persons owning a controlling interest in AGENT or an Affiliate, during the term of this Agreement and for a period of one (1) year following the later of the expiration or termination of this Agreement, shall not:

[8/31/99 REV]

16

(1) directly or indirectly, induce, influence or suggest to any Subscriber of CELLULAR ONE's CRS to purchase CRS or any other CMRS from another reseller or provider of CRS or CMRS in the Area;

(2) directly or indirectly, induce, influence or suggest to any Subscriber of any other Authorized Service to purchase a competing service from any other provider or reseller of such competing service in the Area, whether or not the competing service is technologically the same as the Authorized Service in question;

(3) under any circumstances or conditions whatsoever, directly or indirectly, as an individual, partner, stockholder, director, officer, employee, manager or in any other relation or capacity whatsoever engage in the sale or promotion of CRS, CMRS, or any other Authorized Service on behalf of any competing reseller or provider of such service in the Area;

(4) directly or indirectly, allow any other person, firm or other entity to use the name, trade name, goodwill or any other assets or property of AGENT or CELLULAR ONE in any manner in connection with such other entity's sale of CRS, CMRS or any other Authorized Service on behalf of a competing reseller or provider in the Area, and AGENT specifically agrees not to transfer, assign, authorize or consent to the transfer of an AGENT telephone number to any other person, firm or other entity upon the expiration or termination of this Agreement.

Notwithstanding any language to the contrary, the restrictive covenants contained herein shall not operate so as to restrict AGENT from the businesses of providing or selling Paging Services.

## 21. SEVERABILITY AND SUBSTITUTION OF VALID PROVISIONS

Except as expressly provided to the contrary herein, each term and condition of this Agreement, and any portion thereof, shall be considered severable and if, for any reason, any such provision hereof is held to be invalid, contrary to, or in conflict with any applicable present or future law, regulation or public policy in a final, unappealable ruling issued by any court, agency or tribunal with competent jurisdiction in a proceeding to which CELLULAR ONE or its Affiliate is a party, that ruling shall not impair the operation of, or have any other effect upon, such other portions of this Agreement as may remain otherwise enforceable which shall continue to be given full force and effect and bind the parties hereto, although any portion held to be invalid shall be deemed not to be a part of this Agreement from the date the time for appeal expires, if AGENT is a party thereto, otherwise upon AGENT's receipt of a notice of nonenforcement thereof from CELLULAR ONE.

To the extent that Paragraphs 4 or 20 contain or impose a restriction upon AGENT that is deemed unenforceable by virtue of its scope in terms of area, business activity prohibited and/or length of time, but could be enforceable by reducing any or all thereof, AGENT and CELLULAR ONE agree that same shall be enforced to the fullest extent permissible under the laws and public policies applied in the jurisdiction in which enforcement is sought. CELLULAR ONE and AGENT shall mutually agree to a modification of any invalid or unenforceable term or condition hereof to the extent required

to be valid and enforceable. Such modifications to this Agreement shall be required only in the area directly affected by any such ruling.

## 22. WAIVER OF OBLIGATIONS

CELLULAR ONE and AGENT may by written instrument unilaterally waive or reduce any obligation of or restriction upon the other under this Agreement, effective upon delivery of written notice thereof to the other or such other effective date stated in the notice of waiver.

Whenever this Agreement requires the consent of a Party, such request shall be in writing and no consent may be unreasonably withheld. All consents or withholding of consent with reasons therefore shall be in writing. Neither party makes any guarantees upon which the other may rely, and assumes no liability or obligation to the other, by granting any waiver, approval or consent to the other, or by reason of any neglect, delay or denial of any request therefor. Any waiver granted by either Party shall be without prejudice to any other right that Party may have, will be subject to continuing review, and may be revoked, at the waiving party's sole discretion, at any time and for any reason, effective upon delivery to the other of ten (10) days' prior written notice.

CELLULAR ONE and AGENT shall not be deemed to have waived or impaired any right, power or option reserved by this Agreement (including, without limitation, the right to demand exact compliance with every term, condition and covenant herein, or to declare any breach hereof to be a default and to terminate this Agreement prior to the expiration of its term), by virtue of any custom or practice of the parties at variance with the terms hereof, or any failure, refusal or neglect of CELLULAR ONE or AGENT to exercise any right under this Agreement or to insist upon exact compliance by the other with its obligations hereunder, including without limitation any rule or procedure, or any waiver, forbearance, delay, failure or omission by CELLULAR ONE to exercise any right, power or option, whether of the same, similar or different nature, with respect to one or more other authorized agents or other forms of distribution.

## 23. RIGHTS OF PARTIES ARE CUMULATIVE

The rights of CELLULAR ONE and AGENT hereunder are cumulative and no exercise or enforcement by CELLULAR ONE and AGENT of any right or remedy hereunder shall preclude the exercise or enforcement by CELLULAR ONE or AGENT of any other right or remedy hereunder or which CELLULAR ONE or AGENT is entitled by law to enforce.

## 24. GOVERNING LAW

Except to the extent governed by United States law that preempts state law, this Agreement shall be interpreted under and governed by the laws of the State of Illinois. If any suit or action shall be brought to enforce or declare any of the terms of this Agreement, to terminate this Agreement or to recover any damages sustained as a result of a default in the performance of any obligations under this Agreement, or a breach of any of the representations and warranties herein contained or otherwise pursuant to this Agreement, then except as otherwise provided in Paragraph 35, the party not prevailing in such suit or action shall be liable to the prevailing party for the prevailing party's costs

[8/31/99 REV]

18

and expenses, including, without limitation, court costs and reasonable attorneys' and expert witnesses' fees (including, without limitation, the value of time spent by in-house personnel), the amount of which shall be fixed by the court and shall be made a part of any judgment rendered. The parties agree that any such suit or action must be brought, if at all, within one (1) year after the underlying cause of action accrues.

## 25.  TESTIMONY

Matters relating to this Agreement may be an issue before various regulatory bodies. Upon reasonable notice AGENT agrees to fully cooperate with CELLULAR ONE regarding any such matters including willingly providing employees of AGENT to testify at appropriate times regarding any aspect of this Agreement or other related issues. CELLULAR ONE agrees to reimburse AGENT for reasonable costs expended in supplying such testimony.

## 26.  BINDING EFFECT

This Agreement is binding upon the parties hereto, their respective executors, administrators, heirs, assigns and successors in interest.

All obligations by either party which expressly or by their nature survive the expiration or termination of this Agreement shall continue in full force and effect subsequent to and notwithstanding its expiration or termination and until they are satisfied in full or by their nature.

## 27.  IMPOSSIBILITY OF PERFORMANCE

Neither CELLULAR ONE nor AGENT shall be liable for loss or damage or deemed to be in breach of this Agreement if its failure to perform its obligations results from: (1) compliance with any law, ruling, order, regulation, requirement or instruction of any federal, state or municipal government or any department or agency thereof or court of competent jurisdiction; (2) acts of God; (3) acts or omissions of the other party; and (4) fires, strikes, embargoes, war, insurrection or riot. Any delay resulting from any of said causes shall extend performance accordingly or excuse performance, in whole or in part, as may be reasonable.

## 28.  INTERPRETATION

The preambles and exhibits to this Agreement are a part of this Agreement, which constitutes the entire agreement of the parties, and there are no other oral or written understandings or agreements between CELLULAR ONE and AGENT relating to the subject matter hereof. This Agreement supersedes any prior agreements or understandings between the parties relating to the subject matter hereof.

Nothing in this Agreement is intended, nor shall be deemed, to confer any rights or remedies upon any person or legal entity not a party hereto, except for those affiliates of CELLULAR ONE as may be involved in the provision of one or more of the Authorized Services.

[8/31/99 REV]

19

The headings of the several paragraphs hereof are for convenience only and do not define, limit or construe the contents of such paragraphs.

The term "AGENT" as used herein is applicable to one or more persons, a corporation or a partnership, as the case may be, and the singular usage includes the plural and the masculine includes the feminine.

If two or more persons are at any time AGENT hereunder, whether or not as partners or joint venturers, their obligations and liabilities to CELLULAR ONE shall be joint and several.

This Agreement shall be executed in multiple copies, each of which shall be deemed an original.

29. INDEMNITY

Subject to the provisions of Paragraph 3, each party hereto agrees to defend, indemnify and save harmless the other party and its successors and assigns and its employees and agents and their heirs, legal representatives and assigns from any and all claims or demands whatsoever, including the costs, expenses and reasonable attorney's fees incurred on account thereof, that may be made (1) by the indemnifying Party's employees or any other persons for bodily injury or damage to property occasioned by the acts or omissions of the Party of its subcontractor, or the employees or agents of any of them, and (2) by the Party's employees under worker's compensation or similar acts.

Further, AGENT agrees to indemnify, hold harmless and, upon CELLULAR ONE's written request, defend CELLULAR ONE (including its officers, directors and employees) from and against any and all liability, loss, damages, costs, attorneys' fees, or other expense of any kind, that arises out of any threatened or actual claim or any suit for damages, injunction, or other relief on account of (a) injury to or death of any person, (b) damage to any property, (c) public charges and penalties, or (d) any demand, liability or lien, whether caused by, resulting from, or in connection with, the negligent or intentional acts, omissions or misrepresentations of AGENT (including any of its subordinates, sub-agents, employees or servants), solely or jointly with others, including CELLULAR ONE, its employees or servants (except for the negligent acts or omissions solely of CELLULAR ONE or any of its employees or servants) in the performance of or in connection with the performance of AGENT's responsibilities under this Agreement.

30. SURVIVAL

The terms, provisions, representations, and warranties contained in this Agreement that by their sense and context are intended to survive the performance thereof by either or both parties hereunder shall so survive the completion of performances and termination of this Agreement, including the making of any and all payments due hereunder.

31. LICENSES

[8/31/99 REV]

No licenses, express or implied, under any patents or copyrights are granted by CELLULAR ONE or its Affiliates to AGENT.

32.    NOTICES AND PAYMENTS

All payments due AGENT shall be made to such address or bank as AGENT from time to time designates.  All notices and reports required to be delivered by the provisions of the Agreement shall be deemed so delivered three (3) business days after placement in the United States Certified or Registered Mail, postage prepaid and addressed to the party to be notified at its most current principal business address of which the notifying party has been notified.  All reports and other information required by this Agreement shall be directed to CELLULAR ONE at the data processing center or the address provided to AGENT from time to time, or to such other persons and places as CELLULAR ONE may direct from time to time.  Any required report not actually received or postmarked by CELLULAR ONE or AGENT during regular business hours on the date due shall be deemed delinquent.

33.    CONFIDENTIAL INFORMATION

Any specifications, drawings, sketches, models, samples, data, computer programs or documentation, or technical or business information ("Information") furnished or disclosed by CELLULAR ONE to AGENT hereunder shall be deemed the exclusive property of CELLULAR ONE, including title to copyright in all copyrightable material, and, when in tangible form, shall be returned to CELLULAR ONE upon completion or termination of authorized work.  Unless such information was previously known to AGENT free of any obligation to keep it confidential, or has been or is subsequently made public by CELLULAR ONE or a third party, it shall be held in confidence by AGENT, shall be used only for the purposes hereunder, and may be used for other purposes only upon such terms and conditions as may be mutually agreed upon in writing.  In addition, the parties hereby agree that Subscriber lists and related information or data are the exclusive property of CELLULAR ONE and are to be used by AGENT solely in the performance of its obligations and duties as described herein and are to be returned to CELLULAR ONE upon the termination of this Agreement.

If AGENT is served with process to obtain Information, AGENT shall immediately notify CELLULAR ONE which shall, in addition to AGENT efforts, if any, have the right to seek to quash such process.

Unless marked "proprietary," any Information furnished or disclosed by AGENT to CELLULAR ONE shall not obligate CELLULAR ONE to hold such information in confidence.

34.    COVENANT NOT TO SOLICIT EMPLOYMENT

AGENT recognizes and agrees that CELLULAR ONE takes a great deal of time to hire and train employees for its business.  AGENT fully understands the time and expense CELLULAR ONE incurs to obtain qualified personnel, and AGENT therefore agrees not to offer employment to or accept to hire any of CELLULAR ONE's employees. This Paragraph 34 cannot be waived except by

the President and Chief Executive Officer of CELLULAR ONE in writing. In the event AGENT, or any affiliate or person associated with AGENT, does hire any of CELLULAR ONE's employees during the term of this Agreement, or during any renewal or option period, or hires such employees during a period of 90 days after any such employee leaves the employment of CELLULAR ONE, such hiring also will constitute a material breach of this Agreement.

Moreover, CELLULAR ONE and AGENT have considered the matter and have reasonably endeavored to estimate the actual damages to CELLULAR ONE in the event AGENT breaches this Agreement and offers or accepts to hire any of CELLULAR ONE's employees, and both realize that it would be impractical or extremely difficult to fix the actual damages to CELLULAR ONE resulting from such offer or hiring of CELLULAR ONE's employees. CELLULAR ONE and AGENT therefore agree that if AGENT offers or accepts to hire any of CELLULAR ONE's employees during the periods of time heretofore mentioned, AGENT agrees to reimburse CELLULAR ONE for its costs in replacing each such employee, which costs shall be deemed to be one year's salary or wages of each such employee. Said sum represents the amount agreed upon by the parties as CELLULAR ONE's liquidated damages for such breach and shall be in addition to CELLULAR ONE's right to terminate this Agreement for such breach.

35. DISPUTE RESOLUTION AND MEDIATION

For all disputes relating to this Agreement except those relating to Paragraph 20, Covenants Not to Compete, prior to instituting litigation in connection with this Agreement in any forum, including but not limited to, state, federal, or regulatory proceedings, each party agrees to the following procedures:

(a) The aggrieved party shall give detailed written notice to the other party of its specific complaint, including the amount of actual damages and expenses, including attorney's fees, claimed by the aggrieved party. The aggrieved party shall include copies of all documents that support its claims. Within thirty (30) days after receipt of the notice, the party receiving the notice shall tender to the aggrieved party a written offer of settlement. Any offer of settlement not accepted within thirty (30) days of receipt by the aggrieved party shall be deemed to have been rejected.

(b) In the event of litigation, a settlement offer made pursuant to Paragraph 35(a) above, if rejected by the aggrieved party, may be filed with the court together with an affidavit certifying its rejection. If the court finds that the amount tendered in the settlement offer is greater than or equal to the actual damages found by the trier of fact, the aggrieved party shall incur the costs of its own attorney's fees and shall reimburse the other party for its reasonable attorney's fees incurred. If recovery is more that the amount tendered in the settlement offer, then the accused party will reimburse the aggrieved party for its reasonable attorneys' fees.

(c) The tender of an offer of settlement is not an admission of engaging in an unlawful act or practice or of liability. Evidence of a settlement offer may be used only for the purposes specified in Paragraph 35(b) above, and is not to be revealed to the trier of fact as part of its determination of damages or liability.

