# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Sidney I. Schenkier | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 5403 | **DATE** | 3/11/2003 |
| **CASE TITLE** | Kempner Mobile Electronics, Inc. vs. Southwestern Bell Mobile Systems, LLC, d/b/a Cingular Wireless | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____.  Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] **ENTER CORRECTED MEMORANDUM OPINION AND ORDER,** nunc pro tunc to 03/07/03 to correct typographical error on line 1 of page 17.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | |
|---|---|---|---|
| | No notices required, advised in open court. | | |
| | No notices required. | number of notices | |
| | Notices mailed by judge's staff. | | Document Number |
| ✓ | Notified counsel by telephone. | MAR 1 2 2003 date docketed | |
| | Docketing to mail notices. | | 44 |
| | Mail AO 450 form. | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | |

U.S. DISTRICT COURT
CLERK
03 MAR 11 PM 3: 42
FILED-ED 10

JJK courtroom deputy's initials

date mailed notice

Date/time received in central Clerk's Office

mailing deputy initials

KEMPNER MOBILE ELECTRONICS, INC., )
an Illinois corporation, )
 )
 Plaintiff, )
 ) No. 02 C 5403
vs. )
 ) Magistrate Judge Schenkier
SOUTHWESTERN BELL MOBILE )
SYSTEMS, LLC, d/b/a CINGULAR )
WIRELESS f/k/a/ SOUTHWESTERN BELL )
MOBILE SYSTEMS, INC. d/b/a CELLULAR )
ONE-CHICAGO, )
 )
 Defendant. )

DOCKETED

MAR 1 2 2003

## MEMORANDUM OPINION AND ORDER

This diversity lawsuit, originally filed in state court but then removed to federal court, arises

out of disputes between the parties concerning their business relationship. Plaintiff, Kempner

Mobile Electronics, Inc. ("Kempner"), an Illinois corporation with its principal place of business in

Illinois, is engaged in the marketing and sale of, among other things, cellular telephone products and

services. Defendant (which, for simplicity, we will refer to as "Cingular"), a Delaware limited

liability corporation with its principal place of business in Georgia, is involved in the development,

establishment and sale of cellular telephones and services in various parts of the United States,

including the Chicago metropolitan area. In late 1999, Kempner and Cingular entered into an

Authorized Agency Agreement ("the 1999 Agreement"), which was the last of several written

agreements entered into by the parties dating back to the beginning of their relationship in 1989. By

its terms, the 1999 Agreement was to extend through December 31, 2002, unless extended by

Cingular or terminated early by Kempner or Cingular for one of the specified reasons in the 1999 Agreement.

On May 6, 2002, Kempner filed an eleven-count complaint against Cingular in state court, asserting various claims for breach of contract, and common law and statutory tort. In addition, Kempner sought a declaration that Kempner was not bound by any of the terms of the 1999 Agreement, including its "exclusivity" and non-compete provisions (which, among other things, prohibited Kempner from selling competitive services). Although filed in May 2002, the state court complaint was not served on Cingular until late July 2002 – after Cingular learned that Kempner was selling competitive products and then, on July 23, 2002, issued a notice terminating Kempner as an agent under the 1999 Agreement. Kempner thereafter amended the state court complaint, and on July 26, 2002, filed a motion for a temporary restraining order in state court.

Before a ruling on that motion, Cingular (after an initial misstep) successfully removed this case to federal court (doc. # 1), and Kempner renewed in this Court its motion for preliminary relief (doc. # 2). Cingular responded with a motion to stay the action, pending the outcome of the private mediation process required the 1999 Agreement (doc. # 3). On August 8, 2002, the district judge then presiding in the case granted Cingular's motion to stay, and compelled mediation of all claims "except as to plaintiff's request for preliminary injunction, which will go forward to preserve the status quo and prevent irreparable harm" (doc. # 4).

Pursuant to the consent of the parties (doc. ## 5-6), the case was then reassigned to this Court for all proceedings pursuant to 28 U.S.C. § 636(c) (doc. # 7). On August 21, 2002, the Court considered Kempner's renewed motion for a temporary restraining order. The Court denied that motion insofar as it sought to stay Cingular's termination of Kempner as an agent and to allow

Kempner continued access to Cingular's computer system. The Court also denied Kempner's motion to stay enforcement of the non-compete provisions of the 1999 Agreement as moot, because the parties had agreed among themselves that any enforcement of the non-compete provisions would be stayed pending the outcome of a preliminary injunction hearing. Finally, the Court granted the temporary restraining order insofar as it sought to require payment by Cingular to Kempner of $50,000 in commissions allegedly due and owing as of the date of the termination, based on Kempner's unrebutted submissions at that time showing some likelihood of success and irreparable harm. Payment of that amount was conditioned on Kempner posting a $50,000 bond as security, which Kempner subsequently provided.

At that time, with the agreement of the parties, the Court set September 26-27, 2002 for an evidentiary hearing on Kempner's motion for preliminary injunction, and for Cingular's competing motion for preliminary injunction to enforce the non-compete provisions of the 1999 Agreement. That hearing later was continued by agreement of the parties to November 14-15, 2002, and then on Kempner's motion to January 9-10, 2003 (doc. # 17), and later to January 27-28, 2003 (doc. # 26). At the joint request of the parties, the date for the preliminary injunction hearing then was adjusted by one day, to take place on January 28-29, 2003 (doc. # 30).

During the more than five months between this Court's ruling on plaintiff's renewed motion for temporary restraining order and the commencement of the preliminary injunction hearing, the parties engaged in substantial discovery. Prior to the preliminary injunction hearing, the parties submitted proposed findings of fact and conclusions of law (doc. ## 36-37). In addition, Cingular filed several motions *in limine*, which the Court ruled upon in advance of the hearing (doc. ## 30, 38). During the preliminary injunction hearing, the Court received into evidence some 72 exhibits,

and received testimony from four witnesses testifying in person and from 12 others through depositions and stipulations. At the close of evidence, the Court heard oral argument from the attorneys.

The Court has now considered the testimony of the witnesses, the exhibits presented at the hearing, and the oral and written submissions of counsel. After careful consideration, the Court GRANTS in part and DENIES in part both Kempner's motion to enjoin enforcement of the non-compete provisions of the 1999 Agreement and Cingular's corresponding motion to enforce those provisions. The Court further GRANTS Kempner's motion for preliminary injunction concerning payment of residual commission only as to the $50,000 that Cingular was required to pay pursuant to the Court's August 21, 2002 order; in all other respects, the Court DENIES Kempner's motion for preliminary injunction concerning residual commissions and other payments.

## I.

### A.    The Parties.

Kempner is an Illinois corporation that is engaged in the business of marketing mobile electronic devices including radios, paging equipment, cellular communication equipment and services. The president of Kempner is Scott Kempner. Mr. Kempner entered into this line of business in 1986, when he began selling paging devices (01/28/03 Tr. 12 (Kempner)). In 1989, Mr. Kempner expanded his business to include the sale of cellular equipment and services, and at that time formed Kempner as a proprietorship; subsequently, in 1993, Kempner was incorporated.

It was also in 1989 that Kempner began its business relationship with Cingular, through a contract with Comtech (a division of Cingular) (01/28/03 Tr.12 (Kempner)).[1] Cingular is involved in the development, establishment and sale of Cellular services and equipment in the Chicago metropolitan area and in other markets (*see, e.g.*, PX 1).[2]

Cingular utilizes several different types of retail channels for its services and equipment: (1) large "big box" retailers (*e.g.*, Best Buy), which offer both Cingular and other companies' cellular services and equipment as part of a large variety of consumer electronic products that they sell; (2) dealers, which tend to be small-scale operations that sell not only cellular equipment and services but other electronic items (such as, paging devices and car alarms); and (3) agents, the larger of which are also known as sales and service centers, which tend to focus more heavily on the marketing and sales of the cellular service and equipment and which, through their "look and feel," tend to be closely associated with Cingular (01/29/03 Tr. 359-360 (Flack)). The sales and service centers, in turn, fall into two categories: those that are "company stores" owned by Cingular, and those that are run by outside agents pursuant to agreements with Cingular (*Id.* at 360). Outside agents/sales and service centers constitute Cingular's primary channel of distribution, accounting for fifty percent of its sales (*Id.* at 557 (Nelson)). Company-owned sales and service centers (fifteen percent), big box stores (ten to twenty percent), direct sales by Cingular (ten percent), and dealers

---

[1]As is apparent from the case caption, Cingular formerly did business under the name "Cellular One-Chicago." As a result, a number of the exhibits discussed in this opinion refer to the defendant as Cellular One. For ease of reference, throughout this opinion we will use the name Cingular to refer to the defendant even during the time it was known as Cellular One. Kempner also has proposed that the Court make various findings concerning other corporate relationships involving Cingular and has suggested that there were various corporate changes that went along with the change in name from Cellular One to Cingular. Inasmuch as there is no dispute that Cingular is a proper party on this motion, the Court finds it unnecessary to make findings on these additional matters suggested by plaintiff.

[2]References to exhibits admitted into evidence at the preliminary injunction hearing will be prefaced by "PX" for Kempner's exhibits, and "DX" for Cingular's exhibits.

(five percent) account for the balance of Cingular sales (*Id.*). According to Kempner, a close carrier-agent relationship helps the carrier retain customers, who otherwise frequently would switch carriers based on price or product promotions (01/28/03 Tr. 213 (Kempner); *see also* DX 23, ¶ 10).

When Kempner first began selling products and services for Cingular, Kempner's principal customer base consisted of those who had bought paging devices and services; Cingular did not initially provide a primary source of plaintiff's business (01/28/03 Tr. 13 (Kempner)). In 1993, plaintiff entered into a new contract with Cingular to become a sales and service center (*Id.*). Kempner remained in that relationship with Cingular through the summer of 2002, pursuant to various contracts entered into between 1993 and 1999, all of which were nearly identical in their terms. The last of those agreements, the 1999 Agreement, contains a merger and integration clause stating that it constitutes the "entire agreement of the parties," that there are "no other oral or written understandings or agreements between [the parties] relating to the subject matter" of that Agreement, and that the 1999 Agreement "supersedes any prior agreements or understandings between the parties relating to the subject matter hereof" (PX 1, ¶ 28). For this reason, the Court focuses on the terms of the 1999 Agreement; and, we discuss preceding conversations, agreements, or other writings only insofar as they shed light on the meaning of the 1999 Agreement. *See, e.g., Air Safety v. Teachers Realty Corp.*, 706 N.E.2d 882, 886 (Ill. S.Ct. 1999) (documents created before the contract was finalized play a limited role).

**B.     The 1999 Agreement.**

The 1999 Agreement is a 25-page, single spaced document containing numerous terms. We summarize here certain of its key terms; to the extent that other terms are relevant to the analysis, we will discuss them below as necessary.

The 1999 Agreement defines "Authorized Services" as the services offered by Cingular that Kempner was allowed to sell under the 1999 Agreement (PX 1, ¶ 1). Under the 1999 Agreement, Kempner was authorized to sell only cellular radio service ("CRS") (*Id.*, Ex. A), not commercial mobile radio services ("CMRS"). Kempner also was authorized to sell or lease customer premises equipment ("CPE"): that is, the cellular telephones or other related hardware necessary for the customer to use Cingular's cellular services being marketed by Kempner (*Id.*, ¶¶ 1, 4(g)). The 1999 Agreement authorized Kempner to sell these products and services in a defined "Area" – the six-county Chicago metropolitan area (*Id.*, ¶ 1 and Ex. A). The 1999 Agreement defined "Subscribers" as customers of the Authorized Services provided by Cingular; each telephone number assigned to a customer of Authorized Services was counted as a separate "Subscriber" (*Id.*, ¶ 1).

The 1999 Agreement expressly states that the relationship between the parties was not a "general agency, joint venture, partnership, employment relationship or franchise" (PX 1, ¶ 3).[3] Under the 1999 Agreement, Kempner was a "non-exclusive authorized agent" for Cingular, in that Cingular reserved the right to market its cellular services and CPE "in the same geographical areas served by [Kempner], whether through [Cingular's] own representatives or through others including, but not limited to, other authorized agents, retailers, resellers and distributors" (*Id.*). In addition, Kempner was not limited in its ability to sell paging services or CPE offered by companies other than Cingular (*Id.*, ¶ 4(j)). However, the 1999 Agreement prohibited Kempner from acting as a representative or agent of any other reseller or provider of cellular services in a six-county Chicago

---

[3]Kempner pointed to an undated document, which he said he received from Cingular in 1994, that referred to the relationship between Cingular and its authorized sales and service centers as a "joint venture" (PX 24). However, the 1999 Agreement could not be more clear in stating that the relationship was *not* a joint venture, and in further making it clear that any agreements or understandings prior to the 1999 Agreement were superseded.

metropolitan area, or to attempt to persuade Subscribers of Cingular's services to obtain from another provider services that competed with CRS, CMRS or other Authorized Services.

