## United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Sidney I. Schenkier | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 5403 | **DATE** | 11/6/2003 |
| **CASE TITLE** | Kempner Mobile Electronics, Inc. vs. Southwestern Bell Mobile Syst. | | |

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**MOTION:**

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference [held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
     ☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]  ENTER MEMORANDUM OPINION AND ORDER (attached). Defendant's motion for summary judgment is GRANTED as to the contract claims in Counts III, IV, the statutory fraud claim in Count VIII, and the Franchise Act claim in Count IX; the motion is DENIED as to the common law fraud claim in Count VII.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | Document Number |
|---|---|---|---|---|
| | No notices required. | | number of notices | |
| | Notices mailed by judge's staff. | | NOV 0 7 2003 | |
| | Notified counsel by telephone. | | date docketed | |
| ✓ | Docketing to mail notices. | | | |
| | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | date mailed notice | |
| mm7 | courtroom deputy's initials | | Date/time received in central Clerk's Office | mailing deputy initials |

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| KEMPNER MOBILE ELECTRONICS, INC.,<br>an Illinois corporation,<br><br>Plaintiff,<br><br>vs.<br><br>SOUTHWESTERN BELL MOBILE<br>SYSTEMS, LLC, d/b/a CINGULAR<br>WIRELESS f/k/a SOUTHWESTERN BELL<br>MOBILE SYSTEMS, INC. d/b/a CELLULAR<br>ONE-CHICAGO,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**DOCKETED**

NOV 0 7 2003

Case No. 02 C 5403

Magistrate Judge Schenkier

## MEMORANDUM OPINION AND ORDER[1]

Defendant, Southwestern Bell Mobile Systems, LLC d/b/a Cingular Wireless ("Cingular"), seeks summary judgment on Counts III, IV, VII, VIII and IX of the First Amended Verified Complaint filed by Plaintiff, Kempner Mobile Electronics, Inc. ("Kempner"). For the reasons given below, the Court grants Cingular's motion for summary judgment on Counts III, IV, VIII, and IX, and denies summary judgment on Count VII.

## I.

The legal standards governing a motion for summary judgment are well-established. Summary judgment is proper if the record shows that there is no genuine issue as to any material fact, and that the moving parties are entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). Where the issues to be decided are purely legal, and the parties have filed cross-motions for summary

---

[1]By consent of the parties and pursuant to 28 U.S.C. § 636(c), the case has been assigned to this Court for all proceedings, including the entry of final judgment (doc. #s 5-7).

100

judgment on that issue, the Court must resolve the legal issue and enter judgment "as a matter of law" for one side or the other.

With regard to factual issues, a genuine issue for trial exists only when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Id.* at 249-50; *see also Flip Side Productions, Inc. v. Jam Productions, Ltd.*, 843 F.2d 1024, 1032 (7th Cir.), *cert. denied*, 488 U.S. 909 (1988). In deciding a motion for summary judgment, the Court must view all evidence in the light most favorable to the nonmoving party, *Valley Liquors, Inc. v. Renfield Importers, Ltd.*, 822 F.2d 656, 659 (7th Cir.), *cert. denied*, 484 U.S. 977 (1987), and must draw all reasonable inferences in the nonmovant's favor. *Santiago v. Lane*, 894 F.2d 218, 221 (7th Cir. 1990).

When a material fact or a set of facts yields competing, but reasonable, inferences, then there is a genuine issue that precludes summary judgment. The non-moving party's burden is to identify facts that are both material and genuinely disputed. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986) To be material, a fact must be outcome determinative under the substantive law governing the motion. *Insolia v. Philip Morris Inc.,* 216 F.3d 596, 598-99 (7th Cir. 2000). A "genuine issue" exists when the party opposing the motion for summary judgment serves and files, pursuant to local Rule 56.1, a concise statement outlining the material facts that require denial of summary judgment, supported by citations to the evidentiary materials that support those denials (*e.g.,* affidavits, depositions, answers to interrogatories, admissions etc.). Fed. R.Civ.P. 56(c). Although the party seeking summary judgment bears the initial burden of proving that there is no genuine issue of material fact, *Celotex,* 477 U.S. at 323, the non-moving party cannot rely upon the pleadings alone,

but must use the evidentiary tools outlined above to identify the material facts that show there is a genuine issue for trial. *Id.* at 324; *Insolia,* 216 F.3d at 598.

## II.

Applying these principles, the Court finds that Cingular is entitled to summary judgment on Counts III, IV, VIII, and IX, but not on Count VII, the common law fraud claim. We will first address Counts III and IV, which allege breach of contract claims involving a three-mile exclusive territory allegation, and then move to Count IX, a claim under the Illinois Franchise Act. Finally, we address the common law and statutory fraud claims in Counts VII and VIII.

### A.

In Count III, Kempner alleges that Cingular breached the parties' 1999 Agreement by opening a Cingular-owned kiosk at the Lincolnwood Town Center in September 1998, shortly after Kempner closed its sales kiosk there in April 1998[2] (Def.'s Rule 56.1 St. Exs., Am. Compl. ¶¶ 34-44, Tab 3).[3] In Count IV, Kempner alleges that Cingular also breached the Agreement when it opened a Cingular-owned kiosk at 4730 West Dempster Street in Skokie (Am. Compl., ¶¶ 46-47, Tab 3). Kempner alleges that the opening of these Cingular kiosks violated the 1999 Agreement because:

- Cingular is obligated to establish Administrative Procedures and Guidelines for the sale of Cingular products and services (*Id.,* ¶ 42).

---

[2] Mr. Kempner opened the Lincolnwood kiosk in April 1997, but he could not obtain authorization from Cingular to sell Cingular cellular telephone products and services there (Def.'s 56.1 St. ¶¶ 35-39).

[3] Hereinafter, the Court will refer to the defendant's statement of undisputed facts as "Def.'s 56.1 St. ¶ ___" and to the evidentiary exhibits submitted by defendant in support of those facts as "Tab" and the number designated to that Tab (*e.g.,* "Tab 1"). The plaintiff's response to the defendant's statement of facts will be designated "Pl.'s 56.1 Resp. ¶ ___." And, reference to the plaintiff's supporting exhibits is designated "Tab ___" with the letter designated to that Tab (*e.g.,* "Tab A").