(d) If the parties are unable to settle their disputes through the above procedure, the parties agree to submit their dispute to mediation as described in this paragraph within 90 days after rejection of the settlement offer. Compliance with these procedures on dispute resolution and mediation shall be a condition precedent to instituting any judicial, quasi-judicial and/or regulatory proceeding.

(i) Mediation is a process under which an impartial mediator facilitates communication between the parties to promote settlement between them. The mediator does not have the authority to decide any issue for the parties, but will attempt to facilitate the voluntary resolution of the dispute by the parties. The mediator is authorized to conduct joint and separate meetings with the parties and to offer suggestions to assist the parties to achieve settlement.

(ii) The parties shall agree to selection of an impartial mediator. A person shall not serve as a mediator in any dispute in which he has any financial or personal interest. Prior to accepting an appointment, the mediator shall disclose any circumstance likely to create a presumption or appearance of bias or prevent a prompt meeting with the parties. The aggrieved party shall have the right to name a mediator, subject to disagreement from the other party based on the mediator's interest in a dispute, affiliation or connection to the aggrieved party or other circumstance likely to create a presumption or appearance of bias. The parties shall each bear half the cost of the mediation.

(iii) The parties, while not committing in advance to settle their case, agree to participate in mediation in good faith with the intention to settle, if at all possible.

## 36. AUTHORITY

Each of the parties represents, warrants and agrees that it is a corporation or partnership duly organized, validly existing and in good standing under the laws of the state of its formation, and has all requisite power and authority to execute and deliver this Agreement and to consummate the transactions contemplated hereby; that the execution and delivery of this Agreement and the performance hereof have been duly and validly authorized by all necessary corporate or partnership action; and that the execution and delivery by it of this Agreement and the performance of this Agreement by it will not conflict with or result in a breach of or constitute or result in a default under any of the terms, conditions or provisions of the Articles or Certificates of Incorporation, By-Laws, or other of its governing instruments or any judgment, order, decree, law, regulation or ruling of any court or governmental authority or any agreement, contract, commitment or other instrument to which it is a party or by which it is bound.

Specifically, AGENT represents and warrants that (i) AGENT is not a party to any agreement to distribute, promote or otherwise sell CRS, CMRS or any other Authorized Service (except Paging

Services) on behalf of any competing provider, reseller or agent in the Area; (ii) the execution and delivery by it of this Agreement and the performance of this Agreement by it will not conflict with or result in a breach or constitute or result in a default under any of the terms, conditions or provisions of any agreement between AGENT and any other carrier, reseller or agent of CRS, CMRS or any other Authorized Service.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement on the date first above written and hereby declare that they HAVE READ AND DO UNDERSTAND EACH AND EVERY TERM, CONDITION AND COVENANT CONTAINED IN, OR INCORPORATED BY REFERENCE INTO, THIS AGREEMENT.

SOUTHWESTERN BELL MOBILE SYSTEMS, INC., d/b/a CELLULAR ONE-Chicago

By: _____

Name: Robert J. Nelson

Title: President – Great Lakes Region

Date: 1/5/00

KEMPNER MOBILE ELECTRONICS, INC.

By: _____

Name: Scott Kempner

Title: President

Date: 12/23/99

<u>EXHIBIT A</u>

<u>AUTHORIZED AGENT LOCATIONS</u>

Initial locations at which AGENT is authorized to operate as described in this Agreement:

It is agreed by AGENT and CELLULAR ONE that if the initial business location(s) and/or the date upon which CRS operations of AGENT will commence are not known at the date of execution of this Agreement, the same may be added from time to time as such information becomes known but no later than the effective date of AGENT operations.

AGENT shall not change or add business locations without CELLULAR ONE's prior written approval. AGENT shall consult with CELLULAR ONE before initiating any action to change or supplement any of its business locations.

Any business locations that AGENT opens and operates in the Area shall be subject to all of the terms of the Agreement, whether or not an amendment is signed by the parties adding the addresses of any new or different locations.

Authorized Locations:

_____

_____

<u>COUNTIES</u>

Counties in which AGENT is authorized:

Cook, Lake, DuPage, Kane, McHenry, Will

<u>AUTHORIZED SERVICES</u>

CRS (including long distance/toll service, if any, provided by CELLULAR ONE to its CRS subscribers)

_____

_____

[8/31/99 REV]

# Exhibit C

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, CHANCERY DIVISION

| | | |
|---|---|---|
| Kempner Mobile Electronics, Inc., | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | |
| | ) | No.:   99 CH 16303 |
| | ) | |
| Southwestern Bell Mobile Systems, LLC d/b/a | ) | Judge Aaron Jaffe |
| Cingular Wireless, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## EMERGENCY NOTICE OF MOTION

To:   Veronica Gomez
      Schopf & Weiss
      312 W. Randolph Street
      Suite 300
      Chicago, IL  60606

PLEASE TAKE NOTICE, that on <u>July 26, 2002,</u> at <u>10:30 a.m.</u>, or as soon thereafter as counsel can be heard, I will appear before the Honorable Aaron Jaffe, or any other judge sitting in his stead, in Courtroom 2405 of the Richard J. Daley Center, Chicago, Illinois, and then and there present the attached <u>Plaintiff's Motion for Expedited Discovery</u>, at which time and place you may appear and be heard.

Respectfully submitted,

Kempner Mobile Electronics, Inc.

By: _____
      One of its attorneys

I, Kenneth B. Drost, an attorney, hereby certify that I served a copy of the attached and foregoing Notice Of Motion on each party of record at the address listed above, by messenger delivery and by facsimile transmission to 312-701-9335, on <u>July 25, 2002</u>, before the hour of 5:00 p.m.

_____
      Kenneth B. Drost

Kenneth B. Drost
Drost & Laue, LLC
Attorney for Plaintiff
111 Lions Drive, Suite 206
Barrington, IL  60010
(847) 381-1070
Atty No. 23746

# IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, CHANCERY DIVISION

KEMPNER MOBILE ELECTRONICS, )
INC., an Illinois corporation, )
 )
   Plaintiff, )
 )  Case No.  02 CH 8976
   v. )
 )
SOUTHWESTERN BELL MOBILE )
SYSTEMS, LLC, d/b/a CINGULAR )
WIRELESS f/k/a SOUTHWESTERN )
BELL MOBILE SYSTEMS, INC. d/b/a )
CELLULAR ONE-CHICAGO )
 )
   Defendant. )

## MOTION FOR EXPEDITED DISCOVERY

Plaintiff Kempner Mobile Electronics, Inc., by its attorneys, moves this court to authorize Plaintiff to conduct expedited discovery under Supreme Court Rule 201 (d).  In support of this Motion, Plaintiff states as follows:

1.  On July 18, 2002 Plaintiff filed its First Amended Verified Complaint ("Complaint") against Defendant Southwestern Bell Mobile Systems LLC d/b/a Cingular Wireless f/k/a Southwestern Bell Mobile Systems, Inc. d/b/a Cellular One-Chicago ("Cingular").  The Complaint alleges that Cingular has used Kempner's purported violation of illegal restrictions contained in a distribution agreement as a ruse for terminating that Agreement.  Among other things, the Complaint seeks a declaration of Kempner's rights under the Agreement and an injunction to prohibit Cingular from terminating the Agreements, from enforcing or attempting to enforce the illegal restrictions, or for refusing to pay Kempner compensation due under the Agreements.

2.     Contemporaneously herewith, Plaintiff has filed a Motion For Temporary Restraining Order to preserve the status quo pending a trial on the merits.  Plaintiff needs to conduct discovery on an expedited basis in order to develop fully a record for hearing on a Motion for Preliminary Injunction.

WHEREFORE, Plaintiff Kempner Mobile Electronics, Inc. asks this court to enter an Order permitting discovery to commence immediately and shortening the time for discovery responses consistent with a schedule to be established by the court.

Respectfully submitted,
Kempner Mobile Electronics, Inc.

By: _____
One of Its attorneys

Kenneth B. Drost
Thomas D. Laue
DROST & LAUE, LLC, Firm No. 23746
111 Lions Drive, Suite 206
Barrington, Illinois 60010
Telephone: 847-381-1070
Facsimile: 847-381-1073

Myron M. Cherry
Myron M. Cherry & Associates LLC, Firm No. 37264
30 N. LaSalle Street
Suite 2300
Chicago, Illinois 60602
Telephone: 312-372-2100
Facsimile: 312-853-0279

### IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
### COUNTY DEPARTMENT, CHANCERY DIVISION

| | | |
|---|---|---|
| Kempner Mobile Electronics, Inc., | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | |
| | ) | No.:  99 CH 16303 |
| | ) | |
| Southwestern Bell Mobile Systems, LLC d/b/a | ) | Judge Aaron Jaffe |
| Cingular Wireless, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

### EMERGENCY NOTICE OF MOTION

To:   Veronica Gomez
      Schopf & Weiss
      312 W. Randolph Street
      Suite 300
      Chicago, IL  60606

PLEASE TAKE NOTICE, that on July 26, 2002, at 10:30 a.m., or as soon thereafter as counsel can be heard, I will appear before the Honorable Aaron Jaffe, or any other judge sitting in his stead, in Courtroom 2405 of the Richard J. Daley Center, Chicago, Illinois, and then and there present the attached Plaintiff's Motion for Temporary Restraining Order, at which time and place you may appear and be heard.

Respectfully submitted,

Kempner Mobile Electronics, Inc.,

By: _____
       One of its attorneys

I, Kenneth B. Drost, an attorney, hereby certify that I served a copy of the attached and foregoing Notice Of Motion on each party of record at the address listed above, by messenger delivery and by facsimile transmission to 312-701-9335, on July 25, 2002, before the hour of 5:00 p.m.

_____
Kenneth B. Drost

Kenneth B. Drost
Drost & Laue, LLC
Attorney for Plaintiff
111 Lions Drive, Suite 206
Barrington, IL  60010
(847) 381-1070
Atty No. 23746

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, CHANCERY DIVISION

| | | |
|---|---|---|
| KEMPNER MOBILE ELECTRONICS, INC., an Illinois corporation, | ) ) ) | |
| Plaintiff, | ) ) ) | Case No. 02 CH 8976 |
| v. | ) ) | Judge Aaron Jaffe |
| SOUTHWESTERN BELL MOBILE SYSTEMS, LLC, d/b/a CINGULAR WIRELESS f/k/a SOUTHWESTERN BELL MOBILE SYSTEMS, INC. d/b/a CELLULAR ONE-CHICAGO | ) ) ) ) ) ) | |
| Defendant. | ) | |

### MOTION FOR TEMPORARY RESTRAINING ORDER

Plaintiff Kempner Mobile Electronics, Inc., ("Kempner") by its attorneys, moves

this court to enter an Order granting temporary relief barring restraining and enjoining

Defendant, Southwestern Bell Mobile Systems, LLC, d/b/a Cingular Wireless f/k/a

Southwestern Bell Mobile Systems, Inc. d/b/a Cellular One-Chicago ("Cingular") from:

(1) taking any action to enforce the provisions of paragraph 4(j) and paragraph 20 of that

certain Agency Agreement Between Southwestern Bell Mobile Systems, d/b/a Cellular

One-Chicago and Kempner Mobile Electronics, Inc. (the "1999 Agreement") attached as

Exhibit 2 to the First Amended Complaint filed by Kempner herein; (2) terminating the

1999 Agreement prior to its expiration on December 31, 2002; or (3) failing to pay

residual commissions due and owning to Kempner. In support of this Motion, Kempner

incorporates herein the allegations contained in the First Amended Verified Complaint

("Complaint"), and the Plaintiff's Memorandum In Support of Motion for Temporary

Restraining Order as well as the Affidavit of Scott Kempner ("Kempner Aff."). In further

support, Kempner states as follows:

      1.      Kempner is an authorized sales and service center marketing, among other

things, cellular telephone products and services, and has been so engaged in business

since at least 1993. Cingular is the successor in interest to a signatory of the 1999

Agreement formed approximately January 2001 as a result of the merger between SBC

Communications and Bell South Corporation (Complaint ¶¶ 1-2;7). Cingular provides

cellular telephone services in various parts of the United States, including the

metropolitan Chicago area (Complaint ¶ 5). Kempner became a dealer for Cingular

executing a series of written agreements. The most recent of these agreements are

attached as Exhibits to the Complaint and incorporate by reference various administrative

procedures adopted from time to time by Cingular. In addition, Cingular adopted and

Kempner accepted certain business practices developed from time to time during the

relationship (Complaint ¶¶ 8-11).

      2.      At the outset, Kempner was encouraged to and did invest substantial

amounts of time and money to develop the market for cellular telephone products and

services in the greater Chicago metropolitan area for the benefit of Cingular. Kempner

was encouraged to do so with the promise by Cingular that Kempner would be permitted

to expand its business to additional locations within a six-county territory, which

locations Cingular would approve. In exchange for this promise of permitted expansion,

Kempner agreed to market cellular telephone services exclusively on behalf of Cingular

and to refrain from offering the products or services of Cingular's competitors.

3.      The 1999 Agreement also included periodic schedules which set the compensation that Cingular would pay Kempner. Kempner developed customers for the purchase of cellular telephone products and services which customers would not have become known to Cingular but for the efforts of Kempner. In establishing this customer relationship, Kempner earned the right to residual compensation for the duration of that customer's affiliation with Cingular and developed a reasonable expectation of continuing business relationship (Complaint ¶¶16-17).

4.      Despite the promised opportunity for expansion, Cingular repeatedly and unjustifiably refused Kempner permission to expand its business. In one particularly egregious example, Cingular refused to permit Kempner to market cellular telephone products and services at a kiosk operated by Kempner at the Lincolnwood Town Center Shopping Mall. Less than one year after Kempner closed its kiosk, due to this denial of permission to market cellular telephone products and services, Cingular opened its own kiosk at the very same location where permission had been denied to Kempner and began marketing cellular telephone products and services on its own behalf. (Complaint ¶¶ 18B -18D).

5.      While refusing to permit Kempner to expand its business, Cingular simultaneously whittled away at Kempner's customer base through a series of underhanded fraudulent and illegal devices. Among other things, Cingular did the following:

A.  In response to Kempner's repeated complaints that Cingular-owned points of distribution were offering promotions to customers that Cingular refused to permit Kempner to offer, Cingular represented in

3

writing on May 8, 2001, that : "all dealers have access to the same

level of service pricing as the internal team." In fact, Kempner

discovered numerous instances were Cingular offered discounts to

customers through Cingular-owned points of distribution, but when

Kempner requested the authority too quote the customer on precisely

the same terms Kempner was falsely told that the proposed terms were

"unavailable." (Complaint, ¶18E; Kempner Aff. ¶11A-E.)