The persons to whom Kempner sold cellular service on behalf of Cingular became customers of Cingular (PX 1, ¶ 3). Cingular retained sole authority to establish the rates, terms and conditions of the sale by Kempner of Authorized Services (*Id.*, ¶ 5(c)). The 1999 Agreement contains no provision that specifies how the rates, terms and conditions for the sale of services offered by Kempner would compare to that offered by other outside agencies, or to company stores or in-house sales outlets. On the other hand, individuals who bought from Kempner's CPEs (and not Cingular-owned CPE) became customers of Kempner, and Kempner had the authority to set the price at which it would sell CPEs (*Id.*, ¶ 4(g)). Kempner agreed that during the term of the 1999 Agreement and thereafter, Kempner would not divulge Subscriber information to others, and would not use it except as necessary for service related to the CPE or for activities unrelated to CRS, CMRS or other Authorized Services (such as, paging services sold by Kempner) (*Id.*, ¶ 4(m)).

Under the 1999 Agreement, Kempner could provide "pre-paid" and "post-paid" cellular services. Pre-paid services involve the sale of a telephone unit along with a telephone card providing a specified number of minutes of cellular services for one fixed price. When the minutes are used up, the customer either must purchase another phone card providing for specified amount of additional cellular service, or convert to a post-paid plan. Post-paid or contract service requires the customer to enter into a contract for a particular service plan for a specified time (ranging from a few months to three years, with one year being the most common time period (01/28/03 Tr. 20-22 (Kempner)).

Under the 1999 Agreement, Kempner was compensated for sales on a commission basis. Kempner received a commission on both pre-paid and post-paid contracts based on a percentage of the initial payments; with respect to post-paid contracts, Kempner also received a residual commission, based on the periodic payments made by the customer (PX 1, ¶ 7(b)).

The purpose of the residual commission, from the carrier's perspective, is to encourage retention of subscribers on a long-term basis (01/28/03 Tr. 19 (Kempner)). The 1999 Agreement specifies a four percent commission rate (Id.); but, that rate later was increased (see, e.g., PX 18). Kempner was entitled to receive only those residual commissions or other compensation that accrued during the term of the 1999 Agreement; Kempner could earn no further compensation after the 1999 Agreement expired by its own terms on December 31, 2002 or was terminated earlier for some other reason (PX 1, ¶ 7). The 1999 Agreement also provided that Cingular could withhold an offset against this commission stream against amounts past due and owing from Kempner to Cingular (Id.).

In addition to requiring that Cingular pay Kempner commissions for sales made, the 1999 Agreement required Cingular to provide Kempner with promotional literature, sales brochures and information for preparation of catalogs, advertising and other promotional activities, and a reasonable amount of sales training (PX 1, ¶ 5(e)-(g)). The 1999 Agreement also allowed Kempner to use certain Cingular marks in marketing Cingular's services. Kempner acknowledged "the great value of the goodwill associated with the Marks," that the goodwill belonged "exclusively" to Cingular, and that any use of the Marks by Kempner and the goodwill associated with them "shall inure to the exclusive benefit of [Cingular]" (Id., ¶ 8). Kempner further agreed that the terms and conditions of the 1999 Agreement were necessary to maintain the "high standards" for Cingular's

services, and thus to "protect and preserve the goodwill of [Cingular's] CRS, Services and Marks" (*Id.*, ¶ 2).

Under the 1999 Agreement, Kempner was not permitted to "change or add business locations without [Cingular's] prior written approval," which "shall not be unreasonably withheld" (PX 1, ¶ 4(c) and Ex. A). The 1999 Agreement did not specify the considerations Cingular would use in deciding whether to approve new locations.[4]

The 1999 Agreement provided that its duration could be extended beyond December 31, 2002 by Cingular upon prior notice (PX 1, ¶ 16). The 1999 Agreement provided that for a period of one year after its termination or expiration, Kempner could not engage in any of the following acts:

> (1) Directly or indirectly, induce, influence or suggest to any Subscriber of [Cingular's] CRS to purchase CRS or any other CMRS from another reseller or provider of CRS or CMRS in the Area;
>
> (2) Directly or indirectly, induce, influence or suggest to any Subscriber of any other Authorized Service to purchase a competing service from any provider or reseller of such competing service in the Area, whether or not the competing service is technologically the same as the Authorized Service in question;
>
> (3) Under any circumstances or conditions whatsoever, directly or indirectly, as an individual, partner, stockholder, director, officer, employee, manager or in any other relation or capacity whatsoever engage in the sale or promotion of CRS, CMRS, or any other authorized service on behalf of any competing reseller or provider of such service in the Area;
>
> (4) Directly or indirectly, allow any other person, firm or other entity to use the name, trade name, goodwill or any other assets or property of [Kempner or Cingular] in any manner in connection with such other entities' sale of

---

[4] The 1999 Agreement refers to rules and procedures contained in an "Administrative Procedures Manual" that would be incorporated into the agreement (*Id.*, ¶ 10). However, there is no evidence that such a manual ever has existed (*see* 01/28/03 Tr. 336-37 (Kempner); 01/29/03 Tr. 423-424, 460 (Flack)).

CRS, CMRS or any other Authorized Service on behalf of a competing reseller or provider in the Area, . . . and [Kempner] specifically agrees not to transfer, assign, authorize or consent to the transfer of [a Kempner] telephone number to any other person, firm or other entity upon expiration or termination of this Agreement.

(PX 1, ¶ 20). The 1999 Agreement states that the consideration provided by Cingular for these non-compete provisions was Cingular's grant to Kempner "of the right to use the Marks, the right to advertise affiliation with [Cingular] as an authorized agent of [Cingular] and great value of the goodwill associated with [Kempner's] ability to use the Marks . . . and . . . the value of specialized, technical knowledge of the cellular industry and other Services to be imparted by [Cingular] to [Kempner] from time to time" (*Id.*).

Either party was authorized to terminate the 1999 Agreement early, based the occurrence of certain events. Kempner was authorized to terminate the 1999 Agreement if Kempner was in substantial compliance with its terms, and if Cingular materially breached the 1999 Agreement and then failed to cure that breach within thirty days after receiving written notice by Kempner (PX 1, ¶ 18(A)). In the event that Kempner terminated the 1999 Agreement under these circumstances, the termination would be treated as "for cause" and Kempner would not be bound by the non-compete provisions contained in Paragraph 20 (*Id.*). Any termination of the 1999 Agreement by Kempner that did not meet these prerequisites would be treated as without cause and, thus, would not relieve Kempner of the requirement to comply with the non-compete provisions (*Id.*). For its part, Cingular had the right to terminate the 1999 Agreement under a variety of circumstances, including the failure to comply with any provision of the 1999 Agreement, and a failure to timely cure the noncompliance (*Id.*, ¶ 18(B)).

The 1999 Agreement provided that any "specifications, drawings, sketches, models, samples, data, computer programs or documentation, or technical or business information ("Information") furnished or disclosed by [Cingular] to [Kempner] hereunder shall be deemed the exclusive property of [Cingular]" to be "returned to [Cingular] upon completion or termination of authorized work (PX 1, ¶ 33). In addition, the parties agreed that "Subscriber lists and related information or data are the exclusive property of [Cingular] and are to be used by [Kempner] solely in the performance of its obligations and duties under the 1999 Agreement," and that Kempner would return that information to Cingular when the 1999 Agreement came to an end (*Id.*).

The 1999 Agreement contained a number of other terms of significance here. The agreement provided for a process of private dispute resolution and mediation for all disputes that may arise under that agreement – except for those relating to the non-compete provisions in Paragraph 20 (PX 1, ¶ 35). As stated above, the 1999 Agreement contained a merger and integration clause (PX 1, ¶ 28). The parties agreed that the 1999 Agreement "shall be interpreted under and governed by the laws of the State of Illinois" (PX 1, ¶ 24). The parties further agreed that any suit or action concerning the 1999 Agreement must be brought "within one (1) year after the underlying cause of action accrues" (*Id.*). The 1999 Agreement also contained a severability clause (*Id.*, ¶ 21), and provided that to the extent the non-compete provisions in Paragraphs 4 or 20 might be deemed unenforceable "by virtue of its scope in terms of area, business activity prohibited and/or length of time, but could be enforceable by reducing any or all thereof, [Kempner and Cingular] agree that same shall be enforced to the fullest extent permissible under the laws and public policies applied in the jurisdiction in which enforcement is sought" (*Id.*).

According to the testimony of Mr. Kempner, Cingular presented the 1999 Agreement as a "take it or leave it" proposition, and would not agree to vary or negotiate any of its terms (01/28/02 Tr. 38-39, 41 (Kempner)). In particular, Mr. Kempner testified that he asked that the relationship be nonexclusive rather than exclusive, which would permit him to sell competing products (*Id.*, at 41, 88-89). We find Mr. Kempner's testimony that he sought and was denied this revision credible. We note that there is documentary evidence that Mr. Kempner sought certain changes in an earlier agreement with Cingular, which Cingular denied (*see* PX 2; *see also* 01/28/03 Tr. 38, 41 (Kempner)). However, Mr. Kempner acknowledged that he was not compelled to sign the 1999 Agreement (01/28/03 Tr. 131) (Kempner)).

## C.    The Business Relationship Between the Parties.

For a number of years, the relationship between Kempner and Cingular was "excellent" (01/28/03 Tr. 22 (Kempner)). While Kempner had various complaints from time to time about Cingular (which we will discuss further below), Kempner generally was pleased that Cingular encouraged its growth (*Id.*, at 23). Clearly, the major factor in that growth was the ability of Kempner to offer Cingular's services, and to market itself – through Cingular's products and services, various promotional assistance provided by Cingular (*see, e.g.*, DX 15), and the use of Cingular's name and marks – as an authorized sales and service center of Cingular. While Kempner could sell CPE offered by any supplier, the only value of the telephone is the access it provides to the cellular service (01/28/03 Tr. 96 (Kempner)). And, the only such service Kempner offered from 1989 until May 2002 was Cingular's services.

Whether Kempner used various other assistance offered by Cingular is disputed. For example, while Cingular offered various training services to agents such as Kempner (01/29/03 Tr.

13

381-382 (Flack)), Mr. Kempner testified that he utilized very few of those services, and he focused more on the training sessions offered by cellular phone manufacturers (such as Motorola) than on the characteristics and features of their products (01/28/03 Tr. 93 (Kempner)). Cingular also provided information to Kempner on when particular Subscriber contracts were nearing expiration or had recently expired, with the idea that Kempner could target those customers and attempt to retain them or get them back (01/29/03 Tr. 380 (Flack); *see also*, DX 9, DX 61)). But, Kempner denied that it used that information (01/28/03 Tr. 331-32 (Kempner)). Kempner did use the access it was afforded to personnel at Cingular (to discuss complaints, to find out information about shipments of goods or promotional opportunities, and to seek approval for special promotions), as well as to a computer system ("Pos.com") to facilitate the activation of customers from Kempner's business location (01/29/03 Tr. 385-389 (Flack)). Kempner also received information from Cingular about promotional offerings (*see* DX 41-43, 45), schedules showing commissions payable on certain offerings (DX 51), and regular residual commission reports (*see, e.g.,* DX 60). These materials were sent on a regular basis, but generally had little currency after one month or so (01/28/03 Tr. 92 (Kempner)).[5]

By no later than 2001, the relationship between the parties had soured – at least, from the perspective of Kempner. Kempner had a number of complaints about the treatment it was receiving

---

[5]Cingular has suggested that "big box" retail outlets, which do not have exclusivity non-compete provisions in their contracts with Cingular, do not receive all of the types of assistance provided to agents like Kempner, who have those contractual provisions. The Court finds Cingular's evidence on this point unconvincing. The differences in assistance provided to big box retailers, as compared to exclusive agents, appear to the Court to be largely a matter of degree and not kind. Cingular provides training to big box retailers, although perhaps not of the same scope as to exclusive agents (01/29/03 Tr. 381-383 (Flack)); access to personnel (*Id.*, at 385-386); and promotional materials (*Id.* at 384, 391). While big box retailers do not get residual commission reports (because they generally do not have contracts that provide for residual commissions), they do receive commission statements that set forth much of the same Subscriber information as is received by exclusive agents who have non-compete provisions (*Id.*, 395-396).

from Cingular. The complaints that Kempner focused on in the preliminary injunction hearing are discussed below.