The plaintiff also has submitted "additional facts" pursuant to Local Rule 56.1(b)(3). This fact statement is referred to as "Pl.'s Add'l 56.1 St. ¶ ___." The defendant's response to this statement is not used. However, in certain places we refer to defendant's "supplemental facts" submission as: "Def.'s Supp. 56.1 St. ¶ ___"

- One Administrative Procedure "established by Cingular" is the three-mile exclusive territory restriction (*i.e.,* "no entity may open a sales location for the sale of Cingular cellular telephone services and equipment with a three-mile radius of any other sales location for the sale of Cingular cellular telephone services and equipment") (*Id.*).

- Kempner had an established sales location at 4722 W. Touhy Avenue in Lincolnwood, within three miles of the Cingular owned kiosks (*Id.,* ¶ 43).

- The Agreement contains a provision in Section 10 ("Rules and Procedures") which incorporates by reference the terms of the Administrative Procedure Manual ("APM") (Tab 4, Agmt. ¶ 10).

The undisputed facts material to Counts III and IV are as follows. In 1997, Kempner made a request to open a sales location in the Lincolnwood Town Center (Am. Compl., ¶ 35, Tab 3). That location request predates the 1999 Agreement (*Id.,* ¶ 36). By 1998, Cingular was operating a store in the Lincolnwood Town Center (*Id.,* ¶ 39), and Kempner was not. Kempner did not receive and does not complain about any subsequent denials by Cingular of requests by Kempner to open new, additional locations, nor does he complain about the denial of any relocation requests during the term of the contract. And, he cannot: Cingular approved Kempner's only request during the contractual period, which was for the relocation of the Wilmette store – a store that, once moved, existed within three miles of an existing Cingular store (*Id.,* ¶ 37; Tab G, Ex. 2; Def.'s Supp. 56.1 St. ¶ 120).[4] Kempner's other claim does not concern a request that Kempner made, but, instead, concerns an action taken by Cingular in September 2000, when it opened a store in Skokie within three miles of

---

[4]Kempner states that he "refrained from submitting additional locations because Cingular represented that the three-mile rule precluded consideration of these locations," and he cites to his own testimony (Pl.'s 56.1 Resp. ¶ 37; Tab 6, Kempner Hrg. Test. 302:13-17). But, this statement fails to create a genuine fact dispute in the face of undisputed evidence that, in April 2000, Kempner did, in fact, open a store in Wilmette within three miles of another Cingular store, based on Cingular's approval of Kempner's request to do so, and testimony that Kempner "did not care" – or at least did not concern itself with – whether the request for the Wilmette store was within three miles of another Cingular store (Defs.' Supp. 56.1 St., ¶ 120 (citing Tab 6, Kempner Hrg. Test. at 293:24-297:10)).

a Kempner location (Am. Compl., ¶ 40). Both the Cingular Lincolnwood and Skokie stores were within three miles of Kempner's location.

The 1999 Agreement contains a term that establishes a one-year contractual limitation on any claims that arise under the agreement, which states:

> [A]ny suits or action . . . to enforce or declare any of the terms of this Agreement, . . . or to recover any damages sustained as a result of a default in the performance of any obligations under this agreement, . . . must be brought, if at all, within one (1) year after the underlying cause of action accrues.

(Agmt. ¶ 24, Tab 4). It is undisputed that Kempner did not file any suit claiming that Cingular violated the 1999 Agreement by opening its Lincolnwood and Skokie stores until it filed this suit in state court on May 6, 2002 – which then was removed to this Court on July 18, 2002.

The 1999 Agreement also contains a notice and cure requirement that provides:

> if AGENT is in substantial compliance with this Agreement and [Cingular] materially breaches this Agreement and fails to cure such breach within thirty (3) days after written notice thereof is delivered to [CINGULAR], AGENT may terminate this Agreement effective thirty (30) days after delivery to [CINGULAR] of written notice thereof . . . .

(Defs.' 56.1 St. ¶ 22; Agmt. ¶ 18a, Tab 4).

The 1999 Agreement further contains a merger and integration clause which states in relevant part: "This Agreement supersedes any prior agreements or understandings between the parties relating to the subject matter thereof"(Defs.' 56.1 St. ¶ 21; Agmt. ¶ 18a, Tab 4). This provision means, as a matter of law, that the Court may not consider any evidence outside the contract to interpret its terms unless one or more of those terms is ambiguous on its face. *Air Safety, Inc. v. Teachers Realty Corp.*, 706 N.E.2d 882, 885 (Ill. 1999) ("where parties formally include an

integration clause in their contract, they are explicitly manifesting their intention to protect themselves against misrepresentations which might arise from extrinsic evidence").

There is no dispute that the 1999 Agreement contains no express provision barring Cingular from placing a location within three miles of Kempner's locations. The 1999 Agreement does contain a term which states, in relevant part: ". . . Agent agrees to comply, if applicable, with . . . rules and procedures relating to such matters reasonably prescribed from time to time by Cellular One through the Administrative Procedures Manual, which rules and procedures shall constitute provisions hereof as if fully set forth herein . . . ." (Agmt. ¶ 10, Tab 4). Kempner never received any document called an Administrative Procedure Manual ("APM") (*Id.*, ¶ 28). And, no document by this name has been produced in this case.

Kempner's claim in Counts III and IV is based, in part, on a 1994 memorandum ("Vital memo") that pre-dates the parties' 1999 Agreement (Defs.' 56.1 St. ¶ 26), which Kempner asserts is an example of an administrative procedure (Pl.'s 56.1 Resp. ¶ 27).[5] The Vital memo describes a three-mile radius policy that applied to requests for new and/or additional locations, as well as relocations of existing stores, but it did not prescribe a "rule," let alone an "administrative procedure." Instead, the Vital memo merely states:

> [C]ingular may approve additional new distribution points, if there is no other Authorized Sales and Service Center within a radius of three miles. We feel very strongly about the need for strict adherence to this policy and will take appropriate steps to ensure compliance, up to and including termination of the dealer agreement, if necessary. The geographic guidelines to be used for implementing the above are

---

[5]We note that Kempner also relies on alleged representations from a Cingular representative, Bryan Klamer, concerning the Vital memo, representations which also predate the 1999 Agreement (Def.'s' 56.1 St. ¶ 31; Def.'s. Supp. Facts ¶ 100). Although these alleged representations by Mr. Kempner are disputed, the dispute is not material because the alleged representations are not part of the 1999 Agreement, given the merger and integration clause (Agmt. ¶ 28, Tab 4). Although the Vital memorandum also predates the 1999 Agreement, there are other issues regarding that memorandum that we address below.

set out in the existing attachment A. While exceptions to this rule may be considered when the circumstances are particularly compelling, exceptions are not encouraged.