B. Cingular published "bait and switch" advertisements designed to

attract the attention of Kempner's customers and then switch those

customers to accept services on terms and conditions more favorable to

Cingular. On March 31, 2000 Cingular represented to Kempner in

writing that "among the many benefits of becoming a sales and service

center is the inclusion in [Cingular's] promotional advertising…." On

or about January 31, 2002 Cingular ran an ad in the Chicago Sun

Times indicating that new or existing customers who engaged Cingular

telephone service and executed a contract providing for a continuous

term of such services would receive a free Nokia 5165 IRDB cellular

telephone. Kempner's business location was published in this

advertisement. On January 31, 2002, Gene R. Hyman, a regular

customer of Kempner responded to the advertisement, had a telephone

conversation with "Jennifer" at Cingular where Mr. Hyman indicated

his intention to avail himself of the offer published in the newspaper

by activating Cingular's cellular telephone services through Kempner.

Cingular's representative Jennifer directed Mr. Hyman not to patronize Kempner but rather to activate service at the Cingular point of distribution at 3333 West Touhy Avenue because he would not be able to receive a free Nokia 5165 IRDB portable telephone if he activated Cingular telephone service through Kempner despite the advertised solicitation. (Complaint, ¶18F; Kempner Aff. ¶12.)

C. Cingular diverted potential customers from Kempner and misdirected those customers to Cingular. Cingular maintains a 1-800 and a 1-866 telephone number for support and referral of customers. This system is designed to indicate for benefit of customers and dealers like Kempner, through the telephonic input of zip code numbers, the identity of authorized sales and service locations for products and cellular telephone services offered by Cingular. This system has consistently misidentified Kempner's location while correctly identifying the location of a nearby Cingular owned point of distribution. Kempner has repeatedly complained to Cingular about the misidentification and Cingular has repeatedly and falsely represented to Kempner that the problem has been corrected. (Complaint, ¶18G; Kempner Aff. ¶13.)

D. In addition to misappropriating Kempner's customers, Cingular has repeatedly breached the 1999 Agreement by failing to pay Kempner the commission and monthly residual payments due under the Agreements, and failing to make payments within a time period

5

established by the Agreements, as well as by failing to reimburse

Kempner for out-of-pocket costs related to the substitution by Cingular

of its trademarks, service marks, trade names and insignia as required

by the Agreements. (Complaint, ¶¶18H-18I; Kempner Aff. ¶14 & 15.)

6.　　The 1999 Agreement and particular paragraphs 4(j) and 20 thereof, purport

to restrict Kempner's ability to compete with Cingular in the market for cellular

telephone products and services during and after the term of the Agreements.　These

provisions required that, so long as Cingular abided by the terms of the Agreements, to

the extent Kempner sold cellular telephone products and services, Kempner did so

exclusively on behalf of Cingular and would refrain from expanding its business by

offering the products and services of Cingular's competitors.　These provisions further

provided that, except in the event of a breach of the Agreements by Cingular, Kempner

was prohibited from offering the products and services to Cingular's competitors for a

period one year following termination of the Agreements. (Complaint ¶20).

7.　　Cingular recognized that the scope of the restrictions on Kempner's

activities contained in the Agreements were legally suspect, so Cingular, which drafted

the Agreements, included a savings clause which permitted the offensive provisions to be

excised with the remaining provisions of the Agreements remaining valid and

enforceable.　(Complaint ¶21).

8.　　Beginning in May 2002, Kempner began to expand its business by

offering cellular telephone products and services marketed by providers other than

Cingular.　On or about June 20, 2002, Cingular notified Kempner that it would terminate

the Agreements as result of Kempner's exercise of its right to expand its business

effective July 21, 2002. (Complaint, ¶24; Kempner Aff., ¶18.)

9.      Despite receiving a copy of the Complaint, Cingular sent Kempner a letter

on July 23, 2002 purporting to terminate the 1999 Agreement and threatening to enforce

the illegal restrictions. (Kempner Aff., ¶187.)

10.     The restrictive covenants contained in the Agreement are unenforceable

against Kempner, both because Cingular has breached the Agreement and because the

restrictions serve no purpose other than the restriction of competition.  Cingular has

permitted other sales and service centers that compete with Kempner to market the

cellular telephone products and services offered by other carriers, so there is no value

associated with the purported exclusivity of Cingular's trade and service marks.  They are

clearly unnecessary to protect any purported goodwill.  Furthermore, by virtue of

Cingular's actions in stifling Kempner's customer base, the restrictions have become

unduly oppressive to Kempner.  (Complaint, ¶22; Kempner Aff., ¶19).

11.     Unless Cingular is enjoined from enforcing the illegal provisions of the

1999 Agreement, Kempner will suffer irreparable injury, for which there is no adequate

remedy at law.  Kempner enjoys significant good will and ongoing relationships with its

existing customers as a result of time, money and effort invested in customer

development.  If the illegal provisions of the Agreement are enforced, even on a

temporary basis, these relationships will be destroyed and cannot easily be recreated.

(Complaint, ¶22; Kempner Aff., ¶19).

12.     Unless Cingular is enjoined from terminating the 1999 Agreement prior to

its expiration on December 31, 2002, Kempner will suffer irreparable injury, for which

there is no adequate remedy at law. As a result of Kempner's reliance on the fraudulent inducements of Cingular, Kempner has been prevented from developing the revenue stream that would have otherwise been generated from competing providers of cellular telephone products and services, and Kempner requires the remaining term of the 1999 Agreement in order to be placed in a position remotely similar to that which it would have been had Cingular not deceived Kempner. Because the Agreement remains in full force and effect apart from the illegal restrictions, Kempner is entitled to treat the contract as valid while ignoring those restrictions and continue to market cellular telephone products and services on behalf of Cingular. If Kempner's revenue stream from Cingular is terminated before Kempner has the opportunity to establish a competitive position, there is a possibility that Kempner would go out of business. (Complaint, ¶33; Kempner Aff., ¶20.)

WHEREFORE, Plaintiff Kempner Mobile Electronics, Inc. asks this Court for either an order barring, restraining and enjoining Defendant Southwestern Bell Mobile Systems, LLC, d/b/a Cingular Wireless f/k/a Southwestern Bell Mobile Systems, Inc. d/b/a Cellular One-Chicago, until further order of court from:

        A.  Taking any action to enforce the provisions of paragraph 4(j) and paragraph 20 of that certain Agency Agreement Between Southwestern Bell Mobile Systems, d/b/a Cellular One-Chicago and Kempner Mobile Electronics, Inc. (the "1999 Agreement") attached as Exhibit 2 to the First Amended Complaint filed by Kempner herein;

        B.  Terminating the 1999 Agreement prior to its expiration on December 31, 2002; or

C. Failing to pay residual commissions due and owning to Kempner.

Respectfully submitted,
Kempner Mobile Electronics, Inc.

By: _____
One of Its attorneys

Kenneth B. Drost
Thomas D. Laue
DROST & LAUE, LLC, Firm No. 23746
111 Lions Drive, Suite 206
Barrington, Illinois 60010
Telephone: 847-381-1070
Facsimile: 847-381-1073

Myron M. Cherry
Myron M. Cherry & Associates LLC, Firm No. 37264
30 N. LaSalle Street
Suite 2300
Chicago, Illinois 60602
Telephone: 312-372-2100
Facsimile: 312-853-0279

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, CHANCERY DIVISION

Kempner Mobile Electronics, Inc.,      )
                                       )
      Plaintiff,                    )
                                       )
                                       )
      v.                            )     No. 02 CH 8976
                                       )
Southwestern Bell Mobile systems, LLC d/b/a  )     Judge Aaron Jaffee
Cingular Wireless,                     )
                                       )
      Defendant.                    )

## NOTICE OF FILING

To:    Veronica Gomez
        Schopf & Weiss
        312 W. Randolph Street
        Suite 300
        Chicago, IL 60606

      PLEASE TAKE NOTICE, that on the 26th day of July, 2002, we will file with the Clerk of the Circuit Court of Cook County, Illinois, County Department, Chancery Division, the Memorandum In Support Of Plaintiff's Motion For A Temporary Restraining Order, copies of which are attached hereto and herewith served upon you.

                             Kempner Mobile Electronics, Inc.

                             By:                          
                                  One of its attorneys

      I, Kenneth B. Drost, an attorney, hereby certify under penalty of law pursuant to Section 1-109 of the Illinois Code of Civil Procedure that a copy of the attached and foregoing document was served on each party of record at the address listed above, by messenger delivery and facsimile transmission to 312-701-9335, on July 25, 2002, before the hour of 5:00 p.m., and that this certification was executed on such date.

                                  Kenneth B. Drost

Kenneth B. Drost
Drost & Laue, LLC
Attorney for Plaintiff
111 Lions Drive, Suite 206
Barrington, IL 60010
(847) 381-1070
Atty. No. 23746

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, CHANCERY DIVISION

| | | |
|---|---|---|
| KEMPNER MOBILE ELECTRONICS, INC., an Illinois corporation, | ) ) ) | |
| Plaintiff, | ) ) | Case No. 02 CH 8976 |
| v. | ) ) | Judge Aaron Jaffe |
| SOUTHWESTERN BELL MOBILE SYSTEMS, LLC, d/b/a CINGULAR WIRELESS f/k/a SOUTHWESTERN BELL MOBILE SYSTEMS, INC. d/b/a CELLULAR ONE - CHICAGO | ) ) ) ) ) | |
| Defendant. | ) ) | |

MEMORANDUM IN SUPPORT OF
PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER

Plaintiff, Kempner Mobile Electronics, Inc., an Illinois corporation ("Kempner"), submits this Memorandum in Support of its Motion for a Temporary Restraining Order against Southwestern Bell Mobile Systems, LLC, d/b/a Cingular Wireless f/k/a Southwestern Bell Mobile Systems, Inc. d/b/a Cellular One-Chicago (collectively "Defendants"), and states as follows:

### Introduction

This case is the attempt by Kempner to salvage its business in spite of Defendants best efforts to ruin Kempner's business by, among other things, pirating away Kempner's most precious assets. These assets consist of, but are not limited to Kempner's customers and long standing business relationships, Kempner's principal cash flow resource, its residual commissions on cellphone service previously sold by Kempner, and Kempner's allegedly protected sales territories. In addition, the Defendants have engaged in a pattern of deceptive,

tortious, and fraudulent business practices aimed at improperly restricting Kempner's competitive activities while Defendants develop their own sales outlets that belong to and are controlled by Defendants. In addition to Defendant's deceptive, tortious, and fraudulent conduct, Defendants have engaged in multiple breaches of contract and other misconduct all of which is intended to improperly destroy Kempner's business and thereby leave the competitive market place open for exploitation by Defendants. Kempner seeks a finding that as a result of Defendants' bad acts, Kempner should not be bound by the trade restraining anti-competitive provisions of the Agreements.

The basic facts are simple. Kempner was awarded one of the first franchises for the sale of Cingular's cellular telephone products and services. Since 1993, through a series of written contracts and other agreements incorporated therein (hereinafter collectively the "Agreements"), Kempner has been an authorized sales and service center for Defendants. As an authorized sales and service center, Kempner agreed, among other things, to market cellular telephone products and services on behalf of the Defendants. Defendants, on their part, agreed to compensate Kempner in accordance with the terms of the Agreements as well as support rather than interfere with Kempner's ability to market and sell Defendants' products and services.

Kempner has suffered and will continue to suffer irreparable harm as a result of the Defendants' wrongful activities and is therefore entitled to immediate injunctive relief to restore and maintain the status quo between Kempner and Defendants during the time that the Court determines the parties' respective rights and obligations pursuant to the Agreements. As a result of the Defendants' misconduct, Kempner filed this action against the Defendants, seeking among other things a declaration of the parties' respective rights under the Agreements and an injunction barring the Defendants from terminating the Agreements prior to their termination date of

December 31, 2002; requiring the Defendants to continue to pay the residual commissions to Kempner as required by the Agreements; and prohibiting the Defendants from taking any action to enforce the restrictive covenants in the Agreements. Under these circumstances, a temporary restraining order is necessary to protect Kempner's business interests and relationships pending resolution of the merits of Kempner's claims as more fully set out in the First Amended Verified Complaint.

### Background

See, affidavit of Scott Kempner, which is incorporated herein by reference.

### Argument

I. **KEMPNER HAS MADE OUT A *PRIMA FACIA* CASE FOR TEMPORARY INJUNCTIVE RELIEF**

Issuance of a temporary restraining order in the instant proceeding is appropriate because Kempner has demonstrated that (1) there is a reasonable probability that it will succeed at trial; (2) Kempner will suffer irreparable injury and/or is under a threat of irreparable harm absent the requested injunction; (3) a balancing of the equities favors Kempner's position and; (4) the public interest supports the issuance of the requested injunctive relief. See e.g., Kable Printing Co. v. Mount Morris Bookbinders Union Local 65-B, 63 Ill.2d 514, 523-24, 349 N.E.2d 36, 40 (Ill. 1976); Stanton v. City of Chicago, 177 Ill.App.3d 519, 524-25, 532 N.E.2d 464, 467-68 (1st Dist. 1988); Gateway Eastern Ry. Co. v. Terminal R.R. of St. Louis, 35 F.3d 1134, 1137 (7th Cir. 1994).

A. **Kempner Is Likely To Succeed On The Merits.**

1. **The Agreements Themselves Provide a Clear Basis for Relief.**

All Kempner seeks to do is to hold the Defendants to the terms of the Agreements to

3

which they agreed to abide by, and be freed from the otherwise unenforceable anti-competitive provisions of the Agreement. To date, the Defendants have steadfastly refused, without justification, to allow Kempner either form of relief.

> a. *The Agreements and Illinois Law Prohibit the Defendants From Improperly Competing With Kempner*

The Agreements provide that Kempner is entitled to the residual commission for the duration of the time that a customer signed up to Defendants' cellular telephone service by Kempner utilizes Defendants' service. Now Defendants are improperly attempting to cut off these residual commissions by circumventing Kempner's relationship with its customers. Defendants do so by offering upgraded equipment to Kempner's customer through sales outlets owned by Defendants on sales terms that cannot be matched by Kempner, while "purging" their systems of any reference to Kempner's origination of that customer. Defendants make Kempner's customers aware of these equipment upgrades through "bait and switch" advertising which falsely indicates that the sales terms are available through Kempner. Both the act of directly soliciting Kempner's customers and the sales on terms that cannot be matched by Kempner are violations of the terms of the Agreements.