### 1. Store Locations.

The evidence from the hearing shows that, at least as of 1994, Cingular had a "three-mile" policy, pursuant to which Cingular generally would not approve a sales location if it would be within three miles of another Cingular authorized sales and service center (PX 15). Kempner claims that Cingular applied this three-mile policy to deny "repeated requests" by Kempner to open additional locations, but it ignored the policy in allowing Cingular's company-owned stores to open locations within three miles of Kempner's store (*see, e.g.,* Pl.'s Proposed Findings, ¶¶ 43-47). We find the plaintiff's evidence on this point unpersuasive for several reasons.

*First*, while plaintiff established that it made several requests for store locations that were denied, the evidence showed that, with one exception, all of the requests predated the 1999 Agreement and, indeed, took place more than one year before the contractual limitations period set forth in the 1999 Agreement (PX 1, ¶ 24). Moreover, the evidence showed that the only request that Kempner made for an additional store location during the term of the 1999 Agreement was for a location in Wilmette, Illinois that Kempner sought in April 2000 – which Cingular approved (DX 31).

*Second*, the evidence showed that the three-mile policy was changed by 1995 (*see* Boersma Dep. 53-54), thereafter, Cingular looked more generally at the market penetration in a given area, and thus could approve certain locations that were within three miles of another authorized sale and service center (*Id.*, at 54). And, indeed, the evidence showed that the Kempner location in Wilmette, which Cingular approved in April 2000, was within three miles (albeit barely) of another Cingular

15

location (DX 31). Cingular also offered other evidence of some sixteen other instances in which Cingular approved stores that were located within three miles of another existing Cingular outlet – including some within one-half mile or less of each other (DX 64). In at least two instances, these stores were opened within three miles of one another prior to 1995 (DX 64), while the three-mile policy still was in effect – which is consistent with the evidence that the three-mile policy was never a "hard and fast" rule (Klamer Dep. 62).

*Third*, the presence of a Cingular-owned location within three miles of Kempner – the Lincoln Town Center Mall location – does not strongly favor Kempner's contention here. Kempner complains that he was denied approval to open a store at the Lincoln Town Center Mall as far back as 1994 (01/28 Tr. 24 (Kempner)), but that Cingular then opened an outlet at that location itself in 1998. Cingular offered evidence that it actually started using the Lincoln Town Center Mall location as far back as October 1994, providing evidence of lease agreements dating from that point through the present (DX 63). While Kempner argues that the existence of the leases does not show that the space was actually used by Cingular prior to 1998 for the sale of its services and products, it would certainly be reasonable to infer that Cingular did not pay tens of thousands of dollars in rent over a four-year period for space that it did not utilize. Moreover, Kempner testified that he last sought approval for the Lincoln Town Center location in 1997 (01/28 Tr. 24-25) (Kempner)), long before the signing of the 1999 Agreement and well outside the one-year contractual limitations imposed by that agreement.[6]

---

[6]Kempner also says that in September 2000, Cingular opened a location on Dempster Avenue two miles from Kempner's Touhy Avenue location (01/28/03 Tr. 37 (Kempner)). No evidence was offered concerning the circumstances of the opening of that location, which we also note occurred more than one year before Kempner filed its state court complaint in May 2002.

For all these reasons, we find that the evidence does not establish a likelihood of success in showing that Cingular unreasonably withheld approval of new locations for Kempner, or unfairly allowed others to be opened to Kempner's detriment.

## 2. Misidentification of Kempner's Wilmette Location.

Cingular maintained a toll-free number that customers and potential customers could use to identify authorized sales and service locations located within particular geographic areas represented by zip codes. In May 2001, Kempner informed Cingular that a recorded message for the zip code, in which Kempner's Wilmette location was located, identified Kempner's store by the wrong name (Gillian Wireless) and the wrong location (Road House, Illinois), while giving the correct name and location of a Cingular-owned store within the same zip code (01/28/03 Tr. 308 (Kempner) (see also PX 31).

Cingular's explanation is that it took prompt action to correct this problem (01/29/03 Tr. 520 (Whiddon)) is not credible. The problem persisted for about a year thereafter (PX 32), even though Mr. Whiddon had informed plaintiff that Cingular was "reviewing the store listings" on the toll free numbers and "planned to make the necessary revisions in the June [2001] time frame" (PX 18). However, we note that by the spring or early summer of 2002, this problem was corrected.

## 3. Denial of Promotional Opportunities.

According to Kempner, when it became an authorized sales and service center in 1993, Kempner was told by Cingular that it would get the benefit of the same pricing on equipment and services as Cingular gave to its internal channels of distribution (01/28/03 Tr. 16 (Kempner)). The 1999 Agreement does not specifically contain such a guarantee: it simply says that Cingular would establish "rates, terms, and conditions" for the sales of its services (PX 1, ¶ 5(c)), without indicating

what standards Cingular would use or how those prices would compare to prices offered to Cellular-owned channels of distribution. However, in May 2001, Cingular did represent to Kempner in writing that, like all dealers, Kempner would "have access to the same level of service pricing as the internal team," but that any discounts on equipment and accessories "are left to the discretion of the internal/dealer organization" (PX 18; *see also* 01/29/03 Tr. 517 (Whiddon)).

Kempner offered evidence of specific requests it made for promotional pricing that Kempner said was being offered by Cingular-owned channels of distribution, but that were denied to Kempner (*see* PX 19-21, 23, 45). For its part, Cingular offered evidence that Kempner's requests were denied because they were not identical to the promotions being offered, and included more expensive features that would have made it unprofitable for Cingular to offer them (01/29/03 Tr. 398-99 (Flack) (DX 58). The Court's review of these exhibits indicates that there is some merit to Cingular's point; we also note that the exhibits show that, in two instances, while Kempner's proposal was denied as presented, Cingular offered Kempner alternative proposals (PX 21, 45). In the Court's view, this evidence does not support Kempner's contention that Kempner received less favorable pricing than Cingular-owned outlets.

Other evidence offered by Kempner, however, raises a question on this point. Kempner offered an exhibit (PX 29) which suggests that in some instances, company-owned distribution channels may have received a better price on equipment than Kempner received. And, Kempner produced a summary exhibit (PX 30) showing that in December 2000, December 2001, and March 2002, Kempner was charged a higher invoice price than Cingular-owned distribution channels for certain equipment or services (PX 30; *see also* 01/28/03 Tr. 71-72 (Kempner)). We say equipment *or* services because neither the summary exhibit nor the testimony about it explains what products

18

or services the listed serial number codes represent. Moreover, neither the summary nor the testimony about it indicates whether these particular serial numbers reflect all of the invoiced products or services in the months sampled or, instead, whether there are additional products or services reflected on the invoices that show that in some instances Kempner received the same or a better price than company-owned distribution channels. Nonetheless, these exhibits do support Kempner's claim that it did not receive the same level of pricing that Cingular-owned distribution channels enjoyed.

### 4. Alleged Solicitation of Subscribers Originally Activated by Kempner.

The 1999 Agreement reserves to Cingular the right to market the same cellular services marketed by Kempner in the same geographical area served by Kempner, "without obligation or liability" to Kempner (PX 1, ¶ 3). The 1999 Agreement does not describe the ways in which Cingular could exercise this right to compete. But, in light of the restrictions in the 1999 Agreement prohibiting Kempner from offering competitive services that compete with Cingular services, it would be reasonable – in view of the implied duty of good faith and fair dealing – to construe this right to restrict Cingular from initiating contact with Subscribers originally activated by Kempner in order to switch them from Kempner to another dealer, and thus to affect Kempner's commissions adversely. *Voyles v. Sanida Mortgage Corp.*, 751 N.E.2d 1126, 1130-31 (Ill. S.Ct. 2001) (discussing implied duty of good faith and fair dealing in contracts governed by Illinois law); *APS Sports Collectibles, Inc. v. Sports Time, Inc.*, 299 F.3d 624, 628 (7th Cir. 2002) (same).

Cingular appears to agree with this proposition, based on the evidence submitted. According to Cingular, when it initiated contact with a Subscriber originally activated by Kempner – for example, by shipping a telephone with an offer for an upgrade or some other service package –

Kempner would remain identified as the dealer for that Subscriber on any resulting transaction, and thus would continue to receive commissions (01/29/03 Tr. 432-433 (Flack), 518-519 (Whiddon); Boersma Dep. 39-40, 42). However, if a Subscriber originally activated by Kempner initiated a contact with a new distribution channel (whether another outside agent or an in-house distribution channel), the dealer code would change and future commissions would go to the new dealer (01/29/03 Tr. 502-503 (Flack), 519 (Whiddon)).

However, Kempner has offered evidence of instances in which Cingular actively made efforts to initiate contact with Subscribers activated by Kempner, and to switch those Subscribers to another dealer code (*see* Stipulation Regarding Testimony of Gene Hyman, Robert Gomez, Betty Martin-Dwyer, and Harry Sachsel and PXs 25, 26, 27, 28). The fact that at least three of these Subscribers did not have their dealer code switched does not change the fact that an attempt to do so was made in these specific instances.

These instances all occurred in 2001 and 2002. Based on the evidence presented, the Court cannot determine whether these four episodes reflect a more pervasive attempt to switch Subscribers originally activated by Kempner and, if so, whether Cingular was more successful in those efforts than in these four examples. Kempner has offered an exhibit (PX 42) containing the names of some 4,000 Subscribers who originally were activated by Kempner who were not listed on the August 2002 residual commission report that Kempner received (01/28/03 Tr. 107, 112-13 (Kempner)). However, Kempner has not attempted to identify which of these individuals were improperly "switched." Moreover, Kempner acknowledges that this list would include names of Subscribers who no longer were on the residual commission report for wholly innocent reasons, such as that their contracts had expired and they had elected to switch carriers (*Id.* at 107-108). In light of this fact,

and given the lack of success in the efforts to switch specific subscribers identified by Kempner, we are skeptical that many of these 4,000 names reflect the results of switches initiated by Cingular.

## 5. Kempner's Compensation.

Kempner alleges that Cingular owes it some $4,413.21 in out-of-pocket costs that Cingular agreed, but failed, to reimburse (PX 34); $2,600.00 in "charge backs" that Cingular improperly applied but had not paid to Kempner as of November 2001 (PX 40); unpaid commissions totaling $55,720.00 as of July 16, 2002 (PX 41); and $5,219.00 in returned equipment for which Kempner had not received a credit (PX 43), for a total of $67,952.21. Cingular disputes this calculation, and offered an exhibit showing that, according to its records, Kempner owes Cingular $126,242 in unpaid invoices (DX 20). Neither side offered much in the way of testimony or other evidence to substantiate their respective claims for these amounts, or to dispute the other side's claims.

Kempner's calculation of amounts due from Cingular do not include three other categories of claimed damages. Kempner claims that he has received no commission for cellular products and services that he sold to some 100 Cingular Subscribers whom Kempner enrolled between the date of his termination, on or about July 21, 2002, and when he actually stopped selling on behalf of Cingular, approximately one month later (*see* PX 48; Pl.'s Proposed Finding of Fact No. 69).[7] Kempner estimated that it should have received $15,000 to $20,000 in up-front commissions on those sales (01/28/03 Tr. 122-23 (Kempner)). Kempner has not provided a calculation of the amount of any residual commissions he claims would flow from these transactions (which, under the best

---

[7]We discuss below the circumstances concerning Kempner's continued sale of Cingular products and services after the termination letter was issued in July 2002.

of worlds for Kempner, would have ended at the close of December 31, 2002, when the 1999 Agreement would have expired by its terms).

Nor does Kempner's calculation of damages include the Subscribers whom Kempner asserts were removed improperly from the list of subscribers for whom he would receive residual commissions (*see* PX 42). Again, Kempner offered no evidence to assist the Court in determining which of these people were removed because they switched to a competitor's products; or because they switched to another Cingular outlet (whether an independent agent or a company-owned store); or because they were switched at the initiative of Cingular. Nor has Kempner provided any calculation of the amounts he claims would be due and owing for these Subscribers.

Finally, Kempner says he should receive some $80,000 in residual commissions dating from July 23, 2002 through December 31, 2002 (01/28/03 Tr. 313 (Kempner)). Kempner offers no explanation as to how it calculated that sum.

## D. Kempner's Initiation of Relationships with Cingular's Competitors.

By late 2001, Kempner plainly was chafing under the exclusivity and non-compete provisions of the 1999 Agreement. In October 2001, Kempner told Cingular that "[e]ntering into a new exclusive agreement would be a tremendous sacrifice in today's marketplace," and if Cingular were unwilling to make "drastic" changes in commissions, residuals, advertising and marketing support, Kempner would need to consider entering into a competitive non-exclusive agreement when the 1999 Agreement expired (PX 35). In November 2001, Kempner told Cingular that "without a substantial increase in residuals, Kempner demands that a competitive non-exclusive contract be proposed or the non-exclusive clause is waived" (PX 36). We note that, while these letters included some complaints that Cingular was not providing sufficient advertising funds and was directly

soliciting Subscribers activated by Kempner with the intent of switching them, the letters focused principally on what Kempner described as the failure of Cingular to provide competitive services and products and sufficient rates of commission.