(Vital Memo, Tab 7).

Attachment A to the Vital memo states:

Distribution Certification Policy

1.   Dealers may expand through the purchase of another Cellular One distribution point. However, before negotiations are finalized by the seller and buyer, these purchases must have prior written approval by the Vice President – Sales, Cellular One Chicago.

2.   Cellular One may approve additional new distribution points, if there is no other Authorized Sales and Service Center within a radius of three miles. These applications must be submitted through your Dealer Account Representative and be approved in writing by the Vice President – Sales, Cellular One Chicago.

3.   An existing authorized location may be moved within one mile of its existing location. These relocations must be submitted through your Dealer Account Representative and must be approved in writing by the Vice President – Sales, Cellular One Chicago.

(Tab G, Ex. 1).

The evidence establishes that, to the extent a three-mile policy existed in 1994, that policy was not a hard and fast rule: (1) it was changed in 1995 (Prelim. Inj. Order at 15); (2) 16 other stores were allowed to open within three miles of a preexisting Cingular location (Prelim. Inj. Order at 16); (3) Kempner's own Wilmette store was relocated within three miles of a preexisting Cingular location (Def.'s Supp. 56.1 St. ¶ 120); (4) Mr. Kempner testified that, when he asked for approval to relocate to Wilmette, he did not even check whether the location was within three miles of another (Def.'s 56.1 Supp. Facts ¶ 120; Tab 6, Kempner Hrg. Test. at 293:24-297:10); and (5) other witnesses who testified on this subject said that there was no "three-mile" rule; rather, the location

of nearby Cingular stores was one factor among many in determining whether to approve a location for another store (Defs.' 56.1 St. ¶¶ 41-43).[6]

In fact, Kempner's own witness, Cindy Long Gillman,[7] a Cingular Account Manager from November 1997 through April 2000, stated in her declaration that she understood the "three mile rule" as "a criteria that Cingular used in evaluating and approving new points of distribution" (Tab G, ¶ 6). She also stated that, although Cingular "required strict adherence to this policy," there were circumstances that justified "exceptions" (*Id.,* ¶ 7). Although Ms. Gillman stated that while she was an Account Manager, who was responsible for submitting requests for new locations within three miles, "only one exception to the three mile rule was approved"(*Id.,* ¶ 8), she also acknowledged that the form attached to her declaration, a request for approval by Kempner to the Wilmette location, was the type of form she used for approval within a three mile radius. That form indicates that Mr. Kempner's relocation request was approved by Mr. James M. Moen on April 20, 2000 -- another exception to the policy described in the Vital memo.

---

[6] Although Kempner attempts to dispute this testimony, the asserted basis for the dispute does not rise to the level of "genuineness" necessary to defeat summary judgment. For example, in paragraph 41, Kempner acknowledges that there were exceptions to the "three mile rule," but he argues that they were not "encouraged." Kempner's admission underscores the point that: there was no hard and fast rule. In paragraph 42, Kempner argues that one witness, Mr. Sterna, had no basis for his opinion because he did not know "about any locations opened by anyone else." However, Mr. Sterna did have a basis to explain how Cingular treated him, and his testimony was that Cingular allowed another agent to open a store "a few blocks away" from one of Mr. Sterna's stores (Tab 12, 08/22/03, Sterna Dep. at 24:13-25:7). Finally, in paragraph 43, Kempner attempts to dispute the testimony of Mr. Jacobs, who said that "any location less than 2 miles from another was subject to further review," by stating that Mr. Jacobs also indicated that if a store opened within 2 miles of another "that was a big strike against you" (Tab 13, 8/20/03, Jacobs Dep. at 45:24-49:5). This testimony does not undermine, controvert or defeat summary judgment on the *three-mile* rule.

[7] The Court denies Cingular's motion to bar this testimony under Rule 37(c) (Def.'s Mem. at 3, n.4) as moot, in light of the ruling on 10/07/03 stating that, although Ms. Gillman can be called as a witness, Kempner would have to bear the costs of having to depose her belatedly (doc. # 69). We also deny Cingular's request for sanctions in connection with Ms. Gillman's testimony (Def.'s Reply at 5, n.2).

Finally, the 1999 Agreement, by its own terms, expressly authorizes Cingular to open its own stores anywhere within the geographic area in which Kempner operated (Agmt. ¶ 3, Tab 4). The Vital memo is not to the contrary: it did not impose any three-mile restrictions on Cingular's internally-operated stores, but merely referred to the locations of stores operated by dealers (Pl.'s 56.1 Resp. ¶¶ 30, 32).

## B.

These undisputed, material facts lead to the conclusion that summary judgment must be granted on Counts III and IV. There are three reasons for this conclusion.

## 1.

*First,* the one-year contractual limitations period eliminates Mr. Kempner's contract claims in Counts III and IV. Kempner's request for approval on the Lincolnwood location was made in 1997. That request pre-dates the 1999 Agreement and thus that request, and its denial, cannot breach any term of the 1999 Agreement. Moreover, the 1999 Agreement, by its terms, eliminates any prior claims or understandings the parties might have had prior to its execution (Agmt. ¶ 24, Tab 4). In addition, the one-year period eliminates any claim regarding the Skokie store opened by Cingular in September 2000, because Mr. Kempner did not file his original state court complaint until May 8, 2002. And, even if the policy in the Vital memo had been incorporated into the 1999 Agreement, that policy never purported to apply to internal Cingular outlets, as opposed to stores opened by outside dealers of Cingular.