> b. *The Restrictive Covenants in the Agreements are Unenforceable*

Restrictions on competition are to be strictly scrutinized by courts. <u>Eichman v. National Hospital & Healthcare Services, Inc.</u>, 308 Ill. App. 3d 337, 719 N.E.2d 1141, 1145-46 )1$^{st}$ Dist. 1999). Such restrictions will be deemed reasonable only if: (1) they are necessary in their full extent to protect the parties; (2) they are unoppressive to the promissor; and (3) they are not harmful to the public. <u>Hammer Holdings Group Inc. v. Elmore</u>, 244 Ill. App. 3d 1069, 613

N.E.2d 1190, 1199 (1ˢᵗ Dist. 1993). Such covenants will not be enforced simply because the parties have agreed to them. <u>Advent Electronics Inc. v. Buckman,</u> 112 F 3d 267, 274 (7ᵗʰ Cir. 1997). The restrictions contained in paragraphs 4(j) and 20 of the Agreement are not only unenforceable against Kempner because of Defendants' breach of the Agreements, but also because these provisions constitute unenforceable restraints of trade, in that: (1) Defendants have no legitimate protectable interest and no near permanent relationship with customers for cellular telephone services and products; (2) Kempner has legitimate protectable interests in its customers by reason of the time, effort and expense invested in the development of these customers; (3) the purported restrictions are not necessary in their full extent for the protection of the Defendants; (4) there has been a failure of the consideration allegedly supporting Kempner's agreement to these restrictions; (5) the restrictions are oppressive to Kempner; and (6) the restrictions are harmful to the public.

By reason of these restrictions, Kempner is placed in the untenable position of being unable to continue to operate and expand its business on behalf of Defendants because of Defendants' breach of the Agreements and interference with Kempner's business. At the same time Kempner is unable to operate and expand its business on behalf of other providers of cellular telephone products and services because of Defendants' threats to enforce the illegal restrictions contained in the Agreements. By their action Kempner seeks relief from their Catch-22 predicament.

        c.     *Defendants Should Not Be Allowed to Unilaterally*
              *Terminate the Agreements on the Pretext Created*
              *By Defendants' Bad Acts*

Unless the Defendants are enjoined from terminating the Agreements prior to their expiration on December 31, 2002, Kempner will suffer irreparable injury, for which there is no

adequate remedy at law. As a result of Kempner's reliance on the fraudulent inducements of the Defendants, Kempner has been prevented from developing the revenue stream that otherwise would have been generated from competing providers of cellular telephone products and services. As a result, Kempner requires the revenue stream afforded by the remaining term of the Agreements in order to be placed in a position remotely similar to that which it would have been had Defendants not deceived Kempner. Because the Agreements remain in full force and effect apart from the illegal restrictions, Kempner is entitled to treat the contract as valid while ignoring those restrictions and continue to market cellular telephone products and services on behalf of Defendants at least until December 31, 2002. If Kempner's revenue stream from Defendants is terminated before Kempner has the opportunity to establish a competitive position, there is a possibility that Kempner would go out of business.

## 2. The Defendants' Breaches of the Agreements Provide a Basis For Injunctive Relief.

Despite the opportunity for expansion promised in the Agreements, the Defendants repeatedly and unjustifiably refused Kempner permission to expand its business. In one particularly egregious example, the Defendants refused to permit Kempner to market cellular telephone products and services at a kiosk operated by Kempner at the Lincolnwood Town Center Shopping Mall, Lincolnwood, Cook County, Illinois. Less than one year after Kempner closed its kiosk at the Lincolnwood Town Center, due to Defendants' denial of permission to market cellular telephone products and services at that location, Defendants opened their own kiosk at the very same location where permission had been denied to Kempner and Defendants began marketing cellular telephone products and services on their own behalf. Again, in September 2000, Defendants opened a sales location at 4730 West Dempster Street in Skokie,

Cook County, Illinois that was within three miles of the Kempner location at 4722 West Touhy Avenue. In doing so, the Defendants violated the terms and provisions of their own Administrative Procedures incorporated by reference into the Agreements.

As a second breach of the Agreements, Defendants failed to make available to Kempner the same level of pricing and equipment discounts that Defendants offered its internal channels of distribution, despite making affirmative representations to the contrary. As recently as May 8, 2001, Laren Whiddon, Vice-President and General Manager of Defendants, represented to Scott Kempner of Plaintiff, Kempner, that Kempner had access to the same level of pricing and equipment discounts as Defendants' internal channels of distribution. Similar representations had been repeatedly made to Kempner by representatives of Defendants throughout the term of the Agreements. However, Kempner has uncovered numerous examples of instances where Kempner has been told that sales terms offered to customers in writing by Cingular are "unavailable." These lies are designed to conceal Defendants' scheme to defraud Kempner.

Finally, Defendants have breached the Agreement by failing to pay Kempner the commissions it has admittedly earned within the time frame specified by the Agreements. Kempner is currently owed approximately $50,000 in commissions, some of which have not been paid for four years, notwithstanding the Agreements' requirement to make commission payments within fifteen days of customer activation and residual payments within forty-five days of the end of each calendar month. In addition, Cingular has failed to reimburse Kempner for out-of-pocket expenses associated with replacing Cingular's trademark in January, 2001.

These breaches by Cingular prohibit enforcement of the anti-competitive provisions in the Agreement. See for example, Francorp, Inc. v. Siebert, 126 F.Supp. 2d 543, 545-47 (N.D. Ill. 2000) (Material breach of contract, including failure to pay compensation, prohibit enforcement of restrictive covenants of agreements). The remaining provisions of the Agreements may be enforced by Kempner pursuant to the savings clause in the Agreements.

### 3. The Defendants Tortious Interference With Kempner's Business Relationships Provides a Further Basis for Injunctive Relief.

The Defendants have also engaged in repeated and ongoing acts of tortious interference with Kempner's business relationships. Tortious interference requires (1) the existence of, or plaintiff's reasonable expectation of entering into, a valid business relationship; (2) the defendant's knowledge of the relationship, or of plaintiff's expectancy; (3) purposeful interference by the defendant with the relationship, or that prevents the plaintiff's legitimate expectancy from ripening into a valid business relationship; and (4) damages to the plaintiff resulting from the interference. Fellhauer v. City of Geneva, 142 Ill. 2d 495, 511 (1991).

Defendants have knowingly attempted to divert Kempner customers from Kempner to retail outlets owned by the Defendants. Defendants published "bait and switch" advertisements designed to attract the attention of Kempner's customers and then switch that customer to accept services on terms and conditions more favorable to Defendants. Beginning as early as March 31, 2000, Defendants represented to Kempner that one of the benefits of being a sales and service center was Kempner's inclusion in the promotional advertising prepared and distributed by Defendants showing that the terms offered in that advertising would be available to customers who patronized Kempner. However, the benefits represented were not delivered. For example, sometime prior to January 31, 2002, Defendants prepared

and distributed to newspapers of general circulation in the Chicago area including but not limited to the Chicago Sun Times an advertisement indicating that new or existing customers who engaged Defendants' cellular telephone service and executed a contract providing for a continuous term of such services would receive a free Nokia 5165 IRDB portable telephone. Kempner's business location was published in this advertisement. On January 31, 2002, Gene R. Hyman, a regular customer of Kempner responding to the advertisement, while standing at Kempner's place of business had a telephone conversation with "Jennifer" at Defendants place of business. In the course of the conversation Mr. Hyman indicated his intention to avail himself of the offer published in the newspaper by activating Defendants' cellular telephone services through Kempner. Defendants' representative Jennifer directed Mr. Hyman not to patronize Kempner but rather to activate service at the Defendants point of distribution at 3333 West Touhy Avenue because he would not be able to receive a free Nokia 5165 IRDB portable telephone if he activated Defendants' cellular telephone service through Kempner, despite the advertised solicitation.

Kempner has suffered severe damages as a result of the Defendants' tortious interference. Kempner has lost untold numbers of sales and equipment or service upgrades to its existing customer base as a direct result of Defendants' tortuous acts. Kempner can thus establish each element of its claim for tortious interference and Kempner is therefore entitled to injunctive relief to prevent further irreparable harm.

**B.** **The Harm to Kempner Absent Injunctive Relief Far Outweighs Any Potential Harm to the Defendants.**

The showing for this element is perhaps the easiest of all to satisfy in this case, as the benefit of injunctive relief to Kempner far outweighs any undue detriment, if any, to the

Defendants. See Hydroaire, Inc. v. Sager, 98 Ill. App. 3d 758, 761 (First Dist. 1981)(The court must balance the equities or relative inconvenience to the parties and determine thereby whether a greater burden will be imposed on the defendant by granting the injunction than on the plaintiff by denying it.). On the one hand, an injunction will enforce the legitimate terms of the Agreements, which the parties promised to abide by. An injunction will further protect Kempner's relationships with its customers. Finally, by freeing Kempner from the unenforceable provisions of the Agreement, an injunction will protect Kempner's ability to operate its business while the Court addresses Kempner's claims and fashions a just relief in the face of Defendants' bad acts.

On the other hand, an injunction will not cause any harm to the Defendants. Enjoining the Defendants from stealing Kempner's customers, from interfering with Kempner's business relationships, from cutting off Kempner's earned cash flow, and terminating the Agreements is simply ordering the Defendants to live up to their contractual obligations and to stop harming Kempner.

Enjoining the Defendants from stealing Kempner's customers certainly does not harm the Defendants. Defendants will continue to enjoy the revenue derived from those customers, and will only bear the contractually agreed to obligation to pay continuing commissions to Kempner. Likewise, enjoining the Defendants from interfering with Kempner's business relationships certainly does not harm the Defendants. Rather, it simply stops Defendants from harming Kempner. Finally, requiring the Defendants to continue to pay earned commissions to Kempner simply requires Defendants to fulfill their contractual obligations. In short, none of the requested relief will impose any harm on the Defendants. In short, the requested relief will simply protect

Kempner's rights under the Agreements. See, Heritage Standard Bank & Trust v. Steel City National Bank, 234 Ill. App. 3d 48 (First Dist. 1992).

Kempner seeks merely to maintain the status quo and enjoin the Defendants from stealing Kempner's most valuable business assets — its customer relationships, and to prevent the Defendants from further harming Kempner. Even if the Defendants could point to a minimal level of harm they could suffer, their actions negate such concerns. The Defendants have unclean hands from the way they've dealt with Kempner. They cannot now ask for this Court to ignore the bad acts demonstrated by the pleadings and affidavits. The balancing of the equities is overwhelmingly in Kempner's favor.

**C.** **Kempner Will Suffer Irreparable Injury That Cannot Be Compensated By Money Damages.**

The Defendants' conduct is causing Kempner irreparable harm in numerous ways; first and foremost, is the Defendants' ongoing and substantial breaches of the Agreements. Illinois law recognizes that in cases of breaches of contract that result in unfair competition such as the breaches at issue, the victim always faces the threat of irreparable harm to its goodwill, competitive position and continuity of its business relationships. See Prentice Medical Corp. v. Todd, 145 Ill. App. 3d 692, 495 N.E.2d 1044, 1050-51 (1st Dist. 1986). These injuries are, by their very nature, not capable of being adequately compensated by money damages. Id. Justice McMorrow, writing for the Court in Prentice Medical, succinctly articulated this principle:

> Irreparable injury does not mean that the harm is beyond the possibility of repair or beyond compensation in damages, nor does it mean that the injury must be great. The concept of irreparable injury, however, denotes transgressions of a continuing nature such as constant breach of a contract resulting in damage to the goodwill of a business which would be incalculable or loss of competitive position, a species of very real but intangible harm not readily subject to measurement by any certain pecuniary standard.

Prentice Medical, 145 Ill. App. 3d 692, 495 N.E.2d at 1051 (citations omitted).

Here, Kempner is incurring substantial irreparable harm to its business relationships and competitive position by reason of the Defendants' continuous and ongoing breaches of the Agreements and by their unfair competition and interference with Kempner's business relationships. Moreover, the Defendants' threat to cut off Kempner's residual commissions or Defendants' invocation of the unenforceable non-compete provisions of the Agreement would likely force Kempner out of business.

Irreparable harm is further established in that money damages cannot adequately compensate Kempner for the misconduct at issue. Kempner has secured its relationships with its numerous and loyal customers through the expenditure of substantial financial resources and tremendous amounts of time. The destruction of these relationships and the resulting losses, including the loss to Kempner's competitive position in the marketplace, cannot be adequately remedied by money damages. See Ecolab Inc. v. Paola, 753 F. Supp. 1100, 1112 (E.D.N.Y. 1991). Indeed, it is impossible to ascertain with any certainty the degree of the financial loss that Kempner will sustain by virtue of the Defendants' breaches of their contractual obligations and their interference with Kempner's business relationships. In circumstances such as these, "irreparability of harm includes the impossibility of ascertaining with any accuracy the extent of the loss." Roso-Lino Beverage Distributors Inc. v. Coca-Cola Bottling Co., 749 F.2d 124, 126 (2d Cir. 1984).

**D.** **The Issuance of an Injunction Will Promote the Public Interest.**

The public interest is promoted by the issuance of an injunction enforcing reasonable contracts. See e.g., IDS v. Sun America, 958 F. Supp. 1258, 1282 (1997) ("The public has an interest in preventing unfair competition, [and] commercial piracy. . . . Consequently the public

has been disserved by defendants' actions.) Individuals and businesses that negotiate, bargain for and depend on these contracts on a daily basis must be able to rely on their enforceability if the integrity of the marketplace is to be maintained. As the District Court for the Eastern District of Michigan recently noted in Ran:

> The public has another important interest which is at stake in this case: the enforcement of contracts. Unless the court enforces the terms of the contracts entered into by the sophisticated parties and entities in this case, the court will be undermining the legitimate business expectations not only of the parties here, but of all contracting parties. It is the knowledge that valid and enforceable contractual agreements will be enforced in courts of competent jurisdiction which allows our competitive marketplace to thrive. Without such a rule of law, parties could not rely on contracts to conduct their affairs.

Merrill Lynch, Pierce, Fenner & Smith v. Ran, 67 F. Supp.2d 764, 781 (E.D. Mich. 1999).

The public interest is further promoted by protecting against the misappropriation Kempner's customer relationships developed at prohibitive expense, as well as by protecting against ongoing acts of tortious interference. There can be no doubt that the public interest favors issuance of an injunction to prevent such conduct in the future.

## II.  KEMPNER IS ENTITLED TO INJUNCTIVE RELIEF EVEN IF THE DISPUTE IS ULTIMATELY ARBITRABLE.

Certain of Kempner's claims for damages against the Defendants may be resolved through arbitration. There is a provision in the Agreements that requires "mediation" of certain contractual disputes. That fact, however, does not deprive this Court of the power to grant injunctive relief to maintain the status quo pending the outcome of those arbitration proceedings, if they are ordered. The overwhelming weight of authority holds that a court should grant a preliminary injunction to preserve the status quo pending arbitration.