When Cingular neither offered a new contract that allowed for competitive sales nor waived the exclusivity provision, Kempner took matters into its own hands. In May 2002, Kempner entered into several agreements to offer cellular services that competed with those offered by Cingular: Kempner entered into agreements with Nextel on May 7, 2002 (DX 53), with VoiceStream on May 14, 2002 (DX 57), with AT&T Wireless on May 15, 2002 (DX 54), and with Sprint on May 31, 2002 (DX 56).[8] During May 2002, Kempner continued to sell Cingular's services, but also began to make sales of the competing services offered by these carriers (PX 48). And, in May 2002, Kempner filed his complaint in the state court seeking, among other things, a declaration that the non-compete provisions of the 1999 Agreement were void and unenforceable.

Kempner did not inform Cingular that it had entered into these contracts or had commenced sales of competitive products or services (01/28/03 Tr. 97 (Kempner); 01/29/03 Tr. 514 (Whiddon)); Cingular learned about that independently, through information gleaned from activities in the marketplace. In addition, Kempner did not serve the state court complaint on Cingular in May 2002 or inform Cingular of its existence. In fact, Kempner did not inform Cingular of that complaint until late July 2002, after Cingular issued its notice of termination to Kempner (01/28 Tr. 136 (Kempner)).

---

[8]In August 2002, Kempner also entered into an agreement with Prime Co. (DX 55).

## E.    Cingular's Termination of Kempner.

By a letter dated June 20, 2002, Cingular notified Kempner in writing that Cingular had learned that Kempner was "promoting and selling the services of a competitor of Cingular in violation of the provisions contained in Sections 4(j) and 20" of 1999 Agreement (PX 37). In that letter, Cingular invoked the procedure set forth in Paragraph 18(B) of the 1999 Agreement, and informed Kempner that, unless Kempner notified Cingular in writing within 30 days that it had discontinued that activity, Cingular would exercise its right to terminate the 1999 Agreement and to "seek any other remedies available to it at law or in equity" (*Id.*).

Kempner continued its sales of competitive products and services (PX 48). Accordingly, after the passage of 30 days, Cingular sent a letter, dated July 23, 2002, terminating the 1999 Agreement (DX 22). In that letter, Cingular specifically reminded Kempner of its non-compete obligations imposed by Paragraph 20 of the 1999 Agreement (*Id.*). Kempner continued to sell competitive products; moreover, despite receiving the termination notice, Kempner also continued to sell Cingular products and to actively promote itself as affiliated with Cingular. It was not until about one month after the termination notice, after the proceedings in this Court on August 21, 2002, that Kempner removed the Cingular signs and promotional materials from its facility and no longer held itself out as a Cingular sales and service center (01/28/03 Tr. 194-95 (Kempner)).

During the preliminary injunction hearing, Kempner offered no explanation for its failure to inform Cingular in May 2002 that it was entering into competitive contracts and was beginning to sell competitive products and services; nor did Kempner offer any explanation for the failure to inform Cingular of the state court lawsuit for more than two and one-half months after it was filed, and only after Cingular had issued its termination letter. As for Kempner's acts in continuing to hold

itself out as a Cingular retail outlet and continuing to sell Cingular products and services for one month after the termination, the only evidence offered was that Kempner was "confused" and thought that because Cingular had not cancelled all its dealer codes and still sent Kempner some promotional bulletins, Kempner was not sure it really had been terminated (*Id.*) (01/28/03 Tr. 96 (Kempner)). The Court finds that a more reasonable inference to be drawn from the facts here is that Kempner tried to keep its competitive activity secret and to keep the lawsuit from coming to a head on the question of preliminary relief for as long as possible, so that Kempner would have the maximum opportunity to continue to sell Cingular services while at the same time establishing itself as a seller of the competitive services before the relationship with Cingular came to an end (and before Kempner's competitive activities were enjoined, if it came to that).

Kempner's own evidence shows that Kempner benefitted from this period of concealment and delay. From May through August 2002, Kempner's total monthly sales remained relatively consistent: 217 in May 2002, 259 in June 2002, 246 in July 2002 and 202 in August 2002 (PX 48). What changed was the mix between sales of Cingular products and services, and those of Cingular's competitors. In May 2002, Kempner sold 190 Cingular new activations and replacements, and 37 new activations of competitors. In June 2002, Kempner sold 164 Cingular new activations and replacements, and 95 new activations of competitor services and products, a ratio that remained relatively consistent in July 2002 (157 and 89, respectively) (PX 48). In August 2002, when the litigation heated up, the ratio changed dramatically: there were 60 Cingular new activations and replacements, and 142 new activations of competitor services and products (PX 48). Even before August, there was an important change in the pattern of sales. With respect to new activations, in each month from May through July the number of Cingular activations decreased (from 73 in May,

to 59 in June, to 45 in July), and the activations of competitor services increased (from 37 in May, to 95 in June, to 89 in July) (PX 48).

Moreover, it is plain that some number of those activations of competitor products were for individuals who were Subscribers originally activated for Cingular by Kempner. The evidence shows that between May and August 2000, 54 of the new activations Kempner wrote for the services of Cingular's competitors were for Subscribers originally activated by Kempner (*see* DX 49, DX 60 and DX 60A). Kempner denies that it tried to persuade Subscribers of Cingular products and services to enter into contracts for services and products of Cingular's competitors (01/28/03 Tr. 235-239 (Kempner)). Kempner offered evidence that when a potential customer is looking for products and services, Kempner explains the various features and prices of available options, and lets the "product sell itself" to the customer (*Id.*, at 236). And, there is no evidence that Kempner switched any Cingular Subscriber into a different service, in the sense of inducing the subscriber to terminate the Cingular contract early and to substitute that with the contract of a competitor.

But, as the evidence cited above shows, Kempner sold competitive services and products to a number of Cingular Subscribers, which may have had the effect of making those Subscribers less likely to renew agreements with Cingular in the future. Moreover, while we find it credible that in many instances it is the products and services that "sell themselves," without the sales person influencing the customer to choose between one carrier or the other, the Court also finds it highly unlikely that this is always the case. Indeed, evidence offered by Kempner shows that when a customer is undecided, a sales person may direct the customer to one carrier or another for a variety of reasons – for instance, because one carrier offers the sales person a better commission rate than another (*see, e.g.*, Michael Abt Dep. at 27-28).

26

For these reasons, we find it likely that Kempner benefitted from having a three-month period in which he simultaneously sold Cingular and competitive services in two different ways. *First*, by continuing to market his association with Cingular at the same time he was marketing associations with competitors, Kempner was able to increase the potential pool of customers; and *second*, with respect to some of those Subscribers of Cingular services, he was able to sell competitive products to them. This benefit to Kempner is further highlighted by the evidence that after August 2002, when Kempner was no longer able to sell Cingular services, Kempner's sales of the other carriers' services and products fell off substantially. In August 2002, Kempner sold 142 new activations for the products and services of Cingular's competitors; in the following three months, Kempner sold only 96, 76, and 93 new activations, respectively (PX 48).

Kempner has offered evidence that the Subscribers have more loyalty to Kempner than to Cingular (*see, e.g.*, PX 38, 39), and that Kempner did not influence them to obtain competitive services (*see* Stipulation Regarding Testimony of Lili Donio, Danny Zivin). In the Court's view, that evidence is relevant to assessing the extent of the benefit obtained by Kempner from being able to develop subscriber relationships through his affiliation with Cingular. But, the evidence fails to show that Kempner derived no benefit from that affiliation.

**F.    Cingular's Enforcement of Exclusivity Provisions Against Other Dealers/Agents.**

According to the evidence, Cingular's practice is to require exclusivity only for dealers and agents who market post-paid services; Cingular generally does not require exclusive arrangements for "big box" retail outlets or for dealers that sell only pre-paid services (*see* PX 6; 01/29/03 Tr. 360-361, 465 (Flack)). In pointing out the reasons for that distinction, Cingular presented evidence that: (1) although national retailers offer pre-paid and post-paid services, they do not receive residual

commissions, which are paid to agents on exclusive arrangements as part of the inducement to create a closer affiliation with Cingular and to provide broader services; and (2) pre-paid service, which is the only thing offered by non-exclusive dealers, constitutes only five percent or less of Cingular's business (*Id.*, at 362-363).[9]

Kempner offered evidence that there are inconsistencies in Cingular's implementation of its stated practice of not providing residual commissions to "big box" retailers. Kempner offered evidence that Cingular's contract with Circuit City provides for payment of residual commissions (PX 44, ¶ 6). In addition, Kempner offered evidence that for an extended period of time, Abt was allowed to sell Cingular products and services under an unwritten arrangement which provided for residual commissions; that during the last year of this arrangement, Abt began selling wireless service offered by competitors of Cingular; and that ultimately Cingular entered into a written contract that allowed Abt to continue to sell wireless service on a non-exclusive basis and provided a payment schedule that included a form of compensation tantamount to residual commissions (01/29/03 Tr. 474-477 (Flack)) (PX 10).

Kempner's evidence on this point tends to show that Cingular's relationships with Abt and Circuit City are exceptions to the rule, but not that the rule – that is, that "big box" retailers do not get residual commissions – does not exist. The evidence shows that the residual commission structure gives agents an incentive to help the carrier retain customers and build more enduring relationships with them which Kempner itself acknowledges helps Cingular retain Subscribers (DX 23, ¶ 10). This supports Cingular's contention that it has a stronger interest in a non-compete

---

[9]Cingular also offered evidence that exclusive agents are privy to information and assistance that is not provided to "big box" retailers (*Id.*, at 375-376). For the reasons stated above (*see* note 5, *supra*), we find that the evidence on this latter point does not support Cingular's assertion.

provision (at least insofar as it bars efforts to sell to customers developed through the agency relationship) with respect to agents to whom it has paid residual commissions, than in those cases where it has not. This evidence, therefore, does not support Kempner's claim that Cingular either has waived the non-compete provisions, or has no strong protectable interest in them.[10]

Moreover, Kempner has not offered evidence to contradict Cingular's showing that, except for "big box" retailers, all outside dealer and agent retail outlets that sell post-paid service have exclusivity and non-compete provisions in their contracts. Instead, Kempner has offered evidence that those non-compete provisions have not been rigorously enforced in all instances.

*First*, between August and October 2002 (perhaps, not coincidentally, after Kempner's termination), Cingular sent letters to five agents notifying them that the contracts would be terminated within thirty days if they did not stop offering competitive services in violation of the exclusivity provisions of their contracts (PX 11). In each instance, the agents in question had signage on their stores promoting the availability of both Cingular and competitive services (*Id.*). According to the testimony, all of those agents ultimately were terminated because they failed to stop selling competitive services (01/29/03 Tr. 441-443 (Flack)). However, Cingular did not file suit against any of these agents to compel them to stop selling competitive products; does not know if they are continuing to sell competitive products; and does not know if they are still promoting themselves as having any association with Cingular (*Id.* at 443). Cingular's explanation is that each of these agents had only a relatively small number of subscribers that they have activated (500 or so

---

[10]In this vein, we also note that the Abt and Cingular contracts both contain provisions that prohibit the post-termination use of advertising or marketing materials or any use that would associate the retailer with Cingular (PX 10, ¶ 14; PX 44, ¶ 12). In addition, the Abt agreement specifically prohibits, after termination, Abt from knowingly targeting or soliciting Cingular subscribers who are activated by Abt to purchase competitive services (PX 10, ¶ 15).

each), and that it is therefore not worth Cingular's while to pursue them aggressively as it has done with Kempner (who, at the time of termination, had a base of some 7,000 Subscribers whom it had activated). This explanation is not without some force: any company must make an economic decision about whether the costs of seeking to enforce a contractual provision will exceed the damages caused by the alleged violation. Nonetheless, while each of these agents is individually small, collectively they account for some 2,500 subscribers. And, the fact that the termination letters all post-dated Kempner's termination, and the institution of this lawsuit in federal court, raises a question as to whether the notices and terminations were driven not by concerns over the breach of the non-compete, but by the litigation needs in this case.