We reject Kempner's arguments that the one-year contractual limitations period contained in the 1999 Agreement does not and cannot apply to bar these claims. Kempner argues that the contractual limitations period cannot be enforced because Cingular is "estopped . . . as a result of its

conduct" (Pl.'s Mem. at 7-8). Kempner's position is that the contractual limitations period is not enforceable, because the mediation provision in the contract requires completion of the mediation process before a lawsuit can be filed; thus, argues Kempner, the mediation provision is inconsistent with the one-year contractual limitations period, and it makes that limitations period "illusory"(Pl.'s Mem. at 8; Agmt. ¶ 35, Tab 4). Kempner's reading of the 1999 Agreement is incorrect. The mediation provision only requires the aggrieved party to "submit to a dispute resolution and mediation procedure" and "give detailed written notice of its specific complaint to the offending party prior to instituting litigation in any forum" (Defs.' Rule 56.1 St. ¶ 115). The mediation provision is not inconsistent with the limitations provision, because it does not preclude the aggrieved party from instituting an action once the mediation process has begun and notice has been given to the offending party. And, in any event, Kempner never resorted to the mediation procedure prior to filing this suit; thus, Kempner cannot claim its presence delayed the filing of this action.

Kempner also makes an estoppel argument which is based on the notion that Cingular breached a duty of good faith and fair dealing when it refused to grant Kempner's request to open the Lincolnwood store, but later decided to open its own store in Skokie, within three miles of Kempner's Wilmette location – a relocation that Cingular approved only months before it opened the Skokie store (Pl.'s Mem. at 7-8, citing Def.'s 56.1 St. ¶¶ 100-02). This duty cannot support the independent existence of a cause of action. *Beraha v. Baxter Health Care Corp.*, 956 F.2d 1436, 1443 (7th Cir. 1992). Nor can the duty be contorted into creating a contractual provision that is not in the 1999 Agreement. *Id.* ("the covenant guides the construction of explicit terms in the

agreement"). And, Kempner cannot explain its failure to timely sue about actions regarding the Lincolnwood location in 1997, based on actions by Cingular years later.[8]

2.

*Second,* in support of the claim that a three-mile rule was part of the 1999 Agreement (the basis for his argument that Cingular breached the Agreement) Kempner resorts to parol evidence (*e.g.,* the Vital memorandum; the alleged oral representation of Klamer; the Gillman declaration). Such evidence is not admissible unless a disputed term in the contract is ambiguous on its face. *Air Safety Inc. v. Teachers Realty Corp.,* 706 N.E.2d 882, 885 (Ill. 1999) (specifically declining to rule on provisional admission rule absent merger clause). The term at issue is the term "Administrative Procedure Manual." The Court does not find that term ambiguous.[9] Either there is an APM or there is not. It is undisputed that an APM does not exist or cannot be located; nor can an APM to the 1999 Agreement between the parties be identified. The failure of Kempner to prove that an APM exists or that a three-mile policy was incorporated into the 1999 Agreement has nothing to do with ambiguity; it has everything to do with proof. And, Mr. Kempner has failed to offer facts to prove that the parties agreed to include a the three-mile "rule" in the 1999 Agreement.

---

[8]Kempner also argues that Cingular is estopped from enforcing the limitations period because, when Kempner complained to Cingular about what Kempner perceived to be Cingular's breaches of the Agreement, Cingular set up a meeting in December 2001 to discuss purchasing Kempner's business (Pl.'s Mem. at 8-9). Kempner claims that this meeting proposal led him to believe the matter could be settled (*Id.*), and thus Cingular, according to Kempner, is now estopped to assert the contractual limitations period (*Id.* at 9). Although Kempner does not say it, the argument is really that Kempner did not file suit within the one-year limitations period on the three-mile policy claims because Kempner believed, based on the meeting scheduled, that the parties could settle the matter. The pendency of "settlement discussions," which may or may not bear fruit, does not estop a party from asserting a contractual limitations period.

[9]Mr. Kempner argues that the 1999 Agreement is ambiguous because it "is silent as to where Cingular may place additional points of distribution," and because "the contract provides only that it may do so in the same geographical areas (*i.e.,* the five Illinois counties listed on Exhibit A to the Agreement) served by Kempner" (Pl.'s Mem. at 6). The contract is not ambiguous simply because it is silent; if it is silent on the location points for new stores, then Cingular simply has discretion that Mr. Kempner did not negotiate in his favor in the 1999 Agreement.

11

However, even if Kempner's parol evidence were admissible and relevant, this evidence would still fail to defeat summary judgment. The Vital memo is labeled as a "Distribution Certification Procedure" that existed in October 1994, and it merely refers to a three-mile radius policy (that had exceptions) with respect to "additional new distribution points" (Tab G). The Vital memo is simply not evidence that a three-mile rule existed five years later, and was contained in an APM that was integrated and merged into the parties' 1999 Agreement. In other words, the evidentiary link between the Vital memorandum and the 1999 Agreement is too attenuated to provide a jury with a basis upon which to draw a reasonable inference that the three-mile policy was in the APM, referenced in the 1999 Agreement.

**3.**

*Third,* even if we consider the parol evidence offered on the three-mile policy, which we need not do since there is no ambiguity in the 1999 Agreement that requires admission of such evidence, the undisputed facts show that to the extent a three-mile policy existed, there were exceptions to it (Def.'s 56.1 St. ¶¶ 42-43). This testimony of non-party witnesses on this point is consistent with the testimony of Cingular executives, who testified on this subject and explained that distance between Cingular locations was not the only factor considered by Cingular in deciding to authorize a sales location (*Id.* ¶ 41). Moreover, the testimony of Ms. Gillman, Kempner's witness, does not undermine this testimony because she stated in her declaration that the "three-mile rule was a *criteria* that Cingular used in evaluating and approving new points of distribution" (during her tenure as an Account Manager thru April 2000), but that this rule had "exceptions" (Tab G, ¶¶ 6-8) (emphasis added). Kempner was not denied any location requests for new, additional locations during the term of the 1999 Agreement; and Kempner's April 2000 request for a relocation to Wilmette, a move that

placed his store within three miles of an existing Cingular location, was approved (Tab G, Ex. 2). Therefore, Kempner has no injury and thus no cause of action based upon a breach of any three-mile policy, even if it existed.

4.

To summarize, the evidence (read most favorably to Kempner) describes a policy that was subject to Cingular's discretion, was not applied absolutely, and was – in short – not even followed in the case of Kempner, the very company that now wishes to elevate this unwritten, discretionary "policy" to the level of a binding contract term. Moreover, the parol evidence essential to Kempner's argument is inadmissible, because the 1999 Agreement contains unambiguous terms that – under the "four-corners" rule of contract interpretation followed in Illinois – precludes parol evidence to interpret the parties' obligations. And, in any event, the claims are barred by the one-year contractual limitations period. We therefore grant Cingular summary judgment on Counts III and IV.