Courts have uniformly held that a court has jurisdiction to enter injunctive relief pending arbitration. See, e.g., Salvano, 999 F.2d at 214 (pro-arbitration policies reflected in recent supreme

13

court cases are furthered by a rule permitting the district court to preserve the meaningfulness of arbitration by granting injunctive relief); Gateway Eastern Ry. Co. v. Terminal R.R. St. Louis, 35 F.3d 1134, 1141 (7th Cir. 1994); Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Cunningham, 736 F. Supp. 887 (N.D. Ill. 1990). These courts have recognized that entry of a preliminary injunction to preserve the status quo pending arbitration advances the policies that favor arbitration because it ensures that the dispute resolution will be a meaningful process. See Blumenthal, 910 F.2d at 1053 ("Arbitration can become a 'hollow formality' if parties are able to reverse the status quo before the arbitrators are able to render a decision in the dispute."); Bradley, 756 F.2d at 1053 (same); Merrill Lynch, Pierce, Fenner & Smith v. District Ct. of Denver, 672 P.2d 1015, 1018 (Colo. 1983) ("[P]reliminary relief is particularly appropriate where arbitration may be futile if the status quo is not preserved pending the arbitrator's determination.").

Kempner faces a real threat of further irreparable harm to its future and ongoing viability, as well as irreparable harm to Kempner's business relationships and competitive position by virtue of the Defendants ongoing breaches of the Agreement, their continuing tortious misuse of Kempner's customer list, and by virtue of the Defendants' threats to cut off Kempner's principal income source. Kempner's motion for injunctive relief simply cannot await arbitration.

## Conclusion

The Defendants relied upon Kempner to establish and build up their business. Now that the business has matured, Defendants desire to keep Kempner bottled up within the restrictions of Defendants' business operation, while they slowly weaken its competitive edge and devour its customer base for their own. Only at the point that Kempner is driven from business as a viable competitor will the Defendants be satisfied. Kempner requires the assistance of this Court to avoid the certain doom that accompanies such an outcome.

14

For these reasons stated above, Plaintiff Kempner has shown a likelihood of success on the merits, that the balancing of equities falls completely in its favor, that Kempner is likely to sustain irreparable harm unless the injunction is issued, and that the public interest is in favor of entering the requested relief. Accordingly, Kempner respectfully seeks the equitable relief of a temporary restraining order together with such other, further and different relief as this Court deems just and proper.

Dated: July 25, 2002

Respectfully submitted,

KEMPNER MOBILE COMMUNICATIONS, INC.

By: _____
One of its attorneys

Kenneth B. Drost
Thomas D. Laue
DROST & LAUE, LLC, Firm No. 23746
111 Lions Drive, Suite 206
Barrington, Illinois 60010
Telephone: 847-381-1070
Facsimile: 847-381-1073

Myron M. Cherry
Myron M. Cherry & Associates LLC, Firm No. 37264
30 N. LaSalle Street
Suite 2300
Chicago, Illinois 60602
Telephone: 312-372-2100
Facsimile: 312-853-0279

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, CHANCERY DIVISION

| | | |
|---|---|---|
| Kempner Mobile Electronics, Inc., | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 02 CH 8976 |
| | ) | |
| Southwestern Bell Mobile systems, LLC d/b/a Cingular Wireless, | ) | Judge Aaron Jaffee |
| Defendant. | ) | |

## NOTICE OF FILING

To:  Veronica Gomez
     Schopf & Weiss
     312 W. Randolph Street
     Suite 300
     Chicago, IL  60606

PLEASE TAKE NOTICE, that on the <u>26th</u> day of <u>July</u>, <u>2002</u>, we will file with the Clerk of the Circuit Court of Cook County, Illinois, County Department, Chancery Division, the <u>Affidavit of Scott Kempner</u>, copies of which are attached hereto and herewith served upon you.

Kempner Mobile Electronics, Inc.

By: _____
     One of its attorneys

I, Kenneth B. Drost, an attorney, hereby certify under penalty of law pursuant to Section 1-109 of the Illinois Code of Civil Procedure that a copy of the attached and foregoing document was served on each party of record at the address listed above, by messenger delivery and facsimile transmission to 312-701-9335, on <u>July 25, 2002</u>, before the hour of 5:00 p.m., and that this certification was executed on such date.

_____
Kenneth B. Drost

Kenneth B. Drost
Drost & Laue, LLC
Attorney for Plaintiff
111 Lions Drive, Suite 206
Barrington, IL  60010
(847) 381-1070
Atty No. 23746

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, CHANCERY DIVISION

KEMPNER MOBILE ELECTRONICS,   )
INC., an Illinois corporation,   )
      )
   Plaintiff,   )
      )   Case No.  02 CH 8976
   v.   )
      )
SOUTHWESTERN BELL MOBILE   )
SYSTEMS, LLC, d/b/a CINGULAR   )
WIRELESS f/k/a SOUTHWESTERN   )
BELL MOBILE SYSTEMS, INC. d/b/a   )
CELLULAR ONE-CHICAGO   )
      )
   Defendant.   )

### AFFIDAVIT OF SCOTT KEMPNER

Scott Kempner, being first duly sworn deposes and states as follows:

1.    I am the vice-president of Plaintiff Kempner Mobile Electronics Inc. I have personal knowledge of the facts contained in this affidavit and, if sworn as a witness could competently testify thereto.

2.    Kempner was formed in 1989 as a proprietorship and subsequently incorporated in approximately 1993.  Kempner began its operation at 4349 W. Howard Street, Skokie, IL, and relocated to 4722 W. Touhy Avenue, Lincolnwood, IL in 1993. Since inception, Kempner has continually engaged in the business of marketing mobile electronic devices, including radios, paging equipment and cellular telephone equipment and services.

3.    Kempner first established a relationship with the predecessor to Defendant Southwestern Bell Mobile Systems LLC d/b/a Cingular Wireless ("Cingular") in 1989. At that time, Cingular operated its business under the trade name "Comtech," which was

subsequently changed to "Cellular-One." Kempner was one of the earliest franchises awarded by Cingular at a time when the market for cellular telephone products and services was in its infancy.

4.    In 1993, Kempner relocated to 4722 West Touhy Avenue, Lincolnwood, Illinois and became an authorized sales and service center for Cingular. As an inducement to commit the resources necessary to become a sales and service center, I was promised that Cingular would permit me to expand to other locations within the six-county Chicago metropolitan area. Although proposed new locations had to be approved by Cingular, it was assured that this provision would not be unreasonably denied, and terms to that effect were incorporated into written agreements.

5.    As a sales and service center, Kempner was accorded various benefits, including but not limited to the cooperative marketing efforts of Cingular's corporate group accounts group. Attached hereto as Exhibit 1 is a handout given to me by the corporate accounts group referencing and touting the "joint venture" between Cingular and its authorized sales and service locations. The purpose of this relationship was allegedly to drive business operated by Cingular to sales and service locations such as Kempner..

6.    At all times I intended that Kempner would expand its business to other locations. Since 1994 I have submitted numerous potential locations for approval to Cingular, all of which have been denied. In March of 1997 I opened a kiosk at the Lincolnwood Town Center and began selling pagers and car phone accessories. I requested permission from Cingular to market cellular telephone products and services from this location. Again, permission was denied. I closed this location in April of 1998

2

because I could not generate enough revenue from the sale of pagers and accessories along to justify maintenance of the location. That same year, Cingular opened a kiosk at the Lincolnwood Town Center and began direct marketing of cellular telephone products and services.

7.      Although I was told that Cingular had an "administrative policy" requiring that competitive points of distribution for Cingular telephone products and services be located not less than 3 miles apart, this "policy" was never enforced for my benefit. For example, the kiosk which Cingular opened at the Lincolnwood Town Center was within 3 miles of my location on Touhy Avenue. Furthermore, in September 2000, Cingular opened a sales location at 4730 W. Dempster Street that is also less than 3 miles away from my location on Touhy Avenue.

8.      Kempner worked diligently to establish a customer base. In 1998, Kempner had approximately 10,000 customers for cellular telephone products and services. These are loyal customers who return to Kempner's sales location for product upgrades and service renewals and to purchase other mobile electronic products from Kempner. Kempner has established this loyal customer base as a result of extraordinary customer service. Kempner provides demonstrations of cellular telephone products and services, and trains its customers in the use of these products and services. Kempner employees maintain close personal contact with customers to assure customer satisfaction.

9.      Notwithstanding the commitment to a "joint venture," and other repeated assurances of cooperation, beginning in 1999 I noticed an increasing effort on the part of

3

Cingular to target Kempner's customer base and market directly to those customers. I also noticed a continuing erosion of Kempner's customer base.

10.     The market for cellular telephone services in the Chicago area is extremely competitive. A customer currently has at least six different alternatives for service. Without the benefit of an established relationship with a local dealer, customers will repeatedly switch service on the basis price or product promotions.

11.     Since 1999 I have been repeatedly approached by other carriers of cellular telephone service and asked to market products and services on their behalf. I have resisted such attempts principally because of representations made to me by Cingular that Kempner would be granted authority to offer the same level of service pricing and equipment discounts as though that were offered internally by Cingular. Attached hereto as Exhibit 2 is a letter that I received from Laren Whiddon, Vice President and General Manager of Cingular on May 8, 2001 as the result of a meeting wherein I expressed my concerns regarding Cingular's marketing strategies. In that letter Mr. Whiddon specifically represents that "all dealers have access to the same level of service pricing as the internal team." I subsequently discovered that this and the other representations made to me were false and that Cingular repeatedly lied to me about the promotional discounts being offered to my customers. The following are only a few examples of what I have discovered:

A.     Attached hereto as Exhibit 3 is a transcript of an e-mail that Kempner received from Cingular on November 14, 2001 responding to a request Kempner made to quote service to a particular customer (Lauren Restoration) including a switchover credit of $100 per line. This request was denied. Immediately behind this e-

4

mail transcript is a letter which Lauren Restoration received on November 6, 2001 from Ariela Lubowicz at Cingular offering service to this customer, including the $100 switchover credit. Service pricing to this customer offered by the "internal team" was denied to Kempner by Cingular.

        B.     Attached hereto as Exhibit 4 is a transcript of an e-mail which Kempner received from Cingular reflecting Cingular's response to a request made by Kempner on December 4, 2001 to quote a particular customer (Corporate Image) including a switchover credit of $50 per line. This request was denied. Immediately behind this email is a proposal which Corporate Image received from Debra Mangoon at Cingular on November 29, 2001 offering to provide this customer with not only a $100 switchover credit but a waiver of the $25 activation fee. Again, service pricing offered to a customer by the "internal team" was denied to Kempner by Cingular.

        C.     Attached hereto as Exhibit 5 is a transcript of an e-mail which Kempner received from Cingular on January 26, 2002 responding to a request that Kempner be permitted to create a flyer offering 100 free minutes of air time to customers of Starbucks and Dunkin Donuts in conjunction with a special promotion. This request was denied. Immediately behind this email is a copy of a flyer produced by the Cingular-owned facility at 1662 Willow Road, Northfield, IL offering service pricing on precisely these terms during the period January 12, 2002 through February 2, 2002..

        D.     Attached hereto is Exhibit 6 is a transcript of an e-mail which I sent to Cingular on or about March 15, 2002 requesting permission to create a flyer offering customers a 50 minute air time credit if they referred a customer who activated new service, as well as the response I received from Cingular on March 21, 2002 denying

<div align="center">5</div>

this request. This response specifically denied that Cingular was "running any other promotion in conjunction with aggressive pricing on the National plans." Immediately behind this is a copy of a flyer which a customer brought into our store during the week of March 15, 2002 offering service pricing on precisely these terms on behalf of the Cingular owned facility at 4370 W. Dempster Street.

E.  Cingular has contacted customers who had originally purchased the Cingular telephone product and signed up for Cingular's telephone service through Kempner while such customer's contracts were still in effect and offered to allow such customers to upgrade their cellular telephone product directly from Cingular without allowing Kempner the opportunity to sell equipment to the customer on the same terms. When such customer upgraded their cellular telephone equipment directly from Cingular, Cingular "purged" such customers from the Cingular's records as a Kempner-originated customer and terminated Kempner's monthly residuals for those customers. Attached hereto is Exhibit 7 is a solicitation directed to Betty Martin-Dwyer, a Kempner-originated customer. Ms. Dwyer's name and address would not become known to Cingular but for the efforts of Kempner. At the time of this solicitation, dated March 7, 2001, Mr. Fegan's service contract did not expire until August 5, 2001. In this solicitation, Cingular offered to upgrade Ms. Dwyer's phone equipment and change her service plan, which resulted in a termination of Kempner's residuals. On March 23, 2002 Cingular offered to permit Robert Gomez, another Kempner originated customer, the opportunity to upgrade to a free Nokia 8620 Cingular telephone, but refused to permit Kempner to offer the same unit to the customer with an equipment credit for the cost of the phone. This would result in

Mr. Gomez being purged as a Kempner originated customer and Kempner losing residual commissions.

12.     Cingular represented to Kempner that one of the benefits of being a sales and service center is the inclusion of these locations in promotional advertising created and disseminated by Cingular, which would offer promotions available at these locations. Attached hereto as Exhibit 8 is a letter which I received from James M. Moen, Director of Sales in Illinois date March 31, 2002 wherein Mr. Moen commits to the "continuing development of our distribution partners" by, among other things, "the inclusion in Cellular-One promotional advertising...."  Sometime prior to January 31, 2002, Cingular prepared and distributed in the Chicago Sun Times the advertisement attached hereto as Exhibit 9.  This advertisement identifies Kempner's business location and represents that the customer will receive a free Nokia 5165 IRDB cellular telephone with a new two year agreement.  On January 31, 2002, Gene R. Hyman, a regular customer of Kempner, responded to this advertisement by telephone Cingular where he spoke to a woman named "Jennifer."  Mr. Hyman indicated his intention to avail himself of this offer at Kempner.  At approximately 1:12 PM on January 31, 2002, Jennifer telephoned Mr. Hyman and left a message directing Mr. Hyman not to patronize Kempner but rather to activate service at the Cingular point of distribution at 3333 W. Touhy Avenue because he would not be able to receive a free Nokia 5165 IRDB cellular telephone if he activated Cingular's telephone service through Kempner, despite the advertised solicitation.  A transcript of the message left by Jennifer is attached hereto as Exhibit 10.

13.     In addition to targeting Kempner's existing customer base, Cingular has diverted potential customers from Kempner to Cingular.  Cingular maintains 1-800 and 1-

866 telephone numbers for the support and referral of customers. This system is supposed to indicate for the benefit of the customers and dealers, through the telephonic input of zip code numbers, the identity of authorized sales and service locations for products and cellular telephone services offered by Cingular. For as long as I can remember, this system identified Kempner's location as "Jillian Wireless" in "Roadhouse, IL." The location of the Cingular-owned store at 253 Old Orchard Center contained in this same listing is correctly identified. I have repeatedly complained to Cingular about the erroneous misidentification of Kempner in the 1-866 support number system. Cingular has repeatedly and falsely represented to me that the identity of the store locations in the 1-866 support number system has been corrected. For example, in the letter Mr. Whiddon wrote me on May 8, 2001, attached hereto as Exhibit 2, Mr. Whiddon stated that "we are currently reviewing the store listings on our 1-800 and 1-866 - Cingular support numbers and plan to make the necessary revisions in the June [2001] time frame." As of July 5, 2002 the misidentification persists.