*Second*, there is evidence that in the spring of 2002, Cingular instituted a program for addressing violations of the exclusivity/non-compete provisions of their agency agreements. Under this program, the exclusive agency agreement would be terminated and the agent would enter into a new contract allowing it to market only Cingular's pre-paid services, and not its post-paid services. The agents would be permitted to offer these cellular services on a non-exclusive basis, meaning that they could offer both pre-paid and post-paid services of other carriers (PX 12; 01/29/03 Tr. 467-468 (Flack)). The agents could not use Cingular's marks or other materials provided by Cingular after termination of the new agreement (PX 12, ¶ 10(c)). According to the evidence, it was "standard procedure" for Cingular to make this offer to agents who were in breach of their non-compete provisions, and between March and August 2002, Cingular entered into nearly 20 such agreements

(01/29/03 Tr. 468 (Flack); see also PX 13). Thus, in none of those instances did Cingular enforce the non-compete provisions of the agency agreements.[11]

Cingular explained that one motivation for this program was to try to preserve these agents as outlets for the pre-paid services (01/29/03 Tr. 490-491 (Flack)). Cingular also offered evidence that all of these agents were small, and none were sales and service centers like Kempner (*Id.* at 505). However, one reasonably may wonder why Cingular would want to maintain relationships with agents who were violating the non-compete provisions, so that the agents could sell a service (pre-paid contracts) which constitutes a very small part (five percent or less) of Cingular's business. Moreover, a Cingular witness testified that Kempner was not offered this arrangement because Kempner had filed a suit against Cingular – not because Kempner was bigger than the other agents who had been offered this arrangement (01/29/03 Tr. 538 (Whiddon)). That explanation does not square with the undisputed evidence that Cingular did not know of Kempner's lawsuit until after Cingular issued the termination letter dated July 23, 2002. Moreover, the same witness earlier testified in his deposition that he could think of no good reason why this arrangement had not been offered to Kempner (*Id.*, at 538 (Whiddon)).

That said, we can envision understandable reasons why Cingular would not offer this arrangement to Kempner. The chain of correspondence between the parties in 2001 and early 2002 show that the relationship between the parties was in serious disrepair, and it would not have been unreasonable for Cingular to decide not to allow a large (and disaffected) sales and service center like Kempner to have carte blanche to sell competitive products. And, in any event, there is no

---

[11]Kempner also attempted to establish that Cingular allowed one of its agents to violate the exclusive/non-compete provisions because of its relationship with a Cingular vice president (PX 14; 01/29/03 Tr. 523-537 (Whiddon)). Kempner's evidence was not persuasive to the Court on this point.

evidence showing that Kempner would have accepted this mutual termination agreement had it been offered. In all these circumstances, we do not view this mutual termination program as strong evidence that Cingular does not have an important interest to be protected by the exclusive/non-compete provisions of its agency agreements, or that Cingular has waived those provisions.

## II.

"The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981). Because the purpose of a preliminary injunction is limited, a party is not required to prove its case in full at the preliminary injunction hearing. *Id.* A preliminary injunction nonetheless remains "an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing* carries the burden of persuasion." *Mazuerk v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam) (citing 11A C. WRIGHT, A. MILLER & M. KANE, FEDERAL PRACTICE AND PROCEDURE § 2948 pp. 129-130 (2d. ed. 1995) (emphasis added)).

At the threshold, "a party seeking a preliminary injunction must demonstrate: (1) some likelihood of succeeding on the merits, and (2) that it has 'no adequate remedy at law' and will suffer 'irreparable harm' if preliminary relief is denied." *Abbott Labs. v. Meade Johnson Co.*, 971 F.2d 6, 11 (7th Cir. 1992) (citing *Lawson Prods., Inc. v. Avnet, Inc.*, 782 F.2d 1429, 1433 (7th Cir. 1986); *see also, Allied Signal, Inc. v. B.F. Goodrich Co.*, 183 F.3d 567, 573 (7th Cir. 1999). "If the moving party cannot establish either of these prerequisites, a Court's inquiry is over and the injunction must be denied. If, however, the moving party clears both thresholds, the Court then must consider: (3) the irreparable harm the non-moving party will suffer if preliminary relief is granted, balancing that harm against the irreparable harm to the moving party if relief is denied; and (4) the public interest,

meaning the consequences of granting or denying the injunction to non-parties." *Abbott Labs.*, 971 F.2d at 11-12. The Court then weighs all four factors, seeking to "minimize the costs of being mistaken." *Abbott Labs.*, 971 F.2d at 11-12. *See also American Hospital Supply Corp. v. Hospital Products Ltd.*, 780 F.2d 589, 593-594 (7th Cir. 1985).

In this case, there are three separate requests for preliminary injunctive relief. *First*, Kempner seeks a preliminary injunction to restrain Cingular from enforcing any aspect of the non-compete provisions of the 1999 Agreement. *Second*, Cingular seeks a mirror image preliminary injunction, restraining Kempner from taking acts that would violate any portion of the non-compete provisions in the 1999 Agreement. *Third*, Kempner seeks a preliminary injunction requiring payment by Cingular of certain commissions and other monies that Kempner claims are due and owing. Utilizing the principles set forth above, we turn to an analysis of each of these claims for preliminary injunctive relief.[12]

## III.

We begin with the question of likelihood of success. The Seventh Circuit has held that a movant must show "a reasonable likelihood of success on the merits," which can be satisfied by proof that the chance of prevailing at trial is better than negligible. *Kinney v. Int.'l Union of Operating Engineers*, 994 F.2d 1271, 1275 (7th Cir. 1993). Under the "better than negligible" standard, the "threshold is low" for establishing likelihood of success. *Roland Machinery Co. v. Dresser Industries, Inc.*, 749 F.2d 380, 387 (7th Cir. 1984). Thus, as this Court previously has

---

[12]Kempner also originally asked to enjoin termination of the 1999 Agreement prior to December 31, 2002, and sought related preliminary relief in the form of access to certain computer equipment and systems that would be part and parcel of the continuation of 1999 Agreement (*see* Pl.'s Renewed Motion for Preliminary Injunctive Relief, doc. # 39, at 6). The passage of time has rendered these aspects of Kempner's request of preliminary injunctive relief moot, and we therefore do not address them further.

observed, there is no conceptual reason that a plaintiff and defendant both may not have a "better than negligible" likelihood of success on the same issue, "since the 'better than negligible' standard surely does not require a finding that it is more likely than not that one side will prevail." *Oxford Capital Illinois, L.L.C. v. Sterling Payroll Financial, L.L.C.*, No. 01 C 1173, 2002 WL 411553 (N.D. Ill. Mar. 15, 2002). With this in mind, we consider first each side's likelihood of success on their claims regarding the enforceability of the non-compete provisions, and then Kempner's likelihood of success on its commission claims.

## A.

In assessing the non-compete provisions in the 1999 Agreement, we look to Illinois law, which the parties have contractually selected (PX 1, ¶ 24). "[T]he question of whether a restrictive covenant is enforceable or not is a question of law." *Liautaud v. Liautaud*, 221 F.3d 981, 986 (7th Cir. 2000). Citing *Lawrence Allen, Inc. v. Cambridge Human Resources Group, Inc.*, 292 Ill. App.3d 131, 685, N.E.2d 434, 440 (1997). Under Illinois law, non-competition clauses are disfavored. *Advent Electronics, Inc. v. Buckman*, 112 F.3d 267, 274 (7th Cir. 1997) (applying Illinois law). As a result, the fact that the parties agreed to the non-compete provisions is not dispositive, indeed, "[i]t is improper under Illinois law to enforce a non-competition clause merely because the parties agreed to such an arrangement." *Id.*

In determining the enforceability of the non-competition provisions at issue in this case, we consider first whether they are "ancillary to a valid transaction, such that the covenant not to compete is subordinate to the main purpose of the transaction." *Liautaud*, 221 F.3d at 986. If that prerequisite is met, we next consider "whether the scope of the non-competition agreement is reasonable, a determination which is based on the facts and circumstances of the particular case."

*Liautaud*, 221 F.3d at 987; *see also House of Vision, Inc. v. Hiyane*, 225 N.E. 2d 21, 24 (Ill. S. Ct. 1967) ("[t]he validity of a contract in restraint of competition is conditioned upon its reasonableness in terms of its affect upon the parties to the contract and the public."). For the restriction to be reasonable, it must not impose restrictions that are greater than those necessary to protect Cingular's legitimate interests; it must not be oppressive to Kempner; and it must not be injurious to the general public. *Liautaud*, 221 F.3d at 987. In assessing the reasonableness of the restrictions, we consider the interests that Cingular seeks to protect by the restrictions; the duration and geographical scope of the restrictions; and the activities that are sought to be restrained.

The parties agreed by contract that if the non-competition provisions were held unenforceable by virtue of "scope in terms of area, business activity prohibited and/or length of time," but "could be enforceable by reducing any or all" of these elements, the non-compete "shall be enforced to the fullest extent permissible" (PX 1, ¶ 21). That provision comports with Illinois law, to a point. Under Illinois law, "the fairness of the restraint initially imposed is a relevant consideration to a court of equity" in determining whether the restraints may be enforced as modified. *House of Vision*, 225 N.E. 2d at 25. Accordingly, "while Illinois law allows a court to modify a restrictive covenant, and even where the parties have incorporated this principle into their agreement through the use of express language allowing modification, a court should refuse to modify an unreasonable restrictive covenant, not merely because it is unreasonable, but where the *degree* of unreasonableness renders it unfair." *Eichmann v. National Hosp. and Healthcare Services, Inc.*, 719 N.E.2d 1141, 1149 (Ill. App. 1st Dist. 1999); *see also, Lee/O'Keefe Ins., Inc. Agency v. Ferega*, 516 N.E.2d 1313, 1319 (Ill. App. 4th Dist. 1987) (affirming trial court refusal to modify the terms of a non-compete agreement where to do so "would have involved more than a temporal or geographical modification and would

have been tantamount to drafting a new contract."). To the extent that the non-compete provisions in the 1999 Agreement are unreasonable in any respect, and in determining whether they may be modified and then enforced, we must consider whether the unreasonableness is of such a degree that the provisions must be eliminated rather than modified. *Eichmann*, 719 N.E.2d at 1149 ("A restrictive covenant is unfair where its terms 'clearly extend far beyond those necessary to the protection any legitimate interest of the employer or, in other words, amount to 'unrealistic boundaries in time and space.'") (quoting *House of Vision*, 225 N.E.2d at 25).

In light of these guiding principles, we consider, in turn, (1) Kempner's argument that the non-compete provisions are void (and Cingular's counter-argument that they are reasonable and should be fully enforced); and (2) Kempner's alternative argument that even if not void, the non-compete provisions are nonetheless unenforceable due to Cingular's alleged material breaches of the 1999 Agreement.

## 1.

We may dispense with certain of Kempner's arguments with little discussion. *First*, we conclude that the non-compete provisions are, as required, ancillary to a valid contract and supported by consideration. *See, e.g., Union Trust & Savings Bank v. Kinloch Long Distance Telephone Co.*, 101 N.E. 535, 537 (1913) ("the restraint of trade has been auxiliary to the main purpose of the contract, and has been necessary to protect one party from injury by the unfair use of the subject matter of the contract by the other party")) (quoting *Abel v. Fox*, 645 N.E.2d 591, 596, 818-819 (4th Dist. 1995). Here, the non-compete provisions were ancillary to the 1999 Agreement, and not its primary focus. The primary focus of that agreement was to establish a relationship through which Kempner would market products and services of Cingular, and would be compensated for that effort.

The non-compete provisions were obtained from Kempner in consideration of certain benefits that Kempner received under the 1999 Agreement, including the right to use Cingular's marks and the "great value of the goodwill" associated with that right; the right to advertise affiliation with Cingular; and the receipt of specialized, technical knowledge and other services to be supplied by Cingular (PX 1, ¶ 20). Moreover, the non-compete provisions effectuate the agreement that Subscribers enrolled by Kempner through its affiliation with Cingular would become customers of Cingular (*Id.*, ¶ 3). The non-compete provisions in the 1999 Agreement thus were not just "naked promises" not to compete, but were in furtherance of larger goals set forth in the contract between the parties.

*Second*, in considering the reasonableness of the restrictions imposed, we have little trouble finding that Kempner has not shown the requisite likelihood of success in establishing that the one-year duration and six-county Chicago metropolitan geographical scope of the restrictions are unreasonable. Non-compete agreements lasting for one year (or even more) have been upheld, *see, e.g., Canfield v. Spear*, 254 N.E.2d 433, 435 (1969) (upholding a three year non-compete agreement); *Bauer v. Sawyer*, 134 N.E.2d 329, 331-32, 355 (Ill. 1956) (upholding a five year non-compete agreement), and the evidence in this case does not indicate that a one-year duration is unreasonable. The average length of the contracts entered into between Cingular and its customers for post-paid services is one year, and customers on average remain in a relationship with a particular carrier for four years (01/29/03 Tr. 558 (Nelson)). Moreover, the geographical scope of the non-compete provisions corresponds with the counties in which Cingular does business. *Midwest Television, Inc. v. Oloffson*, 699 N.E.2d 230, 235 (Ill. App. Ct. 3d Dist. 1998) (restrictive covenant is reasonable if the restricted geographical is coextensive with the employer's business territory).