B.

In Count IX, Kempner claims that Cingular violated the Illinois Franchise Disclosure Act (the "Act"). Cingular moves for summary judgment on Count IX, claiming that Kempner fails to qualify as a franchisee under the Act. The undisputed material facts also require summary judgment on this claim.

To qualify for the Act's protections, a potential franchisee must satisfy a three-prong test. 815 ILCS 705/3(1) (2003). Cingular contends that the undisputed facts show Kempner cannot satisfy the Act's third requirement: "the person granted the right to engage in such business is required to pay, directly or indirectly, a franchise fee of $500 or more." 815 ILCS 705/3(1)(c). A franchise fee is

defined as the right to enter into a particular business or to sell goods under an agreement. 815 ILCS 705/3(14). "A payment alleged to be a franchise fee must fit precisely within the statutory definition." *Account Serv. Corp. v. DAKCS Software Services, Inc.*, 567 N.E. 2d 381, 399 (Ill. App. Ct. 1990).

The statute directs the Illinois Attorney General to promulgate additional standards under the Act. As to the franchise fee, the Illinois Administrative Code explains that franchise fees can be made to either the franchisor or an affiliate of the franchisor. 14 Ill. Adm. Code 200.105(a) (2003). But, payments made to a franchisor or an affiliate do not count as a franchise fee if the purchases are not required, or if the franchisee could purchase the items from another source. 14 Ill. Adm. Code 200.105(c).

Here, Kempner's claim that it was a franchise flies in the face of the provision in the 1999 Agreement expressly stating that the relationship between the parties was not a franchise (Tab 4, ¶ 3). Moreover, Kempner admits that it paid no direct or explicit franchise fee to Cingular (Pl.'s 56.1 Resp. ¶¶ 66-67, 70). Nonetheless, Kempner argues that two payments it made under the 1999 Agreement constitute indirect payment of the franchise fee.[10] *First*, Kempner made construction improvements to its store on Touhy Avenue. (Pl.'s 56.1 Resp., ¶ 69). *Second*, Kempner made payments to Cingular for inventory purchases of cellular phone equipment (Pl.'s 56.1 Resp., ¶ 71). The undisputed facts show that neither of the two payments qualifies as franchise fees under the Act.

---

[10] Cingular argued that insurance payments Kempner made to State Farm do not constitute a franchise fee (Def.'s Mem. at 15-16). Kempner did not address the insurance payments in its memorandum in opposition; we therefore deemed abandoned any claim by Kempner that insurance payments were franchise fee payments.

1.

The construction improvements to the Touhy Avenue store do not constitute an indirect franchise fee. An "alleged franchise fee must be an unrecoverable investment in the manufacturer's distributorship." *Cent. States Distrib., Inc. v. Minnesota Mining & Mfg. Co.*, No. 97 C 622, 1997 WL 370191 at *6 (N.D. Ill. June 27, 1997). Kempner maintains that it paid Cingular directly "through offsets from commissions to Kempner" for the construction improvements. (Pl.'s Mem. at 12). Not only does Kempner fail to offer evidence that the monetary value of these improvements was greater than $500, as requested by the Franchise Act, but Kempner also fails to dispute Cingular's contention that these improvements fall under the Act's necessary fixtures exception. 815 ILCS 705/3(14)(d). Finally, Kempner admits that these payments were in fact repayments of an interest-free loan that Cingular advanced to Kempner, and thus could not constitute an unrecoverable investment (Tab 6, Transcript of Preliminary Injunction Vol. 1A, 93:10 - 94:24, 227:19 - 228:1).

In addition, Kempner fails to offer any facts to show that Cingular required Kempner to "build out" the Touhy Avenue store, or that any sums paid to Cingular for the construction improvements could not have been paid to another source. Payments purporting to be franchise fees must go beyond the range of ordinary business expenses. *See TLMS Motor Corp. v. Toyota Motor Distrib.*, No. 95 C 180, 1998 WL 182475, *3 (N.D. Ill. April 15, 1998). Kempner concedes that the 1999 Agreement did not require Kempner to build out its store (Pl.'s 56.1 Resp., ¶ 72). Although Cingular required that agents adopt a particular "look," the undisputed facts show that Kempner paid third party vendors directly for the construction improvements made to the Touhy Avenue store. (Pl.'s 56.1 Resp., ¶ 79). And, Kempner does not allege that the third party vendors were affiliates of Cingular.

## 2.

The purchase of cellular phone equipment also does not satisfy the franchise fee requirement. Kempner correctly states that equipment purchases may constitute a franchise fee when the franchisee is required to maintain unreasonably large inventories. *TLMS Motor Corp.,* 1998 WL 182475 at *4 (citing *Wright-Moore Corp. v. Ricoh Corp.,* 908 F.2d 128 (7th Cir. 1990)). Even if Kempner could show that Cingular required it to maintain a large inventory, Kempner would also have to show that such a large inventory could not be resold within a reasonable time. 14 Ill. Adm. Code 200.105(c); *TLMS Motor Corp.,* 1998 WL 182475 at *4 (quoting *Marathon Petroleum Co. v. LoBosco,* 623 F.Supp. 129, 134 (N.D. Ill. 1985). Not a single fact in the record supports the claim that Kempner was required to maintain an unreasonably large inventory, or that Kempner could not sell its existing inventory within a reasonable time.

Moreover, Kempner maintains that there was "no market for it to purchase equipment other than through Cingular," thus resulting in a functional requirement to buy its inventory from Cingular (Pl.'s Mem. at 12). But, Kempner admits that it could purchase cellular phone equipment from other vendors (*Id.*; Pl.'s 56.1 Resp., ¶¶ 93, 98). Thus, Kempner's cellular phone equipment purchases fall squarely within the Administrative Code exception whereby items available for purchase from other sources cannot qualify as payment of the franchise fee. 14 Ill. Adm. Code 200.105(c).

Because payments satisfying the franchise fee requirement must fit precisely within the dictates of the Illinois Franchise Disclosure Act, both the construction improvements and the purchase of cellular phone equipment fail to satisfy the franchise fee requirement. Therefore, summary judgment is granted to Cingular on Count IX.

## III.

Genuine issues of material fact preclude summary judgment on Count VII, the common law consumer fraud claim, but not on Count VIII, the statutory fraud claims. We address each of those claims in turn.