14.     Cingular has failed to pay Kempner the commissions and residuals payments due under the written agreements. The most recent Agreement attached as Exhibit 2 to the First Amended Verified Complaint in this matter states that commissions must be paid within fifteen days following customer activation and monthly residuals are paid within forty-five days of the end of each calendar month. Currently, Cingular owes Kempner approximately $50,000 of past due commissions and residuals. Attached hereto is Exhibit 11 are examples of only our most recent communications with Cingular demanding payment of the monies, some of which have been due since 1998. I have attached only the first few pages of the communication which included numerous pages

8

of backup documentation. Although Cingular owes Kempner tens of thousands of dollars of unpaid commissions, Cingular has placed Kempner on "credit hold" for the purchase of new equipment.

15.     Approximately January 14, 2001, the current manifestation of Cingular was formed by merger between SBC Communications and Bell South Corporation. At that same time, Cingular changed its trade and service mark from "Cellular-One" to "Cingular" and simultaneously changed associated trade and service markets. Pursuant to my written agreements with Cingular, I was required to discontinue my use of any prior mark and substitute the new marks to identify my relationship with Cingular. Cingular agreed to reimburse me for my out-of-pocket costs of doing so. Attached hereto as Exhibit 12 is a copy of a demand which I made to Cingular for reimbursement of these costs. Also included was several pages of backup documentation identifying the specific expenses. Despite this demand, these sums due have not been paid.

16.     When I entered into my relationship with Cingular, I agreed to market cellular telephone products and services exclusively on behalf of Cingular in exchange for Cingular's promise to permit me to expand by business on behalf of Cingular without interference and without the unreasonable withholding of permission for expansion. As a result of Cingular's failure to abide by its commitment and as a result of Cingular's failure to pay me the commissions that it owes me, these exclusivity restrictions have become oppressive. Kempner's customer base has decreased from approximately 10,000 in 1998 to approximately 7,000 today, principally as the result of attrition due to the acts of Cingular. Kempner cannot survive without the ability to market cellular telephone products and services on behalf of other carriers.

9

17.     Preventing Kempner from offering the products and services of competing providers is not necessary for the protection of Cingular.  Cingular currently permits other sales and service centers, including A. B. T. Electronics and Circuit City to market the products and services of competitors..  Attached hereto is Exhibit 13 is an advertisement generated on behalf of Circuit City which references Circuit City's marketing of multiple carrier services, including Cingular, Spirit and AT&T.

18.     Kempner began marketing cellular telephone products and services on behalf of other carriers in May 2002 after commencing this action against Cingular.  On or about June 20, 2002, I received a letter form Cingular threatening to terminate my franchise as a result of this activity.  A copy of this letter is attached hereto as Exhibit 14.  On July 8, 2002, I delivered to Mr. Whiddon a copy of the First Amended Complaint filed by Plaintiff in this matter, wherein Kempner indicates that the restrictions sought to be enforced are void and that any purported termination on that basis would be wrongful.  Not withstanding the receipt of that pleading, on or about July 23, 2002, Mr. Whiddon sent me the letter attached hereto as Exhibit 15 terminating my franchise and threatening to enforce the restrictive covenants of the Agreements.

19.     Unless Cingular is enjoined from enforcing the illegal provisions of the Agreements, Kempner will suffer irreparable injury.  Kempner enjoys significant good will and ongoing relationships with its existing customers as a result of the time, money and effort invested in customer development.  If these illegal restrictions are enforced, even on a temporary basis, these relations will be destroyed and cannot be easily recreated.

20.    Unless Cingular is enjoined from terminating the 1999 Agreement prior to

its expiration on December 31, 2002, Kempner will suffer irreparable injury for which

there is no adequate remedy at law. As a result of Cingular's false and fraudulent

representations to Kempner, Kempner refrained from offering the services of other

carriers earlier, and has been prevented from developing the revenue stream that would

have otherwise been generated from these competing providers. Kempner requires the

remaining term of the 1999 Agreement in order to be placed in a position remotely

similar to that which it could have been in had Cingular not deceived Kempner. If

Kempner's revenue stream from Cingular is terminated before Kempner has the

opportunity to establish a competitive position, Kempner will likely go out of business.

Under penalties provided by law pursuant to Section 1-109 of the Code of Civil

Procedure, the undersigned certified that the statements set forth in this instrument are

true and correct, except as to matters therein stated to be on information and belief, and as

to such matters, the undersigned certifies as aforesaid that (s)he verily believes the same

to be true.

Scott Kempner

Dated: _____, 2002

Kenneth B. Drost
Thomas D. Laue
DROST & LAUE, LLC, Firm No. 23746
111 Lions Drive, Suite 206
Barrington, Illinois 60010
Telephone: 847-381-1070
Facsimile: 847-381-1073

11

# A JOINT VENTURE BETWEEN CELLULAR ONE

## &

## AUTHORIZED SALES & SERVICE LOCATIONS



EXHIBIT

1

# INTRODUCING.......

# THE EMPLOYEE PROGRAM PAK





# CORPORATE ACCOUNT EXECUTIVES RESPONSIBILITIES

**Your Choice! EPP or SMA**

- Establish Main Contact at Company

- Qualify Account - Using Criteria for EPP Program

- Involve A.S.&S. by Location of Potential Account

- Get Authorization Number Assigned

- Arrange Promotion Date Convenient for Account & A.S.&S.

- Get Human Resources Authorization Signature

- Answer any Questions Regarding Program - On-Sight

- Assist Customers with the Completion of the Corporate Contract

- Once Active, Maintain Account



# A.S.&S. RESPONSIBILITIES

*Your Choice! Digital or Analog*

- Provide Corporate Account Executive Pricing on the Equipment Featured for Promotion

- Travel On-Sight with Executive to Account Location

- Present Equipment

- Answer any Questions Regarding Equipment or Cellular Service

- Assist Customers with the Completion of the Corporate Contract

- Program/Install Equipment

# LETS SUMMARIZE THE PROCEDURE

- Executive Establishes Main Contact

- Executive Qualifies Account

- Executive Contacts A.S.&S Closest to Location of Account

- A.S.&S Provides Equipment Pricing to the Executive

- Executive receives Authorization # from Cellular One to Establish Account

- Executive Arranges Promotion Date

- Executive and A.S.&S Travel On-Sight for Promotion

- Executive has Human Resources Sign Letter of Authorization


**X cingular**
WIRELESS

Laren Whiddon
Vice President and General Manager-Illinois and Wisconsin
2000 West Ameritech Center Drive
Hoffman Estates, IL 60195
(847) 765-8671

May 8, 2001

Scott Kempner
Kempner Mobile Electronics
4722 W. Touhy Avenue
Lincolnwood, IL 60712

Dear Scott:

Thank you for your letter dated May 7th. I enjoyed our meeting as well, and have summarized our actions relative to your concerns below.

We are currently reviewing the store listings on our 1-800 and 1-866-Cingular support numbers and plan to make the necessary revisions in the June timeframe.

Your concern relative to the listing of national retail distribution, which is nonexclusive, in our advertising is noted. We are confirming whether or not we have contract commitments, which would preclude us removing them from our print advertising. If there is no contract commitment, we plan to remove them.

IVR and related network issues created unacceptable service levels during the month of March. Cingular is committed to providing high service levels, which our customers expect and deserve. We have addressed the noted issues and our service levels are now approaching are targeted levels. I personally agree that we should explore a dedicated group to assist our authorized sales and service dealers. We are looking into the feasibility of establishing such a team and will communicate our decision by the end of this month.

This week we will announce a guaranteed 5% residual to our authorized sales and service dealers. There should be no further concern relative to the impact of quota issues.

Cingular will continue to move forward with the expansion of the internal corporate sales organization. All dealers have access to the same level of service pricing as the internal team. Discounts applied to equipment and accessory pricing are left to the discretion of the internal/dealer organization and impact their respective margins accordingly. We are evaluating the commission level for corporate business lines and will communicate any decision to increase by the end of this month.

**EXHIBIT**
2

We acknowledge the poor coverage surrounding your Wilmette retail location and are attempting to secure zoning approval to address the issue. As an interim solution, our engineering team will deploy an enhancer in your location. My understanding is that landlord approval has been secured and work should be completed within a few weeks.

Again, I appreciate your input and hope that the above will address your concerns. I look forward to working together to move our business forward.


Regards,

Laren Whiddon

**Kempner Mokile Electronics**

| | |
|---|---|
| **From:** | DOPPKE, ROBERT J. (SBMS) |
| **To:** | <joy@kempner.com> |
| **Sent:** | Wednesday, November 14, 2001 3:36 PM |
| **Subject:** | FW: Approval: Lauren Restoration - 11-13-01 |

> -----Original Message-----
> From: FLY, PAMELA L (AIT)  .
> Sent: Tuesday, November 13, 2001 6:03 PM
> To: DOPPKE, ROBERT J. (SBMS)
> Cc: ANETSBERGER, JAMES R (SBMS); BOERSMA, ROCHELLE J (SBMS); PEDONE,
> MICHELLE (AIT); COPRE, CHERYL A (SBMS); EVANS, JENNIFER (SBMS); MORRISSEY,
> MELANIE A (SBMS); Spencer, LaTrice; Johnson, Jeananna; Feronti, Gregg
> Subject: Approval:  Lauren Restoration - 11-13-01
> Importance: High
>
> Rob-
>
> The Special Bid team has reviewed your request for Lauren Restoration.
> Your comments that were reflected on the bid are shown below.
>
> CUSTOMER HISTORY OR COMMENTS WITH OTHER CARRIER:
> This customer is currently with Nextel and is not happy with service.
> Looking to move to service provider with a better cellular network and
> save more money in the process.
> EXPLAIN YOUR STRATEGY OR PROPOSED OPTIONS FOR WINNING OR RETAINING THIS
> ACCOUNT:
> The customer is looking go with the Cingular Home 250 ($29.99) rate with
> the mobile to mobile 750 at no charge and the switchover credits of
> $100.00 per line.  The switchover credits are to help offset the cost of
> cancelation and equipment with NexTel.  The customer has used a demo line
> and is satisfied with the service.  The customer feels they will greatly
> benefit from moving over all of their lines to Cingular.
>
> The Special Bid team offers the following approval contingent on you
> acquiring 25 Corporate Liable Lines.
>
> TWO (2) YEAR CONTRACT REQUIRED FOR ALL CORPORATE LIABLE LINES.
> * Free MTM on Cingular Home Plans of $29.99 and above*
>    OR
> * Current Promotion*
> * No Switcher Credits
> * Standard Phone Rebates
>
> *Free MTM Code is SBM
> * The customer can choose MTM or the current promotion, but is not
> approved for both.
>
> Standard equipment rebates, promotions and termination fees apply.

EXHIBIT
3

Nov 08 01 11:22a        Laurens Restoration Inc.        (847)470-1911                    p.3


WIRELESS

November 6, 2001

Keith,

Here is a recap of everything I mentioned in our phone conversation on November 5th 2001. Cingular
will give you a $100 switchover credit per phone. The activation fee of $25 will be waived on each line of
$29.99 or higher.

25 lines at $100 a piece for switchover credit          $2500
25 lines $25 Activation fee for each phone (29.99 or higher)     $ 625
                                                Total $3125

Cancellation fee for 9 lines                            $1800
Total credit you will be receiving from Cingular        $1325

If you have any other questions please feel free to give me a call. I'm also including the current
promotions we are offering at this time. I look forward to working with you in the future.

Sincerely,

Ariela Lubowicz

Ariela Lubowicz

## Kempner Mokile Electronics

| | |
|---|---|
| **From:** | DOPPKE, ROBERT J. (SBMS) |
| **To:** | <joy@kempner.com> |
| **Sent:** | Tuesday, December 04, 2001 10:49 AM |
| **Subject:** | FW: Approval: Corporate Images - 12-4-01 |

> -----Original Message-----
> From: FLY, PAMELA L (AIT)
> Sent: Tuesday, December 04, 2001 10:48 AM
> To: DOPPKE, ROBERT J. (SBMS)
> Cc: ANETSBERGER, JAMES R (SBMS); BOERSMA, ROCHELLE J (SBMS); MUNOZ, LORI
> MARIE (SBMS); Feronti, Gregg; Spencer, LaTrice; Johnson, Jeananna; PEDONE,
> MICHELLE (AIT); MORRISSEY, MELANIE A (SBMS); COPRE, CHERYL A (SBMS);
> SEERY, TRACIE A (SBMS); EVANS, JENNIFER (SBMS)
> Subject: Approval: Corporate Images - 12-4-01
> Importance: High
>
> Rob-
>
> The Special Bid has reviewed your request for Corporate Images. Your
> comments that were reflected on the bid are shown below.
>
> CUSTOMER HISTORY OR COMMENTS
> This customer is currently with Nextel and is
> Looking to move to service provider with a l
> save more money in the process.
> EXPLAIN YOUR STRATEGY OR PROP'                                    ING OR RETAINING THIS
> ACCOUNT:
> The customer is looking go with the Cingu...
> Cingular Home 400 ($39.99) rates with the unlimited moone .. ...    t no
> charge and the switchover credits of $50.00 per line. The customer was
> lost to Nextel and is now shopping for another carrier. The were
> previously a customer with Cingular and left for the ease of use that
> Nextel offers.
>
> The Special Bid team offers the following approval contingent on you
> acquiring 8 new Corporate Liable Lines.
>
> TWO (2) YEAR CONTRACT REQUIRED FOR ALL CORPORATE LIABLE LINES.
> * Free MTM on Cingular Home Plans of $29.99 and above*
>     OR
> * Current Promotion*
> * No Switcher Credits
> * Standard Phone Rebates
>
> *The Free MTM code is SBM. This customer can choose free MTM or the
> current promotion but is not approved for both.
>
> Standard equipment rebates, promotions, and

**EXHIBIT**
**4**

NOV 29 2001 3:16PM    HP LASERJET 3200                                    P.2
    NOV-29-2001  13:31    Cingular-DSR Group              147 762 2188   P.01/04

# ✕ cingular™
WIRELESS

Corporate Image
Attention: Peter
Ph: 847-729.3800
Fax: 847-729-3888

Proposal Date: November 29, 2001

**Rate Plan**
400 Local minutes per mo.$39.99
10% corporate Discount   $ 3.99
Net monthly charge       $35.99
500 mobile to mobile min $ 4.99
Total monthly per line     $40.98
Plus Taxes

6 lines @ $40.95 = $245.88 plus tax
Local plans include, caller ID, voice mail, three way calling, call waiting
Unlimited nights and weekends, long distance Add'l min. 35¢min. roaming 69¢ min.