That is the same geographic area in which the 1999 Agreement authorized Kempner to do business. And (although he did not have locations in all of these areas) the advertising by Cingular for Kempner extended into areas outside Cook County (*see* PX 27, 28). In these circumstances, we believe that the geographical scope is sufficiently tailored to be reasonable.

We now consider the activities barred by the non-compete provision.

### a.

The non-compete prohibits Kempner from using the name, goodwill or other assets or property of Cingular on behalf of a competitor for cellular services (PX 1, ¶ 20(4)). Kempner has offered no argument as to why it should be permitted to use Cingular's marks or other information, which Cingular provided to Kempner only as a result of the contractual relationship with Kempner and which Kempner recognized to be Cingular's property (*see, e.g.*, PX 1, ¶ 8). We see no basis to conclude that this restriction is unreasonable, and find that Kempner does not have a better than negligible chance of success on that point.

### b.

We also do not believe that Kempner has a better than negligible chance of showing that the non-compete restrictions are unreasonable insofar as they bar Kempner – for one year, and throughout the six-county Chicago metropolitan area – from selling or attempting to sell services that compete with Cingular's cellular services to any Cingular Subscriber whom Kempner activated (PX 1, ¶ 20(1), (2)). Kempner sold those services to the Subscribers as a result of his affiliation with Cingular, and utilized the service offerings made available by Cingular in doing so. Under the 1999 Agreement, Kempner was entitled to receive compensation for those efforts in the form of commissions, and assistance in making those efforts in the form of various promotional and other

support. And, as part of this contractual relationship, Kempner agreed that the Subscribers of the services Kempner sold on behalf of Cingular would be customers of Cingular (PX 1, ¶ 3).

Based on the evidence submitted at the preliminary injunction hearing, the identity of the Cingular Subscribers, and the service choices they have made, is information that Cingular keeps confidential. There is no evidence that this Subscriber information may be readily obtained by Cingular's competitors in the marketplace on any systematic basis.[13] While Kempner certainly knows the identity of the subscribers and their service choices, that is only because Kempner was authorized by Cingular to sell those services to Subscribers on Cingular's behalf. And, the 1999 Agreement provides that Kempner may use the Subscriber lists only for purposes allowed by the agreement, and may not divulge that information to others (PX 1, ¶ 4(m)).

This is not a case like *Hydroaire, Inc. v. Sager*, 424 N.E.2d 719, 725 (Ill. App. Ct. 1st Dist. 1981), where the court found that the company seeking to enforce a restrictive covenant was attempting to restrain the former employee "from contacting customers *previously* known and readily available to [the former employee], rather than . . . protect[ing] a legitimate aspect of its business against an improper or unfair method of competition." *Hydroaire*, 424 N.E.2d at 725 (emphasis added). The evidence here shows that, prior to beginning its relationship with Cingular in 1989, Kempner had a small clientele to which it sold only paging products; it was through Kempner's affiliation with Cingular, from 1989 until 2002, that Kempner expanded the clientele to which it sold products to some 10,000 at one point, and some 7,000 by the time of the termination in July 2002.

---

[13]We recognize that if a Cingular Subscriber were to visit, say, a Sprint retail outlet for the purpose of considering replacement of the Cingular service, the Sprint retailer well might learn from the Cingular subscriber much or all of this information. But, that kind of random or episodic possibility falls far short of proof that the information is ascertainable by Cingular's competitors on any general or systematic basis, or by reference to publicly available sources such as telephone directories or industry publications. *Cf. A.J. Dralle, Inc. v. Technologies, Inc.*, 627 N.E.2d 690, 696 (Ill. App. Ct. 2nd Dist. 1994).

Restricting Kempner for a one-year period from marketing competing products to the Cingular Subscribers Kempner enrolled also is a reasonable means of protecting against what otherwise likely would be inevitable disclosure of the Subscriber information. The "inevitable disclosure" doctrine has been recognized in trade secret misappropriation cases under Illinois law. *See Pepsi Co., Inc. v. Redmand*, 54 F.3d 1262, 1269 (7th Cir. 1995); *Strata Marketing, Inc. v. Murphy*, 740 N.E.2d 1166, 1178-79 (Ill. App. Ct. 1st Dist. 2000). While we have found no case that discusses the application of this doctrine in the specific context of a noncompete case that involves confidential (and not trade secret) information, we see no reason, in principle, that it should not apply in assessing both the interest to be protected and the reasonableness of the restraints imposed. Here, if Kempner were allowed to sell to Subscribers Kempner enrolled, the Court believes it likely would be inevitable that the Subscriber information Kempner obtained through its affiliation with Cingular would be used to sell competing products and services to those Subscribers. Thus, a restriction on Kempner selling to Subscribers enrolled by Kempner likely would be reasonable to ensure that Subscriber information is used only for permitted purposes (such as, for periodic contact with Subscribers concerning CPE).

Finally, we note that the evidence here shows that Cingular has a better than negligible chance of showing that it has a "near permanent" relationship with Subscribers, which independently constitutes a sufficient protectable interest to warrant a restrictive covenant. *See Curtis One Thousand, Inc. v. Suess*, 24 F.3d 944, 947, 1000 (7th Cir. 1994); *A.J. Dralle, Inc.*, 627 N.E.2d 690, 696-697 (Ill. App. Ct. 2nd Dist. 1994). *See also Label Printers v. Pflug*, 564 N.E.2d 1382, 1387 (Ill. App. Ct. 2nd Dist. 1991) ("Factors to be considered in determining whether a near-permanent relationship exists . . . for the purpose of enforcing non-competition covenants include the time, cost,

and difficulty involved in developing and maintaining the clientele, the parties' intention to remain affiliated for an indefinite period, and the continuity as well as the duration of the relationship."); *see also McRand, Inc. v. Van Beelen*, 486 N.E.2d 1306, 1311-1312 (Ill. App. Ct. 1st Dist. 1985). We say only "better than negligible" because, here, we find the evidence does not favor Cingular quite so strongly. What is offered here is a service, which is the type of transaction that could create a protectable interest in relations with customers. *Curtis One Thousand*, 24 F.3d at 948. On the other hand, there is evidence that price and quality in competing services is what drives consumer decisions, and not trust in a particular supplier of the services; that would militate against a finding that Cingular has a near permanent relationship with Subscribers. *Id.* at 948. But, the evidence here shows that even though the average contract that Cingular has with subscribers lasts for one year, Cingular typically retains the relationship with the subscriber for four years (01/29/03 Tr. 558 (Nelson)). Unless Cingular always offered the best price and service (which is contrary to Kempner's view of things (PXs 37-38)), that suggests more durability to the relationship and would weigh in favor of a finding of near permanence. Kempner suggests that the durability of the relationship is a result of Subscriber loyalty to Kempner and not Cingular; but, even if so, that is a loyalty built in substantial measure through Kempner's affiliation with Cingular over an extended period of time. And, that is loyalty Cingular bargained for in deciding to pay residual commissions and to encourage a close association between it and Kempner. In short, while there are arguments to be made on each side, we believe that shows that Cingular has a better than negligible chance of proving a near permanent relationship with customers.

Thus, insofar as the non-competition restriction prohibits Kempner from attempting to market competitive services to Subscribers who were enrolled by Kempner and who remained Cingular

Subscribers as of July 23, 2002 (*i.e.*, the date of the termination letter), we believe that Kempner has not made a better than negligible showing of likelihood of success that this restriction is unreasonable.

c.

However, we view the remaining restrictions in the non-competition clause differently. Those restrictions would bar Kempner, for a period of one year, from engaging in the sale or promotion of cellular services on behalf of any competing reseller or provider in the six-county Chicago metropolitan area (PX 1, ¶ 20(3)); from attempting to influence any Cingular Subscriber to acquire a service that competes with Cingular's cellular service, even if that Subscriber was not enrolled by Kempner (*Id.*, ¶¶ 20(1) (2) and (3)); and from using its own name, assets or property in connection with a marketing of services that compete with Cingular's cellular services (*Id.*, ¶ 20(4)). We believe that Kempner has made a strong showing of likelihood of success on the proposition that these various restrictions are unreasonable.

Barring Kempner from selling any competitive cellular services is both broader than is necessary to protect Cingular's legitimate interests, and oppressive to Kempner. As described above, we believe Cingular likely will show that it has protectable interests in, at a minimum, its name and goodwill, and that it allowed Kempner to use information that Kempner had about product offerings and market plans, and Subscriber information that was known to Kempner only through his work with Cingular. But, Kempner from selling *any* competing cellular product to *anyone* is not reasonably tailored to protect those interests. The interest in protecting Cingular's name and goodwill is satisfied by the provision of Paragraph 20 barring Kempner from using those assets to its advantage (PX 1, ¶ 20(4)). We see no reason to believe that Cingular's name and goodwill would

42

be inevitably used by Kempner if Kempner were allowed to offer competing products. There is no evidence that Kempner has done so since August 2002, a six-month period during which Kempner has been offering competing products. To the extent Cingular wishes to do so, it readily can police compliance that restriction (such as, by undisclosed visits or calls to Kempner to see if Kempner is promoting any Cingular affiliation).

As for product and other information that Kempner received during the course of his relationship with Cingular, the evidence persuades this Court that this information is rapidly changing, and thus has a limited useful life. According to the evidence, this information is updated and revised every 30-90 days (01/28/03 Tr. 92 (Kempner)). Kempner has not received any such information since August 2002, and anything Kempner received before then likely is of little (if any) value. We see little likelihood that Cingular's interest in outdated information (such as details of past promotions to the public, which would be in the public domain anyway once the promotions were offered) could support a complete bar on Kempner marketing competing cellular products after his termination.

Finally, as for Cingular's interest in its investment in developing Subscriber lists and information (or relationships with the Subscribers), that interest is protected by the provisions of the non-compete clause that bar Kempner from selling competing services to those Subscribers Kempner enrolled who remained Cingular Subscribers as of July 23, 2002. To go farther, and to prohibit Kempner from offering competitive services to individuals who were not enrolled by Kempner and who were not active Subscribers as of the termination date, would exceed the scope of Cingular's protectable interest.

These restrictions not only likely exceed the scope of Cingular's protectable interest, but likely would be oppressive to Kempner. Barring Kempner from selling any competitive services is, in effect, barring Kempner from engaging in its chosen line of business. The evidence shows that the sale of cellular services constitutes seventy percent of Kempner's business (01/28/03 Tr. 125 (Kempner)). It is reasonable to infer that a business that loses seventy percent of its revenue source might not be able to survive for one year. While that harsh result may be required were it necessary to safeguard Cingular's protectable interest, we do not think that is the case here. Moreover, the restriction that would in substance require Kempner to change its name and corporate identity in order to sell competing service would cause Kempner to lose the identity that it has developed over more than a decade, which may be of great utility to Kempner in selling the paging services and other products and services that constitute the other thirty percent of his business.

In summary, on the question of the reasonableness of the restrictive covenant, we find that Cingular has made a strong showing that the restrictive covenant is reasonable insofar as it bars Kempner from using Cingular's name, goodwill and other assets or property in selling competing services, and bars Kempner – for a period of one year in the Chicago six-county metropolitan area – from selling services that compete with Cingular's cellular services to Subscribers that Kempner enrolled and who were active Cingular Subscribers as of July 23, 2002. However, we find that Kempner has made a strong showing of likelihood of success that the restrictive covenant is unreasonable insofar as it would bar Kempner from selling competitive services to persons who were not active Cingular Subscribers that Kempner enrolled, or using Kempner's own name, goodwill, assets or property in engaging in that business activity. Moreover, while Kempner has shown that these latter aspects of the non-compete likely exceed what is reasonably necessary to safeguard

44

Cingular's protectable interests, Kempner has failed to make a better than negligible showing that, taken as a whole, the non-compete is so unreasonable as to be totally unfair and thus not capable of judicial modification. Thus, we believe that it is likely that, after a trial on the merits, the non-compete provisions would be enforced in the modified form set forth above.[14]

## 2.

We now turn to Kempner's alternative argument concerning the non-compete provisions: that even if valid, they are unenforceable. Kempner offers two theories of unenforceability: that Cingular cannot enforce the restrictions due to Cingular's material breaches of the 1999 Agreement, and that Cingular has waived the restrictions due to its inconsistent enforcement of those restrictions against others. For the reasons that follow, the Court finds that Kempner has not made a showing that it has a better than negligible chance of prevailing on this theory of unenforceability.