### A.

In Count VII, Kempner alleges a claim of common law fraud (Tab 3, Am. Compl. ¶ 61-65). To survive summary judgment on this claim, Kempner must identify genuine issues of material fact that, if resolved in its favor, would establish that Cingular made: "(1) [a] false statement of material fact; (2) known or believed to be false by the party making it; (3) made to induce the other party to act; (4) action by the other party in [justifiable] reliance on the truth of the statement; and (5) damage to the other party resulting from such reliance." *HPI Health Care Services, Inc. v. Mt. Vernon Hosp. Inc.,* 545 N.E.2d 672, 681 (Ill. 1989). The Court finds that Kempner has established genuine disputes of material fact on all of the elements for common law fraud.

In its first amended complaint, Kempner alleges misrepresentation regarding: (1) access to the same level of pricing and equipment discounts as Cingular internal distribution channels; (2) promotional advertising terms (*i.e.,* that the "terms offered in the joint promotional advertising required by the Agreements would be available to customers who patronized Kempner"); and (3) review and revision of the store listings on the support number system (Tab 3, Am. Compl. ¶ 61). Mr. Kempner conceded in deposition testimony that there is no triable issue on the second alleged misrepresentation concerning joint promotional advertising, by acknowledging that the allegations in his first amended complaint must have been "a typo" (Tab 5, Kempner Dep. 689:17-21; 690:3-11; 691:13-20). Mr. Kempner's attempt to vary that testimony by his recently submitted declaration

17

(Tab A, Kempner Decl. ¶ 11) is futile. The Court will not allow eleventh-hour self-serving testimony by Mr. Kempner to contradict earlier testimony under oath to defeat summary judgment. *See Palmer v. Circuit Court of Cook County,* 905 F. Supp. 499, 504-05 (N.D. Ill. 1995) (citing *Koelsch v. Beltone Electronics Corp.,* 46 F.3d 705, 708 (7th Cir. 1995); *Kalis v. Colgate-Palmolive Co.,* 231 F.3d 1049, 1055 (7th Cir. 2000). The Court does not consider the advertisements to be such evidence (Tab 16, Advertisements).

Therefore, there are only two alleged misrepresentations that we address below. We will first address the alleged misrepresentations regarding pricing on equipment and services, and then move the support number system allegations.

### 1.

In Count VII, Kempner alleges that Cingular misrepresented that he would receive the same levels of equipment and service pricing available to its own internal channels. Kempner's equipment and service pricing allegations are supported by evidence that is genuinely disputed by the parties. Kempner claims that he detrimentally relied on the alleged misrepresentation from Cingular that Kempner would receive the same equipment and service pricing as enjoyed by Cingular's internal distribution channels (Pl.'s 56.1 Resp. ¶ 61; Pl.'s 56.1 Add'l Facts ¶ 99). Kempner claims that, in fact, he did not receive the same equipment and service pricing as Cingular's internal distribution channels, and that he knows this because he dug through the garbage of one of the internal distributors in March 2002 and found documentation showing a disparity in pricing (Pl.'s 56.1 Add'l Facts ¶ 99). Moreover, evidence produced during discovery support the proposition that Kempner was charged higher prices than internal distribution outlets (Prelim. Inj. Order at 18-19).

18

Kempner's assertion regarding Cingular's misrepresentations on equipment and service pricing is based, in part, on a letter, dated May 8, 2001, from Laren Whiddon, Cingular's Vice President and General Manager of Illinois and Wisconsin. The letter states in relevant part:

> All dealers have access to the same level of *service pricing* as the internal team. Discounts applied to *equipment and accessory pricing* are left to the discretion of the internal/dealer organization and impact their respective margins accordingly.

(Whiddon letter, Tab 14) (emphasis added). Although the actual content of the letter cannot be genuinely disputed, Kempner's claim is based not only on the letter, itself, but also on an asserted oral representation by Mr. Whiddon. Mr. Whiddon allegedly told Mr. Kempner, at a meeting during the first week of May 2001, prior to the date of the letter (which Kempner asserts summarized their conversation and was consistent with Whiddon's oral representations), that "his costs were still the same for equipment as the internal channels" (Pl.'s 56.1 Resp. ¶¶ 47-48, citing 09/09/03 Kempner Dep. at 488:10-22; 489:6; 491:10, Tab 5; Kempner Decl., Tab A). Cingular claims there was no misrepresentation. Cingular says that the Agreement did not "guaranty Kempner access to identical pricing for wireless service as other distribution channels" (Def.'s 56.1 St. ¶ 15). While Kempner agrees that the 1999 Agreement is "silent" with respect to pricing, Kempner also points out that the 1999 Agreement "gives Cingular discretion to establish the[] prices" at which he was permitted to offer service to Cingular customers (Agmt. ¶ 5(C), Tab 4). Kempner's point, therefore, is that Cingular misled him by saying his prices would be the same as those offered to internal distribution channels, when in fact that was not so.

A jury must determine whether to believe Mr. Kempner because Cingular, conversely, asserts that "[a]t no time did Whiddon promise Kempner any particular pricing on equipment (Def.'s 56.1

St. ¶ 48; Pl.'s 56.1 Resp. ¶ 48).[11] This disputed testimony can only be resolved by the trier of fact

who must assess the credibility of the witnesses and make a judgment about whether the alleged

representations were made by Whiddon: A jury must determine from the disputed testimony (by

assessing credibility as well as the other evidence) whether the alleged oral representations regarding

equipment were made by Whiddon – or not. The jury must then determine whether these statements

were not only false (*i.e.,* that Mr. Kempner received differential pricing contrary to representations

made by Cingular), but also whether Mr. Whiddon knew or believed those representations to be false

(a credibility question) and, by making these statements, whether Whiddon (and, thus, Cingular)

intended to "induce" Mr. Kempner to act in the way Kempner alleges (*i.e.,* to be loyal and to sell

exclusively for Cingular).[12]

A jury must also determine from Mr. Kempner's testimony, which he offers on summary

judgment, whether Kempner relied on the "truth" of these representations and, in so doing, suffered

damage as a proximate cause of such reliance. The parties spar about just what detrimental reliance

---

[11]Cingular disputes that its statements to Kempner regarding access to service and equipment pricing were false, but it provided no citation to the record to support this dispute. The Court therefore deems this fact admitted, for summary judgment purposes, pursuant to Local Rule 56.1. However, this admission does not mean summary judgment must be granted in favor of Kempner, because Cingular has genuinely disputed facts elsewhere in the record, based on other fact statements, that put Kempner's allegations in Count VII into genuine dispute.