**Additional Credits**
$100 Switch over credit per line = $600.00 Credit
$25.00 Activation Fee Waived = $150.00 Savings

**Phones**
Ericsson R278  FREE
Nokia 5165I  $9.99
Nokia 3360  $49.99
Headset, Leather Case, Car Adapter Pkg. $35.00

Proposal good for 30 days

*Debra Magoon*
*Cingular Wireless*
*847-762-2086*

**Kempner Mobile Electronics**

From:       DOPPKE, ROBERT J. (SBMS)
To:         <joy@kempner.com>
Sent:       Wednesday, January 16, 2002 1:49 PM
Subject:    100 Free min

Scott,

The request to run a special promotion for Starbucks and Dunkin Doughnuts in which you wanted to create a flyer for 100 free minutes of airtime for customer activating service has not been approved.  Ocasionally, requests of this nature are used for events such as corporate signup days as an incentive to purchase while on site similar to your signup day with Chicago Police Deptartment.  Possible alternatives are offering the 10% discount for customer who qualify or a percentage off of accessories purchased with proof of sale.

Please feel free to call me with any questions.

Rob

EXHIBIT
5

1/16/02



**kempner**

| | |
|---|---|
| **From:** | "DOPPKE, ROBERT J." <robert.j.doppke@cingular.com> |
| **To:** | "'Kempner Mobile Electronics'" <kme@kempner.com> |
| **Sent:** | Thursday, March 21, 2002 11:06 AM |
| **Subject:** | RE: Denial: File Murphy 3-15-02 |

Scott,

When a bid is denied it is denied in it's entirety not parts approved and parts denied. I did request the 1x 100 minute credit per line, as you requested, which is indicated my strategy to win the account. The start of service fee is automatically waived on all directly billed lines so there is no need to bid for that.

The request for the ability to issue a 50 minute credit for all customers bring in a Kempner filer has not been approved. We are not currently running any other promotion in conjunction with aggressive pricing on the National plans. Possible alternatives are the 10% off discount for employees of qualifying companies or accessories.

Let me know if you have any questions or want to re-bid for something else.

Rob


-----Original Message-----
From: Kempner Mobile Electronics [
Sent: Wednesday, March 20, 2002 12
To: DOPPKE, ROBERT J.
Subject: Re: Denial: Figel Murphy 3


Rob,
    Received the special bid info but there was no mention regarding approval of the customer receiving a one time 100 minute credit and /or waiving the start of service fee.
    Can Kempner create a flyer offering customers to receive a 50 minute airtime credit if they refer someone who activates new service with a 2 year contract?
        please advise,
        Scott Kempner

---- Original Message -----
From: DOPPKE, ROBERT J. <robert.j.doppke@cingular.com >
To: <joy@kempner.com>
Sent: Monday, March 18, 2002 2:15 PM
Subject: FW: Denial: Figel Murphy 3 -15-02



EXHIBIT
6

  

**Cingular Wireless**
**4730 West Dempster**
**Skokie, IL 60076**
**(847)982-1739**

# Get 50 Minutes Free!

KNOW SOMEONE THAT NEEDS NEW CELLULAR SERVICE?
SEND THEM TO US AND RECEIVE A 50 MINUTE**
CREDIT TOWARDS YOUR ACCOUNT

Your Name:_____ Your Mobile # : (_____) _____-_____

**FOR EVERY CUSTOMER THAT ACTIVATES <u>NEW SERVICE</u> WITH Cingular Wireless THROUGH OUR LOCATION
(SKOKIE, IL)
50 Minute credit is the dollar amount equivalent to your rate plan overage per-minute rate. (i.e. the 400 minute rate
the per-minute rate over the 400 allotted minutes is: .35 cents per minute = 50 x .35 = $17.50 credit.)
New customer must submit this referral form in order for you to receive credit.

New Customer:

Name:_____

Address:_____

City and zipcode:_____, ILL _____

JUL. -25' 02 (THU) 13:15    KEMPNER MOBIL          TEL:847-675-6567              P. 002

✕ cingular
WIRELESS

Date: 03/07/2001

## Receipt
C601-I-003625

Sold To:
BETTY MARTIN-DWYER
5200 N LUDIAM AVE
CHICAGO, IL 60630

Ship To:
BETTY MARTIN-DWYER
5200 N LUDIAM AVE
CHICAGO, IL 60630

| Sales Representative | CTN | Customer PO Number | Cashier | Drawer | Customer ID | Order Number | Order Date |
|---|---|---|---|---|---|---|---|
| CHIC32 Vecchio, Mary Anne | | 7736120320 | 582376 Shi | 492 | C60101074 | C601-O-003959 | 03/07/2001 |

| Line | Type | Qty Ordered | B.O. Qty | Shipment Description / Comments | Item ID | Unit Price | Extended Price |
|---|---|---|---|---|---|---|---|
| 1 | S | 1 | 0 | 1  PHO NOK5165 BLK CEL N | 61038 | $0.00 | $0.00 |
| Sales Rep: Vecchio, Mary Anne CHIC32   Serial #: 11409817854 | | | | N | | | |
| 2 | S | 1 | 0 | 1  CAS NOK5100 LTHR W/PLST AR | 60038 | $0.00 CTN #: 773-612-0320 | $0.00 |
| Sales Rep: Vecchio, Mary Anne CHIC32 | | | | | | | |
| 3 | S | 1 | 0 | 1  CLA NOKALL STD AR | 60065 | $0.00 | $0.00 |
| Sales Rep: Vecchio, Mary Anne CHIC32 | | | | | | | |

I agree to pay the below total amount.

Signature: _____

EXHIBIT
tabbies
7

|  | Order Totals | Backorder Totals | Shipment Totals |
|---|---|---|---|
| Subtotal: | $0.00 | $0.00 | $0.00 |
| Tax: | $0.00 | $0.00 | $0.00 |
| Total: | $0.00 | $0.00 | $0.00 |

Thank you for choosing us!
Business Accounts Desk
930 NATIONAL PKWY
SCHAUMBURG, IL 60173-5115

Exchanges on equipment or accessories may be made within 5 business days from purchase with original receipt. Equipment must have less than 30 minutes of total usage and must be in original carton in new condition with all manuals and accessories. Restocking fees and other restrictions may apply. No cash refunds.

cingular™
WIRELESS

## Whether you're a new customer or a treasured friend, welcome!

On behalf of all the Cingular employees dedicated to helping you express yourself, thank you for choosing Cingular Wireless. Enclosed please find the state-of-the-art wireless phone you selected along with some important information about your new service. Follow these simple steps to begin taking advantage of your new wireless phone:

**1. Review the enclosed terms and conditions brochure and calling plan brochure.**

**2. Refer to your information sheet for instructions on how to activate your wireless telephone**

Just follow these two simple steps, and start using your wireless phone today to exercise your freedom of expression. It's that easy!

If you ever have any questions, call us at 1-800-331-0500, visit us online at www.cingular.com or stop by any one of our conveniently located Cingular Wireless retail stores. As part of our Cingular Promise, we are here to make your wireless communications experience easy and useful the way wireless service should be.

From the entire Cingular team, thank you for choosing Cingular Wireless. We look forward to serving you for a long time to come.



March 31, 2000

**CELLULARONE®**

930 National Parkway
Schaumburg, IL 60173-5935

Scott Kempner
Kempner Communications
4722 W. Touhy Avenue
Lincolnwood, IL 60646

Dear Scott,

The wireless industry continues to experience explosive growth - adding a new customer every two seconds. This growth presents considerable opportunity for experienced, responsive companies, like SBC Wireless. Local rates, regional rates, USA rates, and competitive equipment pricing are just the beginning.

SBC continues to strengthen its pursuit as a national and global telecommunications player. Locally at Cellular One our vision and our focus is on improving our processes to enhance efficiency and refining practices to better serve our customers and to gain a competitive edge. Creating value for our customers is our number one job. It is the key to our long-term health as a company.

Cellular One-Chicago's strong distribution network has excelled in providing customer satisfaction and focus. Our intention is to continue to grow new business and in doing so our department is committed to continuing the development of our distribution partners and strengthening our management practices to better service our customers.

Cellular One is taking this opportunity to refine the methodology of the Authorized Sales and Service Program. Sales and Service locations are held to the highest of standards in regards to store image, service and productivity. Among the many benefits of becoming a Sales and Service Center is the inclusion in Cellular One promotional advertising and increased co-op earnings over the standard dealer program. The Authorized Sales and Service key components and requirements are detailed in the enclosed attachment.

This letter serves as notice that effective April 1, 2000 Cellular One will review the adherence to the Authorized Sales and Service Program requirements on a quarterly basis. The first review will take place in July 2000.

Cellular One wishes you continued success and thanks you for all your efforts. Should you have any questions regarding the Authorized Sales and Service Program, please do not hesitate to contact your Account Manager.

Sincerely,

James M. Moen
Director-Sales, Illinois

EXHIBIT
C

Chicago Sun-Times  Friday, February 1, 2002



Share the love.

# never
## pay long
## distance
## again.

For true lovers of talk, Free Nationwide Long Distance makes this Valentine's Day extra-special. No matter which plan you select, you can now chat with friends and family anywhere in the country and never have to worry about paying extra for long distance.

— 3500 —
Night and Weekend Bonus Minutes On Plans Starting at
$29.99



$149.99 no commitment price.
-$100 Instant Savings
$49.99 Your Cost with new 2-year agreement.

NOKIA 3360 Phone



$100 no commitment price.
-$100 Instant Savings
FREE with new 2-year agreement.

NOKIA 5165 Phone

X cingular
WIRELESS

What do you have to...

Call 1-866-CINGULAR or visit www.cingular...

We received a 5-star rating from Telephia for overall network performance in Chicago. Proof, that we're doing everything we can to help you express yourself better.

## 5-stars for overall network performance in Chicago.

*Open Sunday        For free delivery, call 1-866-CINGULAR.        Service offer available to new and existing customers.

EXHIBIT
9

1

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

KEMPNER MOBILE ELECTRONICS


GENE HYMAN'S VOICEMAIL - JANUARY 31, 2002

Debra Hass & Associates

EXHIBIT
10

1        MR. KEMPNER:  Gene Hyman, and what is your

2   cellular phone number?

3        MR. HYMAN:  847 --

4        MR. KEMPNER:  (847) 827 --

5        MR. HYMAN:  828-0023.

6        MR. KEMPNER:  (847) 828-0023.  And has our

7   permission to record his voicemail message.

8   Okay.  Go ahead.

9                (The following is transcribed from

10                a voicemail tape.)

11       A VOICE:   You have no unheard messages.

12            First saved message, sent today at

13   1:12 p.m.

14       JENNIFER:  Hi, Gene, this is Jennifer, the

15   girl you just talked to at Cingular Wireless.  I

16   needed to tell you something that I forgot.  I

17   forgot to tell you that you should go to the 333

18   West Touhy Avenue, because it is a Cingular

19   store, and that's where you will be able to get

20   your free phone; okay?  So don't go to the

21   Kempner one.  Go to the 3333 West Touhy Avenue,

22   okay?  Or you can call in here and get a free

23   phone through our direct ship department; okay?

24   All right, have a good day, thank you, bye.

February 20, 2002

Debbie Keller
Cingular Wireless
930 National Parkway
Schaumburg IL. 60713

Dear Debbie,

Enclosed is the last of the Macrocell replacement research.

As I am sure you are aware the slowdown in commission payments has caused tremendous financial hardships on the sales and service centers. Could you please advise us as to when we can expect payment on the enclosed paperwork as well as the missing replacement paperwork dating back as late as September. I have a large stack that has not been paid or denied. Should I submit these as research or are you guys aware of the problem?

Please email me and let me know,
Thanks,


Joy Cleland
Kempner Mobile electronics
Joy@kempner.com

EXHIBIT
1

JUL. -18' 02 (THU) 14:42   KEMPNER MOBIL          TEL:847-67~~567                    P. 003

SUBMITTED TO CINGULAR
05-19-2002

Sheet1

OUTSTANDING NEW LINE RESEARCH 10-01 - 3-02

| MONTH/STORE | BASE OWED | REBATE OWED | TOTAL OWED |
|---|---|---|---|
| OCTOBER BOTH | 325 | 590 | 915 |
| NOVEMBER H79W0 | 10 | 25 | 255 |
| NOVEMBER H0790 | 990 | 845 | 1835 |
| DECEMBER H79W0 | 440 | 940 | 1380 |
| DECEMBER H0790 | 580 | 285 | 865 |
| JANUARY H0790 | 951 | 545 | 640 |
| JANUARY H0790 | 1010 | 445 | 1455 |
| FEBRUARY H79W0 | 190 | 280 | 470 |
| FEBRUARY H0790 | 575 | 265 | 840 |
| MARCH H79W0 | 305 | 235 | 540 |
| MARCH H0790 | 795 | 295 | 1090 |
| | | | 10285 |

| | |
|---|---|
| NOT PAID NOR DENIED SUBMITTED 5-17-02 | 18920 |
| LUST RESEARCH 12/01-4-02 SUBMITTED 5-17 | 1510 |
| LAST OF THE MACROCELL RESEARCH SUBMITTED 2-20-02 | 3125 |
| OLD REPLACEMENT RESEARCH SUBMITTED 2-20-02 | 4120 |
| DENIAL REPLACEMENT RESEARCH SUBMITTED 2-20-02 | 4180 |
| NOT PAID OR DENIED SUBMITTED 1-2000 | 13580 |
| | 0 |
| OUSTANDING LINE RESEARCH 10/01-03/02 SUBMITTED 5/17 | 10285 |
| | 55720 |

JUL. -18' 02 (THU) 14:42    KEMPNER MOBIL              TEL:847-67567                    P. 005

February 20, 2002

Robert Dopke
Cingular Wireless
930 National Parkway

Dear Rob,

Enclosed is old replacement research. All of this was submitted in January of 2000 when
Mary Bredfield said that I better get all of my replacement research in by the end of the
month, I did. When I didn't see anything completed, except for some of the 1999
research I submitted it again to Michelle Mohr in early 2001. The pile of replacements is
those that were neither paid nor denied. See what you can do.
   There is also a sheet that was submitted in October of 2000 I haven't gotten any
response on.
   Thanks,

Joy Ferstein
Kempner Mobile Electronics

JUL.-24'02(WED) 17:18   KEMPNER MOBIL            TEL:847-675-6567          P. 001



MOBILE ELECTRONICS

Authorized Agent of



July 16, 2002

Laura Prace
Cingular Wireless
930 National Parkway
Schaumburg, IL 60713

Dear Laura,

Enclosed is a spreadsheet outlining research that has been submitted to Debbie Keller and
Chris Marczak; some of which goes back as far as 1998.

These back commissions are in excess of $55,000.00.

Kempner has recently been notified that more commissions are not being paid and are
being kicked back for ESN's not found.

The outstanding commission amounts of those ESN's are unknown at this time. It has
been extremely frustrating that Kempner has to laboriously account for Cingular's errors
which further delays payment of commissions which are long overdue, and in return
affect Kempner's ability to pay its equipment invoices in a timely fashion.