### a.

As to whether there were material breaches by Cingular, the evidence is conflicting. Kempner claims that it was not paid substantial commissions, a point which is not sufficiently developed for the Court to conclude that either side has the better of this point. Moreover, because

---

[14]In reaching this conclusion, we have considered the decision in *Statco Wireless, L.L.C. v. Southwestern Bell Wireless, L.L.C.*, No. CA 02-391, 80 Ark. App. 284 (Ark. Ct. App., 2003). In *Statco*, the appellate court upheld an injunction enforcing the precise non-compete provisions at issue here. The appellate court did so based largely on its conclusion that the trial judge's findings at trial were not clearly erroneous, based on the evidentiary record presented at trial in that case.

*Statco*, of course, is not binding on this Court. And, based on the evidentiary record presented here, we respectfully consider *Statco* unpersuasive to the extent that it upheld portions of the non-compete provisions that we find are likely to be unenforceable after a trial. In that regard, we note that the *Statco* decision found that Cingular's strongest protectable interest rested in its marks and subscriber information, and in preventing the agent from using that information to steal Cingular customers. The *Statco* court did not explain why the portions of the non-compete provisions that go farther, and that would prevent the agent from engaging in any competitive activity whatsoever, were not greater than needed to protect Cingular's legitimate interests and were not oppressive to the agent – which are inquiries we must make under Illinois law. *Liautaud*, 221 F.3d at 987.

Kempner has not offered evidence concerning what its normal commission stream would be, the Court cannot determine whether the alleged failure to fully pay commissions – if proven – would constitute a *material* breach of the contract.

Kempner's best evidence of material breach is with respect to the claim that Cingular tried to undermine Kempner's business by depriving it of pricing that was given to company-owned outlets, and by attempting to divert Subscribers from Kempner to company-owned outlets. While Cingular retained the right to compete with Kempner through company-owned stores, under the duty of good faith and fair dealing Cingular had the obligation to exercise that right in a fair manner. *See Prudential Ins. Co. v. McCurry*, 492 N.E.2d 1026, 1028 (Ill. App. 3d Dist. 1986). Whether the evidence, as fully developed for trial, will show that this conduct was a part of a purposeful plan remains to be seen. But, at this preliminary phase, we believe the evidence is enough to show that Kempner may be able to show that these acts were not merely aberrations. Thus, at the very least, Kempner has a better than negligible chance of showing a material breach.

However, that does not translate into a better than negligible likelihood of success on the theory that a material breach would excuse Kempner from complying with the non-compete provisions. Certainly, a material breach by one party to a contract may provide the basis for the other party to terminate the contract in its entirety. Indeed, that principle is recognized in the 1999 Agreement itself, which gave Kempner the right to terminate the 1999 Agreement in its entirety upon a material breach by Cingular that was not cured within thirty days of notice (PX 1, ¶ 18(A)). In that event, the 1999 Agreement specifically states that Kempner would "not be bound by the provisions in Paragraph 20, Covenants Not To Compete" (*Id.*).

But, Kempner did not choose that course (01/28/03 Tr. 338-39 (Kempner)). Rather, what Kempner sought in filing the state court complaint in May 2002, and then the amended complaint in this Court in August 2002, was to have its cake and eat it, too: that is, Kempner wanted to force Cingular to remain in the 1999 Agreement through the scheduled expiration date of December 31, 2002, so that Kempner could continue to have the benefits of that contractual relationship, but to selectively excise from that agent the non-compete provisions, so that Kempner also could sell the products and services of competitors. It appears, then, that what Kempner seeks is a form of selective contract "repudiation" – which is not permitted under Illinois law. *Maffel v. Ginocchio*, 132 N.E. 518, 520 (Ill. 1921). "An anticipating repudiation has been defined as a manifestation by one party to a contract of an intent not to perform its contractual duty when the time fixed in the contact has arrived." *See Pope v. Economy Fire & Cas. Co.*, 779 N.E.2d 461, 465 (Ill. App. 1st Dist. 2002) (citing *In re Marriage of Olsen*, 528 N.E.2d 684, 686 (1988)). "The party's manifestation must clearly and unequivocally be that it will not render the promised performance when it becomes due." *Id.* We have found no case in Illinois which permits a selective repudiation of one part of the contract but enforcement of the other parts of the contract, and Kempner has cited none.

Nor do the facts here fit a theory of reformation of contract. *See, e.g.*, 13 W. JAEGER, WILLSTON ON CONTRACTS § 1585, at 559 (3d ed. 1970) ("The desirable rule governing reformation is that if the writing actually executed does not contain all that the parties agreed that it should contain, it will be reformed whether the reason why it fails to express the agreement is due to a mistake of fact or law"); *Janssen Bros., Inc. v. Northbrook Trust and Sav. Bank*, 299 N.E.2d 431, 434 (Ill. App. 2nd Dist. 1973). Reformation is appropriate only when "clear and convincing evidence compels the conclusion that the instrument as it stands does not reflect the true intention of the

parties, and that there has been either a mutual mistake or a mistake by one party and a fraud by the other." *Magnus v. Barrett*, 557 N.E.2d 252, 255 (Ill. App. 1st Dist. 1990). Kempner has not cited any case authority to support the view that a material breach can lead to the reformation of a contract, and we have found none. Here, there is no doubt that the non-compete provisions were included in the contract intentionally, not mistakenly, and that the parties signed the 1999 Agreement fully aware of those provisions. Kempner has not cited any case authority to support the view that a material breach can lead to the reformation of a contract, and we have found none.

In closing argument, Kempner's counsel candidly admitted that the only authority Kempner has for this argument is found in the severability provision of the 1999 Agreement, which states that if any portion of the 1999 Agreement is held "invalid, contrary to, or in conflict with any applicable present or future law, regulation for public policy," that portion of the 1999 Agreement would be severed and "shall not impair the operation of, or have any other effect upon, such other portions of this Agreement as may otherwise remain enforceable" (PX 1, ¶ 21). We do not think that the insertion of this common provision created for Kempner a legal right that is not generally recognized in Illinois common law. What's more, the language of the severability provisions is ill-suited to the argument Kempner makes. In this alternative argument, Kempner is not claiming that the non-compete provisions are "invalid, contrary to, or in conflict with . . . law." Rather, this argument assumes that the restrictive covenant is valid, but that Cingular's alleged material breaches bar its enforcement. The severability clause does not fit that situation.

**b.**

Kempner also argues that Cingular cannot enforce the non-compete provisions because it has waived the contractual right to do so. We are not persuaded that Kempner has even a negligible chance of succeeding on this point.

To establish a waiver, Kempner must show that Cingular's actions in failing to enforce the non-compete provisions amount to a complete disregard for those provisions. *See, e.g., Surgidev Corp. v. Eye Technology, Inc.,* 648 F. Supp. 661, 698 (D. Minn. 1986) (court found defendant had waived its right to enforce non-compete provision after it "blithely ignored" provision with prior employees); *Midwest Television, Inc. v. Oloffson,* 699 N.E. 2d 230, 237 (Ill. App. 3d 1999) (3d Dist. 1998) (adopting *Surgidev* waiver standard and holding that a question of fact existed as to whether defendant employer waived the non-compete provision by selective enforcement). Kempner has not persuaded the Court that it likely will satisfy that high standard. The evidence shows that Cingular regularly insists on this provision in the contracts with agents who sell post-paid services. While there is evidence that Cingular did not sue certain agents who breached those provisions, this evidence does not satisfy, in this Court's view, the "complete disregard" standard adopted in *Midwest.* Because there is no other authority or evidence to support the waiver argument, the Court finds that Cingular did not waive its legal right to enforce the non-compete provision against Kempner.

**c.**

Finally, we note that one who invokes the equity jurisdiction of the Court, as has Kempner, must come to the Court with clean hands. *Yugoslav-American Cultural Ctr., Inc. v. Parkway Bank & Trust Co.*, 763 N.E.2d 360, 368 (Ill. App. 3rd Dist. 2001) (GREIMAN, dissenting on other grounds). Aspects of Kempner's conduct here give the Court concern about whether Kempner has done so. Rather than utilize the provision that would allow Kempner to terminate the 1999 Agreement upon uncured material breaches by Cingular, Kempner took matters into its own hands. Kempner signed contracts with four of Cingular's competitors in May 2002, and began offering their competitive services in May 2002, without ever telling Cingular. Kempner filed a state court complaint against Cingular in May 2002, without serving the complaint or taking steps to bring it to Cingular's attention until late July 2002 – after Cingular learned of Kempner's competitive activity and terminated the 1999 Agreement. As the Court has found above, this conduct could be interpreted as Kempner concealing information to buy itself time to establish relationships with Cingular's competitors, and to continue selling Cingular's products as long as possible, before litigation brought matters to a head. And, Kempner's own evidence shows that during the period from May through July 2002, Kempner was able to continue selling a substantial number of Cingular services at the same time he built up his sales of competitive services (PX 48). This is further reason that we find that Kempner has failed to show a better than negligible chance of success on his theory that the non-compete provision, even if valid, is not enforceable.

**B.**

Turning to Kempner's claim for commissions and other payments, neither side has presented a particularly strong case. Kempner has offered exhibits derived from its business records claiming $67,952.21 in commissions and other payments not made (PXs 34, 41, 43). For its part, Cingular has offered an exhibit, derived from its records, showing that Kempner owes more than $126,242.00 in unpaid debt to Cingular (DX 20). Neither side has offered much in the way of evidence to show how the calculations set forth in their summary exhibits were derived, or the underlying basis for them. In these circumstances, we assume that each side has a better than negligible chance in prevailing on its commission claims.

Kempner also claims unpaid residual commissions for subscribers activated by Kempner, but who were removed from his residual commission calculation, due to: (a) improper solicitation by Cingular prior to termination in July 2002; and (b) termination of the 1999 Agreement by Cingular, which Kempner says was improper. As to the first part of this theory, Kempner has offered no evidence to put a number on their alleged damage amount. As to the second part of that claim, if Kempner could prove a wrongful termination, then Kempner would have a claim to residual commissions, at most, for the period from July 23, 2002 through December 31, 2002 (when the contract would have expired anyway), which Kempner says amounts to $80,000.00 (01/28/03 Tr. 313 (Kempner)). Mr. Kempner offered no explanation for how he derived that number. And, even had he done so, the Court's foregoing analysis shows that Kempner does not have a likelihood of success in proving the complete unenforceability of the non-compete provisions. Beginning in May 2002, Kempner clearly engaged in acts that violated the exclusivity provisions of the 1999 Agreement: he entered into contracts with Cingular's competitors, and he began selling competitive

services to Cingular Subscribers. Under the 1999 Agreement, that gave Cingular cause to terminate Kempner's contract. In these circumstances, we do not believe Kempner can show a better than negligible likelihood that it would prevail on the claim that Kempner was improperly terminated in July 2002, and thus is entitled to continue to receive residual commissions through December 31, 2002.

One other commission issue remains. After termination of the 1999 Agreement on July 23, 2002, Kempner continued selling Cingular products for approximately a month or so. During that time, Kempner sold Cingular services and products to approximately 100 subscribers.[15] According to Mr. Kempner, he should have received $15,000 to $20,000 in commissions (01/28/03 Tr. 121-22 (Kempner)). But again, Kempner offers no explanation of how this figure was derived. Moreover, no one has addressed the legal question of whether Kempner is entitled to commission for post-termination sales (perhaps under a theory of quantum meruit), or whether Kempner is entitled to no commission because the sales were made in the face of a termination letter and thus, at best, Kempner acted as a volunteer. Because Kempner is the one seeking preliminary injunctive relief on that claim, this failure prevents Kempner from proving a better than negligible likelihood of success on this portion of the commission claim.

**IV.**

We consider now the question of irreparable harm. The Court finds that Kempner has shown it would suffer irreparable harm if those portions of the restrictive covenant which Kempner has a

---

[15]We derive that number from PX 48. That exhibit shows that Kempner made 60 sales of Cingular products in August 2002. It shows that he made 157 during the entire month of July 2002; if we assume an equal distribution throughout the month, that would leave approximately 40 sales during the period in July after the termination letter was sent.

likelihood of showing are unreasonable were preliminarily enforced. Kempner has shown that its level of sales is far diminished from what it was when Kempner was a Cingular sales and service center (PX 48). Kempner also has shown that the cellular services that Cingular seeks to entirely bar Kempner from marketing constitute seventy percent of Kempner's business activity. Enforcement of the portions of the non-compete provisions that would bar Kempner from selling of competing cellular services, even to persons that Kempner did not enroll as Cingular Subscribers and who were not active Cingular Subscribers as of July 23, 2002, might put Kempner out of business. In these circumstances, the availability of money damages if Kempner ultimately prevailed at trial would be "seriously deficient as a remedy for the harm suffered," and thus does not undermine Kempner's showing of irreparable harm. *Roland Machinery Co. v. Dresser Indus.*, 749 F.2d 380, 386 (7th Cir. 1984) (a damages remedy is inadequate where "[t]he damage award . . . come[s] too late to save the plaintiff's business. He may go broke while waiting, or may have to shut down his business but without declaring bankruptcy.").