[12]Cingular attempts to obtain summary judgment by arguing that Kempner must prove the misrepresentation of an *existing* fact, as opposed to the representation of a *future* fact, citing *HPI Health Care Services, Inc. v. Mt. Vernon Hosp., Inc.,* 545 N.E.2d 672, 682 (Ill. 1989). Although the *HPI* court does state that this is the general rule, it admits an exception where, as here, "the false promise or representation of future conduct is alleged to be the scheme employed to accomplish the fraud." *Id.* at 682 (quoting *Steinberg v. Chicago Med. Sch.,* 371 N.E.2d 634, 641). Kempner argues that this exception applies to his claims and, for purposes of assessing summary judgment, we agree.

In addition, we question whether Cingular properly may assert that statements allegedly made by Cingular concerning actions solely within Cingular's control (specifically, that it would charge Kempner the same price for services in products that it would charge to internal dealers) are not actionable on the ground that they are representations of future facts. A statement about the prices Cingular will charge certainly is a representation about something that would happen in the future. But, then again, so is a representation by one party that it will perform the terms of a contract, such as, by paying the agreed contractual amount. Yet, if the party at that time knew it never intended to do so, no one would claim that representation could not be the basis for a fraud action – assuming the other elements of fraud were met.

Kempner claims. Cingular asserts that Kempner is improperly attempting to introduce into the case a belated claim that Kempner was fraudulently induced to enter into the 1999 Agreement (Reply Mem. at 5). We agree that it would be improper to introduce such a claim into the case on the eve of trial; however, we do not read Kempner's argument as attempting to do so. Rather, Kempner asserts that the alleged misrepresentations occurred during the course of Cingular's performance of the 1999 Agreement, and were made not to induce him to enter into that agreement but rather to "induce him to remain loyal to Cingular" during the term of the agreement (Pl.'s 56.1 Resp., ¶¶ 61-63; Kempner Mem. at 10). Kempner argues that, throughout the duration of the 1999 Agreement, he had "a standing offer to enter into a lucrative master dealer agreement with Nextel," which he did not exploit because of his reliance on Cingular's alleged misrepresentations (*Id.*; *see also* Pl.'s 56.1 Resp., ¶ 110). Kempner further claims that had it known that Cingular's representations were false, Kempner "could have terminated the Cingular Agreement and entered into the agreement with Nextel" (Pl.'s 56.1 Resp., ¶ 111).[13]

Foregoing a lucrative business opportunity would constitute detrimental reliance. Cingular does not confront that point, but rather argues that any asserted reliance by Kempner would have been unreasonable because Kempner made a conscious decision not to declare the 1999 Agreement terminated, and "knew at all times how its business was performing and whether it considered the

---

[13]Kempner does not argue that it would have been able to enter into an agreement with Nextel and, at the same time, remain an authorized dealer with Cingular. Indeed, the 1999 Agreement expressly prohibited Kempner from doing so, providing that during the term of the Agreement Kempner "agrees not to act as a representative or agent of any other reseller or provider . . . in the relevant Area" (Def.'s Rule 56.1 St., Appendix 1, Tab 4 (Agmt., ¶ 4(j)). Kempner has offered no argument in the summary judgment papers as to why that exclusivity provision would not have been enforceable during the term of the 1999 Agreement. Indeed, if Kempner's position was that the exclusivity provision was not enforceable during the term of the 1999 Agreement, Kempner would be hard pressed to explain why it did not enter into the "lucrative master dealer agreement with Nextel" and market Nextel products along with those of Cingular. Put another way, Kempner could not show that his failure to enter into a Nextel agreement was in *reasonable* reliance on anything that Cingular said or didn't say, if Kempner were able to market products for both companies simultaneously.

21

exclusive arrangement it had agreed to sufficiently lucrative" (Reply Mem. at 6). However, Cingular's argument assumes the very point that is in factual dispute – whether, when assessing how his business was performing, Kempner relied on representations that he was getting the same pricing as internal Cingular outlets when, in fact, that was not the case. Whether knowledge of the true state of affairs (assuming that there were misrepresentations in fact made) would have caused Kempner to jettison the Cingular agreement and move to Nextel is a question for the jury to decide at trial, and not for the Court to resolve on summary judgment.[14]

The elements necessary to establish a common law fraud claim to a jury – questions of belief, intent, and reliance – are typically fact questions. *See James v. Lifeline Mobile Medics*, 792 N.E.2d 461, 465 (Ill. 4th Dist. 2003) (issues of misrepresentation and reliance – which require the injured party to use ordinary prudence and due diligence before relying on allegedly false statement – are questions of fact to be determined by the trial court). *See also Roe v. Jewish Children's Bureau of Chicago*, 790 N.E.2d 882, 895-96 (Ill. 1st Dist. 2003) (summary judgment denied on fraudulent misrepresentation claim, where fact issues precluded it on questions of intent to deceive). We find that, in this case, those issues need to be decided by a jury based on the credibility of the witnesses.

---

[14]Whether Mr. Kempner can prove that it lost profits as a proximate cause of his reliance on the alleged misrepresentations is a disputed question of fact for the jury (Def.'s 56.1 St. ¶¶ 63-64) (Pl.'s Opp. Mem. at 10). But, Kempner need not, as Cingular asserts, provide Cingular or the Court with a calculation of damages to defeat summary judgment (Def.'s Mem. at 9) (Def.'s 56.1 St. ¶ 64).

Cingular also claims that Kempner's lost profits claim is precluded by a contractual limitation of remedies provision in the contract (*see* Def.'s Rule 56.1 St., App. 1, Tab 4 (Agmt., ¶ 2)). We disagree. "Illinois law is clear that exculpatory clauses are not enforceable to insulate a party against responsibility for its own intentional torts – most particularly fraud." *Time Warner Sports Merch. v. Chicagoland Processing Corp.*, 974 F. Supp. 1163, 1175 (N.D. Ill. 1997). Moreover, Illinois law does not enforce such clauses to exclude claims that are not "explicitly covered" by the terms of that clause. *See Tyler Enterprises of Elwood, Inc. v. Skiver*, 633 N.E.2d 1331, 1337 (Ill. 3d Dist. 1994) (citing *Scott & Fetzer Co. v. Montgomery Ward & Co.*, 493 N.E.2d 1022, 1029-30 (Ill. 1986)). And, the exculpatory clause in Paragraph 2 of the 1999 Agreement does not "explicitly cover" – or even mention – tort claims.