Please apply all back commissions applied and credit the equipment invoices, so that
Kempner can have an opportunity to bring its account current before any future
commissions would be applied.

Sincerely,
Kempner Mobile Electronics

Scott Kempner

MOTORCYCLE & AUTO ALARMS • PAGERS • CELLULAR • VOICE MAIL SYSTEMS • TWO-WAY RADIO
4722 W. TOUHY AVE. / LINCOLNWOOD, IL 60712
3207 W. LAKE AVE. / WILMETTE, IL 60091



# KEMPNER
## MOBILE ELECTRONICS

Authorized Agent of

✕ cingular™
WIRELESS

January 9, 2002

Ms. Patsy Sirkyer
Cingular Wireless
930 National Parkway
Schaumburg, IL 60173

Dear Patsy,

I left you several voicemails regarding the enclosed name change reimbursement.

This was originally submitted for co-op when it should have been sent to you.

I would greatly appreciate it if this reimbursement could make the next check run.

Thanks for all your help.

Sincerely,

Scott Kempner

MOTORCYCLE & AUTO ALARMS • PAGERS • CELLULAR • VOICE MAIL SYSTEMS • TWO-WAY RADIOS
4722 W. TOUHY AVE. / LINCOLNWOOD, IL 60712
3207 W. LAKE AVE. / WILMETTE, IL 60091
1-800-KEMPNER • WWW.KEMPNER.COM



EXHIBIT

12



# KEMPNER
## MOBILE ELECTRONICS

KEMPNER MOBILE ELECTRONICS, INC.
722 W. TOUHY AVE. • LINCOLNWOOD, IL 60712
TEL: (847) 675-6543 • FAX: (847) 675-6567



**INVOICE**

55314

DATE
12/31/01

SCOTT

Authorized Agent of

**✕ cingular**
WIRELESS

CINGULAR WIRELESS
PATSY STRYKER
930 NATIONAL PARKWAY
SCHAUMBURG, IL 60173

PLEASE REMIT
4413.21

| | | DESCRIPTION | | AMOUNT |
|---|---|---|---|---|
| 1 | MISC | PRINTING EXPENSES FOR NAME CHANGE | 4413.21 | 4413.21 |

I, CINGULAR WIRELESS, agree to maintain
on CellularOne/Kempner service package for a period
of 365 days. Should service suspend or cancel prior
to the above minimum days, you have my authorization
to charge, via my credit card or checking account,
a cancellation fee of $250.00. If you are unable to
charge my credit card for any reason, I agree to pay
the cancellation fee by check or cash within 10 days
of cancellation or be liable for all reasonable
expenses incurred to collect the cancellation fee.

AGREED & ACCEPTED BY: _____

CARD #: _____ EXP. DATE: _____

| | |
|---|---|
| NonTaxable Subtotal | 4413.21 |
| Taxable Subtotal | 0.00 |
| Tax ( 8.250 % ) | 0.00 |
| Total Invoice | 4413.21 |
| Less Payment Recvd | 0.00 |

| | | TERMS | BALANCE DUE |
|---|---|---|---|
| 12/31/01 | SCOTT | C.O.D. | |

**KEMPNER MOBILE ELECTRONICS, INC.** 4722 W. TOUHY AVE. • LINCOLNWOOD, IL 60712 TEL: (847) 675-6543



# Save $50 – $170
on select wireless phones

After instant and mail-in rebates and new service activation. Excludes prepaid cellular.

**save $100**
A **79⁹⁹**
after $50 mail-in rebate
before additional
$50 mail-in rebate

SANYO
Clear Digital
PCS Phone
• Built-in speakerphone
• Voice-activated dialing
• Silent vibration alert
SCP1200

**save $100**
B **99⁹⁹**
after $50 mail-in rebate
before additional
$50 mail-in rebate

LG
Clear Digital
PCS Phone
• Changeable color side caps
• Voice-activated dialing and memo
TG2001

**Sprint.**
**4000 minutes**
including long distance
only 39.99 per month





**save $50**
C **49⁹⁹**
before $50
mail-in rebate

ERICSSON
Digital Phone with
Internal Antenna
• Voice-activated
Dialing
R300LX

**save $150**
D **149⁹⁹**
after $100 Mail-in Rebate
before additional
$50 mail-in rebate

MOTOROLA
Ultra-Compact
Digital Phone
• Lustrous metallic finish
• FM stereo capable with optional accessory
• Voice-activated dialing
M8100

**unlimited nights and weekends**
plus 300 anytime minutes and
nationwide long distance
with no roaming charges
for 34.99 per month

save $170
**19⁹⁹**
after $120
Mail-in Rebate
before additional
$50 mail-in
rebate

ERICSSON
Stylish Digital Phone
with Internal Antenna
• Voice-activated dialing
• Downloadable ring tones
T60D/T61Z

**✕ cingular**

**3850 minutes**
including long distance
and roaming for
only 39.99 per month

**20% off**
All Hands-free &
Wireless Accessories

Leather Carry Cases
**19⁹⁹**
before instant savings

Car Power Cords
**24⁹⁹ – 29⁹⁹**
before instant savings

Rechargeable Batteries
**29⁹⁹ – 49⁹⁹**
before instant savings

NOT ALL RATE PLANS/PHONES AVAILABLE IN ALL LOCATIONS. CONSULT THE WIRELESS ADVISOR ONLINE @ CIRCUITCITY.COM FOR AVAILABILITY. WIRELESS PHONES REQUIRE IN-STORE ACTIVATION. NO DEALER SALES. Certain restrictions apply. Offer not valid in Kansas City.

CIRCUIT CITY CHICAGO TRIBUNE INSERT SUNDAY JULY 7, 2002


EXHIBIT 13

JUN.-20'02(THU) 15:15    KEMPNER MOBIL                TEL:847-675-6567              P. 001
   JUN-20-2002  16:07          CELLULAR ONE                   847 762 2552    P.01/01



VIA OVERNIGHT COURIER

June 20, 2002

Mr. Scott Kempner
Kempner Communications
4722 W. Touhy Avenue
Lincolnwood, IL 60646

        Re:  Authorized Agency Agreement having an effective date of January 5, 2000 (the
        "Agreement") by and between Kempner Mobile Electronics, Inc. d/b/a Kempner
        Communications ("Kempner") and Southwestern Bell Mobile Systems, LLC d/b/a
        Cingular Wireless (successor to Southwestern Bell Mobile Systems, Inc. d/b/a Cellular
        One-Chicago) ("Cingular")

Dear Mr. Kempner:

        It has come to my attention that Kempner Communications is promoting and selling the
services of a competitor of Cingular in violation of the provisions contained in Sections 4(j) and 20
of the above-referenced Agreement. Accordingly, pursuant to the provisions contained in Section
18 B of the Agreement, you are hereby notified that unless Kempner remedies its violation of the
Agreement by discontinuing its promotion and sale of the services of any and all competitors of
Cingular within thirty (30) days from the date of this letter, Cingular will exercise its right to
terminate the Agreement.

        Please notify me in writing that you have remedied your default under the terms of the
Agreement by no later than July 21, 2002. If you fail to do so, Cingular will deem the Agreement
to be terminated as of that date, and in addition may seek any other remedies available to it at law
or in equity.

        If you have any questions concerning the matters set forth in the letter, please call
Rob Doppke at 847-762-2545.

                                        Very truly yours,

                                        Karen Whiddon

                                        Karen Whiddon
                                        VP/GM, Illinois & Wisconsin

                                                                    EXHIBIT
                                                                      14

JUL -23'02(TUE) 16:13   KEMPNER MOBIL          TEL:847-675-6567          P. 002
07/23/2002 16:08 FAX                                                    ☒002

# ✕cingular
## WIRELESS

**Via Certified Mail & Facsimile**
**Return Receipt Requested**

July 23, 2002

Mr. Scott Kempner
Kempner Mobile Electronics, Inc. d/b/a Kempner Communications
4722 W. Touhy Avenue
Lincolnwood, IL 60646

Re:   Authorized Agency Agreement having an effective date of January 5, 2000 (the
      "Agreement") by and between Kempner Mobile Electronics, Inc. d/b/a Kempner
      Communications ("Kempner") and Southwestern Bell Mobile Systems, LLC d/b/a
      Cingular Wireless (successor to Southwestern Bell Mobile Systems, Inc. d/b/a
      Cellular One-Chicago) ("Cingular")

Dear Mr. Kempner:

   This letter shall serve as Cingular's notice of termination of the above-referenced Agreement.
Cingular is terminating the Agreement because Kempner has not remedied its violations of the Agreement
as described in my letter dated June 20, 2002.

   Please be reminded that paragraph 20 of the Agreement provides that for a period of one (1) year
following the termination of the Agreement, you shall not

   1)   directly or indirectly, induce, influence or suggest to any Subscriber of [CINGULAR's]
        CRS to purchase CRS or any other CMRS from another reseller or provider of CRS or
        CMRS in the Area;

   2)   directly or indirectly, induce, influence or suggest to any Subscriber of any other
        Authorized Service to purchase a competing service from any other provider or reseller
        of such competing service in the Area, whether or not the competing service is
        technologically the same as the Authorized Service in question;

   3)   under any circumstances or conditions whatsoever, directly or indirectly, as an individual,
        partner, stockholder, director, officer, employee, manager or in any other relation or
        capacity whatsoever engage in the sale or promotion of CRS, CMRS, or any other
        Authorized Service on behalf of any competing reseller or provider of such service in the
        Area;

   4)   directly or indirectly, allow any other person, firm or other entity to use the name, trade
        name, goodwill or any other assets or property of AGENT or [CINGULAR] in any
        manner in connection with such other entity's sale of CRS, CMRS, or any other
        Authorized Service on behalf of a competing reseller or provider in the Area, and
        AGENT specifically agrees not to transfer, assign, authorize or consent to the transfer of
        an AGENT telephone number to any other person, firm or other entity upon the
        expiration or termination of this Agreement.

**EXHIBIT**
**15**

# ✕cingular
### WIRELESS

*Scott Kempner*
*July 23, 2002*
*Page 2*

If you have any questions concerning this matter, please call Todd Flack at (847) 762-2521.

Very truly yours,

*[signature]*

Laren Whiddon

cc:   Legal Department
      Veronica Gomez, Esq.
      Todd Flack

Cingular Wireless • 930 National Parkway • Schaumburg, IL 60173

*JUDGE ALESIA*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS    MAGISTRATE JUDGE SCHENKIER

# Civil Cover Sheet  **02C  5403**

This automated JS-44 conforms generally to the manual JS-44 approved by the Judicial Conference of the United States in September 1974. The data is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. The information contained herein neither replaces nor supplements the filing and service of pleadings or other papers as required by law. This form is authorized for use only in the Northern District of Illinois.

| | |
|---|---|
| **Plaintiff(s):  KEMPNER MOBILE ELECTRONICS, INC.** | **Defendant(s):SOUTHWESTERN BELL MOBILE SYSTEMS, LLC, d/b/a CINGULAR WIRELESS f/k/a SOUTHWESTERN BELL MOBILE SYSTEMS, INC. d/b/a CELLULAR ONE - CHICAGO** |

**DOCKETED**

| | |
|---|---|
| County of Residence: | County of Residence: |
| Plaintiff's Atty:  Kenneth B. Drost<br>Drost & Laue, LLC<br>11 Lions Drive, Suite 206,<br>Barrington, IL 60010<br>847-381-1070 | Defendant's Atty:  Veronica Gomez<br>Schopf & Weiss<br>312 West Randolph Street,<br>Suite 300, Chicago, Illinois<br>312-701-9300 |

JUL 3 1 2002

II. Basis of Jurisdiction:    **4. Diversity (complete item III)**

III. Citizenship of Principal
Parties **(Diversity Cases Only)**
           Plaintiff:-**4 IL corp or Principal place of Bus. in IL**
        Defendant:-**2 Citizen of Another State**

IV. Origin :    **4. Reinstated or Reopened**

V. Nature of Suit:    **190 Other Contract**

VI.Cause of Action:    **Removal pursuant to 28 USC Section 1332, 1441, and 1446**

VII. Requested in Complaint
        Class Action:**No**
        Dollar Demand:**in excess of $5,000,000**
        Jury Demand:Yes

                              remanded
VIII. This case **IS** a refiling of a previously ~~dismissed~~ case. Case number **02 C 5297** by Judge **Alesia**

Signature:

Date:  July 31, 2002

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

JUDGE ALESIA

In the Matter of

Kempner Mobile Electronics, Inc. v. Southwestern Bell Mobile Systems, L.L.C. MAGISTRATE JUDGE SCHENKIER

Case Number:

02C 5403

APPEARANCES ARE HEREBY FILED BY THE UNDERSIGNED AS ATTORNEY(S) FOR:

DOCKETED

JUL 3 1 2002

Defendant Southwestern Bell Mobile Systems, L.L.C.

| (A) | (B) |
|---|---|
| SIGNATURE | SIGNATURE |
| NAME Verónica Gómez | NAME Lisa B. Swedenborg |
| FIRM SCHOPF & WEISS | FIRM SCHOPF & WEISS |
| STREET ADDRESS 312 West Randolph Street; Suite 300 | STREET ADDRESS 312 West Randolph Street, Suite 300 |
| CITY/STATE/ZIP Chicago, Illinois 60606 | CITY/STATE/ZIP Chicago, Illinois 60606 |
| TELEPHONE NUMBER 312.701.9300 | TELEPHONE NUMBER 312.701.9300 |
| IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) 6225042 | IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) 6273135 |
| MEMBER OF TRIAL BAR? YES ☑ NO ☐ | MEMBER OF TRIAL BAR? YES ☐ NO ☑ |
| TRIAL ATTORNEY? YES ☑ NO ☐ | TRIAL ATTORNEY? YES ☑ NO ☐ |
| | DESIGNATED AS LOCAL COUNSEL? YES ☐ NO ☑ |

| (C) | (D) |
|---|---|
| SIGNATURE | SIGNATURE |
| NAME Kenneth E. Kraus | NAME |
| FIRM SCHOPF & WEISS | FIRM |
| STREET ADDRESS 312 West Randolph Street, Suite 300 | STREET ADDRESS |
| CITY/STATE/ZIP Chicago, Illinois 60606 | CITY/STATE/ZIP |
| TELEPHONE NUMBER 312.701.9300 | TELEPHONE NUMBER |
| IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) 6193664 | IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) |
| MEMBER OF TRIAL BAR? YES ☑ NO ☐ | MEMBER OF TRIAL BAR? YES ☐ NO ☐ |
| TRIAL ATTORNEY? YES ☑ NO ☐ | TRIAL ATTORNEY? YES ☐ NO ☐ |
| DESIGNATED AS LOCAL COUNSEL? YES ☐ NO ☑ | DESIGNATED AS LOCAL COUNSEL? YES ☐ NO ☐ |