However, the Court does not believe that Kempner would suffer irreparable harm if the remaining portions of the non-compete provisions were to be enforced pending trial. The evidence is that Kempner is already abiding by several of those provisions: Kempner is no longer advertising any affiliation with Cingular, and there is no evidence that Kempner is continuing to use Cingular information in doing business (*see* PX 1, ¶ 20(4)). In addition, there is no evidence that Kempner has switched Cingular customers that Kempner originally activated out of Cingular services and into the services of a competitor (*Id.*, ¶ 20(1), (2)). The one thing that Kempner has continued to do pending the outcome of this preliminary injunction proceeding that would be prohibited by the non-compete provision (as the Court believes it would likely be modified after a trial) is to sell additional

services to active Cingular Subscribers that Kempner enrolled. However, for several reasons, we do not believe that Kempner would suffer irreparable harm if enjoined preliminarily from continuing that activity.

*First*, during the period from May through August 2002, Kempner sold competitive services to 54 active Cingular Subscribers (Stipulation Regarding DX 49 and DX 60). During that same period, Kempner sold the services of Cingular's competitors to 309 other persons (PX 48). Thus, Kempner's sales during that period to Cingular Subscribers accounted for only about fifteen percent (54 out of 363) of Kempner's sales of services that compete with those offered by Cingular. We do not think Kempner would be irreparably harmed from refraining from that limited scope of activity.

*Second*, enforcing this restriction would still allow Kempner access to a broad Chicago area marketplace, in which the number of potential customers for cellular services dwarfs the number of Subscribers to whom Kempner would be prohibited from marketing competitive services for a one-year period. Thus, we see no likelihood that enforcing this restriction would force Kempner out of business altogether.

Shifting to the Cingular side of the question, the Court finds that Cingular has made a showing that it would suffer irreparable harm if those portions of the non-compete provisions that the Court finds likely will be enforceable are not preliminarily enforced pending trial. Preliminarily enjoining Kempner from using the Cingular name or affiliation pending trial is necessary to prevent Cingular from losing control over its name and goodwill. *See Meridian Mut. Ins. Co. v. Meridian Ins. Group, Inc.*, 128 F.3d 1111, 1114, 1117 (7th Cir. 1997). Moreover, the Court agrees that the harm that would result from Kempner selling to Cingular Subscribers that Kempner originally activated might prove irreparable, for several reasons.

*First*, once Subscribers enter into a relationship with a competitive carrier, it may be difficult – or impossible – for Cingular to undo that relationship and to regain the subscriber, at least for a significant period of time (especially if Cingular's experience that the average subscriber remains with Cingular for four years is typical of other carriers). *Second*, even if this loss could be measured in damages (*see*, 01/29/03 Tr. 541-542, (Whiddon)), Kempner has claimed that its business is operating on the razor's edge of survival. Just as damages are not an adequate remedy for a plaintiff who may go bankrupt while waiting for the trial on the merits, so too are damages an inadequate remedy for Cingular if Kempner "may become insolvent before final judgment can be entered and collected." *Roland Machinery Co.*, 749 F.2d at 386.

However, Cingular has not established that irreparable harm would occur if the provisions that the Court finds are likely to be held unreasonable are not preliminarily enforced pending trial. Cingular says that it would suffer irreparable harm in this case absent preliminary injunctive relief by virtue of "Kempner's diversion of Cingular's customers to competitors, use of Cingular's confidential information for the benefit of Kempner and Cingular's competitors, and improper use of Cingular's valuable goodwill and marks" (Def.'s Amended Proposed Findings of Fact and Conclusions of Law, ¶ 97). The portions of the non-compete clause that the Court finds likely to be enforceable adequately protect those interests. We see no irreparable harm to come from Kempner offering competitive services (which are offered anyway by a myriad of other retail outlets used by Cingular's competitors) to persons who were not: (a) active Subscribers to Cingular services as of July 23, 2000, (b) who were enrolled in Cingular services by Kempner. This is particularly so given that Kempner has offered competing services ever since the termination letter was sent in July 2002, now some seven months ago. Yet, Cingular has pointed no evidence that Kempner has used

confidential information provided by Cingular improperly or that Cingular otherwise has suffered in the marketplace from Kempner's activities.

Finally, turning to the question of Kempner's alleged irreparable harm on the commission claim, we note that Kempner has not made a strong showing that it is entitled to more than the $50,000 that the Court ordered to be paid in August 2002 on a temporary basis. The question is whether, in light of the rather weak showing that each side has made on the commission claims, Kempner has established sufficient irreparable harm to warrant preliminary injunctive relief in the form of keeping that $50,000 pending the outcome of the litigation. Although the question is a close one, we believe that Kempner has made that showing. It certainly would have been preferable to receive evidence that more concretely showed Kempner's revenues, expenses and debt, so that the Court could assess more thoroughly the impact the loss of this $50,000 would have on Kempner. Nonetheless, the evidence shows that cellular sales constitute seventy percent of Kempner's sales, and that after August 2002, when Kempner no longer was offering cellular services, its sales of cellular services dropped by fifty percent or more from what they were when Kempner offered Cingular's services (PX 48). By any measure, that is a substantial drop, and Cingular has offered no evidence to dispute plaintiff's testimony (01/28/03 Tr. 124 (Kempner)) that Kempner is in a precarious economic situation.

## V.

Based on the foregoing analysis, we find that Kempner has established likelihood of success and irreparable harm from enforcement of the non-compete provisions insofar as they would bar Kempner from (1) offering the cellular services of Cingular's competitors to persons who were not active Cingular Subscribers as of the termination on July 23, 2002 and who were not originally

enrolled by Kempner, and (2) from using its own name, mark and goodwill in doing so. Conversely, we find that Cingular has established likelihood of success and irreparable harm from the failure to enforce those portions of the non-competition provisions that prohibit Kempner from using Cingular's name, goodwill and confidential information, and that bar Kempner from marketing competitor's services to persons who were active Cingular Subscribers as of July 23, 2002 and who originally were enrolled by Kempner. The Court further finds that Kempner has established likelihood of success and irreparable harm on the question of return of the $50,000 in commission that the Court ordered paid in August 2002. Accordingly, on these points we turn to the final elements of the preliminary injunction analysis: balance of the hardships and public interest.

### A.

The Court finds that, with respect to those portions of the non-competition provisions that the Court holds are likely to be found reasonable at trial, the balance of hardships favors Cingular. If these provisions are not enforced, Cingular runs the risk of losing the ability to control its name, marks, goodwill, and Subscriber information, as well as Subscriber relationships that may be difficult to regain in the future. To the extent that this harm could be quantified and reduced to a damage award were Cingular to prevail at trial, that remedy is uncertain given Kempner's evidence concerning its precarious economic situation. The harm Cingular would suffer outweighs the harm that Kempner would experience from the enforcement of these provisions. According to Kempner's testimony, it already is complying with most of the provisions that the Court finds are likely to be found reasonable at trial. Enforcing the limitation prohibiting Kempner from soliciting Cingular Subscribers who Kempner originally activated and who remained active as of July 23, 2002 is not a substantial burden on Kempner: as described above, from the evidence offered so far it appears

that only a small percentage of Kempner's sales from May through August 2002 fell within that category. Enforcement of this restriction would only remove from Kempner's potential customer pool for a period of one year some 7,000 persons, leaving hundreds of thousands of potential customers in the Chicago metropolitan area to whom Kempner freely may market. If, after a full trial on the merits, that restriction were deemed unenforceable, Kempner could seek monetary damages from Cingular – and there is no argument that Cingular would be unable to pay them if proven.

As to those portions of the non-compete provisions that the Court believes are likely to be found unreasonable at trial, the balance of the hardships favors Kempner. Enforcement of those provisions would eliminate seventy percent of Kempner's business for a one-year period, and would run the risk of putting Kempner out of business. By contrast, failure to enforce the restrictions would not cause harm to Cingular: Kempner still would be prohibited from using Cingular's name, goodwill or confidential information, and from soliciting persons originally enrolled by Kempner who were still active Cingular Subscribers as of July 23, 2002. What Cingular would be prevented from doing is keeping Kempner from using Kempner's own name and goodwill, and from selling competitive products to persons who were not active Cingular Subscribers as of the time of termination. To the extent that those actions would harm any protectable interest of Cingular, that harm is far less than the harm Kempner would experience were those activities prohibited.

Finally, with respect to the $50,000 in commissions, the balance of harms favors Kempner. If, after trial, it turns out that the money should go back to Cingular, Cingular will be able to collect because there is a bond guaranteeing a source of payment for that sum. On the other hand, if Kempner is required to pay the money now and it turns out after trial that Kempner was entitled to keep those funds, that victory would be pyhrric if, in the meantime, Kempner has become insolvent.

**B.**

The Court finds that the public interest factor does not materially add to or alter the preceding analysis. To be sure, there is a strong public interest to be served by enforcing contracts. *See, e.g., Cook, Inc. v. Boston Scientific Corp.*, No. 1 C 9479, 2002 WL 31236289, at * 6 (N.D. Ill. Oct. 1, 2002). On the other hand, there is a strong interest in competition, and Illinois public policy reflects that interest by looking at restrictive covenants with a critical eye. *See Boyar-Schultz Corp. Tomasek*, 418 N.E.2d 911, 913 (Ill. App. Ct. 1st Dist. 1981). The Court's enforcement, pending trial, of the non-compete provisions, as modified, serves both of these interests. Moreover, given the large number of retail outlets for cellular services, the general public is unlikely to be affected one way or the other by the enforcement, *vel non*, of the non-compete provisions at issue here.

## CONCLUSION

For the foregoing reasons, the Court rules as follows on the pending preliminary injunction motions:

1.      The Court GRANTS in part and DENIES in part Kempner's and Cingular's competing preliminary injunction motions directed to the non-compete provisions. The Court GRANTS Cingular's motion to the extent that the Court hereby preliminarily enjoins Kempner from engaging in any of the following activities in Chicago and the surrounding six-county Chicago metropolitan area for a period of one year from the date of this opinion (unless terminated earlier after trial, or as a result of the pending mediation proceedings between the parties):

a.      Kempner may not directly or indirectly, induce, influence or suggest to any Subscriber of Cingular's cellular services, who originally was activated in Cingular's service by Kempner and remained an active Subscriber as of July 23, 2002, to purchase CRS or any other

CMRS or other competing service from another provider or reseller of such services in the six-county Chicago metropolitan area; and

b.     Kempner may not directly or indirectly use or allow any other person, firm or other entity to use the name, trade name, goodwill or any other assets or property of Cingular in any manner in connection of the sale of CRS, CMRS, or other cellular services on behalf of a competing reseller or provider in the six-county Chicago metropolitan area.[16]

In all other respects, the Court GRANTS Kempner's motion to preliminarily enjoin enforcement of the restrictive covenant, and DENIES Cingular's motion to preliminarily enjoin Kempner from acting in a manner contrary to those provisions.

Under Fed.R.Civ.R. 65, a party who obtains a preliminary injunction must provide security to support it. *Gateway Eastern Ry. Co. v. Terminal RR Assoc. of St. Louis*, 35 F.3d 1134, 1141 (7th Cir. 1994). When setting an injunction bond, the trial court "should err on the high side." *Mead Johnson & Co. v. Abbot Laboratories*, 201 F.3d 883, 888 (7th Cir. 2000). As a condition of the preliminary injunction granted to each side, the Court orders each side to post bond in the amount of $150,000.00, which in closing argument each side suggested would be a reasonable amount to support a preliminary injunction were one to issue.

2.     Kempner's motion for preliminary injunction with respect to payment of commissions and other amounts is GRANTED in part, limited solely to permitting Kempner to retain the $50,000 payment that the Court ordered be made in August 2002. In all other respects, Kempner's motion for preliminary injunction requiring payment of additional commissions is DENIED. The $50,000

---

[16]Although Kempner would have us start counting the one-year period, for the non-compete provisions, from the date of his termination in July 2002, we refuse that course because Kempner treated the one-year limitation as unenforceable and continued to sell to Cingular Subscribers that Kempner activated after the termination.

bond that the Court required as a condition of the payment by Cingular to Kempner in August 2002 shall remain in effect and stand as the bond to support this aspect of the preliminary injunction. The $150,000 injunctive bond that the Court requires Kempner to post in connection with the injunction concerning the non-compete provisions is in addition to the previously-posted $50,000 bond.

**ENTER:**

**SIDNEY I. SCHENKIER**
**United States Magistrate Judge**

**Dated: March 7, 2003**