The Court, therefore, denies summary judgment to Cingular on the equipment and service pricing claim in Count VII.[15]

**2.**

We reach a different conclusion as to the other alleged misrepresentations upon which Kempner seeks to rely. As discussed above, there are no genuine disputed material facts that support Kempner's claim of misrepresentation with respect to promotional advertising. There are genuine disputes concerning the facts surrounding Cingular's efforts (or lack of efforts) to correct the erroneous listing for one of Kempner's location that was on Cingular's "support number system." Kempner claims that Cingular told Kempner that it was reviewing the listings and making necessary revisions, when in fact Cingular was dragging its feet in making those revisions; Cingular claims that in fact it was timely reviewing the listings in attempting to make revisions (compare Def.'s Rule 56.1(a)(3) St., ¶¶ 57-59 *with* Pl.'s Rule 56.1 Response to those assertions).

However that factual dispute may be resolved, the Court finds that Kempner has offered no genuine material facts – disputed or otherwise – to support the proposition that any misrepresentation

---

[15]We note that Cingular also has raised the argument that the one-year contractual limitations period bars the common law consumer fraud and statutory fraud claims (Def.'s Mem. at 10, 11). Although this would appear, at first blush, to be a threshold issue, the argument is made as a passing last sentence with respect to the common law claim and is buried toward the end of the arguments regarding statutory fraud. The case cited by Cingular to support the argument that the parties limitation period applies to bar this claim is *Cange v. Stotler and Co., Inc.,* 826 F.2d 581, 584-85 (7th Cir. 1987). There, the Court of Appeals found that the parties' one-year contractual limitation period did apply to bar the statutory fraud claim raised in that case (despite the longer three year period contained within that statute) because public policy did not preclude the parties from contracting for a shorter limitations period than the one provided by statute. *Id.* at 585. Kempner argues that the one-year contractual limitations period in this case does not apply, as it did in *Cange,* because there the parties agreed to apply that limitations period to "any controversy between us arising out of this Agreement" whereas, here, the parties only agreed to apply the one-year provision to "two discrete claims (if any): those to enforce or declare terms of the Agreement; and those to recover damages for breach of the Agreement" (Pl.'s Mem. at 9, n.2). Kempner argues that his fraud claims, both under common law and statute, are not affected by the contractual limitations period in the 1999 Agreement because the fraud claims arise *outside of the Agreement and its terms.* Cingular abandons the argument in its Reply – and, in any event, we agree with Kempner's readings that the one-year limitations period does not apply to the tort claims Kempner asserts in this case.

23

about the pace at which Cingular was correcting the inaccurate listing in the support number system was something that he relied on in deciding to continue the relationship with Cingular under the 1999 Agreement, and not to forego a relationship with Nextel. A reasonable jury could not conclude if, in fact, Kempner did rely on this representation in making such an important business decision, that such reliance was reasonable – particularly because Mr. Kempner concedes that he repeatedly checked with Cingular to see if the problem was fixed and was aware that for an extended period of time it was not (Pl.'s Rule 56.1 Resp. ¶ 60). A party may not reasonably rely on a statement where the facts within his grasp show the statement to be false. *See GreatAmerica Leasing Corp. v. Cozzi Iron & Metal, Inc.* 76 F. Supp. 2d 875, 878-80 (N.D. Ill. 1999).

Accordingly, while we deny Cingular's motion for summary judgment on Count VII, our ruling limits the alleged misrepresentations that Kempner may seek to prove at trial to misrepresentations concerning the level of pricing for services and equipment.

## C.

In Count VIII, Kempner pleads a statutory fraud claim under the Illinois Consumer Fraud and Deceptive Practices Act, 815 ILCS 505/10a. On this claim, summary judgment must be granted, because Kempner cannot satisfy the consumer nexus requirement under the Act.

The Act requires: (1) a deceptive act or practice; (2) defendant's intent that plaintiff rely on the deception; (3) occurrence of the deception in the course of conduct of trade or commerce; (4) actual damage to the plaintiff; (5) proximately caused by the deception. *Oliveira v. Amoco Oil Co.,* 776 N.E.2d 151, 160 (Ill. 2002); *Daniels v. Bursey,* No. 03 C 1550, 2003 WL 22053580 (N.D. Ill., Sept. 3, 2003). Cingular properly points out that Kempner must identify a genuine issue of material fact that would support a finding that there is a nexus between his claim and a public injury. *Athey*

*Products Corp. v. Harris Bank Roselle,* 89 F.3d 430, 436 (7th Cir. 1996); *J.C. Whitney & Co. v. Renaissance Software Corp.,* No. 99 C 3714, 2000 WL 556610, *13-17 (N.D.Ill., Apr. 19, 2000). Kempner has neither alleged nor shown that there is a consumer nexus between his claimed injuries and the alleged misrepresentations by Cingular. Mr. Kempner is not a consumer of Cingular's products or services, and Mr. Kempner has neither alleged nor argued that he is one.

Although Kempner seeks to satisfy the consumer nexus element by arguing that its advertising allegations involved deception "directed to consumers" (Pl.'s Mem. at 11), this argument fails completely. Kempner conceded the advertising allegations when, in his deposition, he indicated that the allegations must have been a "typo." Moreover, the promotional advertisements, by their own terms, did not claim universal applicability to every listed store (Def.'s 56.1 St. ¶ 56, citing Tab 5, Kempner Dep. 690:3-11; 691:1-20). If this is the best argument Kempner has to defeat summary judgment, then the statutory fraud claim must fail. The Court will grant summary judgment for Cingular on Count VIII.

## CONCLUSION

IT IS THEREFORE ORDERED that the Clerk of the Court grant the defendant's motion for summary judgment in part and deny it in part (doc. # 65). Final judgment should be entered in favor

of defendant on Counts III, IV, VIII and IX of plaintiff's Amended Complaint. Summary judgment is denied to defendant on Count VII, the common law fraud claim.

ENTER:

SIDNEY I. SCHENKIER
United States Magistrate Judge

Dated: November 6, 2003